## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**11 CIV 6946**

Case No.:

NJK Holding Corporation, DCC Ventures, LLC, Nasser J. Kazeminy, and The Triomphe Investors, LLC,

Plaintiffs,

vs.

FLI Deep Marine LLC, Bressner Partners Limited, Logan Langberg, Harley Langberg, and Jeffrey Langberg,

Defendants.

**COMPLAINT AND JURY DEMAND**

COME NOW Plaintiffs NJK Holding Corporation ("NJK"), DCC Ventures LLC ("DCC"), Nasser J. Kazeminy ("Kazeminy"), and The Triomphe Investors, LLC ("Triomphe") (collectively, "Plaintiffs"), as and for their Complaint against Defendants FLI Deep Marine LLC ("FLI"), Bressner Partners Ltd. ("Bressner"), Logan Langberg, Harley Langberg, and Jeffrey Langberg (collectively "Defendants"), states and alleges as follows:

### INTRODUCTION

Greed and bad faith can wreak havoc. When greed and bad faith are combined with opportunity, a perfect storm of destruction is formed. This case is about the willingness of a rogue group of vindictive minority shareholders to broadcast lie upon lie as part of a plot of extortion and destruction against Plaintiffs. The problem with their plot was that the intended victims refused to cave to their illegal and bad faith demands

and admit to false accusations. Notwithstanding the same, the problem with a lie is that once it has been broadcast, it cannot be undone. Defendants' disregard for the truth and their propensity to spread false accusations against Nasser Kazeminy, Deep Marine Technology, Inc., and other related individuals has resulted in millions of dollars of unnecessary legal fees, a needless investigation by the United States Department of Justice, the loss of a sitting United States Senator's reelection campaign, and, ultimately, the demise of a company that had recently been valued at approximately $100 million. Enough is enough. With complete disregard for the truth, Defendants have made false accusations in multiple forums, including as officers of the court, without any recourse. Defendants' escapades through extortion, smear campaigns and defamatory accusations stops now. As set forth herein, but for Defendants' actions, Deep Marine Technologies would be alive and well and Plaintiffs would not have incurred millions of dollars in needless legal fees, would not have been forced to defend their good reputations in the court of public opinion, and would not have been required to participate in an invasive and costly Department of Justice investigation.

## PARTIES, JURISDICTION, AND VENUE

1.      Defendants FLI, Bressner, Jeffrey Langberg, Harley Langberg, and Logan Langberg are former minority shareholders of Deep Marine Holdings, Inc. ("DMH") and, before that, its wholly-owned subsidiary, Deep Marine Technology, Inc. ("DMT"), now both in Chapter 11 Bankruptcy proceedings in the United States Bankruptcy Court, Southern District of Texas.

2.     Plaintiff Nasser J. Kazeminy ("Kazeminy") is a Florida resident and a shareholder of DMH.

3.     Plaintiff NJK Holding Corporation is a Minnesota corporation with its principal place of business in Bloomington, Minnesota and a shareholder of DMH.

4.     Plaintiff DCC Ventures, LLC is a Nevada limited liability company and a shareholder of DMH.

5.     Plaintiff The Triomphe Investors, LLC is a Nevada limited liability company and a shareholder in DMH.

6.     Plaintiffs are the assignees of any and all claims, demands, and causes of action that exist in law or equity against FLI, Bressner Partners Ltd., Jeffrey Langberg, Harley Langberg, and Logan Langberg and which were owned by the Deep Marine Liquidating Trust, the successor in interest to DMH and DMT, pursuant to an Assignment Agreement, which is attached hereto as Exhibit A.

7.     Upon information and belief, Defendants Jeffrey Langberg, Logan Langberg and Harley Langberg are residents of the State of New York. Upon information and belief, Jeffrey Langberg, Logan Langberg, and Harley Langberg all regularly travel to and conduct business in this District, including, but not limited to, the conduct described in paragraph 29, *infra*.

8.     FLI is a limited liability company registered with the State of Delaware. Upon information and belief, FLI's sole member is First Long Island Investors, LLC, a limited liability company based out of Long Island, New York, the members of which are Robert Rosenthal, Ralph Palleschi, Bruce Siegel, and Stephen Juchem, all of which are

residents of the State of New York. Upon information and belief, all of these entities and individuals regularly travel to and conduct business in this District, including, but not limited to, the conduct described in paragraph 29, *infra*.

9.      Upon information and belief, Bressner Partners Limited is a business entity run by Jeffrey Langberg with a principal place of business in the State of New York. Upon information and belief, Bressner Partners Limited regularly travels to and conducts business in this District, including, but not limited to, the conduct described in paragraph 29, *infra*.

10.     This Court is vested with personal jurisdiction over Defendants.

11.     This Court has subject matter jurisdiction over this controversy pursuant to 28 U.S.C. § 1332 because this lawsuit involves citizens of different states and the amount in controversy exceeds $75,000.

## FACTUAL BACKGROUND

12.     At various points in time relevant to this matter, Plaintiffs were or are shareholders of DMH, a Delaware corporation.  DMH and DMT are debtors currently in joint Chapter 11 bankruptcy proceedings filed on December 4, 2009 in the United States Bankruptcy Court, Southern District of Texas.

13.     DMH is the sole shareholder of DMT, a Houston-based company which provided services and labor to the off-shore oil industry worldwide.  In 2007, DMH was organized and became the sole shareholder of DMT.  DMT had four subsidiaries (DM1, DM2, DM3, DM4), each of which were entities that owned a single sea vessel (DMH,

DMT and its subsidiaries shall be collectively referred to herein, unless expressly referred to by name, as "DMT").

14.     Prior to the bankruptcy filings, DMT, among other things, operated remote vehicles, subsea construction and field development works, and performed deepwater intervention tasks, inspections, and repair services.

**DMT'S Early History**

15.     Paul McKim ("McKim") founded DMT in 2000.  McKim, a former deep-sea diver and insurance producer, (who once hired ex-presidential candidate and Grand Wizard of the Ku Klux Klan, David Duke, as an employee), served as the CEO of DMT from its founding until July 30, 2008.

16.     Upon information and belief, in late 2001 or early 2002, McKim prepared a rough private placement memorandum and began to seek outside financing for the purpose of raising money for DMT.  Ultimately, DMT received its first funding from State Street Research Energy in the purported amount of $5 million.  Further, upon information and belief, McKim convinced Jeffrey Langberg, Harley Langberg, Logan Langberg, Bressner Partners, and FLI to invest in DMT at or about the same time.  Upon information and belief, as part of his campaign, McKim promised these parties 10% of any amount McKim received when he eventually sold his stock in DMT.  At or about the same time, an individual by the name of Joe Grano invested in DMT.

17.     It soon became apparent that DMT would need additional funding to "take the company to the next level."

18.     By late 2003, DMT was in need of additional funding.  Because none of the existing shareholders were willing to make an additional equity infusion, Grano approached Kazeminy regarding becoming an investor in DMT.   Kazeminy had previously met Grano when they each received the Ellis Island Metal of Honor.  As such, on June 1, 2004, DCC, one of Kazeminy's investment vehicles, purchased stock in DMT. Later that year, utilizing DCC, Kazeminy acquired the majority of State Street's interest in DMT and essentially became an owner of approximately 49% of DMT.  From 2004-2008, Plaintiffs engaged in various stock conversions that increased their collective equity interest in DMT, including purchasing all but 1% of Grano's stock in 2008.

19.     During late 2004, McKim and DMT formed a business relationship with Otto Candies, LLC and Candies Shipbuilders, LLC.  These entities are owned by the Candies family, based in New Orleans, that has been prominent in the shipping and oil industry for generations (Otto Candies, LLC and Candies Shipbuilders, LCC shall be collectively referred to as the "Candies Parties").  McKim sought out the Candies Parties as a potential business partner due to McKim's desire for DMT to acquire its own deep-sea diving vessels.  McKim suggested that if the Candies Parties would provide DMT with a deep-sea diving vessel, DMT would provide the Candies Parties with equity in DMT in an amount equal to a reasonable valuation of the provided vessel.  Prior to McKim's introduction, Plaintiffs had never met or heard of the Candies Parties. Additionally, it was ultimately agreed that if DMT went under within a certain number of years, the vessel would be returned to the Candies Parties.

20.     Ultimately, DMT purchased a vessel, which became known as the DMT Diamond, at a price of $15.2 million. The Candies Parties financed the purchase and DMT executed a 3 year non-recourse, convertible promissory note in favor of the Candies Parties.  It was anticipated that upon conversion of the note, and if other financing also went as planned, the Candies Parties would own between 22% and 25% of the common equity of DMT.  On October 4, 2006, the outstanding balance of the note of $15.2 million, plus accrued interest of $820,000 was converted at DMT's request into 11,558 shares of common stock.  In other words, the Candies did not receive any monetary payment in exchange for the DMT Diamond, a vessel valued at over $15 million.

21.     Upon information and belief, DMT entered into various other vessel purchases and crew chartering agreements with the Candies Parties in which DMT provided the Candies Parties with stock in exchange for services and/or vessels.

22.     By the late spring/early summer of 2008, DMT was experiencing unprecedented growth and it was anticipated that DMT would realize $110 million in revenue in 2008 and $37 million EBITA.  Indeed, DMT was named to Entrepreneur Magazine's top ten fastest growing companies for both 2007 and 2008. As a result of this growth, it was determined that DMT was in need of a CEO with more business acumen than that possessed by McKim.

**FLI and McKim Destroy Deep Marine**

23.     Despite Plaintiffs' support of DMT through equity and debt infusions and the Candies Parties' support of DMT through favorable boat sales, by 2007, it became

clear that DMT, under the management of McKim, was not going to be capable of growing to the next level. Indeed, in 2007, Plaintiffs were informed by Grano (then a member of the board of DMT) and others, that McKim was no longer capable of managing a company the size of DMT. First, McKim was an extraordinarily volatile and unpredictable individual with a drinking problem. Second, DMT had grown in size to become increasingly capital intensive and required a CEO with more business acumen than McKim possessed. Third, McKim had displayed a consistent propensity to lie to DMT employees about various business matters, as well as to the Plaintiffs and the Candies Parties, in an attempt to create a split among shareholders and employees so that he could maintain as much power as possible. Further, at or about this time, DMT was subjected to a lawsuit initiated by a major competitor, in which it was alleged that McKim had plagiarized an operations manual. These were but a few of the complaints about McKim made by DMT board members, managers, officers and employees.

24.    On or about July 30, 2008, DMT made the business decision to replace McKim as CEO and thereafter engaged in negotiation in an effort to structure a fair and equitable severance package. Out of respect for McKim's status as founder of the company, it was determined that, if at all possible, McKim would simply be elevated to Chairman of the Board of DMT and another CEO would take over. This would allow DMT to grow with a more seasoned, capable CEO, and allow McKim to stay with the company.

25.    When first approached, McKim was delighted with the idea of becoming Chairman of the Board and having DMT hire a more experienced CEO. McKim quickly

agreed, in principle, to the idea and appreciated the fact that he was offered a salary identical to the one he received as CEO.

26.     Unfortunately, McKim's behavior became increasingly erratic and volatile. As an example, McKim took credit for being a chief contact in connection with contract negotiations with a major customer.  However, when DMT personnel met personally with the customer, it became clear that the customer had no idea who McKim was.  As a result, it was determined that McKim could not be trusted in any capacity and must sever all ties with DMT.

27.     Further, McKim made repeated efforts to reopen negotiations in an attempt to secure more advantageous severance terms that he had initially agreed to.  After a few other instances of similar conduct, it was determined that there was an irreconcilable breakdown in the relationship with McKim.  At or about this time, McKim became increasingly overtly hostile to Plaintiffs, Candies, and DMT.  This included McKim issuing thinly-veiled threats to Plaintiffs and DMT such as, "its going to happen, or *its* going to happen."

28.     At this time, McKim engaged in an unfortunate, yet transparent, campaign to threaten, extort, and otherwise smear the Plaintiffs and Candies Parties due to their status as the two largest shareholders of DMH.  In that vein, McKim began to have conversations with other minority shareholders, including FLI, Bressner, and Jeffrey Langberg, and, together with these minority shareholders, demanded that their stock be purchased based on a valuation of DMT of $180 million, almost double what McKim previously stated was the value of the company!

29.     As part of McKim's smear campaign, McKim, armed with a Deep Marine credit card, went to New York in the spring of 2008 to meet with the Defendants. While spinning wild tales of fraud and other misconduct by Plaintiffs and the Candies Parties, McKim, while in New York, treated another couple and his girlfriend to lavish dinners, purchases of jewelry, Broadway shows, and luxury hotels that costs thousands of dollars per night.   Upon information and belief, it was during the spring 2008 escapade to New York in which the Defendants' and McKim's mean-spirited and vindictive extortion plot was hatched. McKim knew two things about Mr. Kazeminy.   While he was incredibly successful, he also went out of his way not to be boastful and court media attention.   In fact, Mr. Kazeminy's only response to media inquiries had always been no comment.   He also knew that Mr. Kazeminy was intensely loyal and true to his friends.   Armed with those two facts, he met with FLI and the plot was hatched.

