Anthony Paduano
Katherine B. Harrison
Willard R. Knox
PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas, Ninth Floor
New York, New York  10020
(212) 785-9100
Attorneys for Defendants and Counterclaimants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

NJK HOLDINGS CORP., DCC VENTURES,              :
LLC, NASSER J. KAZEMINY, and                   :
THE TRIOMPHE INVESTORS, LLC,                   :
                                               :
                    Plaintiffs,                :
                                               :       Case No. 11-cv-6946 (DLC)
v.                                             :              ECF Case
                                               :
FIRST LONG ISLAND INVESTORS, LLC,              :
FLI DEEP MARINE LLC, BRESSNER                  :
PARTNERS LTD., LOGAN LANGBERG,                 :
HARLEY LANGBERG, and JEFFREY LANGBERG,         :
                                               :
                Defendants and                 :
                Counterclaimants,              :
                                               :
v.                                             :
                                               :
NJK HOLDINGS CORP., DCC VENTURES,              :
LLC, NASSER J. KAZEMINY, THE TRIOMPHE          :
INVESTORS, LLC, NADER KAZEMINY, OTTO           :
CANDIES, JR., OTTO CANDIES, III, OTTO          :
CANDIES, LLC, JOSEPH J. GRANO, JR. and         :
CENTURION HOLDINGS LLC,                        :
                                               :
                Counterclaim Defendants.       :
-------------------------------------------------------------------x

## DEFENDANTS' FIRST AMENDED ANSWER,
## AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defedants/Counterclaimants First Long Island Investors, LLC, FLI Deep Marine LLC, Bressner Partners Ltd., Logan Langberg, Harley Langberg, and Jeffrey Langberg[1] (collectively, the "FLI Parties" or "Defendants") as and for their First Amended Answer, Affirmative Defenses, and Counterclaims, in response to the correspondingly numbered paragraphs of the Amended Complaint filed by NJK Holdings Corp., DCC Ventures, LLC, Nasser J. Kazeminy, and The Triomphe Investors, LLC (collectively, "Plaintiffs"), allege:

1.      Defendants deny the allegations contained in paragraph 1 of the Amended Complaint.

2.      Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 2 of the Amended Complaint.

3.      Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 3 of the Amended Complaint.

4.      Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 4 of the Amended Complaint.

---

[1]      None of Bressner Partners, Logan Langberg, Harley Langberg, or Jeffrey Langberg (the Langberg Parties") was properly served with the Amended Complaint.  The Langberg Parties therefore reserve all rights related thereto.

5.      Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 5 of the Amended Complaint.

6.      Defendants aver that paragraph 6 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise denies the allegations contained in paragraph 6 of the Amended Complaint.

7.      Defendants deny the allegations contained in paragraph 7 of the Amended Complaint.

8.      Defendants deny the allegations contained in paragraph 8 of the Amended Complaint.

9.      Defendants deny the allegations contained in paragraph 9 of the Amended Complaint.

10.     Defendants aver that paragraph 10 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 10 of the Amended Complaint.

11.     Defendants aver that paragraph 11 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 11 of the Amended Complaint.

12.     Defendants deny the allegations contained in paragraph 12 of the Amended Complaint.

13.    Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 13 of the Amended Complaint.

14.    Defendants admit the allegations contained in paragraph 14 of the Amended Complaint.

15.    As to paragraph 15 of the Amended Complaint, Defendants admit that McKim founded DMT and served as its CEO until he was forced out of the company.  Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the remainder of the allegations contained in paragraph 15 of the Amended Complaint.

16.    As to paragraph 16 of the Amended Complaint, Defendants admit that FLI Deep Marine LLC, Bressner Partners Ltd., Logan Langberg, Harley Langberg, and Jeff Langberg invested in DMT.  Defendants deny that FLI Investors invested in DMT.  Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the remainder of the allegations contained in paragraph 16 of the Amended Complaint.

17.    Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 17 of the Amended Complaint.

18.    Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 18 of the Amended Complaint.

19.    Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 19 of the Amended Complaint.

20.    Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 20 of the Amended Complaint.

21.    Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 21 of the Amended Complaint.

22.    Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 22 of the Amended Complaint.

23.    Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 23 of the Amended Complaint.

24.    Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 24 of the Amended Complaint.

25.    Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 25 of the Amended Complaint.

26.     Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 26 of the Amended Complaint.

27.     Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 27 of the Amended Complaint.

28.     Defendants deny the allegations contained in paragraph 28 of the Amended Complaint.

29.     Defendants deny the last sentence of paragraph 29 and otherwise deny having knowledge or information sufficient to form a belief as to the truth or falsity of the remainder of the allegations contained in paragraph 29 of the Amended Complaint.

30.     Defendants deny the allegations contained in paragraph 30 of the Amended Complaint.

31.     As to paragraph 31, Defendants admit that the demand letter demanded that DMT immediately form an independent special committee to investigate the allegations contained therein.   Defendants deny the remaining allegations contained in paragraph 31.

32.     Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 32 of the Amended Complaint.

33.     Defendants deny the allegations contained in paragraph 33 of the Amended Complaint.

34.     Defendants deny the allegations contained in paragraph 34 of the Amended Complaint.

35.     Defendants deny the allegations contained in paragraph 35 of the Amended Complaint.

36.     Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 36 of the Amended Complaint.

37.     Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 37 of the Amended Complaint.

38.     Defendants deny the allegations contained in paragraph 38 of the Amended Complaint.

39.     Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 39 of the Amended Complaint.

40.     Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 40 of the Amended Complaint.

41.     As to paragraph 41, Defendants admit that after the short form merger, the Kazeminy and Candies parties purported to be the sole shareholders of

DMH.  Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the remainder of the allegations contained in paragraph 41 of the Amended Complaint.

42.    Defendants deny the allegations contained in paragraph 42 of the Amended Complaint.

43.    Defendants deny the allegations contained in paragraph 43 of the Amended Complaint.

44.    As to paragraph 44, Defendants admit that DMT's counsel filed a suggestion of bankruptcy with the Court of Chancery on December 4, 2009. Defendants further admit that Defendants opposed the temporary restraining order and argued that the October 2009 Action stated direct and not derivative claims. Defendants deny the remaining allegations contained in paragraph 44 of the Amended Complaint.

45.    Defendants deny the allegations contained in the first sentence of paragraph 45 of the Amended Complaint.  Defendants aver that the bankruptcy court's Order speaks for itself and refer to the Order at Deep Marine Holdings, et al. v. FLI Deep Marine, et al., Case No. 10-03026, Docket No. 72 (S.D. Texas filed Nov. 2, 2010) for the contents thereof.   Defendants further aver that the bankruptcy court never held the November 30, 2010 hearing on the order to show cause referenced in the November 2, 2010 Order.

46.    Defendants admit the allegations contained in paragraph 46 of the Amended Complaint.

47.     As to paragraph 47, Defendants admit that Defendants filed a "Proposed Amended Complaint" as part of their summary judgment opposition and otherwise deny the remaining allegations contained in paragraph 47 of the Amended Complaint.

48.     Defendants deny the allegations contained in paragraph 48 of the Amended Complaint and aver that the bankruptcy court and the United States District Court for the Southern District of Texas (the "Texas District Court") have already opined that the causes of action in the Proposed Amended Complaint are direct claims of Defendants, not derivative, and may be pursued by Defendants. See Deep Marine Holdings, et al. v. FLI Deep Marine, et al., Case No. 10-03026, Docket No. 149 (S.D. Texas filed Oct. 14, 2011).

## COUNT I

### DECLARATORY JUDGMENT

49.     Defendants have filed a motion to dismiss Count I pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time.  To the extent that a response is required, Defendants deny the allegations contained in paragraph 49 of the Amended Complaint.