30.     On or about October 10, 2008, Attorneys Anthony Paduano ("Paduano") and Katherine Harrison ("Harrison"), on behalf of FLI, Bressner, Jeffrey Langberg, Harley Langberg, and Logan Langberg, acting in concert with McKim, prepared and served a demand letter on the board members of DMT.  On information and belief, and among other things, Defendants attended meetings regarding the substance of the allegations in the demand letter in the Southern District of New York and the demand letter was drafted, in whole or in part, using information provided by Defendants, in the Southern District of New York.  The timing of the demand letter was not coincidental.  In the October/November 2008 timeframe, there was a hotly contested senatorial election in Minnesota, involving Al Franken and Senator Norm Coleman.  Kazeminy had been both

a friend and a supporter of Senator Coleman.   McKim and Defendants used this connection to spin the unforgivable lie that Kazeminy, an Ellis Island Medal Award recipient and proud patriot, used DMT in a clumsy attempt to funnel $75,000 to Senator Coleman.[1]   Defendants knew only too well that if their defamatory comments were made public that they would be the subject of local, nationwide, and even international dissemination in view of the ongoing election process.   As such, Defendants demanded that impossible deadlines be met, such as that the entire investigation be completed within a couple weeks of the date of the demand letter, all while McKim refused to participate in the investigation.   Defendants' scheme was clear: to extort a settlement from Plaintiffs on Defendants' terms or else threaten to cause maximum damage to Plaintiffs' good name, DMT, and the election.

31.     In connection with the demand letter, Defendants demanded that DMT immediately form an independent special litigation committee ("SLC") to investigate the allegations contained therein.   Much to Defendants' and McKim's chagrin, that is exactly what DMT did.

32.     Within three days of the receipt of the demand letter, in accordance with applicable corporate law,   an independent committee of disinterested and independent directors of DMT was formed and, in turn, engaged independent counsel to the SLC, the international law firm of Greenberg Traurig ("Greenberg").   The SLC and Greenberg immediately began a comprehensive and thorough review of the false and defamatory

---

[1] Due to the national attention this particular senate race received, as well as the distasteful nature of Defendants' allegations, Kazeminy and the allegations against him were broadcast through hundreds of media outlets. Kazeminy, a well respected, yet private individual, was the subject of incredibly vicious media attacks.

allegations found in the demand letter. Their investigation concluded in the review of tens of thousands of pages of documents and the interview or deposition of twenty six individuals.

33.    Despite DMT forming the SLC that the Defendants requested, it quickly became clear that Defendants and McKim had no intention of awaiting the results of the investigation. Indeed, Defendants and McKim never intended that their inflammatory and otherwise false claims should be investigated. Instead, McKim and the Defendants viewed the demand letter as a way to extort a settlement from DMT in the form of a stock buyout based on a grossly overstated valuation. In fear that their bluff would be called, McKim and Defendants immediately began to threaten that unless the shares of McKim, FLI, Bressner, Jeffrey Langberg, Harley Langberg, and Logan Langberg were purchased at a valuation of $180 million immediately, they would "go public and to the media." Defendants' intent was clear: to intimidate and coerce Kazeminy by threatening to thrust him into the media spotlight, causing him to lose the privacy that they were well aware he cherished. The opportunity was there. The Minnesota senate election was a very close, expensive and visible race. Any such story, true or not would result in an instant media typhoon and Kazeminy, as well as Senator Coleman, would be subject to relentless attacks.

34.    During this timeframe, Plaintiffs, knowing that Defendants' allegations were false, attempted to resolve any possible dispute informally and provided Defendants with various documents evidencing the falsehood of the allegations.

35.    Unwilling to succumb to the Defendants' "high-noon" demands or to give any legitimacy to Defendants' lies, Plaintiffs refused to cave to Defendants' pressure. As a result, in late October 2008, both McKim and Defendants filed, voluntarily dismissed, and refiled complaints in Harris County, Texas, and the Chancery Court of the State of Delaware, that contained the same false, frivolous accusations found in the demand letter. Further, the October 10, 2008 demand letter "mysteriously" found its way to the Minneapolis Star Tribune.  Upon information and belief, FLI, Bressner, Paduano, and/or Harrison sent the demand letter to the Minnesota Star Tribune.  This set off a media fire storm that forced Kazeminy and DMT into the media spotlight.  Nonetheless, Defendants and McKim continued to offer to voluntarily withdraw their lawsuits if they were bought out of DMT based on a valuation of $180 million!  As the entire country's media picked up on the story and Kazeminy and DMT were subjected to hundreds of headlines, and press releases, Defendants' "cat was out of the bag."  Nonetheless, Paduano offered to write a letter to the Minneapolis Star Tribune advising it that the allegations found in the October 10, 2008, demand letter were the result of regrettable misunderstanding if the Plaintiffs would agree to buyout his clients based upon a valuation of $180 million. Further, during these discussions, both McKim and B.J. Thomas, DMT's former Chief Financial Officer whose employment was terminated after DMT learned that Thomas had been barred by the United States Securities Exchange Commission for, upon information and belief, making multiple misrepresentations to investors, prepared affidavits that admitted that many of the allegations found in the October 10, 2008, demand letter were not true. Defendants were all provided these affidavits in October, 2008.

36.    Given the nature of the allegations found in Defendants' and McKim's Complaints and the demand letter, the United States Department of Justice began an investigation into the relationship between Senator Coleman and Kazeminy. This in turn required Kazeminy to engage in a costly and incredibly time consuming investigation in order to fully comply with the Department of Justice. Nonetheless, after a complete and full investigation, the Department of Justice determined that Kazeminy was a fully cooperative witness, voluntarily provided all relevant records, and appeared in person to answer all questions put to him by the Department of Justice, without requesting any privileges or immunity, and, as a result, closed its case and concluded that criminal charges were not warranted.

37.    Almost immediately, McKim's and Defendants' frivolous proceedings in Texas and Delaware had a deleterious impact upon DMT. Lenders, in particular, became most uneasy with continuing any relationship with DMT in view of the allegations of fraud and other corporate wrongdoing in the wide-spread media coverage and pending litigation. Indeed, as a result of Defendants' false allegations, DMT was unable to secure outside financing from financial lending institutions almost immediately after the Defendants filed their lawsuits. A number of these institutions indicated that one of the reasons they were unwilling to lend to DMT was the nature of the allegations contained in the Defendants' and McKim's lawsuits, as well as the negative publicity surrounding the same. Additionally, DMT lost numerous contracts as numerous clients "chilled" to the idea of conducting business with a company that was connected to these allegations— true or not.

38.   On April 21, 2009, the Delaware Chancery Court dismissed Defendants' Complaint for failure to follow the proper corporate formalities. Namely, Defendants violated Delaware law by demanding that DMT investigate the allegations found in the demand letter and then filing a lawsuit prior to the completion of the investigation.

39.   DMT, struggling to survive due the deleterious impact that Defendants' and McKim's lawsuits had on the company, repeatedly approached the Candies Parties and Plaintiffs throughout the spring and summer of 2009 and asked to be loaned additional funds.   On occasion, the Candies Parties and Plaintiffs parties provided such loans. These loans were negotiated at arms length between representatives of DMT and the Kazeminy and/or Candies Parties   But for the despicable acts of Defendants and McKim, DMT would have been able to obtain financing during this time from more traditional lenders than the Candies Parties and Plaintiffs.

40.   In July of 2009, after many months of investigation, the review of tens of thousands of documents and the examination or interview of many individuals, the SLC completed its investigation and concluded that the claims generated by McKim and the Defendants were baseless, lacking in merit and otherwise frivolous, and recommended that DMT pursue sanctions against Defendants and McKim for their wrongful pursuit of the demand letter allegations and the harm that they caused DMT.

**DMT's Short Form Merger And Filing For Bankruptcy**

41.   Throughout the summer of 2009, DMT continuously approached the Candies Parties and Plaintiffs for financing.   Tired of making unsecured loans to DMT while the other shareholders, i.e. the Defendants, who caused so much economic damage

to DMT, continued to reap the benefits, and confident in their position after being completely exonerated by the SLC, in July of 2009 the Candies and Kazeminys engaged in a short form merger under Delaware law. It is beyond dispute that the short form merger was executed in accordance with Delaware law. The short form merger had the immediate impact of "cashing out" the shareholder interests of Defendants, leaving them as creditors of DMT. In other words, after the short form merger, the Kazeminy and Candies parties were the sole shareholders of DMH. Importantly, Plaintiffs had never heard of, let alone contemplated, a short form merger until the summer of 2009.

42. Unfortunately, the damage caused by Defendants and McKim was done and DMT was never able to recover. As a direct result of Defendants' conduct, on December 4, 2009, DMH and DMT filed for Chapter 11 bankruptcy protection.

**Defendants Violate The Bankruptcy Stay**

43. Prior to the bankruptcy, on October 29, 2009, Defendants filed yet another Complaint in the Delaware Chancery Court that named Plaintiffs as defendants ("October 2009 Action"). The October 29, 2009, Complaint repeated many of the same old, tired, and false allegations found in the October 10, 2008, demand letter. As the causes of action alleged therein were undisputedly derivative, DMT was also named as defendants.

44. Upon the filing of DMT's bankruptcy, the October 2009 Action was automatically stayed. Indeed, on December 4, 2009, DMT's counsel filed a suggestion of bankruptcy with the Court of Chancery. Despite the same, Defendants refused to cease prosecuting the October 2009 Action against Plaintiffs and DMT. As a result, DMT's counsel, at the expense of DMT, was forced to commence an adversary proceeding

against Defendants and move for a temporary restraining order from the bankruptcy court on January 21, 2010. Defendants strongly opposed the temporary restraining order and argued that the October 2009 Action stated direct and not derivative claims.

45.     Despite the issuance of the temporary restraining order, Defendants refused (again) to cease prosecution of the October 2009 Action. Indeed on March 2, 2010, the bankruptcy court found that Defendants violated the automatic stay after the imposition of the temporary restraining order by attempting to conduct discovery on the merits of the October 2009 Action. As a result, the bankruptcy court ordered Defendants to show cause why they should not be sanctioned for their conduct and stated that if they failed to show such cause, Defendants would be liable for DMH and DMT's attorneys' fees and costs that were incurred in responding to Defendants' discovery. Plaintiffs have since acquired the right to DMH's and DMT's claims against Defendants

46.     On February 16, 2011, DMT moved for summary judgment in the adversary proceeding against Defendants, arguing that, as a matter of law, all of the causes of action found in the October 2009 Action and, therefore, the demand letter and Defendants previous lawsuits, were derivative and thus property of DMT's estate.

47.     In response to DMT's motion for summary judgment, Defendants finally conceded that the October 2009 Action and the demand letter only contained derivative causes of action and, thus, were not Defendants' claims to assert. As part of this concession, Defendants filed as an exhibit a "Proposed Amended Complaint" which purported to set forth Defendants "direct" causes of action against certain of the Plaintiffs. A copy of the "Proposed Amended Complaint" is attached hereto as Exhibit B.

48. A review of the Proposed Amended Complaint reveals that it contains allegations and causes of action that either (1) state derivative causes of action that are property of DMT or (2) as a matter of law, fail to state a claim upon which relief can be granted. Despite the same, Defendants have refused to concede that they do not directly possess a cause of action against Plaintiffs.

## COUNT I

## DECLARATORY JUDGMENT

49. Plaintiffs restate and reallege paragraphs 1 through 48 above as though fully set forth herein.

50. Plaintiffs are entitled to a declaration that the claims set forth in the "Proposed Amended Complaint" are, among other things, unenforceable as a matter of law, do not state a claim upon which relief may be granted, barred by the doctrine of unclean hands, barred by the doctrine of accord and satisfaction, barred by the doctrine of release and discharge, barred by the doctrines of estoppel, laches and/or waiver, and/or are derivative in nature and therefore cannot be pursued by Defendants.

## COUNT II

## TORTIOUS INTEREFERENCE WITH CONTRACT

51. Plaintiffs restate and realleges paragraphs 1 through 50 as though fully set forth herein.

52. Defendants knew that DMT was in desperate need of financing to continue to operate.

53.   Defendants knew that DMT was actively engaged in entering into agreements with lenders for such financing.

54   As a direct and proximate result of Defendants' frivolous pursuit of the demand letter and the various afore-mentioned complaints, the dissemination of false allegations of fraud and other corporate wrongdoing in the wide-spread media coverage, DMT was unable to consummate these agreements and was unable to secure outside financing from financial lending institutions almost immediately after the Defendants filed their lawsuits.

55.   Defendants further knew that DMT was actively engaged in entering into contracts with DMT clients.

56.   As a direct and proximate result of Defendants' pursuit of the demand letter and the various afore-mentioned complaints, the dissemination of false allegations of fraud and other corporate wrongdoing in the wide-spread media coverage, DMT lost numerous contracts as numerous clients "chilled" the idea of conducting business with a company that was connected to these allegation.

57.   As a direct and proximate result of Defendants' wrongful interference, Plaintiffs have suffered, both directly and as assignees to DMH's and DMT's rights, and will continue to suffer, damages in, among other things, lost business relationships and the loss of goodwill in the business community, all in an amount to be determined at trial but believe to be in excess of $50,000,000.

## COUNT III

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

58.   Plaintiffs restate and realleges paragraphs 1 through 57 as though fully set forth herein.

59.   At all relevant times hereto, there existed a reasonable expectation of economic advantage or economic benefit on the part of the Plaintiffs in connection with their involvement in and ownership of DMT.   Similarly, there existed a reasonable expectation of economic advantage or economic benefit on the part of DMT and DMH in connection with its relationship with its lenders and current and prospective clients.

60.   At all relevant times hereto, Defendants had knowledge of Plaintiffs', DMH's, and DMT's expectation with regard to the reasonable expectation of economic advantage or economic benefit.