50.     Defendants have filed a motion to dismiss Count I pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 50 of the Amended Complaint.

## COUNT II

**TORTIOUS INTERFERENCE WITH CONTRACT**

51.    Defendants incorporate herein by reference the averrals, admissions, and denials set forth in the foregoing paragraphs 1 to 50.

52.    Defendants deny the allegations contained in paragraph 52 of the Amended Complaint.

53.    Defendants deny the allegations contained in paragraph 53 of the Amended Complaint.

54.    Defendants aver that paragraph 54 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 54 of the Amended Complaint.

55.    Defendants deny the allegations contained in paragraph 55 of the Amended Complaint.

56.    Defendants aver that paragraph 56 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 56 of the Amended Complaint.

57.    Defendants aver that paragraph 57 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 57 of the Amended Complaint.

## COUNT III

**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

58.    Defendants incorporate herein by reference the averrals, admissions, and denials set forth in the foregoing paragraphs 1 to 57.

59.    Defendants aver that paragraph 59 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 59 of the Amended Complaint.

60.    Defendants deny the allegations contained in paragraph 60 of the Amended Complaint.

61.    Defendants deny the allegations contained in paragraph 60 of the Amended Complaint.

62.    Defendants aver that paragraph 62 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 62 of the Amended Complaint.

63.    Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 63 of the Amended Complaint.

64.    Defendants aver that paragraph 64 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 64 of the Amended Complaint.

## COUNT IV

**ABUSE OF PROCESS**

65.     Defendants have filed a motion to dismiss Count IV pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 65 of the Amended Complaint.

66.     Defendants have filed a motion to dismiss Count IV pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 66 of the Amended Complaint.

67.     Defendants have filed a motion to dismiss Count IV pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 67 of the Amended Complaint.

68.     Defendants have filed a motion to dismiss Count IV pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 68 of the Amended Complaint.

69.     Defendants have filed a motion to dismiss Count IV pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time.  To the extent that a response is required, Defendants deny the allegations contained in paragraph 69 of the Amended Complaint.

70.     Defendants have filed a motion to dismiss Count IV pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 70 of the Amended Complaint.

## COUNT V

### RICO

71.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 71 of the Amended Complaint.

72.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 72 of the Amended Complaint.

73.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 73 of the Amended Complaint.

74.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these

allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 74 of the Amended Complaint.

75.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 75 of the Amended Complaint.

76.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 76 of the Amended Complaint.

77.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 77 of the Amended Complaint.

78.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 78 of the Amended Complaint.

79.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 79 of the Amended Complaint.

80.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 80 of the Amended Complaint.

81.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 81 of the Amended Complaint.

82.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 82 of the Amended Complaint.

83.     Defendants have filed a motion to dismiss Count V pursuant to Fed. R. Civ. P. 12(b) and are therefore not required to provide a response to these allegations at this time. To the extent that a response is required, Defendants deny the allegations contained in paragraph 83 of the Amended Complaint.

<u>COUNT VI</u>

**COMMERCIAL DISPARAGEMENT**

84.     Defendants incorporate herein by reference the averrals, admissions, and denials set forth in the foregoing paragraphs 1 to 83.

85.     Defendants aver that paragraph 85 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 85 of the Amended Complaint.

86.     Defendants deny the allegations contained in paragraph 86 of the Amended Complaint.

87.     Defendants aver that paragraph 87 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 85 of the Amended Complaint.

88.     Defendants deny the allegations contained in paragraph 88 of the Amended Complaint.

89.     Defendants deny the allegations contained in paragraph 89 of the Amended Complaint.

90.     Defendants deny the allegations contained in paragraph 90 of the Amended Complaint.

91.     Defendants aver that paragraph 91 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 91 of the Amended Complaint.

16

92.    Defendants aver that paragraph 92 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 92 of the Amended Complaint.

93.    Defendants aver that paragraph 93 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 93 of the Amended Complaint.

94.    Defendants aver that paragraph 94 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 94 of the Amended Complaint.

## COUNT VII

### DEFAMATION *PER SE*

95.    Defendants incorporate herein by reference the averrals, admissions, and denials set forth in the foregoing paragraphs 1 to 94.

96.    Defendants deny the allegations contained in paragraph 96 of the Amended Complaint.

97.    Defendants deny the allegations contained in paragraph 97 of the Amended Complaint.

98.    Defendants deny the allegations contained in paragraph 98 of the Amended Complaint.

99.    Defendants deny the allegations contained in paragraph 99 of the Amended Complaint.

100.   Defendants deny the allegations contained in paragraph 100 of the Amended Complaint.

101.   Defendants deny the allegations contained in paragraph 101 of the Amended Complaint.

102.   Defendants aver that paragraph 102 of the Amended Complaint contains legal conclusions as to which no response is required, and otherwise deny the allegations contained in paragraph 6 of the Amended Complaint.

## DEFENSES

### First Defense

The Amended Complaint fails to state a claim upon which relief can be granted.

### Second Defense

Plaintiffs are guilty of unclean hands.

### Third Defense

Plaintiffs do not have standing to bring some or all of the claims in the Amended Complaint.

### Fourth Defense

The Amended Complaint is barred in whole or in part based on the doctrines of *res judicata*, collateral estoppel, and claim preclusion.

### Fifth Defense

The Amended Complaint is barred in whole or in part based on the doctrines of waiver and estoppel.

## Sixth Defense

The Amended Complaint is barred in whole or in part based on the doctrine of ratification.

## Seventh Defense

The Amended Complaint is barred in whole or in part based on the doctrine of laches.

## Eighth Defense

Some or all of the Amended Complaint is barred by the applicable statutes of limitation and statutes of repose.

## Ninth Defense

The Amended Complaint is barred in whole or in part because Plaintiffs have failed to mitigate their alleged damages.

## Tenth Defense

The Amended Complaint is barred in whole or in part because to the extent that any damages are assessed in connection with claims of DMH, DMT or the Deep Marine Liquidating Trust which were assigned to Plaintiffs, Plaintiffs are responsible for such damages.

WHEREFORE, Defendants respectfully demand judgment dismissing the Amended Complaint, reimbursement for the attorneys' fees, costs and disbursements incurred in connection with this action, and for such other and further relief as this Court deems just and equitable.

## AMENDED COUNTERCLAIMS

As and for their Amended Counterclaims, Defendants/ Counterclaimants[2] allege:

## NATURE OF THE ACTION

1.     Counterclaimants FLI Deep Marine LLC ("FLI"), Bressner Partners Ltd., Logan Langberg, Harley Langberg, and Jeffrey Langberg (collectively, the "FLI Parties") are former minority shareholders of Deep Marine Holdings, Inc., and – prior to a recapitalization – its wholly owned subsidiary, Deep Marine Technology, Inc. (together "DMT"), now both in Chapter 11 bankruptcy proceedings.

2.     The FLI Parties are the victims of a group of shareholders, including Nasser Kazeminy, Otto Candies, Jr., Otto Candies, III, and NJK Holdings Corp., DCC Ventures, LLC, and Otto Candies, LLC – entities owned and controlled by Nasser Kazeminy and the Candies – who dominated and controlled DMT (the "Controlling Shareholders") and breached their fiduciary obligations to the FLI Parties, oppressed the FLI Parties, and enriched themselves at the FLI Parties' expense.  In their efforts to persecute the FLI Parties for daring to ask questions about corporate looting and possibly illegal activities, the Controlling Shareholders corrupted DMT even further, wasting hundreds of thousands of dollars on a bogus

---

[2]     For purposes of the Counterclaims, none of Bressner Partners Ltd., Logan Langberg, Harley Langberg, or Jeffrey Langberg (collectively, the "Langberg Parties") is adverse to Grano or Centurion.  In connection with any causes of action for which Grano or Centurion is listed as a Counterclaim Defendant, FLI Deep Marine alone is the Counterclaimant vis-à-vis Grano and/or Centurion.