61.   By way of example and among other things, Plaintiffs, DMH, and DMT had a reasonable expectation that DMT would be able to obtain financing from third party lenders.   Further, DMH, DMT, and Plaintiffs had a reasonable expectation that DMT would be able to continue to grow its existing relationships with existing clients and continue to attract new clients.   As a direct result of Defendants' blatantly false, defamatory and inflammatory allegations regarding alleged payments made to Norm Coleman, DMT was unable to secure third party financing because lenders indicated concern regarding the nature of the allegations in the demand letter, Defendants various complaints, and the negative publicity surrounding the same.   Similarly, as a direct result

of Defendants' blatantly false, defamatory and inflammatory allegations regarding alleged payments made to Norm Coleman, DMT lost key contracts with existing clients and prospective clients, as these parties refused to conduct business with DMT given the nature of Defendants' wrongful allegations.

62.     By, among other things, (i) conspiring with McKim in issuing the October 10, 2008, demand letter to DMT, which contained various patently false and defamatory statements about Kazeminy; (ii) filing the various complaints in which Defendants asserted these baseless, defamatory claims; (iii) allowing the dissemination of these baseless, defamatory statements to the media; and (iv) chilling DMT's ability to obtain financing from third party lenders, Defendants wrongfully and without justification interfered with DMH's, DMT's, and Plaintiffs' expectations.

63.     There exists a reasonable probability that Plaintiff, DMH, and DMT would have realized and obtained the economic advantage or economic benefit had Defendants not interfered.

64.     As a direct and proximate result of Defendants' interference, Plaintiffs have suffered, directly and as assignees of DMH's and DMT's rights, and will continue to suffer, damages in, among other things, lost business relationships and the loss of goodwill in the business community, all in an amount to be determined at trial.

## COUNT IV

### ABUSE OF PROCESS

65.     Plaintiffs restate and reallege paragraphs 1 through 64 above as though fully set forth herein.

66.     Defendants have abused the process of the court in a wrongful manner and in bad faith, through the filing of their various complaints in the Chancery Court of Delaware, specifically to harass and intimidate DMH, DMT, and Plaintiffs and cause DMH, DMT, and Plaintiffs to incur expenses and other damages.

67.     Defendants have further abused the process of the court in a wrongful manner through the Delaware Complaint, through the suppression of evidence, the obstruction of justice and the assassination of DMH's, DMT's, and Plaintiffs' reputation.

68.     Defendants acted with an ulterior motive to willfully and intentionally cause DMH, DMT, and Plaintiffs to incur expenses, assassinate DMH's, DMT's, and Plaintiffs' reputation, chill DMH's, DMT's, and Plaintiffs' business relations and prospects, and to retaliate against DMH, DMT, and Plaintiffs in said litigation.

69.     Defendants have committed willful acts of intimidation, threats, and submission of false and confidential documents not authorized by the process of litigation, and not proper in the regular conduct of litigation.

70.     As a direct and proximate result of the abuse of such legal process, Plaintiffs have suffered damage, loss and harm, directly and indirectly as assignees of DMH's and DMT's rights, all in an amount to be determined at trial.

## COUNT V

## RICO

71.     Plaintiffs reallege and restate the foregoing paragraphs as if they were fully restated herein in connection with this cause of action which arises under the civil

provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 and 1964.

72.    Defendants are each a "person" as defined in 18 U.S.C. § 1961(3).

73.    Upon information and belief, Defendants were an "enterprise" as defined in 18 U.S.C. § 1961(4), in that they were "a group of individuals associated in fact."  One of the purposes of the RICO enterprise was to spread false and inflammatory statements about Plaintiffs, chill Plaintiffs' business relationships, harass Plaintiffs, assassinate Plaintiffs' reputations and otherwise cause Plaintiff to suffer loss.

74.    In furtherance of the enterprise, Defendants sent interstate facsimiles and letters through the United States mail containing inflammatory allegations regarding Plaintiffs, including for example, the October 10, 2008, demand letter and the afore-mentioned complaints.

75.    Defendants have personally or through their agents, conducted, participated in, engaged in, conspired to engage in, or aided and abetted, the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).  This racketeering activity included repeated predicate acts of (1) mail fraud in violation of 18 U.S.C. § 1341; (2) wire fraud, in violation of 18 U.S.C. § 1343; and (3) extortion in violation of 18 U.S.C. § 1951.  These acts all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

76.    The predicate acts of mail fraud include, among other things: sending interstate facsimiles and letters through the United States mail containing inflammatory

allegations regarding Plaintiffs, including for example, the October 10, 2008 demand letter and the afore-mentioned complaints.

77.    The predicate acts of wire fraud include, among other things: participating in and transmitting information regarding interviews with the press, ultimately resulting in articles published both in hard copy newspapers and online through blogs and other news outlets across the country and internationally.

78.    The predicate acts of extortion include, among other things: the pattern of racketeering-involved schemes to extort money from Plaintiffs through the use of a frivolous lawsuit intermixed with false allegations coupled with the dissemination of these false allegations to the press all designed to harass, embarrass and otherwise cause injury to Plaintiffs.

79.    At all relevant times, each of the above described enterprises was engaged in and its activities affected interstate commerce and foreign commerce.

80.    All of the predicate acts described above were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that, *inter alia*, their common purpose was to unlawfully obtain money from Plaintiffs and damage their reputations; the acts involved the same perpetrators and the same ultimate goal; Plaintiffs were the victim of the acts; and/or the acts were otherwise interrelated by distinguishing characteristics and were not isolated events.

81.    All of the predicate acts described above were continuous so as to form a pattern of racketeering activity in that Defendants engaged in the predicate acts described above over a substantial period of time (from October 2008 through today).

82.     In the alternative, Defendants were an enterprise as described in 18 U.S.C. § 1961(4), in that they were "a group of individuals associated in fact."  The purpose of this RICO enterprise was to spread lies about DMH, DMT, and Plaintiffs.  Beginning in October 2008 through the present, Defendants have personally or through their agents conducted, participated in, engaged in, conspired to engage in or aided and abetted the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).  This racketeering activity included, among other things, schemes to extort money from Plaintiffs  through the use of a frivolous lawsuit intermixed with false allegations coupled with the dissemination of these false allegations to the press all designed to harass, embarrass and otherwise cause injury to DMH, DMT, and Plaintiffs.  Predicate acts that by their nature threaten repeated unlawful conduct are actionable.  *McDonald v. Schencker*, 18 F.3d 491, 497 (7th Cir. 1994).  Defendants continue to pose a threat that he will continue to engage in a pattern of racketeering activities against Plaintiffs.

83.     As a direct and proximate result and by reason of the activities of Defendants, and conduct in violation of 18 U.S.C. § 1962(c), DMH, DMT, and Plaintiffs have been injured within the meaning of 18 U.S.C. § 1964(c).  Plaintiffs are therefore entitled to recover threefold the damages DMH, DMT, and Plaintiffs have  sustained together with punitive damages and the costs of the suit, including reasonable attorneys' and experts' fees.

## COUNT VI

### COMMERCIAL DISPARAGEMENT

84.     Plaintiffs restate and reallege paragraphs 1 through 83 above as though fully set forth herein.

85.     Defendants' actions as described above constitute commercial disparagement.

86.     Defendants have made false statements regarding, DMH, DMT and Plaintiffs.

87.     Defendants' statements constitute defamation per se in that they defame DMH, DMT, Plaintiffs and their trade.

88.     Defendants knew or should have known that the statements published were false, and as a result, Defendants' actions were intentional or with fault amounting to at least negligence.

89.     Defendants published these statements to various third parties without privilege.

90.     Defendants worked together to publish defamatory statements about Plaintiffs to, among other things, the *Minneapolis Star Tribune*.

91.     On information and belief, Defendants formed a conspiracy to carry out this misconduct.

92.     As a proximate result of the foregoing acts, Defendants have caused actual harm and are liable to DMH, DMT and Plaintiffs in an amount to be proven at trial.

93.    As a direct and proximate result of the actions, conduct, and practice of Defendants' alleged above, DMT, DMH and Plaintiffs have been damaged and will continue to be damaged.

94.    DMH, DMT and Plaintiffs have no adequate remedy at law.

## COUNT VII

### DEFAMATION *PER SE*

95.    Plaintiffs restate and reallege paragraphs 1 through 94 as though fully set forth herein.

96.    Defendants published or disseminated or cause to be published or disseminated numerous false and injurious written and/or oral statements to persons other than DMH, DMT and Plaintiffs, including the *Minneapolis Star Tribune* and others.

97.    Defendants knew, or should have known, that such disparaging and injurious statements were false and/or misleading.    Defendants' false and injurious statements have forced, and will continue to force, DMH, DMT and Plaintiffs to defend themselves in the court of public opinion.

98.    Defendants' false and injurious statements to the, among other things, *Minneapolis Star Tribune*, which were ultimately disseminated to hard copy and online news outlets across the nation and internationally, concerning DMH, DMT and Plaintiffs were defamatory *per se* as the statements related to DMH, DMT and Plaintiffs in their business, trade, profession, and/or occupation.

99.    In making such statements, Defendants acted with knowledge that such statements were false and/or with reckless disregard of whether they were false or not.

100.   Defendants made such defamatory statements without any legal excuse.

101.   Defendants' defamatory statements injured DMH's, DMT's and Plaintiffs' reputations in the business community.   This has undoubtedly harmed DMT's, DMH's and Plaintiffs' eal and potential business relationships.

102.   As a direct and proximate result of Defendants' defamatory statements, DMH, DMT and Plaintiffs have suffered, and will continue to suffer, damages in lost business relationships and the loss of goodwill in the business community, all in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants and seek the following relief:

1.   As to Count I, for declaratory judgment determining that the causes of action in the Delaware Complaint are frivolous and do not state a claim upon which relief can be granted, or, in the alternative, are derivative and therefore cannot be pursued by Defendants;

2.   As to Count II, awarding judgment in favor of Plaintiffs and against Defendants in an amount in excess of $50,000,000 to be determined at trial;

3.   As to Count III, awarding judgment in favor of Plaintiffs and against Defendants in an amount in excess of $50,000,000 to be determined at trial;

4.   As to Count IV, awarding judgment in favor of Plaintiffs and against Defendants in an amount in excess of $50,000,000 to be determined at trial;

5.      As to Count V, awarding judgment in favor of Plaintiffs and against Defendants in an amount in excess of $50,000,000, trebled, to be determined at trial;

6.      As to Count VI, awarding judgment in favor of Plaintiffs and against Defendants in an amount in excess of $50,000,000, to be determined at trial;

7.      As to Count VII, awarding judgment in favor of Plaintiffs and against Defendants in an amount in excess of $50,000,000, to be determined at trial;

8.      An award to Plaintiffs for their costs, disbursements, and attorneys' fees incurred in connection with this litigation; and

9.      Such other relief as may be permitted under applicable law and which this Court deems equitable and just.

COLE SCHOTZ MEISEL
FORMAN & LEONARD, P.A.
900 Third Avenue – 16th Floor
New York, New York 10022

-and-

25 Main Street – Court Plaza North
Hackensack, New Jersey 07601

By: _____
      Michael S. Meisel (MM 7794)

WINTHROP & WEINSTINE, P.A.
Robert R. Weinstine (#115435)
Christianna L. Finnern (#310724)
Joseph M. Windler (#387758)

225 South Sixth Street, Suite 3500
Minneapolis, Minnesota 55402
Tel:  (612) 604-6400
Fax:  (612) 604-6800
*Counsel for Plaintiffs*

October 3, 2011

# EXHIBIT A

## ASSIGNMENT OF CLAIMS

This assignment of claims ("Assignment"), made this 28th day of April 2011, by (a) John D. Bittner, as trustee (the "Liquidating Trustee") of the Deep Marine Liquidating Trust (the "Liquidating Trust"), to (b) Nasser Kazeminy, NJK Holding Corp., DCC Ventures, LLC, and Triomphe Investors, LLC, (the "Kazeminy Parties") (the Liquidating Trustee and the Kazeminy Parties jointly referred to hereinafter as the "Parties").

Now, for good and valuable consideration, including the payment set forth below, and in reliance upon the promises and representations set forth below, the Parties agree as follows:

1.  Payment and Closing.  The closing of this Assignment is expressly conditioned upon the closing of the Binding and Final Release and Settlement Agreement (the "Settlement Agreement") between and among the Parties and Otto B. Candies, Jr., Otto B. Candies, III, Otto Candies, LLC and Candies Shipbuilders, LLC. If the closing of the Settlement Agreement does not occur, then this Assignment shall not be effective, and the assignment of Claims contemplated by this Assignment shall not occur. If the closing of the Settlement Agreement occurs, then within five days after such closing, and only with court approval of this Assignment or after a determination by the court that no court approval of this Assignment is needed, the Parties shall close (the "Closing") this Assignment, which Closing shall include the payment by the Kazeminy Parties of $12,500 (the "Payment") to the Liquidating Trust in good and sufficient funds. Upon the Closing, the assignment of claims and the other provisions of this Assignment shall become effective.

2.  Assignment and Acceptance.  Upon Closing, the Liquidating Trustee assigns to the Kazeminy Parties all of the Liquidating Trustee's claims, demands, and causes of action, known or unknown, now existing or existing in the future, at law or at equity, against:

> FLJ Deep Marine, Bressner Partners Ltd., Jeffrey Langberg, Harley Langberg, Logan Langberg, and Deepwork, Inc., and their officers, directors, employees, attorneys, and agents (the "Subject Parties").