"special committee" and expensive aggressive lawyers who wrote a sham Special Committee Report and then refused to give it to the FLI Parties. The Controlling Shareholders conspired to drive the FLI Parties out via a short form merger and ultimately put DMT into bankruptcy to shield their wrongdoing from the courts.

3.    The Controlling Shareholders were aided and abetted by another shareholder of DMT, Joseph Grano, and his company, Centurion Holdings LLC (the "Grano Defendants"), as well as by Nader Kazeminy, Nasser Kazeminy's son and principal of Counterclaim Defendants The Triomphe Investors, LLC ("Triomphe"). The Controlling Shareholders, the Grano Defendants, Triomphe, and Nader Kazeminy are referred to herein as "Counterclaim Defendants."

4.    From approximately 2005 to 2008, the Controlling Shareholders diluted the FLI Parties' stock in DMT to benefit themselves.

5.    From approximately 2005 to 2008, the Controlling Shareholders mismanaged and used DMT for their own nefarious purposes. The Controlling Shareholders' wrongful actions against DMT and the ensuing damage to the corporation are, however, not the subject of this lawsuit. At stake in this action are the Controlling Shareholders' intentional tortious acts – aided and abetted by the Grano Defendants and Nader Kazeminy – against the FLI Parties.

6.    In its short life prior to its voluntary Chapter 11 filing, DMT, a subsea service provider to offshore gas and oil industries, thrived. By 2008-2009, the FLI Parties' investments – made at DMT's formation in 2001-2002 and again

when FLI exercised DMT warrants in 2003 and 2006 – had grown to a value of approximately $5 million as DMT's value soared to more than $100 million.

7.     But in early 2008, after the FLI Parties learned of the Controlling Shareholders' wrongful actions, the FLI Parties wanted to preserve their investment before the Controlling Shareholders could entirely destroy it and/or DMT.  When the FLI Parties attempted to remedy and investigate the Controlling Shareholders' wrongdoing by way of a derivative action in Delaware Chancery Court in late 2008, the Controlling Shareholders commissioned an expensive whitewash "Special Report" to obfuscate and stall for time.  On June 30, 2009, the Special Committee issued a press release declaring that the investigation had concluded with no evidence of wrongdoing.  The Special Committee refused to show the report to the FLI Parties.  On July 1, 2009, the day after the bogus Special Report purportedly concluded there was no wrongdoing by the Controlling Shareholders, those same Controlling Shareholders, with the critical assistance of the Grano Defendants and Nader Kazeminy, effected a short form merger squeezing the FLI Parties out of DMT.

8.     On information and belief, the Controlling Shareholders' purposes in forcing the FLI Parties out of DMT in the short form merger were twofold:  (i) to deprive the FLI Parties of standing to continue their derivative action so that the Controlling Shareholders' wrongful actions at DMT would remain covered up; and (ii) to appropriate the FLI Parties' stake in DMT for no value.

9.     In October 2009, the FLI Parties sued again in Delaware Chancery Court to recover damages for their DMT investment and sought expedited discovery, which the Delaware Chancery Court granted on November 2, 2009.[3]   On December 3, 2009 the Controlling Shareholders put DMT into bankruptcy, thereby halting the action and all discovery.  On information and belief, the Controlling Shareholders did so to frustrate the Delaware Chancery Court's November 2 order.  The board resolutions authorizing DMT's bankruptcy filings did not assert that the entities were insolvent, but only that bankruptcy proceedings were "desirable" and "in the best interests of [DMT]".

10.     On information and belief DMT's trade creditors and lenders will be paid in full in the bankruptcy process.  Thus, on information and belief, the Controlling Shareholders' true and fraudulent purpose in directing the bankruptcy filing was to frustrate the FLI Parties' and others minority shareholders' efforts to be made whole for the Controlling Shareholders' dilution and oppression of the minority shareholders.

11.     As a direct result of the Controlling Shareholders' intentional campaign of vexatious litigation and sophisticated corporate maneuvers intended to rob the FLI Parties of their investment, aided and abetted by the Grano Defendants and Nader Kazeminy, the FLI Parties lost the entire value of their investment in DMT.  The Controlling Shareholders' actions were in breach of their fiduciary duties

---

[3]     A copy of the Transcript of the Delaware Chancery Court's November 2, 2009 Office Conference is attached hereto as <u>Exhibit A</u>.

to the FLI Parties and, on information and belief, designed to deprive the FLI Parties of their day in court and redress for such breaches.

## THE PARTIES

### The FLI Parties

12. FLI Deep Marine LLC, Bressner Partners Ltd., Logan Langberg and Harley Langberg were, until the consummation of the short form merger of NKOC, Inc.[4] and DMT on July 1, 2009 (the "Merger"), minority shareholders in DMT. The FLI Parties were early investors in DMT, having been solicited to provide a portion of its original capital. FLI made additional investments in 2003 and 2006 when they purchased and exercised warrants to purchase additional DMT shares.

13. Upon information and belief, in 2006 the FLI Parties' shares of DMT's common stock represented more than 8.5% of the outstanding common stock of DMT. Estimation of the FLI Parties' percentage ownership of DMT at any particular time is impossible due to the lack of company disclosures, and the self-dealing dilutive transactions by the controlling shareholders, as discussed in further detail below. FLI alone has invested approximately $1.73 million in DMT, yet according to the Notice of Merger sent by DMT, the total value of all the equity owned by minority investors – including but not limited to the FLI Parties – is only approximately $22,000.

---

[4]    NKOC, Inc. is an entity set up by Nasser Kazeminy and the Candies for the express purpose of holding their DMT shares in order to effectuate a short form merger between NKOC, Inc. and DMT. On information and belief the separate existence of NKOC, Inc. terminated as a result of the short form merger.

14.     All of the outstanding stock of Deep Marine Technology, Inc. was transferred to Deep Marine Holdings, Inc. effective May 30, 2008.   In exchange, each of the then-current shareholders of Deep Marine Technology, Inc. received 380 shares of common stock of Deep Marine Holdings, Inc. for each share of Deep Marine Technology, Inc. exchanged.

**Counterclaim Defendants**

15.     Counterclaim Defendant Nasser Kazeminy ("Nasser Kazeminy") controlled the operations of DMT pursuant to his majority equity stake in DMT, as well as an Oversight Services Agreement between DMT and NJK Holdings Corporation.   NJK Holdings is also a former stockholder in DMT and on information and belief owned or controlled by Nasser Kazeminy.   On information and belief, Nasser Kazeminy also owns or controls DCC Ventures, LLC, another former shareholder of DMT.     In characteristically self-aggrandizing manner, Nasser Kazeminy referred to himself as the sole "Controlling Shareholder" of DMT.

16.     On information and belief, Counterclaim Defendant The Triomphe Investors, LLC ("Triomphe") is a Nevada limited liability company, with its principal office at 3960 Howard Hughes Parkway, Las Vegas, Nevada, 89109. On April 9, 2008, Triomphe purchased the majority of Grano's DMT shares at a price that imputed a value of $100 million for DMT.   On information and belief, Triomphe is owned and controlled by Nasser Kazeminy's son, Nader Kazeminy ("Nader Kazeminy").