(all of the foregoing, collectively, the "Claims"). No other claims, demands, or causes of action are being assigned to the Kazeminy Parties. Without limiting the foregoing sentence, the Claims do not include any claims, demands, or causes of action against the affiliates of the Subject Parties, including, but not limited to, claims against Nuytco Research Limited. Upon the Closing, the Kazeminy Parties agree to accept the aforementioned assignment.

3.  No Prior Assignment.  The Liquidating Trustee represents and warrants that he has not previously assigned the Claims to any other person or entity.

4.  Further Assurances.  The Liquidating Trustee agrees (i) to provide or make available to the Kazeminy Parties all documents memorializing the relationship between Deep Marine Holdings, Inc., Deep Marine Technology, Inc., Deep Marine 1, LLC, Deep Marine 2, LLC, Deep Marine 3, LLC, Deep Marine 4, LLC and the Subject Parties, to the extent such documents are reasonably necessary to effectuate the purposes of this Assignment; and (ii) to execute and deliver such other and further documents as are necessary to effectuate the purposes of this Assignment; provided, however, that the Kazeminy Parties agree to compensate the Liquidating Trustee for all

reasonable fees, costs, and expenses incurred in the course of responding to the Kazeminy Parties' requests for documents or other information.

5.   No Representations or Warranties and Waiver of Claims.   The Liquidating Trustee, the Liquidating Trust, their counsel, the Trust Advisory Board and Grant Thornton make no representations or warranties regarding the nature, character, or validity of any Claim, including whether (i) any Claim against the Subject Parties exists, (ii) any Claim that may exist is assignable, or (iii) any Claim is actionable, meritorious, or of any value whatsoever.   The Kazeminy Parties expressly acknowledge that they have no recourse against, and expressly waive and release all claims against, the Liquidating Trust, the Liquidating Trustee, their counsel, the Trust Advisory Board and Grant Thornton relating to this Assignment or the Claims, including claims relating to (i) the non-existence of any Claim, (ii) the non-assignability of any Claim, and (iii) the invalidity or lack of merit or value of any Claim.

6.   Indemnification.   The Kazeminy Parties agree that, notwithstanding Paragraph 4 above or any other provision of this Assignment, neither the Liquidating Trust nor the Liquidating Trustee shall have any obligation to (i) participate in any litigation relating to the Claims or the Assignment of the Claims, (ii) assert or otherwise prosecute the Claims, or (iii) defend the Kazeminy Parties' rights to assert the Claims.   Further, the Kazeminy Parties assume all liabilities and obligations relating to the Claims and agree that the Liquidating Trust and the Liquidating Trustee shall not be responsible for any liabilities, obligations, judgments, costs, or expenses relating to the Claims. The Kazeminy Parties assume a duty to defend, hold harmless and indemnify the Liquidating Trust, the Liquidating Trustee, their counsel, the Trust Advisory Board, and Grant Thornton for any claims, obligations, judgments, costs, or expenses arising from or relating to the Claims or this Assignment.

7.   Court Approval Sought.   The Parties agree that they will use reasonable efforts and proceed in good faith to obtain recognition and/or approval of this Assignment by the Bankruptcy Court or such other court, including appellate courts, that may ultimately approve or effectuate this Assignment.   The Liquidating Trust shall request court approval of this Assignment. If a non-appealable final order determines that this Assignment is effective without court approval, it shall be enforceable notwithstanding the lack of final court approval.

8.   Authority and Capacity to Execute Assignment.   The undersigned each represents and warrants that he or she has the authority and capacity to sign this Assignment on behalf of whatever association, group or entity the undersigned purports to represent.

9.   Dispute Resolution; Choice of Laws.   This Assignment shall be interpreted according to the laws of the State of Texas without reference to its Conflict of Laws.   All actions concerning and/or relating to this Assignment shall be exclusively determined in and exclusively venued in the District Court for Harris County, Texas, and the Parties hereby agree to and submit to the jurisdiction (including, without limitation, personal jurisdiction) of and by such Court. A party's failure to enforce a breach of any part of this Assignment shall not prevent such party from enforcing it as to any other breach of this Assignment that such party discovers. If a court rules that any part of this Assignment is not enforceable, such ruling shall in no way affect the validity or enforceability of any other portion of this Assignment, which shall be deemed modified, restricted, or omitted to the extent necessary to make the Assignment enforceable.

10. Severability. The terms of this Assignment are mutually dependant and not severable.

2

11.  Shared Drafting.  The Parties expressly agree and acknowledge that this Assignment was prepared and approved jointly by the Parties, and not by any Party to the exclusion of another Party.

12.  Miscellaneous.  This Assignment may not be canceled or modified except by another written agreement executed by all of the Parties.  This Assignment constitutes the entire understanding between the Parties as to the subject matter hereof and supersedes all prior agreements, understanding, and representations whether in writing, by oral communication, or otherwise related to the Claims.  This Assignment shall be considered to have been entered into subsequent to the Settlement Agreement for purposes of Section 12 of the Settlement Agreement ("Merger of All Agreements"), but this Assignment does not otherwise supersede, alter, amend, or modify in any manner the Parties' Settlement Agreement.

IN WITNESS WHEREOF, the Parties have executed this Assignment as of April 28, 2011.

DEEP MARINE LIQUIDATING TRUST

By: _____

John Bittner, Trustee

This instrument was acknowledged before me on the 28 day of April, 2011 by _____, Trustee of Deep Marine Liquidating Trust.

Sworn to and subscribed before me this 28th day of April, 2011.

_____

Notary Public in and for the State of Arizona

STEPHANIE COPE
Notary Public, State of Arizona
Maricopa County
My Commission Expires

3

DM4us 3231996

**TRUSTEE**

_____
John Bittner, Trustee

This instrument was acknowledged before me on the 28th day of April 2011, by John Bittner, Trustee of Deep Marine Liquidating Trust.

Sworn to and subscribed before me this 28th day of April, 2011.

_____
Notary Public in and for the State of Texas Arizona

OFFICIAL SEAL
RONALD KEITH CRAWFORD
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires May 31, 2011

4

**KAZEMINY PARTIES**

_N. Kazh_

**NASSER J. KAZEMINY**

This instrument was acknowledged before me on the 28th day of April, 2011 by Nasser J. Kazeminy.

Sworn to and subscribed before me this 28th day of April, 2011.

[Notary Seal: TRACI R MALLACE / Notary Public / Minnesota / My Comm. Expires / Jan 31, 2015]

Notary Public in and for the State of ~~Texas~~ Minnesota

---

**NJK HOLDING, CORP.**

By: _N. Kazh_

This instrument was acknowledged before me on the 28th day of April, 2011 by Nasser J. Kazeminy of NJK Holding, Inc., a Minnesota corporation, on behalf of said corporation.

Sworn to and subscribed before me this 28th day of April, 2011.

[Notary Seal: TRACI R MALLACE / Notary Public / Minnesota / My Comm. Expires / Jan 31, 2015]

Notary Public in and for the State of Minnesota

**THE TRIOMPHE INVESTORS, LLC**

By: _____

This instrument was acknowledged before me on the 28th day of April, 2011
by Nader C Pazirandeh _____ of The Triomphe Investors, LLC, a
Nevada limited liability corporation, on behalf of said corporation.

Sworn to and subscribed before me this 28th day of April, 2011.

Notary Public in and for the State of Minnesota

---

**DCC VENTURES, LLC**

By: _____

This instrument was acknowledged before me on the 28th day of April, 2011
by Michael T Davies _____ of DCC Ventures, LLC, a Nevada
limited liability corporation, on behalf of said corporation.

Sworn to and subscribed before me this 28th day of April, 2011.

Notary Public in and for the State of Minnesota

Dallas 3123189v4

**EXHIBIT B**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

```
. . . . .          . . . . .          . . .  . . . . . . . . . . -X
FLI DEEP MARINE LLC,                             :

                                                 :

              Plaintiff,                         :

                                                 :
     -against-                                        C.A. No. 5020—VCS

                                                 :
                                                     AMENDED COMPLAINT

                                                 :
NASSER KAZEMINY, OTTO CANDIES, JR., OTTO
CANDIES, III, DCC VENTURES, LLC, NJK HOLDINGS    :
CORPORATION, NKOC, INC., OTTO CANDIES, LLC,
JOSEPH J. GRANO, JR., CENTURION HOLDINGS LLC,    :
and THE TRIOMPHE INVESTORS, LLC

                                                 :
              Defendants.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
```

As and for its Amended Complaint, Plaintiff alleges:

## NATURE OF THE ACTION

1.    Plaintiff FLI Deep Marine LLC is a former minority shareholder of Deep Marine Holdings, Inc., and – prior to a recapitalization – its wholly owned subsidiary, Deep Marine Technology, Inc. (together "DMT"), now both in Chapter 11 bankruptcy proceedings.

2.    Plaintiff is the victim of a group of shareholders who controlled DMT (the "Controlling Shareholders," a group which included defendant Nasser Kazeminy and other defendants) and breached their fiduciary obligations to Plaintiff, oppressed Plaintiff, and enriched themselves at Plaintiff's expense.   They were aided and abetted by another shareholder of DMT, Joseph Grano, and his company, Centurion Holdings LLC (the "Grano Defendants").   From approximately

2005 to 2008, the Controlling Shareholders diluted Plaintiff's stock in DMT to benefit themselves.

       3.     From approximately 2005 to 2008, the Controlling Shareholders mismanaged and used DMT for their own nefarious purposes.  The Controlling Shareholders' wrongful actions against DMT and the ensuing damage to the corporation are not the subject of this lawsuit and are being prosecuted in a separate action by DMT's Trustee in bankruptcy.[1]  At stake in this action are the Controlling Shareholders' tortious acts – aided and abetted by the Grano Defendants – directed against Plaintiff.

       4.     In its short life prior to its voluntary Chapter 11 filing, DMT, a subsea service provider to offshore gas and oil industries, thrived.  By 2008-2009, Plaintiff's investments – made at DMT's formation in 2001-2002 and again when Plaintiff exercised DMT warrants in 2003 and 2006 – had grown to a value of approximately $5 million as DMT's value soared to more than $100 million.

       5.     But in early 2008, after Plaintiff learned of the Controlling Shareholders' wrongful actions, it wanted to preserve its investment before the Controlling Shareholders could entirely destroy it and/or DMT.  When Plaintiff attempted to remedy and investigate the Controlling Shareholders' wrongdoing by way of a derivative action in this Court in late 2008, the Controlling Shareholders commissioned an expensive whitewash "Special Report" to obfuscate and stall for time.  On June 30, 2009, the Special Committee issued a press release declaring

---

[1] See Case No. 10-03312, Docket No. 1, S.D. Tex. Bankr.

2

that the investigation had concluded with no evidence of wrongdoing.  The Special Committee refused to show the report to Plaintiff.  On July 1, 2009, the day after the bogus Special Report purportedly concluded there was no wrongdoing by the Controlling Shareholders, those same Controlling Shareholders, with the critical assistance of the Grano Defendants, effected a short form merger squeezing Plaintiff out of DMT.

       6.    On information and belief, the Controlling Shareholders' purposes in forcing Plaintiff out of DMT in the short form merger were twofold:  (i) to deprive Plaintiff of standing to continue its derivative action so that the Controlling Shareholders' wrongful actions at DMT would remain covered up; and (ii) to appropriate Plaintiff's stake in DMT for no value.

       7.    In October 2009, Plaintiff sued again in this Court to recover damages for its DMT investment and sought expedited discovery, which this Court granted on November 2, 2009.  On December 3, 2009 the Controlling Shareholders put DMT into bankruptcy, thereby halting the action and all discovery.  On information and belief, the Controlling Shareholders did so to frustrate the Court's November 2 order.  The board resolutions authorizing DMT's bankruptcy filings did not assert that the entities were insolvent, but only that bankruptcy proceedings were "desirable" and "in the best interests of [DMT]".

       8.    DMT trade creditors and lenders may be paid in full in the bankruptcy process.  Thus, on information and belief, the Controlling Shareholders' true purpose in directing the bankruptcy filing was to frustrate Plaintiff's and

others' efforts to be made whole for the Controlling Shareholders' activities and to destroy any remaining value of Plaintiff's investments.

9.    As a direct result of the Controlling Shareholders' campaign of vexatious litigation and sophisticated corporate maneuvers intended to rob Plaintiff of its investment, aided and abetted by the Grano Defendants, Plaintiff lost the entire value of its investment in DMT. The Controlling Shareholders' actions were in breach of their fiduciary duties to Plaintiff and, on information and belief, designed to deprive Plaintiff of its day in court and redress for such breaches.

## THE PARTIES

10.    Plaintiff FLI Deep Marine LLC ("FLI" or "Plaintiff") was, until the consummation of the short form merger of NKOC, Inc. and DMT on July 1, 2009 (the "Merger"), a minority shareholder in DMT. Plaintiff was an early investor in DMT, having been solicited to provide a portion of its original capital. Plaintiff made additional investments in 2003 and 2006 when it purchased and exercised warrants to purchase additional DMT shares.

11.    All of the outstanding stock of Deep Marine Technology, Inc. was transferred to Deep Marine Holdings, Inc. effective May 30, 2008. In exchange, each of the then-current shareholders of Deep Marine Technology, Inc. received 380 shares of common stock of Deep Marine Holdings, Inc. for each share of Deep Marine Technology, Inc. exchanged.