17.    On information and belief Counterclaim Defendant Nader Kazeminy is the principal owner of The Triomphe Investors, LLC ("Triomphe"). Triomphe is the entity that purchased the Grano Defendants' DMT stock, purportedly giving Nasser Kazeminy and the Candies control over 90% of DMT's stock and facilitating the short form merger designed to strip the FLI Parties of their DMT stock and standing to bring derivative claims on behalf of DMT.   Nader Kazeminy signed the letter setting forth the agreement between Triomphe and Grano and on information and belief played a key role in the negotiation of that transaction.   On information and belief, Nader Kazeminy also participated in the conspiracy to dilute and oppress DMT's minority shareholders, including the FLI Parties.

18.    On information and belief, Counterclaim Defendant Otto Candies, Jr. ("Candies Jr."), together with his son Counterclaim Defendant Otto Candies, III ("Candies III") and Counterclaim Defendant Otto Candies, LLC ("Candies LLC" and, together with Candies Jr. and Candies LLC, the "Candies") was a shareholder in DMT and, along with Nasser Kazeminy, a Controlling Stockholder.   On information and belief, Candies Jr. is Chairman of the Board and Chief Executive Officer of Candies LLC.

19.    On information and belief, Candies, III is Secretary of Candies, LLC and has previously been a member of DMT's board of directors.   Together with Candies Jr., Candies III owns and controls Candies, LLC, and the three together are Controlling Shareholders of DMT.

26

20.    On information and belief, Candies Jr. attended meetings in New York City, either by telephone or in person at Grano's office, at which the conspiracy was hatched, and Candies III also attended such meetings in New York City, either in person or by telephone.

21.    On information and belief, Counterclaim Defendant NJK Holdings Corporation ("NJK Holdings") is a Minnesota corporation, owned and/or controlled by Counterclaim Defendant Nasser Kazeminy, with its principal offices located at 8500 Normandale Lake Boulevard #600, Minneapolis, Minnesota, 55437.  On information and belief, NJK Holdings was a shareholder of DMT.

22.    On information and belief, Counterclaim Defendant DCC Ventures, LLC ("DCC Ventures") is a private investment company owned or controlled by Counterclaim Defendant Nasser Kazeminy.  On information and belief DCC Ventures is a Nevada limited liability company and was a shareholder of DMT.

23.    Together, Nasser Kazeminy, the Candies, NJK Holdings, DCC Ventures, and Triomphe were the Controlling Shareholders.

24.    On information and belief, Counterclaim Defendant Joseph J. Grano, Jr. ("Grano") is an individual residing at 84 Glen Alpin Road, Morristown, New Jersey 07960.  Grano is on information and belief the former President, CEO, and Chairman of UBS Financial Services Inc. (formerly UBS PaineWebber, ("UBS")) and is currently Chairman and CEO of Counterclaim Defendant Centurion Holdings LLC ("Centurion"), located at 1185 Avenue of the Americas, Suite 1750, New York, New York 10036.

27

25.    Grano, individually or through Centurion, was a significant early investor in DMT.   The FLI Parties decided to invest in DMT based in significant part upon Grano's reputation.

26.    On information and belief numerous DMT board meetings, as well as other meetings where the conspiracy to dilute and squeeze out the FLI Parties was hatched, were held in Grano's Centurion offices.   On information and belief Grano served as Chairman of DMT's Advisory Board.   At critical points resulting in the destruction of the FLI Parties' interest in DMT, the Controlling Shareholders were assisted in their scheme by Counterclaim Defendants Centurion and Grano within New York City.   Grano knew the implications of the actions taken against the FLI Parties by the Kazeminys, the Candies, and their various entities.

27.    Grano, by virtue of his reputation as former CEO of UBS, gained the FLI Parties' trust and confidence.   Grano then used that trust – and his relationship with the Controlling Shareholders – to enrich himself while deliberately and intentionally placing the FLI Parties at peril and at the mercy of Nasser Kazeminy, who Grano knew to be hostile to the FLI Parties' interests.

## JURISDICTION AND VENUE

28.    This Court has personal jurisdiction over Counterclaim Defendants and subject matter jurisdiction over this controversy pursuant to 28 U.S.C. § 1332.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the counterclaims occurred in this judicial district.

## FACTUAL ALLEGATIONS

30.     Prior to filing Chapter 11 bankruptcy proceedings, DMT was an independent subsea service provider to the oil and gas industry.  It was founded in late 2001 or early 2002 by industry veteran Paul McKim ("McKim"), who had 25 years of offshore oil and gas experience, with two underwater Directly Operated Vehicles.

**A.     The FLI Parties and Grano Make
Their Initial Investments in DMT**

31.     In 2001, FLI was approached by Jeffrey Langberg – a former Director and consultant to DMT – and McKim regarding a potential investment in DMT.  FLI ultimately decided to make the investment, in significant part because FLI was informed that Grano – then Chairman of UBS – was concurrently investing in DMT and apparently taking an interest in the company.

32.     The FLI Parties believed that Grano's reputation and experience would aid DMT's future prospects and ensure professional management of the company.  Grano's interest and involvement with DMT influenced FLI's decision to invest in DMT.

33.     In late 2001, FLI entered into a subscription agreement to purchase 70 shares of DMT, or 7.04% of DMT's outstanding equity.  On

information and belief, Grano made an identical purchase of DMT shares – 70 shares, equal to 7.04% of DMT's outstanding equity – at about the same time. In early 2002, FLI funded its investment of $1.73 million in DMT.

34.    The FLI Parties' investment provided the critical capital to make the start-up company viable.

## B.    Nasser Kazeminy Becomes Involved With DMT

35.    On information and belief, in 2004, Grano brought his friend Nasser Kazeminy to DMT.  On information and belief, Nasser Kazeminy was enamored with, and wanted to get closer to, Grano because of Grano's reputation, standing, and access to deals and capital.

36.    Nasser Kazeminy, through his investment vehicle DCC Ventures, purchased stock in DMT.  On information and belief, thereafter Nasser Kazeminy decided to take over DMT.  He found out that a stockholder group including State Street Research Energy ("State Street"), which owned more than 60% of DMT's outstanding stock, was looking to shed some non-liquid investments, including its DMT stock.  This group also included Natural Resources Hedge Fund, LLC, Metropolitan Life Small Cap Energy Portfolio, and two Raytheon Retirement Funds.  On information and belief Nasser Kazeminy agreed to purchase a large portion of State Street's DMT stock.  As of June 10, 2004, Nasser Kazeminy – acting through his entity DCC Ventures – owned 49.53% of DMT's outstanding stock, leaving State Street with 11.02%.

C.   **Grano Helped the Controlling Shareholders Execute the Merger**

37.   On information and belief, Grano took an active role in DMT; all or substantially all of DMT's board meetings were held at Grano's New York City office.  Though Grano was never a director (he was nominated for DMT's board but declined the nomination), nonetheless he participated in board meetings and on information and belief exercised control, with Nasser Kazeminy and his entities, over DMT's business affairs.  Grano was given access and received regular updates as to DMT's operations from Nasser Kazeminy, the Candies and DMT management while the FLI Parties were "blacked out" and received no information.

38.   Although Grano and the FLI Parties had discussed selling their DMT stock together and Grano knew that the FLI Parties were relying on Grano's statements indicating he would "get out" with the FLI Parties, in April 2008 Grano struck his own secret deal with Nasser Kazeminy and his entities, selling the bulk of his DMT stock to Nasser Kazeminy through Nader Kazeminy and Triomphe, based on a DMT valuation of $100 million.  On information and belief, Grano knew of the Controlling Shareholders' intentions regarding the Merger and intentionally sold Nasser Kazeminy just enough DMT stock for Nasser Kazeminy and the Candies to reach the 90% ownership of DMT they needed to consummate the Merger.