12.    Defendant Nasser Kazeminy ("Kazeminy") controlled the operations of DMT pursuant to his majority equity stake in DMT, as well as an

4

Oversight Services Agreement between DMT and NJK Holdings Corporation. NJK is also a former stockholder in the Company and on information and belief owned or controlled by Kazeminy. On information and belief, Kazeminy also owns or controls DCC Ventures, another former shareholder of DMT. Kazeminy referred to himself as the "Controlling Shareholder" of DMT.

13. On information and belief, Defendant Otto Candies, Jr. ("Candies Jr."), together with his son Defendant Otto Candies, III ("Candies III") and Defendant Otto Candies, LLC ("Candies LLC" and, together with Candies Jr. and Candies LLC, the "Candies") was a stockholder in the Company and, along with Kazeminy, a Controlling Stockholder. On information and belief, Candies Jr. is Chairman of the Board and Chief Executive Officer of Candies LLC.

14. On information and belief, Defendant Otto Candies, III is Secretary of Defendant Otto Candies, LLC and has previously been a member of DMT's b oard of directors. Together with Candies Jr ., Candies III owns a nd controls Candies, LLC, and the three together are Controlling Shareholders of DMT.

15. On information and belief, Defendant Otto Candies, LLC, a Louisiana corporation, is a marine transportation company with its principal offices located at 17271 Hwy. 90, Des Allemandes, Louisiana, 70030-0025. On information and belief, Candies LLC is a Controlling Shareholder of DMT.

16. On information and belief, Defendant NJK Holdings Corporation ("NJK Holdings") is a Minnesota corporation, owned and/or controlled by Defendant Kazeminy, with its principal offices located at 8500 Normandale Lake

5

Boulevard #800, Minneapolis, Minnesota, 55437. On information and belief, NJK
Holdings was a shareholder of DMT.

17.    On information and belief, Defendant DCC Ventures, LLC ("DCC
Ventures") is a private investment company owned or controlled by Defendant
Kazeminy. On information and belief DCC Ventures is a Nevada limited liability
company and was a shareholder of DMT.

18.    On information and belief, Defendant NKOC, Inc. ("NKOC") was
a Delaware corporation that merged with and into DMT on July 1, 2009, with DMT
as the surviving corporation. On information and belief, NKOC was formed by
Kazeminy, Candies Jr. and Candies III, and was the entity into which the
Controlling Shareholders contributed their DMT shares for the purpose of
consummating the Merger, thereby carrying out the Controlling Shareholders'
scheme to squeeze out Plaintiff. On further information and belief the separate
corporate existence of NKOC ceased as of the date of the Merger.

19.    On information and belief, Defendant The Triomphe Investors,
LLC ("Triomphe") is a Nevada limited liability company, with its principal office at
3960 Howard Hughes Parkway, Las Vegas, Nevada, 89109. On April 9, 2008,
Triomphe purchased the majority of Grano's DMT shares at a price that imputed a
value of $100 million for DMT. On information and belief, Triomphe is owned and
controlled by Kazeminy's son, Nader Kazeminy.

20.    Together, Kazeminy, the Candies, NJK Holdings, DCC Ventures,
NKOC and Triomphe were the Controlling Shareholders.

6

21.   On information and belief, Defendant Joseph J. Grano, Jr. ("Grano") is an individual residing at 84 Glen Alpin Road, Morristown, New Jersey 07960. Grano is on information and belief the former Chairman of UBS Financial Services Inc. (formerly UBS PaineWebber, ("UBS")) and is currently Chairman and CEO of Defendant Centurion Holdings LLC ("Centurion"), located at 1185 Avenue of the Americas, Suite 1750, New York, New York 10036. Grano, individually or through Centurion, was a significant early investor in DMT.   Plaintiff decided to invest in DMT based in significant part upon Grano's reputation. At critical points resulting in the destruction of Plaintiff's interest in DMT, the Controlling Shareholders were assisted in their scheme by Defendants Centurion and Grano.

22.   Grano, by virtue of his reputation as former Chairman of UBS, gained Plaintiff's trust and confidence. On information and belief, Grano then used that trust – and his relationship with the Controlling Shareholders – to enrich himself while deliberately placing Plaintiff at peril and at the mercy of Kazeminy and the Candies, who Grano knew to be hostile to Plaintiff's interests.

## FACTUAL ALLEGATIONS

23.   Prior to filing Chapter 11 bankruptcy proceedings, DMT was an independent subsea service provider to the oil and gas industry. It was founded in late 2001 or early 2002 by industry veteran Paul McKim ("McKim"), who had 25 years of offshore oil and gas experience, with two underwater Directly Operated Vehicles.

7

### A.   Plaintiff and Grano Make Their Initial Investments in DMT

24.   In 2001, Plaintiff was approached by Jeffrey Langberg – principal of Bressner Partners, another minority shareholder of DMT, and a former Director and consultant to DMT – and McKim regarding a potential investment in DMT. Plaintiff ultimately decided to make the investment, in significant part because Plaintiff was informed that Grano – then Chairman of UBS – was concurrently investing in DMT and apparently taking an interest in the company.

25.   Plaintiff believed that Grano's reputation and experience would aid DMT's future prospects and ensure professional management of the company. Grano's interest and involvement with DMT influenced Plaintiff's decision to invest in DMT.

26.   In late 2001, Plaintiff entered into a subscription agreement to purchase 70 shares of DMT, or 7.04% of DMT's outstanding equity. On information and belief, Grano made an identical purchase of DMT shares – 70 shares, equal to 7.04% of DMT's outstanding equity – at about the same time. In early 2002, Plaintiff funded its investment in DMT.

### B.   Nasser Kazeminy Becomes Involved With DMT

27.   On information and belief, in 2004, Grano introduced Kazeminy to an opportunity to invest in DMT. On information and belief, Kazeminy was enamored with, and wanted to get closer to, Grano because of Grano's reputation, standing, and access to deals and capital.

8

28.    Kazeminy, through his investment vehicle DCC Ventures, purchased stock in DMT. On information and belief, thereafter Kazeminy found out that a stockholder group including State Street Research Energy ("State Street"), which owned more than 60% of DMT's outstanding stock, was looking to shed some non-liquid investments, including its DMT stock. This group also included Natural Resources Hedge Fund, LLC, Metropolitan Life Small Cap Energy Portfolio, and two Raytheon Retirement Funds. On information and belief Kazeminy agreed to purchase a large portion of State Street's DMT stock. As of June 10, 2004, Kazeminy – acting through DCC Ventures – owned 49.53% of DMT's outstanding stock, leaving State Street with 11.02%.

C.    **Grano Helped the Controlling Shareholders Execute the Merger**

29.    On information and belief, Grano took an active role in DMT; all or substantially all of DMT's board meetings were held at Grano's New York office. Though Grano was never a director (he was nominated for DMT's board – on information and belief by John Ellingboe with whom Grano served on the board of directors of Content Analyst Company – but declined the nomination), he participated in board meetings. Grano received regular updates from Kazeminy, the Candies and DMT management even when Plaintiff was receiving no information.

30.    While Grano and Plaintiff had discussed selling their DMT stock together, in April 2008 Grano sold the bulk of his DMT stock to Kazeminy, based on a DMT valuation of $100 million. On information and belief, Grano knew of the Controlling Shareholders' intentions regarding the Merger and sold Kazeminy just

9

enough DMT stock for Kazeminy and the Candies to reach the 90% ownership of DMT they needed to consummate the Merger.

**D.   Kazeminy Takes Control of DMT**

        31.    Between 2004 – when Kazeminy made his initial investments in DMT – and 2006, he continued to increase his stake in and control of DMT.

        32.    On information and belief, in 2005, Kazeminy converted to equity $600,000 worth of certain DMT bonds he owned.  The conversion rate on those bonds had initially been set at $1,600 per share, but the conversion rate suddenly was reduced with no notice to the Plaintiff.  At a conversion rate of $383.80 per share, Kazeminy was issued 13.92% of DMT's stock.  This would have resulted in significant dilution of Plaintiff relative to the original conversion rate.

        33.    After Plaintiff found out about the dilution, it reached out to Grano and Langberg.  Grano interceded on Plaintiff's behalf, causing the issuance to Plaintiff of warrants to purchase 901 DMT shares (the "FLI Warrants") to compensate for the dilution.  Plaintiff was not aware that Kazeminy completely dominated DMT, either at the time of the issuance of the options or when it later exercised the FLI Warrants, in each case because Kazeminy hid such domination from Plaintiff.

        34.    Grano's actions caused Plaintiff to believe that it could trust Grano to protect its rights as a minority shareholder.  On information and belief, Grano used Plaintiff's trust against it when he participated with Kazeminy and the

10

Candies in the scheme to squeeze the minority shareholders out of their stock in DMT in the Merger, as further discussed below.

35.   On information and belief, Kazeminy together with DCC Ventures controlled 56.55% of DMT's outstanding equity in 2005.

36.   By 2006, after converting additional bonds and warrants, Kazeminy's stake in DMT increased to 66.34% and Grano's to 18.21%, while Plaintiff saw its stake diluted to 9.29%. See Exhibit A. No notice was given to the minority shareholders in connection with any of these transactions.

37.   By 2006, Kazeminy consolidated control of DMT's equity and its operations. On information and belief, on June 12, 2006, DMT's board entered into an Oversight Services Agreement (the "OSA") with another Kazeminy-controlled company, NJK Holdings. The OSA gave Kazeminy, not an officer or director of DMT, complete control over its day-to-day operations. Pursuant to the OSA, NJK Holdings provided "advisory, consulting and other services (the "Oversight Services") in relation to the day-to-day operations of DMT, strategic planning, domestic and international marketing and financial oversight and including, without limitation, advisory and consulting services in relation to the selection, retention and supervision of independent auditors, the selection, retention and supervision of outside legal counsel, and the selection, retention and supervision of investment bankers or other financial advisors or consultants."

38.     In doing so, the board ignored its responsibility to manage and oversee DMT, abdicating operating control of DMT and handing Kazeminy complete control over the management and affairs of DMT.

39.     On information and belief, Grano knew about, but did not disclose to Plaintiff, the OSA and the extent of Kazeminy's domination of DMT.

40.     On information and belief, Grano was aware that Kazeminy was dominating DMT and that DMT was not making disclosures to Plaintiff or observing corporate formalities – such as keeping proper records and providing notices of meetings and major corporate actions – but was not concerned because he was still receiving information due to his relationship with Kazeminy and the Controlling Shareholders.

**E.     Otto Candies Becomes Involved With DMT**

41.     In 2004 or 2005, Otto Candies, LLC – owned and control by the Candies family, including Candies Jr. and Candies III – first became involved with DMT. Otto Candies is a marine transportation company. On information and belief, soon after Candies Sr. and Jr. were introduced to McKim and DMT, the Candies began leasing vessels and crews to DMT – even though Otto Candies was a competitor. On information and belief, in or around March 2005, the Candies sold their first vessel to DMT – the Nicki Candies, later renamed the MV Diamond (the "Nicki Candies") – for a convertible promissory note for $15.2 million (the "Nicki Candies Note"). On information and belief, the Nicki Candies was worth substantially less than $15.2 million at the time of the purchase.

12

42.   In November 2006, the Candies converted the Nicki Candies Note into 23.77% of DMT's outstanding equity.  On information and belief this was more stock than the Candies would have received had the Nicki Candies been purchased by DMT for fair market value.

43.   Throughout 2006, 2007 and 2008, on information and belief the Candies repeatedly misrepresented the condition of vessels sold, leased and/or chartered to DMT and intentionally charged DMT hundreds of thousands of dollars for vessels the Candies knew were broken, poorly built or not able to meet U.S. Coast Guard regulations, and for which crews were promised by the Candies but not provided at the last minute.  The vessels at issue were not delivered to DMT in agreed-upon condition; rather, it took hundreds of thousands of dollars of additional work and many months for these vessels to be ready for operations.   On information and belief, DMT lost valuable contracts with its customers and millions of dollars in revenue as a result of the substantial deficiencies in, and the time needed to fix, these vessels.

44.   On information and belief, in or about October 2007 DMT purchased two vessels, the Agnes and the Sapphire, from the Candies.  While the consideration for the purchase was $35 million in DMT stock, on information and belief the vessels were worth no more than $28 million, resulting in an overpayment to the Candies of at least $7 million.

45.   Yet despite the repeated issues with equipment and services the Candies provided to DMT, on information and belief DMT continued to pay above-

13

market rates for substandard and broken vessels simply because the Candies were on both sides of the deals – as a vendor of DMT and as part of its controlling shareholder group.

46.   On information and belief, similar schemes were used in connection with other transactions between DMT and the Candies. Inflated prices were paid for other assets leased or acquired from the Candies, and in some cases the Candies were provided with inflated convertible notes that allowed them to convert their notes into inflated amounts of DMT equity, increasing the share of DMT stock owned by Kazeminy and the Candies while diluting the interests of the minority shareholders including Plaintiff.

**F.    The Controlling Stockholders Prevent the Board
        From Considering Offers To Buy All of DMT's Stock**

47.   The Controlling Shareholders also prevented DMT's board from considering offers for the sale of DMT, including, on information and belief, a $120 million offer made by Hornbeck Offshore Services in 2008.

**G.    Kazeminy Purchases Grano's DMT Stock**

48.   In early to mid-2008, Plaintiff began to learn about gross mismanagement and self-dealing at DMT from a series of conversations with Paul McKim (founder and then-CEO of DMT) and B.J. Thomas (then chief financial officer of DMT).