D.   **Nasser Kazeminy Takes Control of DMT**

39.   Between 2004 – when Nasser Kazeminy made his initial investments in DMT – and 2006, he continued to increase his stake in and control of DMT.

40.     On information and belief, in 2005, Nasser Kazeminy converted to equity $600,000 worth of certain DMT bonds he owned.  The conversion rate on those bonds had initially been set at $1,600 per share, but the conversion rate suddenly was reduced with no notice to the FLI Parties.  At a conversion rate of $383.80 per share, Nasser Kazeminy was issued 13.92% of DMT's stock.  This would have resulted in significant dilution of the FLI Parties relative to the original conversion rate.

41.     After FLI found out about the dilution of its interest by Nasser Kazeminy, FLI reached out to Grano.  Grano interceded on FLI's behalf, causing the issuance to FLI of warrants to purchase 901 DMT shares (the "FLI Warrants") to compensate for the dilution.  The FLI Parties were not aware at this point that Nasser Kazeminy completely dominated DMT, either at the time of the issuance of the options or when FLI later exercised the FLI Warrants, in each case because Nasser Kazeminy intentionally hid such domination from the FLI Parties.

E.     Grano's Role in the Scheme

42.     Grano's actions caused the FLI Parties to believe that they could trust Grano to protect their rights as a minority shareholder and lulled them into a false sense of security as confidants of Grano.  On information and belief, Grano used the FLI Parties' trust and his false friendship with them against the FLI Parties when he conspired with Nasser Kazeminy, Nader Kazeminy, and the Candies in the scheme to dilute the minority shareholders, oppress the minority shareholders, and

ultimately squeeze the minority shareholders out of their stock in DMT in the Merger, as further discussed below.

43.    On information and belief, by 2005 Nasser Kazeminy together with DCC Ventures controlled 56.55% of DMT's outstanding equity.

44.    By 2006, after converting additional bonds and warrants, Nasser Kazeminy's stake in DMT increased to 66.34% and Grano's to 18.21%, while the FLI Parties saw their stake diluted to 9.48%.  See Exhibit B.  Nasser Kazeminy and Grano hid these facts from the minority shareholders in connection with any of these transactions.

F.    **Nasser Kazeminy Secretly Seizes Total Control of DMT Through His Oversight Services Agreement**

45.    By 2006, Nasser Kazeminy consolidated control of DMT's equity and its operations.  On information and belief, on June 12, 2006, DMT's board entered into an Oversight Services Agreement (the "OSA") with another Nasser Kazeminy-controlled company, NJK Holdings, without notice to DMT's minority shareholders.  The OSA gave Nasser Kazeminy, not an officer or director of DMT, complete control over DMT's day-to-day operations.  Pursuant to the OSA, NJK Holdings provided

> advisory, consulting and other services (the "Oversight Services") in relation to the day-to-day operations of DMT, strategic planning, domestic and international marketing and financial oversight and including, without limitation, advisory and consulting services in relation to the selection, retention and supervision of independent auditors, the selection, retention and supervision of outside legal counsel, and the selection,

retention and supervision of investment bankers or other
financial advisors or consultants.

46.     In entering the OSA with Kazeminy, the board ignored its
responsibility to manage and oversee DMT, abdicating operating control of DMT
and handing Nasser Kazeminy complete control over the management and affairs of
DMT.

47.     On information and belief, Grano knew about, but did not
disclose to the FLI Parties, the material information that Nasser Kazeminy had
achieved total domination of DMT through the OSA.

48.     On information and belief, Grano knew that Nasser Kazeminy
had achieved total control and domination of DMT and was scheming to dilute
DMT's minority shareholders in order to take control of DMT without paying any
control premium for the minority shareholders' shares.

G.     Otto Candies Becomes Involved With DMT

49.     In 2004 or 2005, Otto Candies, LLC – owned and control by
the Candies family, including Candies Jr. and Candies III – first became involved
with DMT.  Otto Candies is a marine transportation company.  On information and
belief, soon after Candies Jr. and III were introduced to McKim and DMT, the
Candies began leasing vessels and crews to DMT – even though Otto Candies was
a competitor.  On information and belief, in or around March 2005, the Candies
sold their first vessel to DMT – the Nicki Candies, later renamed the MV Diamond
(the "Nicki Candies") – for a convertible promissory note for $15.2 million (the

"Nicki Candies Note").   On information and belief, the Nicki Candies was worth substantially less than $15.2 million at the time of the purchase.

50.   In November 2006, the Candies converted the Nicki Candies Note into 23.77% of DMT's outstanding equity.   On information and belief this was more stock than the Candies would have received had the Nicki Candies been purchased by DMT for fair market value.

51.   Throughout 2006, 2007 and 2008, on information and belief the Candies repeatedly misrepresented the condition of vessels sold, leased and/or chartered to DMT and intentionally charged DMT hundreds of thousands of dollars for vessels the Candies knew were broken, poorly built or not able to meet U.S. Coast Guard regulations, and for which crews were promised by the Candies but not provided at the last minute.   The vessels at issue were not delivered to DMT in agreed-upon condition; rather, it took hundreds of thousands of dollars of additional work and many months for these vessels to be ready for operations.   On information and belief, DMT lost valuable contracts with its customers and millions of dollars in revenue as a result of the substantial deficiencies in, and the time needed to fix, these vessels.

52.   On information and belief, in or about October 2007 DMT purchased two vessels, the Agnes and the Sapphire, from the Candies.   The Candies received consideration for the purchase of $35 million in DMT stock, while on information and belief the vessels were worth no more than $28 million, resulting in an overpayment to the Candies of at least $7 million.

35

53.     Yet despite the repeated issues with equipment and services the Candies provided to DMT, on information and belief DMT continued to pay above-market rates for substandard and broken vessels simply because the Candies were on both sides of the deals – as a vendor of DMT and as part of its controlling shareholder group.

54.     On information and belief, similar schemes were used in connection with other transactions between DMT and the Candies.  Inflated prices were paid for other assets leased or acquired from the Candies, and in some cases the Candies were provided with inflated convertible notes that allowed them to convert their notes into inflated amounts of DMT equity, increasing the share of DMT stock owned by Nasser Kazeminy and the Candies while diluting the interests of the minority shareholders including the FLI Parties.

## H.    The Controlling Stockholders Prevent the Board From Considering Offers To Buy All of DMT's Stock

55.     The Controlling Shareholders also prevented DMT's board from considering offers for the sale of DMT, including, on information and belief, a $120 million offer made by Hornbeck Offshore Services in 2008.

56.     Such a sale would have given the FLI Parties more than $5.7 million for their interest in DMT at a time when Grano and Nasser Kazeminy knew that the FLI Parties wanted to get out of DMT and recoup the full value of their interests.

I.    **Nader Kazeminy Purchases Grano's DMT Stock
      for Nasser Kazeminy Through Triomphe**

57.    In early to mid-2008, the FLI Parties began to learn about gross mismanagement and self-dealing at DMT from a series of conversations with Paul McKim (founder and then-CEO of DMT) and B.J. Thomas (then-chief financial officer of DMT).