49.   FLI met with certain members of DMT's management and board – namely, CEO McKim, Chairman of the Board Bruce Gilman, and CFO John Hudgens – in April 2008 (the "April 2008 Meeting"). At the meeting, McKim

14

detailed the problems the Candies were causing DMT and the resulting extraordinary cost to DMT. Gilman – who Kazeminy would later install as CEO after dismissing McKim, the person most knowledgeable about DMT and the industry in which it operated – remarked that it was "unprecedented" in the industry to leave a vessel in dry dock for four months, as the Candies' actions had forced DMT to do, when it could have been in service generating approximately $9 million in revenues.

50.     As a result of Plaintiff's concerns about the mismanagement and apparent self-dealing by the Controlling Shareholders of DMT, Plaintiff realized it needed to sell its stock or DMT needed to be sold to a reputable buyer.

51.     After the April 2008 Meeting, Robert Rosenthal ("Rosenthal"), Plaintiff's Chairman and CEO, expressed his concerns to Grano, telling him all that Plaintiff had learned from the meeting with McKim and Gilman and conversations with McKim and Thomas. Rosenthal told Grano clearly that Plaintiff wanted to sell its DMT stock. Grano told Rosenthal: "Maybe I should get out too." Rosenthal responded: "We should get out together." Grano ended the conversation by telling Rosenthal, "I'll get back to you."

52.     As a result of that conversation, Rosenthal believed that Plaintiff and the Grano Defendants had agreed to get out of DMT together. Therefore Plaintiff did not pursue any alternate transaction to sell its shares.

53.     Unbeknownst to Plaintiff however, throughout March 2008, on information and belief, Grano had a series of discussions with Kazeminy regarding

Kazeminy's purchase of Grano's DMT stock through one of Kazeminy's investment vehicles, The Triomphe Investors, LLC ("Triomphe").

54.   In fact, on or about April 9, 2008, Triomphe agreed to purchase 1,595,000 of Grano's DMT shares for $6.5 million.  Given the total shares then outstanding, the transaction imputed a value of approximately $100 million for all of DMT's equity.

55.   Thus, while Grano was falsely pretending concern for Plaintiff's plight and allowing Plaintiff to believe that Plaintiff and Grano would exit DMT together, Grano was secretly negotiating his own deal with Kazeminy and may in fact have already sold his shares to Triomphe, a company controlled by Kazeminy's son.

56.   Plaintiff was not even informed that Grano had sold the majority of his DMT stock, let alone that the sale was to an entity owned and controlled by Kazeminy.

57.   Not only did Grano's secret sale to Kazeminy leave Plaintiff out in the cold, it gave the Controlling Shareholders the additional stock they needed to squeeze Plaintiff out entirely.

58.   On information and belief, Grano's sale of his stock to Triomphe apparently resulted in Kazeminy and the Candies controlling directly or indirectly at least 90% of DMT's outstanding equity.  On information and belief, Grano sold Kazeminy just enough stock to allow Kazeminy and the Candies to reach the 90% ownership threshold for a short form merger.

16

59.   Kazeminy and the Candies have claimed – particularly in the Notice of Merger attached hereto as Exhibit B – that they owned 90% of DMT's outstanding equity prior to consummating the Merger.  In the years leading up to the Merger, however, Plaintiff was not provided with any information about DMT's capitalization, and Plaintiff still does not have sufficient information to evaluate DMT's and Kazeminy's statements regarding the percentage ownership of DMT's various shareholders.

**H.   Kazeminy and the Candies Squeeze Out Plaintiff Via a Short Form Merger**

60.   On July 1, 2009, Kazeminy and the Candies caused DMT to consummate a short form merger which stripped Plaintiff of its DMT shares without compensation.

61.   On July 11, 2009, Plaintiff was notified (the "Notice" attached hereto as Exhibit B) that on July 1, 2009 Deep Marine Holdings and NKOC, Inc. – a corporation formed by Kazeminy and the Candies for the sole purpose of holding their DMT stock – had executed a short form merger pursuant to 8 Del. C. § 253. Plaintiff, as a minority shareholder, would be cashed out at a price of $0.01 per share, or approximately $22,000 for all minority shareholders.  Plaintiff had invested $1.73 million commencing in 2002 to help start DMT, a company which had tremendous success during its seven years of operations.  Yet Plaintiff was forced out for approximately $9,380, and has never even seen that sum.

62.   In the alternative, Plaintiff had the right under Delaware law to an appraisal of the value of its shares by the Delaware Court of Chancery.  After

17

this Court ordered expedited discovery of Kazeminy, the Candies, and DMT, but before Plaintiff had an opportunity to request such an appraisal, on December 4, 2009, Kazeminy and the Candies caused DMT to file for bankruptcy in the United States District Court for the Southern District of Texas. The filing was made even though DMT's balance sheet was strong enough that, on information and belief, every non-insider creditor of DMT – with the notable exception of Plaintiff – will receive 100% of the amounts owed to them as part of DMT's plan of liquidation.

63.    Thus, Defendants have attempted to deprive Plaintiff of all of its interest in DMT without any compensation at all.

### FIRST CAUSE OF ACTION
(Breach of Fiduciary Duty by the Controlling Shareholders)

64.    Plaintiff incorporates herein by reference paragraphs 1 through 63 of this Complaint as if set forth herein.

65.    The Controlling Shareholders were majority and controlling shareholders of DMT.

66.    The Controlling Shareholders breached the fiduciary duties they owed to DMT's minority shareholders as stated herein.

67.    When making its initial investment in DMT, Plaintiff had a reasonable expectation that the majority or controlling shareholders of DMT would not take aggressive actions against Plaintiff, the effect of which would dilute Plaintiff's DMT shares or would strip Plaintiff of its DMT shares.

68.    Instead, on information and belief, the Controlling Shareholders exercised complete domination over DMT and its minority shareholders.

18

69.    On information and belief, the Controlling Shareholders diluted Plaintiff's interest in DMT as part of a scheme to strip Plaintiff of its DMT shares. The Controlling Shareholders also prevented DMT's board from considering offers for the sale of DMT, including, on information and belief, a $120 million offer made by Hornbeck Offshore Services in 2008.

70.    Furthermore, when Plaintiff exercised the FLI Warrants, thus making a second investment in DMT, Plaintiff was not informed of the extent of Kazeminy's involvement with DMT or of his plans for the company. Again, Plaintiff's reasonable expectation at the time it exercised the FLI Warrants was that the majority or controlling shareholders of DMT would not take aggressive actions against Plaintiff, the effect of which would dilute Plaintiff's DMT shares, or would strip Plaintiff of its DMT shares.

71.    On information and belief the Candies sold assets to DMT at inflated prices.

72.    On information and belief the consideration for such assets sales included DMT stock, or notes convertible into DMT stock.

73.    As a result of such inflated sales, the Controlling Shareholders caused DMT to issue to the Candies – and, on information and belief, to Kazeminy – DMT shares for less than reasonably equivalent value.

74.    On information and belief such issuance of shares to the Controlling Shareholders increased the percentage ownership of the Controlling

19

Shareholders while simultaneously decreasing the percentage ownership of Plaintiff in DMT.

75.   As a result of the share issuances plus Grano's sale of his DMT stock to Kazeminy – the Controlling Shareholders were able, on information and belief, to purportedly amass at least 90% of DMT's outstanding stock, allowing them to consummate a short form merger.

76.   Such transactions breached the Controlling Shareholders' duties to Plaintiff and caused Plaintiff to lose all its DMT shares in the short form merger that could never have been consummated without the dilution of DMT's minority shareholders.

77.   As a result of the Controlling Shareholders' breaches of their fiduciary duties, Plaintiff has suffered injury and damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting a Breach of Fiduciary Duty by Grano)

78.   Plaintiff incorporates herein by reference paragraphs 1 through 77 of this Complaint as if set forth herein.

79.   The Controlling Shareholders owed fiduciary duties directly to the minority shareholders, including Plaintiff, and breached those fiduciary duties as set forth in Count I above.

80.   Grano aided and abetted the Controlling Shareholders' breaches of their fiduciary duties by knowingly participating in their schemes.

20

81.   Grano was intimately involved with the operation and oversight of DMT and frequently attended board meetings.  Grano also had a longstanding relationship with Kazeminy and introduced Kazeminy to DMT.  Grano also sold his DMT stock to Kazeminy, allowing Kazeminy and the Candies to amass the 90% of DMT's stock they needed to squeeze Plaintiff out of DMT altogether via short form merger.  Grano assisted Kazeminy and the Candies in the dilution and oppression of Plaintiff.

82.   The scheme caused Plaintiff to lose all of its shares and their value in the Merger, which could not have been consummated without the dilution of DMT's minority shareholders and Grano's secret sale of his stock to Kazeminy.

83.   As a result of Grano's actions aiding and abetting the breaches of fiduciary duties, Plaintiff has suffered injury and damages in an amount to be proved at trial.

### THIRD CAUSE OF ACTION
#### (Shareholder Oppression by the Controlling Shareholders)

84.   Plaintiff incorporates herein by reference paragraphs 1 through 83 of this Complaint as if set forth herein.

85.   The Controlling Shareholders were majority and controlling shareholders of DMT and, on information and belief, dominated and controlled DMT.

86.   When making its initial investment in DMT, Plaintiff had a reasonable expectation that DMT's controlling shareholders would not dilute

21

Plaintiff's stock or engage in a scheme to unfairly strip Plaintiff of its DMT shares for little or no compensation.

87.     On information and belief, the Controlling Shareholders diluted Plaintiff's interest in DMT as part of a scheme to unfairly strip Plaintiff of its stock in DMT and the value of its DMT shares.  The Controlling Shareholders also prevented DMT's board from considering offers for the sale of all stock in DMT including, on information and belief, a $120 million offer made by Hornbeck Offshore Services in 2008.

88.     By their foregoing actions, the Controlling Shareholders oppressed DMT's minority shareholders, including Plaintiff, by violating their reasonable expectations.

89.     Furthermore, when Plaintiff exercised the FLI Warrants, thus making a second investment in DMT, Plaintiff was not informed of the extent of Kazeminy's involvement with DMT or of his plans for the company.   Again, Plaintiff's reasonable expectation at the time it exercised the FLI Warrants was that the majority or controlling shareholders of DMT would not take aggressive actions against Plaintiff, the effect of which would dilute Plaintiff's DMT shares or would strip Plaintiff of its DMT shares.

90.     As a result of the Controlling Shareholders' oppression of Plaintiff, Plaintiff has suffered injury and damages in an amount to be proven at trial.

WHEREFORE, Plaintiff respectfully requests that the Court grant it the following relief:

a) Declaring that the Controlling Shareholders breached their fiduciary duties to Plaintiff;

b) Declaring that Defendant Grano aided and abetted the Controlling Shareholders in their breaches of the fiduciary duties to Plaintiff;

c) Declaring that the Controlling Shareholders oppressed Plaintiff;

d) Awarding damages to compensate Plaintiff for the losses it has suffered caused by Defendants' actions;

e) Awarding Plaintiff the costs and disbursements of this action, including for reasonable attorneys' fees and experts' fees;

f) Awarding Plaintiff pre- and post-judgment interest; and

g) Such other and further relief as the Court deems just and proper.

Dated:

Respectfully submitted,

JASPAN SCHLESINGER LLP

_____

913 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 351-8000
(302) 351-8010

Attorneys for Plaintiff FLI Deep Marine LLC

23

PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100

Special Counsel for Plaintiff
as to First and Third Causes of
Action Only

# EXHIBIT A

**Deep Marine Technology, Inc.**
Corporate Capitalization Table

| | | | |
|---|---|---|---|
| 1/31/2002 | Original Stock Issuance | | |
| | Paul McKim | 117 | 11.76% |
| | Jeffrey Langberg, etal | 50 | 5.03% |
| | Nuytco | 400 | 40.20% |
| | State Street * | 210 | 21.11% |
| | Joseph Grano | 70 | 7.04% |
| | FLI Deep Marine | 70 | 7.04% |
| | JJ Riddle | 65 | 6.53% |
| | Sandy Loyd | 13 | 1.31% |
| | | | 0.00% |
| | | 995 | 100.0% |

* State Street includes State Street Research Energy and Natural Resources
Hedge Fund, Metropolitan Life, and two Raytheon Retirement Funds

| | | | |
|---|---|---|---|
| 1/31/2002 | Issued Shares from exercise of Warrants issued with Series A Bonds | | |
| 4/26/2002 | Paul McKim | 117 | 1.23% |
| | Jeffrey Langberg, etal | 50 | 0.53% |
| | Nuytco | 400 | 4.21% |
| | State Street | 5,710 | 60.14% |
| | Joseph Grano | 1,570 | 16.54% |
| | FLI Deep Marine | 1,570 | 16.54% |
| | JJ Riddle | 65 | 0.68% |
| | Sandy Loyd | 13 | 0.14% |
| | | | 0.00% |
| | | 9,495 | 100.0% |