58.    FLI met with certain members of DMT's management and board – namely, CEO McKim, Chairman of the Board Bruce Gilman, and CFO John Hudgens – in April 2008 (the "April 2008 Meeting").[5]   At the meeting, McKim detailed the problems the Candies were causing DMT and the resulting extraordinary cost to DMT.  Gilman – a member of the bogus "special committee" who Nasser Kazeminy would later install as CEO after dismissing McKim, the person most knowledgeable about DMT and the industry in which it operated – remarked that it was "unprecedented" in the industry to leave a vessel in dry dock for four months, as the Candies' actions had forced DMT to do, when it could have been in service generating approximately $9 million in revenues.  Thus, DMT's management knew of the Candies' corporate looting.

---

[5]        On information and belief, at Nasser Kazeminy's instruction, DMT forced CFO B.J. Thomas to resign, based at least in part on Thomas' refusal to comply with Nasser Kazeminy attempts to use DMT funds to funnel money to then-United States Senator Norm Coleman.  Thomas was replaced by Hudgens, who, on information and belief, did funnel the money to Senator Coleman through Hays Companies ("Hays"), an insurance brokerage that did no business with DMT, but that did employ Senator Coleman's wife, Laurie.  On information and belief, after Hudgens enabled the payments to the Colemans through Hays, Hudgens instructed his controller to delete references to the Hays invoices from DMT's records, in an apparent effort to cover up evidence of DMT's payments to Hays.  Even the bogus whitewash "Special Report" admitted the payments totaling $75,000 were made by DMT to Hays.

59.   The FLI Parties' concerns about the mismanagement and apparent self-dealing by the Controlling Shareholders of DMT, confirmed the FLI Parties' resolve to sell their DMT stock by direct sale to the Controlling Shareholders of the sale of DMT to a reputable buyer.

60.   After the April 2008 Meeting, Robert Rosenthal ("Rosenthal"), FLI's Chairman and CEO, expressed his concerns to Grano, telling him all that the FLI Parties had learned from the meeting with McKim and Gilman and conversations with McKim and Thomas.  Rosenthal told Grano clearly that the FLI Parties wanted to sell their DMT stock.  Grano told Rosenthal: "Maybe I should get out too." Rosenthal responded: "We should get out together." Grano ended the conversation by telling Rosenthal, "I'll get back to you."

61.   As a result of that conversation, Rosenthal believed that the FLI Parties and the Grano Defendants had agreed to get out of DMT together.  In reliance on Grano's statements, the FLI Parties did not pursue any alternate transaction to sell its shares.

62.   Unbeknownst to the FLI Parties however, throughout March 2008, on information and belief, Grano had already had a series of secret discussions with Nasser Kazeminy and Nader Kazeminy regarding Nasser Kazeminy's purchase of Grano's DMT stock through one of Nader Kazeminy's investment vehicles, Triomphe.

63.   On or about April 9, 2008, Nader Kazeminy and Triomphe agreed to purchase 1,595,000 of Grano's DMT shares for $6.5 million.  Given the

total shares then outstanding, the transaction imputed a value of approximately $100 million for all of DMT's equity.

64.     Thus, while Grano, advising DMT's directors and hosting their Board meetings, was falsely professing concern for the FLI Parties' plight and allowing the FLI Parties to believe that the FLI Parties and Grano would exit DMT together, Grano was secretly negotiating his own deal with Nasser Kazeminy and Nader Kazeminy and, on information and belief, had already sold his shares to Triomphe, a company controlled by Nader Kazeminy.

65.     The FLI Parties were not informed of Grano's secret deal with Nasser Kazeminy to sell the majority of his DMT stock, let alone that the sale was to an entity owned and controlled by Nasser Kazeminy and/or Nader Kazeminy.

66.     The FLI Parties still thought that Grano was working on a sale of his stock to Nasser Kazeminy, and that he would bring the FLI Parties along with any such sale.  As a result, the FLI Parties did not pursue any alternate transaction to sell their DMT shares, despite their grave concerns about the management and operation of the company.  But for Grano's actions, the FLI Parties would not have remained shareholders of DMT, and would have sold their DMT stock when they had the opportunity.

67.     Not only did Grano's secret sale to Nasser Kazeminy and/or Nader Kazeminy leave the FLI Parties out in the cold, it gave the Controlling Shareholders the additional stock they needed to squeeze out the FLI Parties entirely.

68.    On information and belief, Grano's sale of his stock to Triomphe resulted in Nasser Kazeminy and the Candies controlling directly or indirectly at least 90% of DMT's outstanding equity.[6]    On information and belief, Grano intentionally sold Nader Kazeminy just enough stock to allow Nasser Kazeminy and the Candies to reach the 90% ownership threshold for a short form merger.

69.    On information and belief, Grano knew that his secret deal with Nasser Kazeminy would allow the Controlling Shareholders to squeeze out the FLI Parties.

70.    Nasser Kazeminy and the Candies have claimed – particularly in the Notice of Merger attached hereto as <u>Exhibit C</u> – that they owned 90% of DMT's outstanding equity prior to consummating the Merger.  In the years leading up to the Merger, however, the FLI Parties were not provided with any information about DMT's capitalization, and the FLI Parties still do not have sufficient information to evaluate DMT's and Nasser Kazeminy's statements regarding the percentage ownership of DMT's various shareholders.

## J.    Nasser Kazeminy and the Candies Squeeze Out the FLI Parties Via a Short Form Merger

71.    On July 1, 2009, Nasser Kazeminy and the Candies caused DMT to consummate a short form merger which stripped the FLI Parties of their DMT shares without compensation.

---

[6]    It is unclear how Nader Kazeminy and Triomphe transferred the shares purchased from Grano to Nasser Kazeminy and NKOC, the company Nasser Kazeminy used to consummate the short form merger with DMT.  It is clear, however, that Nasser Kazeminy and NKOC used the shares purchased from Grano as part of the purported 90% of DMT they owned for purposes of consummating the short form merger.

72.     On July 11, 2009, the FLI Parties were notified (the "Notice" attached hereto as Exhibit C) that on July 1, 2009 Deep Marine Holdings and NKOC, Inc. – a corporation formed by Nasser Kazeminy and the Candies for the sole purpose of holding their DMT stock – had executed a short form merger pursuant to 8 Del. C.  § 253.  The FLI Parties, as minority shareholders, would be cashed out at a price of $0.01 per share, or approximately $22,000 for all minority shareholders.  FLI had invested $1.73 million commencing in 2002 to help start DMT, a company which had tremendous success during its seven years of operations.  Yet the FLI Parties were forced out and told they would receive approximately $11,290 for their share of DMT that was worth approximately $5 million at that time.  The FLI Parties have never even recovered the $11,290.

73.     The FLI Parties had the right under Delaware law to an appraisal of the value of their shares in an appraisal action in the Delaware Court of Chancery.  After the Delaware Chancery Court ordered expedited discovery of Nasser Kazeminy, the Candies, and DMT, but before the FLI Parties had an opportunity to request such an appraisal, on December 4, 2009, Nasser Kazeminy and the Candies caused DMT to file for bankruptcy in the United States District Court for the Southern District of Texas (the "Texas Bankruptcy Court").  The Controlling Shareholders put DMT into bankruptcy even though DMT's balance sheet was strong enough that, on information and belief, every non-insider creditor of DMT – with the notable exception of the FLI Parties – will receive 100% of the amounts owed to them as part of DMT's plan of liquidation.

41

74.    As a result of DMT's bankruptcy filing, the FLI Parties were stayed from pursuing claims against Counterclaims Defendants, including their appraisal claims.