(1 warrants per $1,000 bond, convertable at $290 per share = 5,500 issued)

| | | | |
|---|---|---|---|
| 6/10/2004 | 4,664 Share Stock Purchase from State Street by DCC Ventures | | |
| | Paul McKim | 117 | 1.23% |
| | Jeffrey Langberg, etal | 50 | 0.53% |
| | Nuytco | 400 | 4.21% |
| | State Street | 1,046 | 11.02% |
| | Joseph Grano | 1,570 | 16.54% |
| | FLI Deep Marine | 1,570 | 16.54% |
| | JJ Riddle | 65 | 0.68% |
| | Sandy Loyd | 13 | 0.14% |
| | DCC Ventures | 4,664 | 49.12% |
| | | 9,495 | 100.0% |

| | | | |
|---|---|---|---|
| 10/19/2004 | 78 Share Stock Repurchase - Law Suit w/ Riddle & Loyd | | |
| | Paul McKim | 117 | 1.24% |
| | Jeffrey Langberg, etal | 50 | 0.53% |
| | Nuytco | 400 | 4.32% |
| | State Street | 1,046 | 11.11% |
| | Joseph Grano | 1,570 | 16.67% |
| | FLI Deep Marine | 1,570 | 16.67% |
| | JJ Riddle | | 0.00% |
| | Sandy Loyd | | 0.00% |
| | DCC Ventures | 4,664 | 49.52% |
| | | 9,417 | 100.0% |

| | | | |
|---|---|---|---|
| 7/6/2005 | 1,543 Share Stock Issued from $600,000 Series B Bonds Converted by Mr. K ($388.89/sh) | | |
| | Paul McKim | 117 | 1.07% |
| | Jeffrey Langberg, etal | 50 | 0.46% |
| | Nuytco | 400 | 3.66% |
| | State Street * | 1,046 | 9.56% |
| | Joseph Grano | 1,570 | 14.35% |
| | FLI Deep Marine | 1,570 | 14.35% |
| | DCC Ventures, LLC | 4,664 | 42.63% |

| | | |
|---|---:|---:|
| Nasser J. Kazeminy | 1,522 | 13.32% |
| Total Current Outstanding Stock | 10,340 | 100.00% |

**CURRENT OUTSTANDING**

**10/6/2006**
1,045 shares issued to DOC Ventures for outstanding warrant ($6.01/sh)
901 shares issued to FLI - Deep Marine for outstanding warrant ($6694.6/sh)
13 shares issued to B.J. Thomas for converting $6,406 Series B Notes ($6301.30/sh)
18 shares issued to Paul McKim for converting 33,000 Series B Notes ($6303.30/sh)
2,575 shares issued to Joseph Grano for converting $1,300,000 Series B Notes ($6303.30/sh)
16,431 shares issued to DOC Ventures for converting $4,100,000 Series B Notes ($6303.30/sh)

| | | |
|---|---:|---:|
| Paul McKim | 130 | 0.49% |
| Jeffrey Langberg, et al | 50 | 0.19% |
| Nuytco | 400 | 1.50% |
| State Street | 1,046 | 3.93% |
| Joseph Grano | 4,843 | 18.31% |
| FLI Deep Marine | 2,471 | 9.39% |
| DOC Ventures, LLC | 16,121 | 60.61% |
| Nasser Kazeminy | 1,523 | 5.73% |
| B.J. Thomas | 13 | 0.05% |
| Total Current Outstanding Stock | 26,607 | 100.00% |

**12/1/2006**
16,464 issued to DOC Ventures for converting $4,191,000 Demand Notes

| | | |
|---|---:|---:|
| Paul McKim | 130 | 0.35% |
| Jeffrey Langberg, et al | 50 | 0.13% |
| Nuytco | 400 | 1.06% |
| State Street | 1,046 | 2.82% |
| Joseph Grano | 4,843 | 13.07% |
| FLI Deep Marine | 2,471 | 6.67% |
| DOC Ventures, LLC | 26,585 | 71.72% |
| Nasser Kazeminy | 1,523 | 4.11% |
| B.J. Thomas | 13 | 0.04% |
| Total Current Outstanding Stock | 37,061 | 100.00% |

**11/30/2006**
11,554 issued to Otto Candies, LLC for converting $15,300,000 Note on DMT Diamond

| | | |
|---|---:|---:|
| Paul McKim | 130 | 0.27% |
| Jeffrey Langberg, et al | 50 | 0.10% |
| Nuytco | 400 | 0.83% |
| State Street | 1,046 | 2.16% |
| Joseph Grano | 4,843 | 9.96% |
| FLI Deep Marine | 2,471 | 5.08% |
| DOC Ventures, LLC | 26,585 | 54.68% |
| Nasser Kazeminy | 1,523 | 3.13% |
| B.J. Thomas | 13 | 0.03% |
| Otto Candies, LLC | 11,558 | 23.77% |
| Total Current Outstanding Stock | 48,619 | 100.00% |

**FULLY DILUTED STOCK OUTSTANDING**
1 Add 2,748 shares for Management options ($6303.3/sh)

| | | |
|---|---:|---:|
| Paul McKim | 130 | 0.25% |
| Jeffrey Langberg, et al | 50 | 0.10% |
| Nuytco | 400 | 0.78% |
| State Street | 1,046 | 2.04% |
| Joseph Grano | 4,843 | 9.43% |
| FLI Deep Marine | 2,471 | 4.81% |
| DOC Ventures, LLC | 26,585 | 51.76% |
| Nasser Kazeminy | 1,523 | 2.96% |
| B.J. Thomas | 13 | 0.03% |
| Otto Candies, LLC | 11,558 | 22.50% |
| 1 Management Stock Options | 2,748 | 5.35% |
| | 51,367 | 100.00% |

# EXHIBIT B

July 11, 2009

**DEEP MARINE HOLDINGS, INC.**
**20411 Imperial Valley Dr.**
**Houston, Texas 77073**

---

**Notice Regarding Merger**
**of**
**NKOC, Inc.**
**With and Into**
**Deep Marine Holdings, Inc.**
**and Availability of Appraisal Rights**

*To the former stockholders of Deep Marine Holdings, Inc.:*

This notice is being sent to you by Deep Marine Holdings, Inc., a Delaware corporation. For convenience of reference, such corporation, as it existed prior to the Merger described below, is referred to as "Old DMH" and, as the surviving corporation after the Merger, "New DMH."

New DMH hereby gives you notice under Section 262(d)(2) of the General Corporation Law of the State of Delaware (the "DGCL") that the merger of NKOC, Inc., a Delaware corporation ("NKOC"), with and into Old DMH (the "Merger") became effective at 2:24 p.m., Eastern time, on July 1, 2009 (the "Effective Time"). Immediately prior to the Effective Time, NKOC owned more than 90% of the outstanding shares of common stock, par value $0.01 per share, of Old DMH ("Common Stock"). Accordingly, no action was required or taken by the board of directors or stockholders of Old DMH (other than NKOC) under the DGCL for the Merger to become effective.

Under the terms set forth in the Certificate of Ownership and Merger attached hereto as *Appendix A* and the applicable provisions of Delaware law, former holders of Common Stock (other than NKOC) immediately prior to the Effective Time ("Former Stockholders") became entitled to receive the merger consideration of $0.01 per share in cash and without interest. As a result of the Merger, each share of Common Stock ceased to exist, and each stock certificate (other than certificates held by NKOC) that represented such a share of Common Stock now represents only the right to receive $0.01 per share in cash, without interest. All of the outstanding stock of NKOC was beneficially owned by Nasser Kazeminy, Otto Candies, Jr. and members of their respective families. As a result of the Merger, the separate corporate existence of NKOC has ceased.

Former Stockholders who do not wish to accept the merger consideration have the right to seek an appraisal of the fair value of their shares, together with interest, if any, to be paid thereon. In order to perfect this right of appraisal, Former Stockholders must make a written demand for appraisal to New DMH at the address set forth under "APPRAISAL RIGHTS" below no later than July 31, 2009, the 20th day after the date of mailing of this notice. This notice is being mailed on July 11, 2009 and provides the notice to Former Stockholders required by Section 262(d)(2) of the DGCL. For further information, see "APPRAISAL RIGHTS" and the appendices hereto.

In the Merger, each share of common stock, par value $.001 per share, of NKOC (including fractional shares) was converted into shares of common stock, par value $.01 per share, of New DMH as the surviving corporation, on the basis of 1,000 shares of common stock of New DMH per share of NKOC common stock.

The Merger enabled the owners of NKOC to acquire all the outstanding stock of Old DMH and facilitated an additional, substantial investment in Old DMH by those persons, who were willing to make such investment only if they became the sole stockholders of New DMH. As more fully described below under "Recent Developments—July 1 Financing," such an investment was required to prevent Old DMH from defaulting on its obligations to fund its payroll on July 1 and other near-term obligations.

In this notice, "dissenting share" means each former share of Common Stock as to which appraisal rights have been properly exercised.

Please read carefully the materials this notice contains, including the appendices, in making a determination whether to accept the merger consideration or to seek an appraisal under the DGCL.

## DETERMINATION OF THE MERGER CONSIDERATION

Prior to the Merger, NKOC established the $0.01 per share consideration to be paid to the Former Stockholders in the Merger. The determination by NKOC was based in part on a preliminary estimate of the fair market value as of June 1, 2009 of the equity of Old DMH prepared in late June 2009 for Old DMH by Growth Capital Partners, L.P., an investment and merchant banking firm ("GCP"). GCP's preliminary estimate was that the fair market value as of June 1, 2009 of the equity of Old DMH (including the equity held by NKOC) on a non-marketable, controlling basis was *de minimis* considering the level of interest-bearing debt and obligations of Old DMH. GCP delivered to New DMH its definitive report, dated July 10, 2009 and attached to this notice as *Appendix B*, which confirmed such preliminary estimate of valuation as of June 1, 2009. The fair market value of the equity of Old DMH in the final report was lower than the preliminary estimate. In neither case was there positive equity value.

The aggregate merger consideration valued the total Common Stock of Old DMH, including the Common Stock held by NKOC, outstanding prior to the Merger at approximately $240,000. The aggregate merger consideration to be received by the Former Stockholders totals approximately $22,000.

In light of the above and the matters described below under "Recent Developments," New DMH believes that the $0.01 per share consideration, which equals the par value of the Common Stock, represents a fair price for the shares of Common Stock held by the Former Stockholders prior to the Merger.

## RECENT DEVELOPMENTS

**July 1 Financing.** On July 1, 2009, entities controlled by Nasser Kazeminy, Otto Candies, Jr. and members of their respective families entered into a Term Loan Agreement with Deep Marine 3, LLC, a wholly owned subsidiary of New DMH, as borrower ("DM-3"), pursuant to which such entities made a loan to DM-3 in an aggregate principal amount of $1.84 million on

2

a secured basis. Nasser Kazeminy, Otto Candies, Jr. and members of their respective families were the sole beneficial owners of all the outstanding stock of NKOC, and prior to the formation of NKOC, Nasser Kazeminy, Otto Candies, Jr. and members of their respective families beneficially owned all shares of Common Stock of Old DMH that NKOC owned immediately prior to the Merger. Such persons determined that they would not make such loan absent the concurrent completion of the Merger on July 1, 2009, and such loan was not made until such persons had determined that the steps remaining to complete the effectiveness of the Merger with the Delaware Secretary of State on that date had commenced and were ministerial in nature. The board of directors of Old DMH was not advised that the lenders would extend the financing only if the Merger was accomplished concurrently and therefore did not consider the Merger in approving the financing. If new financing had not been made available on July 1, 2009, Old DMH would not have been able to fund its payroll obligations to its employees on such date and would not have had sufficient liquidity to satisfy other near-term obligations as they became due, including with respect to expenditures in connection with the *DMT Emerald* letter of intent described below. In addition, New DMH believes that it will not be able to meet its ongoing requirements for working capital without obtaining additional loans or equity contributions, and New DMH does not think it is likely that it can obtain any such loans or equity contributions from any source other than such stockholders on commercially reasonable terms based on discussions with its existing lenders and the current state of the markets. As of June 30, 2009, Old DMH had availability under its secured receivables facility of only $150,000 and had no other available lines of credit. Such stockholders determined prior to the Merger that they would not consider making any such additional loans or equity contributions to Old DMH absent the Merger.

**Emerald Letter of Intent.** On June 30, 2009, DMT entered into a nonbinding letter of intent with respect to work for the *DMT Emerald* offshore India. DMT currently is negotiating definitive contract terms with the client. Pursuant to the letter of intent and subject to completion of a definitive contract, the work for the vessel is to commence on or before August 1, 2009. DMT also is to receive a $2.6 million project initiation fee, which is expected to cover the capital expenditures required to upgrade the vessel to contract specifications and the logistical expenses of mobilizing the vessel from the Gulf of Mexico to India. DMT has commenced readying the vessel for the contract, and the related expenses currently are being funded by DMT. Without the loan described above under "—July 1 Financing," DMT would be unable to fund such expenses, and likely would not be in a position to reach a definitive contract with the client.

**Special Litigation Committee Determinations.** As previously disclosed to the New DMH Stockholders, on June 26, 2009, the Special Litigation Committees of the Boards of Directors of Old DMH and its wholly owned subsidiary, Deep Marine Technology, Inc., a Texas corporation ("DMT"), concluded an extensive, eight-month-long investigation into allegations described in a shareholder demand letter and in two lawsuits, one brought by minority shareholders who presented the original demand letter and one brought by the former CEO of DMT and Old DMH. The two lawsuits and the demand letter contained virtually identical allegations.

The investigation included the retention of independent outside counsel to study the allegations, to examine witnesses (24 witnesses were interviewed, including some under oath), and to review voluminous documents. The Special Litigation Committee met on several occasions regarding the allegations and reviewed the report of the independent counsel.