75.    On June 13, 2011, the Texas Bankruptcy Court issued its Memorandum Opinion permitting the FLI Parties to pursue certain claims arising out of allegations of equity dilution, expropriation of economic value, and oppression of minority shareholders.   A copy of the June 13, 2011 Memorandum Opinion is attached as Exhibit D. On August 5, 2011 the Texas Bankruptcy Court issued a Report and Recommendation to the United States District Court for the Southern District of Texas, and on October 14, 2011 the District Court for the Southern District of Texas issued a final order adopting in full the Report and Recommendation of the Texas Bankruptcy Court.   A copy of the Report and Recommendation is attached as Exhibit E and a copy of the October 14, 2011 Final Order is attached as Exhibit F.

## AMENDED COUNTERCLAIMS

### FIRST CAUSE OF ACTION
**(Breach of Fiduciary Duty by Nasser Kazeminy, DCC Ventures,
NJK Holdings, Triomphe, and the Candies)**

76.    The FLI Parties incorporate herein by reference paragraphs 1 through 75 of this First Amended Answer and Counterclaims as if set forth herein.

77.    Nasser Kazeminy, DCC Ventures, NJK Holdings, Triomphe, and the Candies were majority and controlling shareholders of DMT (the "Controlling Shareholders").

78.    The Controlling Shareholders intentionally breached the fiduciary duties they owed to DMT's minority shareholders as stated herein.

79.    When making their initial investment in DMT, the FLI Parties had a reasonable expectation that the majority or controlling shareholders of DMT would not take aggressive actions against the FLI Parties, the effect of which would dilute the FLI Parties' DMT shares or would strip the FLI Parties of their DMT shares.

80.    Instead, on information and belief, the Controlling Shareholders exercised complete domination over DMT and its minority shareholders.

81.    On information and belief, the Controlling Shareholders intentionally diluted the FLI Parties' interest in DMT as part of a scheme to strip the FLI Parties of their DMT shares for no compensation.

82.    The Controlling Shareholders also prevented DMT's board from considering offers for the sale of DMT, including, on information and belief, a $120 million offer made by Hornbeck Offshore Services in 2008 which would have allowed the FLI Parties to recover the true value of their interest or approximately $5.7 million.

83.    Furthermore, when FLI exercised the FLI Warrants, thus making a second investment in DMT, FLI was not informed of the extent of Nasser Kazeminy's involvement with DMT or of his plans for the company.  Again, FLI's reasonable expectation at the time it exercised the FLI Warrants was that the majority or controlling shareholders of DMT would not take aggressive actions

43

against FLI, the effect of which would dilute FLI's DMT shares, or would strip FLI of its DMT shares.

84.    On information and belief the Candies sold assets to DMT at inflated prices.

85.    On information and belief the consideration for such assets sales included DMT stock, or notes convertible into DMT stock.

86.    As a result of such inflated sales, the Controlling Shareholders caused DMT to issue to the Candies – and, on information and belief, to Nasser Kazeminy – DMT shares for less than reasonably equivalent value.

87.    On information and belief such issuance of shares to the Controlling Shareholders increased the percentage ownership of the Controlling Shareholders while simultaneously decreasing the percentage ownership of the FLI Parties in DMT.

88.    As a result of the share issuances plus Grano's sale of his DMT stock to Nasser Kazeminy – the Controlling Shareholders were able, on information and belief, to purportedly amass at least 90% of DMT's outstanding stock, allowing them to consummate a short form merger.

89.    Such transactions breached the Controlling Shareholders' duties to the FLI Parties and caused the FLI Parties to lose all their DMT shares in the short form merger that could never have been consummated without the dilution of DMT's minority shareholders.

90.   As a direct result of the Controlling Shareholders' intentional breaches of their fiduciary duties and the resultant dilution of the minority shareholders' DMT stake, Counterclaimants have suffered injury and damages in amounts to be determined at trial.

### SECOND CAUSE OF ACTION
**(Shareholder Oppression by Nasser Kazeminy, DCC Ventures, NJK Holdings, Triomphe, and the Candies)**

91.   The FLI Parties incorporate herein by reference paragraphs 1 through 90 of this First Amended Answer and Counterclaims as if set forth herein.

92.   The Controlling Shareholders were majority and controlling shareholders of DMT, and on information and belief dominated and controlled DMT.

93.   When making their initial investment in DMT, the FLI Parties had a reasonable expectation that DMT's controlling shareholders would not dilute the FLI Parties' stock or engage in a scheme to unfairly strip the FLI Parties of their DMT shares for little or no compensation.

94.   On information and belief, the Controlling Shareholders intentionally and purposefully diluted the FLI Parties' interest in DMT as part of a scheme to unfairly strip the FLI Parties of their stock in DMT and the value of their DMT shares.   The Controlling Shareholders also intentionally prevented DMT's board from considering offers for the sale of all stock in DMT including, on information and belief, a $120 million offer made by Hornbeck Offshore Services in 2008.

95.    By their foregoing actions, the Controlling Shareholders intentionally oppressed DMT's minority shareholders, including the FLI Parties, by violating their reasonable expectations.

96.    Furthermore, when FLI exercised the FLI Warrants, thus making a second investment in DMT, the Controlling Shareholders and Grano hid from FLI the true extent of Nasser Kazeminy's involvement with DMT and his plans for the company.   Again, FLI's reasonable expectation at the time it exercised the FLI Warrants was that the majority or controlling shareholders of DMT would not take aggressive actions against FLI, the effect of which would dilute FLI's DMT shares and ultimately strip FLI of its full investment in DMT.

97.    As a result of the Controlling Shareholders' oppression of the FLI Parties, the FLI Parties have suffered injury and damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### (Civil Conspiracy as to Nasser Kazeminy, NJK Holdings, DCC Ventures, Triomphe, Grano, Centurion, the Candies, and Nader Kazeminy)

98.    The FLI Parties incorporate herein by reference paragraphs 1 through 97 of this First Amended Answer and Counterclaims as if set forth herein.

99.    Grano and Centurion engaged in a purposeful conspiracy with Nasser Kazeminy, Nader Kazeminy, the Candies, and the entities owned and controlled by each of them.

100.    The purpose of that conspiracy was to oppress DMT's minority shareholders, and in particular the FLI Parties, dilute the minority shareholders in

order that Nasser Kazeminy and the Candies could reach the 90% ownership threshold necessary to consummate the short form merger, and then strip the FLI Parties of their DMT shares for no value.

101.  Further, by intentionally placing DMT into bankruptcy unnecessarily, the conspirators guaranteed that the FLI Parties could not pursue an appraisal action in the Delaware Chancery Court and would recover little or nothing for their DMT shares.

102.  On April 9, 2008, Grano and Triomphe, run by Nader Kazeminy, executed a secret agreement pursuant to which Triomphe purchased 1,595,000 of Grano's DMT shares for a purchase price of $6.5 million.  Based on the total number of shares outstanding, the purchase price of Grano's DMT stock imputed a value of approximately $100 million for all of DMT's equity.

103.  As a result of Grano's secret deal with Triomphe, Nasser Kazeminy and the Candies purportedly reached the 90% ownership threshold necessary to consummate a short form merger under Delaware law.

104.  On July 1, 2009, Nasser Kazeminy and the Candies consummated the short form merger, which stripped the FLI Parties of their DMT shares without providing compensation.

105.  Grano's participation in the conspiracy between Nasser Kazeminy and the Candies and Grano's fraudulent concealment to the FLI Parties squeezed the FLI Parties out of DMT and took their DMT shares from them without compensation in the short form merger.

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty as to Grano)

106.  The FLI Parties incorporate herein by reference paragraphs 1 through 105 of this First Amended Answer and Counterclaims as if set forth herein.

107.  Under New York and Delaware law, shareholders in a closely held corporation share a fiduciary duty among themselves.