After carefully considering the findings of that report and deliberating as to the merits of the allegations in the demand letter and the two lawsuits, the Special Litigation Committee determined that all of the allegations regarding DMT as set forth in the Demand Letter dated October 10, 2009 sent by FLI Deep Marine LLC and others, the Complaint filed by FLI and Bressner Partners Ltd. in the Chancery Court of Delaware in Civil Action No. 4138-VCN, and the First Amended Petition filed by Paul McKim in Harris County, Texas in Cause No. 2008-64385, are without merit. The Special Litigation Committee further concluded that there is no evidence to support any of the allegations that either DMT, Old DMH or any of its current and former officers, directors or major shareholders engaged in waste, fraud or gross mismanagement (except no such finding was made as to Paul McKim, the former CEO of DMT and Old DMH) or made improper payments, directly or indirectly, to an elected official or family member.

As a result of the investigation and the committee's determination, DMT and Old DMH declined to bring or take up a lawsuit against its current or former officers, directors, and major shareholders based upon those allegations. One of the lawsuits, originally brought before the Delaware Court of Chancery, has been dismissed, and DMT has filed a motion to dismiss each of the causes of action in the remaining Texas litigation brought against it by Paul McKim.

### SURRENDER OF CERTIFICATES; PAYMENT FOR SHARES

You must decide whether to accept payment of the merger consideration in respect of your shares or to seek appraisal of those shares under Section 262. If you decide to accept the merger consideration, you must comply with the procedure described below.

A letter of transmittal accompanies this notice for your use in surrendering your stock certificates to New DMH. In order to obtain payment of the merger consideration, you must present to New DMH, either by mail or by hand, stock certificates that formerly represented shares, accompanied by a properly completed letter of transmittal and any required accompanying documentation. As soon as practicable after you surrender to New DMH a stock certificate that formerly represented shares along with a properly completed letter of transmittal and any such documentation, you will be paid the merger consideration in cash, without interest, for each share that the stock certificate represented immediately prior to the Effective Time.

**To receive payment of the merger consideration, you must complete the enclosed letter of transmittal and any required accompanying documentation and must present to New DMH the completed and signed letter of transmittal, any such documentation and the stock certificate(s) formerly representing shares in the manner described above and in the letter of transmittal that accompanies this notice.**

**The method of delivery of certificates that formerly represented shares of Common Stock, the letter of transmittal and all other required documentation is at the option and risk of the holder.**

As the letter of transmittal provides, an "eligible institution" must guarantee signatures on a letter of transmittal, *unless* the certificates that formerly represented shares of Common Stock are surrendered (1) by a registered holder of shares who has not completed the box entitled "Special Payment Instructions" or the box entitled "Special Delivery Instructions" in the letter of transmittal or (2) for the account of an eligible institution.

HOU03:1207548.14                                      4

If the certificates that formerly represented shares of Common Stock are registered in the name of a person other than the person signing the letter of transmittal, the certificates must be endorsed or accompanied by appropriate stock powers, in either case signed exactly as the name or names of the registered owner or owners appear on the certificates, with the signatures on the certificates or stock powers guaranteed by an eligible institution.

Until a stock certificate that formerly represented shares of Common Stock (other than dissenting shares) is actually surrendered for exchange, it shall represent only the right to receive the cash into which the shares it previously represented were converted. If any stock certificate that formerly represented shares of Common Stock is presented to New DMH, it will be canceled and exchanged for the merger consideration in cash, without interest, for each share that such stock certificate represented immediately prior to the Effective Time.

## APPRAISAL RIGHTS

Former Stockholders are entitled to appraisal rights under Sections 253 and 262 of the DGCL, provided they comply with the requirements of Section 262. A Former Stockholder who makes the demand described below with respect to its shares and otherwise complies with the statutory requirements of Section 262 will be entitled to an appraisal by the Delaware Court of Chancery (the "Delaware Court") of the fair value of its shares and, following such appraisal, such Former Stockholder will be entitled to receive that value in cash from New DMH.

Section 253 and Section 262 are reprinted in their entirety as *Appendix C* and *Appendix D*, respectively, to this notice. The following discussion is not a complete statement of the law relating to appraisal rights and is qualified in its entirety by reference to the appendices hereto. Any Former Stockholder wishing to preserve its appraisal rights should review carefully this discussion and the appendices hereto, as the failure to comply with the procedures Section 262 sets forth will result in the loss of appraisal rights. Any Former Stockholder considering demanding appraisal is advised to consult legal counsel.

Under Section 262, if a merger is accomplished without a vote of stockholders under Section 253 of the DGCL, either before or within 10 days after the effective date of the merger, each constituent corporation (or, after the effective date, the surviving constituent corporation) must notify each stockholder of each constituent corporation entitled to appraisal rights of the approval of the merger and that appraisal rights are available to those stockholders and include in each such notice a copy of Section 262. This notice constitutes the notice Section 262 requires to the Former Stockholders.

Former Stockholders who desire to exercise their appraisal rights must deliver a written demand for appraisal of shares to the Secretary of New DMH within 20 days after the mailing of this notice, which was mailed on July 11, 2009, and must otherwise comply with the provisions of Section 262. Written demands must be sent to:

> Deep Marine Holdings, Inc.
> 20411 Imperial Valley Dr.
> Houston, Texas 77073
> Attn: Secretary

The written demand must reasonably inform New DMH of the identity of the Former Stockholder and that the Former Stockholder thereby intends to demand appraisal.

A demand for appraisal must be executed by or for the Former Stockholder, fully and correctly, as its name appears on the stock certificates. If shares are owned of record in a fiduciary capacity, such as by a trustee, guardian or custodian, the fiduciary must execute the demand. If shares are owned of record by more than one person, as in a joint tenancy or tenancy in common, all joint owners must execute the demand. An authorized agent, including an agent for two or more joint owners, may execute the demand for appraisal for a Former Stockholder; however, the agent must identify the record owner and expressly disclose the fact that, in exercising the demand, he is acting as agent for the record holder.

Within 120 days after the Effective Time, either New DMH or any Former Stockholder who has complied with the required conditions of Section 262 and who is otherwise entitled to appraisal rights may commence an appraisal proceeding by filing a petition in the Delaware Court demanding a determination of the fair value of the shares of the dissenting Former Stockholders. If a petition for an appraisal is timely filed, after a hearing on the petition, the Delaware Court will determine which Former Stockholders are entitled to appraisal rights. The appraisal proceeding shall be conducted in accordance with the rules of the Delaware Court, including any rules specifically governing appraisal proceedings. Through such proceeding the Delaware Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the Merger, together with interest to be paid, if any, on the amount determined to be the fair value.

A Former Stockholder who files a petition must serve a copy of the petition to New DMH as set forth above. Within 20 days after that service, New DMH must file in the office of the Register in Chancery in which the petition was filed a duly verified list containing the names and addresses of all Former Stockholders demanding appraisal rights, or "dissenting stockholders." Any dissenting stockholder is entitled, within the 120-day period after the Effective Time and on written request to New DMH, to receive from New DMH a statement setting forth the aggregate number of shares of Common Stock with respect to which demands for appraisal have been received and the number of holders of such shares. New DMH must mail such written statement to the dissenting stockholder within 10 days after the dissenting stockholder's request is received by New DMH or within 10 days after the latest date for delivery of a demand for appraisal under Section 262, whichever is later.

The Delaware Court may order that the Register in Chancery give notice of the time and place fixed for the hearing of the petition by registered or certified mail to New DMH and all dissenting stockholders and by publication at least one week before the day of the hearing in a newspaper of general circulation published in the City of Wilmington, Delaware, or in another publication determined by the Delaware Court. The Delaware Court will approve the form of notice by mail and by publication. New DMH will bear the costs relating to these notices. If the Delaware Court holds a hearing on the petition, it is empowered to determine which dissenting stockholders are entitled to an appraisal of their former shares. The Delaware Court may require that dissenting stockholders submit their stock certificates that formerly represented shares for notation thereon of the pendency of the appraisal proceedings, and the Delaware Court is empowered to dismiss the proceedings as to any dissenting stockholder who does not comply

with this request. Accordingly, dissenting stockholders are cautioned to retain their stock certificates pending resolution of the appraisal proceedings.

In determining fair value, the Delaware Court is to take into account all relevant factors. In *Weinberger v. UOP, Inc.*, the Delaware Supreme Court discussed the factors that could be considered in determining fair value in an appraisal proceeding, stating that "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court" should be considered in appraisal proceedings. The techniques or methods for determining fair value may include "market value, asset value, dividends, earnings prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger which throw any light on future prospects of the merged corporation . . . ." The Delaware Supreme Court has construed Section 262 to mean that "elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered." Section 262 provides, however, that fair value is to be determined "exclusive of any element of value arising from the accomplishment or expectation of the merger." In addition, the Delaware Supreme Court has decided that the statutory appraisal remedy is a dissenting stockholder's exclusive remedy, absent fraud or illegality.

Former Stockholders who are considering seeking appraisal should bear in mind that the fair value of their shares determined under Section 262 could be more than, the same as or less than the merger consideration. New DMH intends to argue in any appraisal proceedings that, for purposes of those proceedings, the "fair value" of the shares of Common Stock is less than $0.01 per share.

The cost of the appraisal proceeding may be determined by the Delaware Court and taxed on the parties as the Delaware Court deems equitable in the circumstances. On application of a dissenting stockholder, the Delaware Court may order that all or a portion of the expenses incurred by any dissenting stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorneys' fees and the fees and expenses of experts, be charged *pro rata* against the value of all shares entitled to appraisal. In the absence of such a determination or assessment, each party bears its own expenses. Determinations by the Delaware Court are subject to appellate review by the Delaware Supreme Court. Dissenting stockholders generally are permitted to participate in appraisal proceedings.

Any Former Stockholder who duly demands appraisal in compliance with Section 262 will not be entitled to vote for any purpose the shares subject to that demand or to receive payment of dividends or other distributions on those shares.

At any time within 60 days after the Effective Time, any Former Stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party will have the right to withdraw his demand for appraisal and to accept in writing the merger consideration of $0.01 per share in cash without interest. After this period, that Former Stockholder may withdraw his demand for appraisal only with New DMH's consent as the surviving corporation. No petition timely filed in the Delaware Court demanding appraisal will be dismissed as to any Former Stockholder without the approval of the Delaware Court, and that approval may be conditioned on terms the Delaware Court deems just; *provided, however,* that this provision shall not affect the right of any Former Stockholder who has not commenced an appraisal proceeding

or joined that proceeding as a named party to withdraw such Former Stockholder's demand for appraisal and to accept the merger consideration within 60 days after the Effective Time. If no petition for appraisal is filed with the Delaware Court within 120 days after the Effective Time, Former Stockholders' rights to appraisal will cease and all Former Stockholders will be entitled to receive the merger consideration. New DMH has no obligation to file such a petition; any Former Stockholder who desires to file such a petition is advised to file it on a timely basis.

*Failure to take any required step in connection with the exercise of appraisal rights may result in the termination or waiver of those rights. New DMH advises any Former Stockholder considering demanding appraisal to consult legal counsel.*

### FEDERAL INCOME TAX CONSIDERATIONS

The receipt of the cash merger consideration or cash representing the appraised value of shares under Section 262 will be a taxable transaction for U.S. federal income tax purposes under the Internal Revenue Code of 1986, as amended, or the "Code," and also may be a taxable transaction under applicable state, local or foreign income or other tax laws. Generally, for U.S. federal income tax purposes, you will recognize gain or loss equal to the difference between the amount of cash you receive and the aggregate tax basis in the shares converted into cash. Gain or loss will be calculated separately for each share.

If you hold shares as capital assets, the gain or loss you will recognize will be capital gain or loss, which will be long-term capital gain or loss if your holding period for the shares exceeds one year. If you are an individual, long term capital gains recognized in 2009 are generally taxable at a rate of 15%. Under present law, the ability to use capital losses to offset ordinary income is limited.

If you surrender certificates that formerly represented shares, you may be subject to 28% backup withholding unless you provide your taxpayer identification number and certify that the number is correct, unless an exemption applies. Exemptions are available for certain Former Stockholders (including, among others, all corporations). If you do not furnish a required identification number, you may be subject to a penalty imposed by the Internal Revenue Service.

If backup withholding applies to you, New DMH is required to withhold 28% from payments to you. Backup withholding is not an additional tax. Rather, the amount of the backup withholding can be credited against the U.S. federal income tax liability of the person subject to the backup withholding, provided that the required information is given to the Internal Revenue Service. If backup withholding results in an overpayment of tax, you can obtain a refund by filing a federal income tax return.

**The foregoing discussion may not be applicable with respect to shares received on the exercise of employee stock options or otherwise as compensation or with respect to holders of shares who are subject to special tax treatment under the Code, such as non-U.S. persons, life insurance companies, tax-exempt organizations and financial institutions, and may not apply to a holder of shares in light of individual circumstances. New DMH urges you to consult your own tax advisor to determine the particular tax consequences to you, including the application and effect of any state, local or foreign income and other tax laws, of the Merger.**

**IRS Circular 230 Disclaimer:** To ensure compliance with requirements imposed by the IRS, we inform you that the discussion above is not intended as tax advice to any Former Stockholder and is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

FINANCIAL INFORMATION

Attached to this notice as *Appendix E* are the unaudited consolidated financial statements of Old DMH as of and for the fiscal years ended March 31, 2009 and 2008 and the unaudited consolidated financial statements as of and for the three-month periods ended June 30, 2009 and 2008.

Deep Marine Holdings, Inc.

HOU03:1207548.14                                              9