108.  When a fiduciary, in furtherance of its individual interests, deals with the beneficiary of the duty in a matter relating to the fiduciary relationship, the fiduciary is strictly obligated to make full disclosure of all material facts.

109.  Furthermore, those shareholders who are in control of a close corporation, or part of a control group, owe a fiduciary duty to the other shareholders.

110.  At all relevant times, DMT was a closely held corporation.

111.  In his dealings with the FLI Parties, Grano, in breach of the fiduciary duties owed to the FLI Parties, hid from the FLI Parties material facts about DMT and Nasser Kazeminy.  Grano did not disclose to the FLI Parties that he was selling his DMT stock to Nasser Kazeminy in a secret deal, nor that Nasser Kazeminy and the Candies intended to squeeze the FLI Parties out of their DMT stock for little or no value, while paying Grano for his DMT shares based on a $100 million valuation of DMT.

112.  Further, although Grano, on information and belief the Chairman of DMT's Advisory Board, knew of the FLI Parties' concerns about the way Nasser

48

Kazeminy and the Candies were running DMT, the Controlling Shareholders' corporate waste, and the Candies' looting of DMT, Grano intentionally hid the nature of his close relationship with Nasser Kazeminy, and also hid what he knew about the operations and prospects of DMT.

113.   Finally, by leading the FLI Parties to believe that he would bring them along in any sale of his DMT stock, Grano intentionally misled the FLI Parties. As a result of Grano's actions, the FLI Parties did not seek out an alternate transaction to sell their DMT shares for full value to a third party buyer.  Grano's part in the conspiracy caused the FLI Parties to be stuck with worthless equity in DMT when the Controlling Shareholders put DMT into bankruptcy.

114.   By his foregoing actions, Grano, as a shareholder in closely-held DMT and as a member of DMT's control group along with Nasser Kazeminy and the Candies, breached the fiduciary duties he owed to the FLI Parties.

### FIFTH CAUSE OF ACTION
**(Fraudulent Concealment as to Grano)**

115.   The FLI Parties incorporate herein by reference paragraphs 1 through 114 of this First Amended Answer and Counterclaims as if set forth herein.

116.   On information and belief Grano intentionally deceived the FLI Parties regarding the sale of DMT stock.  At the time of the April 2008 meeting between Grano and FLI's Rosenthal, Grano had knowledge of a material fact – namely, that he had already negotiated the sale of his DMT stock to Nasser and Nader Kazeminy and may have already consummated the sale – which the FLI

49

Parties did not have, nor could they discover.  Grano also hid from the FLI Parties the facts he knew about the true state of DMT at the time of the stock sale and afterward.

117. As a result of Grano's fraudulent concealment and the impression he gave to the FLI Parties that he would try to get out of DMT with them, the FLI Parties did not proceed with trying to sell their DMT stock separately from Grano, even though Grano knew that the FLI Parties knew that they had grave concerns about Nasser Kazeminy's and the Candies' influence over, and operation of, DMT.

118. In fact, Grano's misrepresentations and omissions were intended to induce the FLI Parties to rely on them, allowing Nasser Kazeminy and the Candies to "acquire" the FLI Parties' shares in the short form merger for little or no value.

119. Grano's misrepresentations and omissions caused the FLI Parties to stop pursuing an alternate sale of their DMT stock and caused the FLI Parties to lose their interest in DMT without compensation in the short form merger.

120. As a direct result of Grano's fraudulent concealment, the FLI Parties have been injured in the amount of the price at which they could have sold their DMT stock in early 2008.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting by Grano and Centurion
### of a Breach of Fiduciary Duty)

121.  The FLI Parties incorporate herein by reference paragraphs 1 through 120 of this First Amended Answer and Counterclaims as if set forth herein.

122.  The Controlling Shareholders owed fiduciary duties directly to the minority shareholders, including the FLI Parties, and breached those fiduciary duties as set forth above.

123.  Grano and Centurion aided and abetted the Controlling Shareholders' breaches of their fiduciary duties by knowingly participating in their schemes.

124.  Grano was intimately involved with the operation and oversight of DMT and frequently attended board meetings and hosted the meetings in his offices, even though he was never a DMT board member.  On information and belief Grano also had a longstanding social and business relationship with Nasser Kazeminy and introduced Nasser Kazeminy to DMT.  Grano also sold his DMT stock to Nasser Kazeminy, allowing Nasser Kazeminy and the Candies to amass the 90% of DMT's stock they needed to squeeze the FLI Parties out of DMT altogether via short form merger.  Grano intentionally and knowingly assisted Nasser Kazeminy and the Candies in the dilution and oppression of the FLI Parties.

125.  The scheme caused the FLI Parties to lose all of their DMT shares without value in the Merger, which could not have been consummated

without the dilution of DMT's minority shareholders and Grano's secret sale of his stock to Nasser Kazeminy.

126.  As a direct result of Grano's and Centurion's actions aiding and abetting the breaches of fiduciary duties, the FLI Parties has suffered injury and damages in an amount to be proved at trial.

## SEVENTH CAUSE OF ACTION

127.  The FLI Parties incorporate herein by reference paragraphs 1 through 126 of this First Amended Answer and Counterclaims as if set forth herein.

128.  Plaintiffs allege that they are the assignees of all claims which were owned by the Deep Marine Liquidating Trust, as successor in interest to DMH and DMT.

129.  The FLI Parties deny any and all liability to Plaintiffs, directly and as assignees.

130.  In the event damages are assessed by the Court in connection with any of the claims Plaintiffs purportedly acquired from the Deep Marine Liquidating Trust, DMT, or DMH, Plaintiffs are the parties responsible for such damages.

WHEREFORE, the FLI Parties respectfully request that the Court grant them an Order:

a) Finding that the Controlling Shareholders breached their fiduciary duties to the FLI Parties;

b) Finding that the Controlling Shareholders oppressed the FLI Parties;

c) Finding that Nasser Kazeminy, NJK Holdings, DCC Ventures, Triomphe, Nader Kazeminy, Grano, Centurion, and the Candies engaged in a conspiracy to oppress the FLI Parties and dilute the DMT shares held by the FLI Parties;

d) Finding that Grano breached the fiduciary duties he owed to the FLI Parties;

e) Finding that Grano fraudulently concealed material information from the FLI Parties;

f) Finding that Grano and Centurion aided and abetted the Controlling Shareholders' breaches of their fiduciary duties to the FLI Parties;

g) Awarding damages to compensate the FLI Parties for the losses they have suffered caused by Counterclaim Defendants' actions;

h) Awarding the FLI Parties the costs and disbursements of this action, their reasonable attorneys' fees and experts' fees;

i) Awarding the FLI Parties pre- and post-judgment interest; and

j) Awarding such other and further relief as the Court deems just and proper.

Dated:        New York, New York
              December 13, 2011

                              PADUANO & WEINTRAUB LLP

                              By: /s/Katherine B. Harrison
                                    Anthony Paduano
                                    Katherine B. Harrison
                                    Willard R. Knox
                              1251 Avenue of the Americas
                              New York, New York 10020
                              (212) 785-9100 (telephone)
                              (212) 785-9099 (telecopier)
                              ap@pwlawyers.com
                              kh@pwlawyers.com
                              wk@pwlawyers.com

                              Attorneys for the FLI Parties
                              as to the First, Second, Third,
                              and Seventh Counterclaims


JASPAN SCHLESINGER LLP

By: /s/Steven Schlesinger
      Steven Schlesinger
      913 North Market Street, 12th Floor
      Wilmington, Delaware 19801
      (302) 351-8000
      (302) 351-8010

Special Counsel for the FLI Parties as to the Fourth,
Fifth, and Sixth Counterclaims Only