Anthony Paduano
Katherine B. Harrison
Willard R. Knox
PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas, Ninth Floor
New York, New York  10020
(212) 785-9100
Attorneys for Defendants and Counterclaimants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

NJK HOLDINGS CORP., DCC VENTURES,     :
LLC, NASSER J. KAZEMINY, and     :
THE TRIOMPHE INVESTORS, LLC,     :
    :
    Plaintiffs,     :
    :     Case No. 11-cv-6946 (DLC)
v.     :           ECF Case
    :
FIRST LONG ISLAND INVESTORS, LLC,     :
FLI DEEP MARINE LLC, BRESSNER     :
PARTNERS LTD., LOGAN LANGBERG,     :
HARLEY LANGBERG, and JEFFREY LANGBERG,     :
    :
    Defendants and     :
    Counterclaimants,     :
    :
v.     :
    :
NJK HOLDINGS CORP., DCC VENTURES,     :
LLC, NASSER J. KAZEMINY, THE TRIOMPHE     :
INVESTORS, LLC, NADER KAZEMINY, OTTO     :
CANDIES, JR., OTTO CANDIES, III, OTTO     :
CANDIES, LLC, JOSEPH J. GRANO, JR. and     :
CENTURION HOLDINGS LLC,     :
    :
    Counterclaim Defendants.     :

----------------------------------------------------------------x

## DECLARATION OF KATHERINE B. HARRISON IN
## SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

    I, Katherine B. Harrison, under penalty of perjury, declare as follows:

1.     I am a member of the bar of this Court, admitted to practice law before the courts of the State of New York, and a member of Paduano & Weintraub LLP, counsel for defendants and counterclaimants First Long Island Investors, LLC, FLI Deep Marine LLC, Bressner Partners Ltd., Logan Langberg, Harley Langberg and Jeffrey Langberg in this action.

2.     I respectfully submit this Declaration in support of Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint as to First Long Island Investors, LLC and Counts I, IV And V of the Second Amended Complaint as to all Defendants (the "Motion to Dismiss") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

3.     A true and correct copy of the transcript of the November 2, 2009 Scheduling Conference before now-Chancellor Strine of the Delaware Chancery Court, referenced in footnote 1 of the Memorandum of Law in Support of Defendants' Motion to Dismiss, is annexed hereto as Exhibit A.

4.     A true and correct copy of the transcript of the January 21, 2010 Temporary Restraining Order Hearing in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), referenced in footnote 2 of the Memorandum of Law in Support of Defendants' Motion to Dismiss, is annexed hereto as Exhibit B.

5.     A true and correct copy of (i) Bankruptcy Court's June 13, 2011 Memorandum Opinion, (ii) the Bankruptcy Court's August 5, 2011 Report and Recommendation to the United States District Court for the Southern District of

Texas, (iii) the Order of the United States District Court for the Southern District of Texas, dated October 14, 2011, adopting the Report and Recommendation of the Bankruptcy Court, and (iv) the Final Judgment of the United States District Court for the Southern District of Texas, dated January 11, 2012, referenced on page 9 of the Memorandum of Law in Support of Defendants' Motion to Dismiss, are annexed hereto as <u>Exhibit C</u>.

**Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 13, 2012.**

_____

Katherine B. Harrison

# EXHIBIT A

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FLI DEEP MARINE LLC, BRESSNER    :
PARTNERS LTD., LOGAN LANGBERG     :
AND HARLEY LANGBERG               :
                                  :
            Plaintiffs,           :
                                  :
        vs.                       :    Civil Action
                                  :    No. 5020-VCS
PAUL McKIM, B.J. THOMAS,          :
DANIEL ERIKSON, FRANCIS WADE      :
ABADIE, OTTO CANDIES, JR.,        :
OTTO CANDIES, III, EUGENE         :
DePALMA, LARRY LENIG, JOHN        :
ELLINGBOE, BRUCE GILMAN, JOHN     :
HUDGENS, NASSER KAZEMINY, DCC     :
VENTURES, LLC, NJK HOLDINGS       :
CORPORATION, NKOC, INC., OTTO     :
CANDIES, LLC, DEEP MARINE         :
HOLDINGS, INC., AND DEEP          :
MARINE TECHNOLOGY, INC.,          :
                                  :
            Defendants.           :

                   - - -

                    Chancery Court Chambers
                    New Castle County Courthouse
                    Wilmington, Delaware
                    Monday, November 2, 2009
                    10:00 a.m.


BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor.

                  OFFICE CONFERENCE


------------------------------------------------------

                CHANCERY COURT REPORTERS
            500 North King Street - Suite 11400
            Wilmington, Delaware 19801-3759
                    (302) 255-0525

2

```
 1    APPEARANCES:

 2            LAURIE SCHENKER POLLECK, ESQ.
              Jaspan Schlesinger LLP
 3                 -and-
              MICHAEL A. LEON, ESQ.
 4            of the New York Bar
              Jaspan Schlesinger LLP
 5                 -and-
              KATHERINE B. HARRISON, ESQ.
 6            JASON J. SNYDER, ESQ.
              of the New York Bar
 7            Paduano & Weintraub LLP
                For Plaintiffs FLI Deep Marine LLC,
 8                Bressner Partners Ltd.,
                  Logan Langberg and Harley Langberg

 9

10            PATRICIA L. ENERIO, ESQ.
              Proctor Heyman LLP
11                For Defendant Paul McKim

12            RICK S. MILLER, ESQ. (via telephone)
              Ferry, Joseph & Pearce, P.A.
13                For Defendant B.J. Thomas

14            MICHAEL J. MAIMONE, ESQ.
              JOSEPH CICERO, ESQ.
15            Greenberg Traurig, LLP
                  For Defendants Deep Marine Holdings, Inc.
16                and Deep Marine Technology, Inc.

17            DENISE SEASTONE KRAFT, ESQ.
              TYLER O'CONNELL, ESQ.
18            Edwards Angell Palmer & Dodge LLP
                  For DeepWork, Inc.

19

20            FRANCES GAUTHIER, ESQ.
              Stradley Ronon Stevens & Young, LLP
21                 -and-
              KEVIN W. GOLDSTEIN, ESQ.
22            of the Pennsylvania Bar
              Stradley Ronon Stevens & Young, LLP
23                For Otto Candies, Jr., Otto Candies, III

                                    (Cont'd)
24
```

```
1    APPEARANCES: (Cont'd)

2              TODD C. SCHILTZ, ESQ.
               Drinker Biddle & Reath LLP
3                For Defendants Bruce Gilman, Larry Lenig
                 and Francis Wade Abadie
4
               DAVID S. EAGLE, ESQ.
5              Klehr, Harrison, Harvey, Branzburg &
               Ellers LLP
6                For Defendants Daniel Erikson,
                 Eugene DePalma, John Hudgens,
7                Nasser Kazeminy, DCC Ventures, LlC and
                 NJK Holdings Corporation
8
9                        -  -  -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1            THE COURT:  Good morning, everyone.

2 You may proceed.

3            MS. HARRISON:  Good morning, Your

4 Honor.  Kate Harrison from Paduano & Weintraub,

5 counsel to FLI Deep Marine LLC, Bressner Partners,

6 Ltd., and the Langbergs, former minority shareholders

7 of approximately 5 percent of Deep Marine Holdings,

8 Inc., and its wholly owned subsidiaries Deep Marine

9 Technology, which we call together DMT.

10            Plaintiffs were most recently squeezed

11 out of DMT in a Delaware short-form merger.  The

12 defendants are DMT, the controlling shareholders and

13 their entities, the current and former officers and

14 directors who have systematically stripped plaintiff

15 of their entire $1.75 million investment and their

16 legal rights to complain or even inquire about what

17 happened to the company they invested in.

18            Plaintiff invested approximately

19 $1.75 million in 2002 in a startup company to provide

20 subsea services in the oil and gas industry --

21 offshore, mainly, Gulf of Mexico.

22            THE COURT:  I've read everything.

23 We're at a scheduling conference.

24            What is it you're seeking to enjoin?

CHANCERY COURT REPORTERS

5

1          MS. HARRISON:  We want to make sure

2   that what remains of the assets of DMT are not taken

3   out of the jurisdiction so that we are left with

4   absolutely no remedy.

5          We fear that DMT and these defendants

6   are right now in the middle of selling the last few

7   valuable assets -- the vessels -- and that they may be

8   selling them under market value and that the proceeds

9   will disappear.  So we seek to -- we seek to enjoin

10  only sales out of the ordinary course, and we just ask

11  that the proceeds be held in escrow and we seek

12  expedited discovery.

13          THE COURT:  Okay.

14          MR. MAIMONE:  Your Honor, Mike Maimone

15  for Deep Marine Holdings and Deep Marine Technology.

16          What plaintiffs are seeking here is,

17  in my view, unusual.  I don't -- we view this as a

18  statutory appraisal action.  We think all the issues

19  that are set forth in the complaint should be dealt

20  with in the appraisal action.  I think the Glassman

21  decision in the Supreme Court holds that.

22          Actually, the fiduciary duty claims

23  are probably subject to a motion to dismiss by my

24  friends on the defendants' side, since I represent the

CHANCERY COURT REPORTERS

1    company, the company has no fiduciary duty.  But in

2    connection with the current application, plaintiffs

3    base their application on pure speculation.  Deep

4    Marine is an operating company.  I was told by Deep

5    Marine that there's no plans to liquidate.  There's no

6    plans to dissolve.  They're merely trying to raise

7    cash to keep the operations going.

8                     The plaintiffs, as a form of

9    stockholders, have taken the status as creditors.  In

10   the Alabama By-Products decision, the Supreme Court

11   held that if you perfect your appraisal rights --

12   we're not conceding that everyone perfected their

13   appraisal rights -- but to the extent that any of the

14   plaintiffs perfected their appraisal rights, they're

15   creditors of the company and we believe they have full

16   rights of creditors.  They have the fraudulent

17   conveyance laws to protect them -- 174 to protect

18   them.  They have all the relief that the Court of

19   Chancery recognized in North American Catholic to

20   protect them.

21                    So we don't really see the reason to

22   enter a TRO because Deep -- there's no -- based in the

23   complaint or any of the papers tendered, a TRO -- Deep

24   Marine is an operating company.  It's going forward.

7

1    If that changes, then plaintiffs can enforce their

2    rights at that time.  Right now, plaintiffs haven't a

3    ripeness argument because nothing is happening.

4    Plaintiffs are dealing with speculation because they

5    don't know anything and there's nothing really to

6    know.  This is a damages action, where we can just

7    move forward in the ordinary course.  My friends on

8    the defendants' side could file whatever motions they

9    deem appropriate in connection with a motion to

10   dismiss.  The company will deal with the appraisal

11   action appropriately, and we can just move forward

12   with the appraisal action and whatever motion practice

13   my friends feel --

14                    THE COURT:  When the appraisal notice

15   was given, was the special committee report disclosed?

16                    MR. MAIMONE:  My understanding is it

17   was not.

18                    MS. HARRISON:  As you can tell from

19   the chronology of the case, the company announced that

20   the committee had reached its conclusion.  It did not

21   give anybody the report, and the very next day it

22   announced the short-form merger.  So it thereby ruined

23   our standing to continue the derivative action the

24   very next day.  So we find the timing of that highly

1   suspicious.  I think, when Vice Chancellor Noble

2   dismissed our derivative action without prejudice, he

3   assumed that we would be back.

4                   THE COURT:  Did no one get Mr. Miller

5   on the phone?

6                   He is on the line.

7                   Okay.  Here's what we're going to do,

8   folks.  I'm not setting up any kind of injunction

9   schedule.  I don't know what we would enjoin.  On the

10  other hand, I am granting expedited discovery.  I'm

11  not exactly clear -- off the record.

12                  (Discussion off the record.)

13                  THE COURT:  Back on the record.  This

14  is a little wacky situation.  I don't want -- I will

15  tell the defendants -- individual defendants -- don't

16  be looking for me to be sympathetic to motions to stay

17  discovery.  Discovery is not going to be stayed.  I'm

18  allowing expedited discovery because, frankly, this is

19  a record that creates a situation that -- at least a

20  colorable perception that people are horsing around.

21  I mean, the moving papers, with all fairness to the

22  defendants, telling me that they somehow got

23  vindicated in the derivative action, that's not what

24  happened at all.  That is not what Vice Chancellor

1    Noble's decision says.  What it says is people goofed

2    up.  It's not the first time I've seen people goof up

3    like this.  Folks who don't consult with Delaware

4    lawyers early on in a process sometimes, when they

5    make a demand, they go, "Oops."  But the point is,

6    there's basis under the law to challenge even a

7    special committee's investigation.  But you have to

8    wait until it's done.

9                  As I understand what the defendants

10   did before Vice Chancellor Noble is say, "Look, the

11   law's the law."  They goofed up.  I believe

12   Vice Chancellor Noble indicated some doubts about the

13   independence of the committee.  He let the process go

14   forward.  Frankly, the defendants made arguments about

15   the amount of time they needed.  It's not clear to me.

16   You can all shed light on this later on whether the

17   defendants were forthcoming about when they were

18   planning the merger, whether they were at all planning

19   a merger during the pendency of the suit before

20   Vice Chancellor Noble, whether they let anyone know

21   about it.  Very interesting circumstances.

22                  It may well be that all of these

23   things can be litigated purely in the context of the

24   appraisal.  But the reality is, that's why discovery

1   should go forward because, if the defendants' --

2   individual defendants' -- argument is it all got

3   bought into the respondent, but you have to value all

4   these claims in the appraisal, well, then, the

5   discovery should go forward because it's essentially a

6   merits discovery.  It's going to be relevant to value.

7                   I also think there is some concern

8   about the respondent and the ability of the respondent

9   to answer these claims.  You know, it would be a much

10  more edifying record, if somebody wants to put out an

11  appraisal notice with the actual report, if there is

12  such a report.  Who knows at this point?  What there

13  was some sort of exculpatory release apparently

14  saying, you know, nothing happened that was actionable

15  and there's a short-form merger and I think people got

16  offered pennies.

17                   MS. HARRISON:  One penny a share.

18                   THE COURT:  A penny a share.

19                   So, it's a rather odd circumstance.  I

20  have read Glassman.  I'm very familiar with the 253

21  jurisprudence.  I don't know what the exception is for

22  fraud, other sorts of things.  But I won't rule out at

23  this stage the following possibility.  There's a

24  derivative action pending.  Folks made a procedural

1  goof-up by making a demand.  A special committee is

2  formed in order to delay, doesn't really do a

3  professional job or an independent job, issues a

4  report which -- to somebody, but not to any of the

5  people who brought the derivative claims.  And while

6  it gets the case dismissed on the grounds of delay,

7  that we need to investigate this and, immediately upon

8  concluding this thing, a short-form merger is done to

9  excuse -- to essentially wipe out the claim.  We do

10 know that there is jurisprudence that says, when a

11 merger is done specifically for the purpose of getting

12 rid of claims, that that doesn't really get rid of the

13 claims.  If there's ever a circumstance again where

14 people have played themselves into a perception, I

15 could not on a motion to dismiss rule out the

16 inference that these folks wanted to get rid of these

17 claims and did a short-form merger.  You know, mergers

18 are powerful things.  They're not just thought of

19 instantaneously.  This one was done fairly shortly

20 after Vice Chancellor Noble considered a motion to

21 dismiss and granted it.

22              So what I would also urge on the

23 plaintiffs' side -- and I think I get into the

24 Delaware law.  There's really no need.  We're seeing

12

1   this more and more in the Court.  7 million counts.  I

2   mean, I'm not saying -- you know, aiding and abetting

3   against the officer and director defendants.  If

4   you're an officer and director, there's a term for

5   when you aid and abet a breach of fiduciary duty.

6   It's called a breach of fiduciary duty.  It's

7   not -- we don't have like everybody is guilty of a

8   breach of fiduciary duty, plus because they did it in

9   concert with their fellows in aiding and abetting

10  claim.

11              I don't know what this fraud through

12  concealment is.  How is that different from breach of

13  fiduciary duty?  Fraud through silence in the face of

14  disclosure.  A claim against controlling shareholders

15  for wrongful equity dilution.  Claim against

16  controlling shareholder defendants for unjust

17  enrichment.  I don't know how that's different from

18  the third cause of action, which is claims against the

19  controlling shareholder for breaches of their

20  fiduciary duties.  It strikes me that, if they didn't

21  breach their fiduciary duties, there was no unjust

22  enrichment that, with respect to wrongful equity

23  dilution, what you're arguing is, there is a breach of

24  fiduciary duty and therefore these were self-dealing

1    transactions that wrongfully diluted folks because the

2    transactions were improperly priced or motivated.

3    These are not really separate causes of action.

4                    Accounting.  Accounting is a remedy.

5    You can put that in the wherefore clause, I believe.

6    You can say, wherefore because there have been

7    breaches of fiduciary duty, we need to get to the

8    bottom of this.  There ought to be an accounting.  All

9    I'm saying is, you're going to get expedited

10   discovery.  I would urge on the cost sides of this --

11   I don't know how big this company is or what it is.

12   All I do know is two, four, six, eight, ten, 12, 13,

13   plus Mr. Miller on the phone, 14 lawyers, let the

14   record reflect.  And I may have miscounted.  I'm not

15   that great at math.  Fourteen lawyers already.  This

16   is an expensive morning; right?  For the cost of this

17   morning, you could have doubled the consideration

18   given in the merger to the plaintiff.  Right?

19                    You know, only clients know what

20   really happened.  Obviously there are professors of

21   philosophy who would say even they don't actually know

22   what happens.  They have a perception of what

23   happened.  But my point is that, you know, one of the

24   things that our profession really has to do is, you

14

1    always have to take -- you want to be vigilant in

2    representing your clients, but you actually need to

3    challenge them and talk to them.  I don't know how

4    really valuable this is from the plaintiffs' side.  I

5    don't know if this was a business going down the

6    drain.  There's obviously the possibility, for

7    example, that these people did trivial -- even if you

8    accept the complaint as true -- did trivial

9    self-dealing transactions around the margins because

10   there was a political buddy.  But that, in the scheme

11   of the world, they don't add up to a lot of economic

12   value.

13            I mean, you know, is this case really

14   about Mr. -- former Senator and Mrs. Coleman?  If it's

15   a matter of that and some sort of principle, the case

16   might be settleable on that basis.  Give to the people

17   who were cashed out the maximum amounts allegedly

18   overpaid to Senator Coleman and Mrs. Coleman.  As I

19   get it -- I might be wrong -- but it wouldn't be

20   gazillions of dollars.  It might be nice for people

21   like around here who work for the state and yearly pay

22   cuts, we would like to have some supplement of 25,000,

23   or whatever it was a month, or $75,000.

24            But my point is that out of that does

CHANCERY COURT REPORTERS

15

1   not an appraisal case make.   These obviously -- these

2   things with boats, though, and other things, at first

3   I couldn't -- Mr. Candies' name got me distracted

4   because I was trying to figure out the synergies

5   between a maritime company and some sort of candy

6   company, until I realized this was just a person's

7   name.   It's like oh, there's Candies.   A venerable

8   chocolatier in Minneapolis.   Everybody at

9   Christmastime gives a box of Otto Candies to their

10  kids.

11              But what I'm saying, you have to size

12  up what you get out of this rather than you're just

13  angry.   I'm not saying that's what's motivating it.

14  You have to figure that out.

15              On the defendants' side, again, you

16  know, you can't represent your clients without doing a

17  reality check on what went on.   And sometimes things

18  that -- you know, sometimes things that look slick are

19  perfectly fine.   And when it's all said and done, it

20  all looks above board.   Obviously, when things that

21  are done are slick, they look slick.   The genuinely

22  slick don't look slick because they figure out ways

23  for it not to look, you know, so immediately

24  suspicious.   This is a situation where people managed.

16

1    Might have been the best thing in the end.  I don't

2    know.  But obviously was a course of events that

3    didn't look exactly edifying, particularly a

4    short-form merger like this where the economic

5    consideration given to the people being cashed out was

6    basically bupkis.

7                   So, before you get into discovery, you

8    may want to figure out where your respective positions

9    are.  What are the plaintiffs seeking out of this?  I

10   don't know how many stockholders there were in

11   general.  Obviously the investment -- is the

12   investment of all the cashed out people 1.7 million?

13                   MS. HARRISON:  No.  That's just our

14   clients.  There are a couple of other -- not very many

15   minority shareholders.  There are a couple of other

16   groups.

17                   THE COURT:  You don't know what their

18   percentage holdings were in comparison to your

19   clients?

20                   MS. HARRISON:  Well, at the end of it,

21   because of the short-form merger, they held

22   90 percent, we held 5 percent.

23                   THE COURT:  I'm just talking about

24   like in terms of cash in.  You're saying your clients

1   put in 1.7 million to get in?

2                   MS. HARRISON:   I don't know that.   But

3   I know there is a group -- there is another group of

4   minority shareholders --

5                   THE COURT:   Did they perfect appraisal

6   rates?

7                   MS. KRAFT:   DeepWork is here, Your

8   Honor, we filed a tag-along action and we did perfect

9   our rights, is our contention, and that was somewhere

10  in the vicinity of $800,000.   A little bit over a

11  million.   I'm still trying to figure that out.

12                  THE COURT:   So there's another action.

13  Have I gotten papers in chambers about that?

14                  MS. KRAFT:   They were sent over on

15  Friday.   My understanding -- and I spoke with counsel

16  for the FLI plaintiff earlier -- is that there are a

17  couple other minority shareholders.   This was not

18  filed as a class action.   That's another consideration

19  for amendment.   We haven't really spoken about that.

20                  THE COURT:   Well, I think one of the

21  things you ought to be talking about is coordinating

22  whether it's a class action or not.   Obviously it

23  would be better to have one complaint.   But between

24  your two groups, do we essentially have all the other

18

1   minority --

2                    MS. HARRISON:  I think a couple of the

3   defendants also have -- were minority shareholders.

4                    THE COURT:  I'm assuming they don't

5   care about that.

6                    MS. HARRISON:  Right.  But what I'm

7   saying is, I think it's a very small universe of

8   minority shareholders.

9                    MS. KRAFT:  We're thinking maybe about

10  a group of five or six.  Would that be correct?

11                   MS. HARRISON:  Yeah, at most.

12                   THE COURT:  Five or six, in addition

13  to your groups?

14                   MS. HARRISON:  No, I think it might be

15  DeepWork and maybe one other group only.

16                   THE COURT:  Is Mr. McKim part of one

17  of these groups?

18                   MS. HARRISON:  Mr. McKim is a

19  defendant.

20                   THE COURT:  I understand that.  I get

21  that he's a defendant.  Your papers didn't seem

22  particularly hostile toward him.

23                   MS. HARRISON:  Well, because we

24  believe he was a whistleblower, in a sense.

19

1          THE COURT:  Right.

2          What I'm trying to talk about here

3    is -- in a room where we got -- what did we say? --we

4    counted up with Mr. Miller, 15 or 14 lawyers -- is, as

5    we go forward, there will be material amounts of money

6    spent.

7          MS. HARRISON:  Absolutely right.

8          THE COURT:  All I'm saying is,

9    sometimes what people want -- you know, they don't

10   want to be suckers -- is sometimes, if you focus early

11   on what's at stake, what the costs of enforcement are

12   and all that kind of good stuff, you know, it may be

13   like everybody gives their clients litigation budgets

14   and all that kind of stuff.  That before you go spend

15   hundreds of thousands of dollars, as you will in

16   discovery, no doubt, that you begin to think about,

17   you know, what it is.  Sometimes people's investments

18   in -- "Like I at least want my money back and I think

19   these people are jerks and I will never invest with

20   them again.  If I can at least get the skin that I put

21   in the game back or something like it, then I'm

22   willing to move on because I'm realistic about the

23   world."  You know, I don't know.  I don't know what

24   that would mean in terms of the defendants.  I don't

CHANCERY COURT REPORTERS

20

1   know any of it.

2             I do know, as professionals, if you're

3   representing people who are being rational, now is the

4   time, rather than later, to think about it.  What I'm

5   saying to the defendants is, this is not a surgical

6   case.  This is not one you're going to come in and say

7   this is a really neat, tidy record.  We had

8   Warren Buffett and Bill Gates as the special

9   committee, advised by counsel for religious elders and

10  ethics professors, and therefore, you know, you just

11  get rid of it early.  It's just not going to be that

12  way.  It may over time bear up.  But it bears up

13  after, you know, that wonderful thing we call

14  discovery.

15            And after the discovery happens,

16  people writing briefs and all that kind of stuff,

17  which, again, I don't know how people keep that in the

18  five figures.  Since you all -- you are going to have

19  those costs, too.  Fee shifting is not prevalent in

20  the U.S.  I don't know what these things are worth in

21  the current market.  So take that to heart.  I don't

22  need to set a schedule at this point.  You need to

23  talk about getting discovery going.

24            What I would suggest would be

1    rational, if you're not going to get it settled, would

2    be that you focus on getting some document discovery

3    done first, then perhaps getting the plaintiffs to --

4    the multiple plaintiffs to coordinate and file an

5    amended pleading that everybody takes a shot at.

6                    MS. HARRISON:  Your Honor, this is a

7    difficult group of lawyers.  I've had already

8    difficult experiences with this group.  If I could ask

9    you to set some kind of a schedule, also.  We need it.

10   That's one reason I'm here.

11                   THE COURT:  What I would tell to the

12   defendants, this is going to be sort of

13   self-enforcing.  You're going to have claims holding

14   over your head until you get the document discovery

15   done.

16                   You know, it's going to be pretty

17   simple.  You know, they're going to want to get rid of

18   the claims.  Well, you're shaking your head.  I'm not

19   going to do this.  Look, they're in court now.  If

20   people horse around with this Court, this Court takes

21   care of them.  I've ordered the discovery to go

22   forward and it's going to go forward.  If people are

23   obstinate, they will -- you can file a motion.

24                   MS. HARRISON:  Thank you.

CHANCERY COURT REPORTERS

22

1          THE COURT:  I think everybody

2    understands.

3          I have no idea -- you said they're

4    difficult.  I don't know how difficult you've been,

5    not to say that you're not the most gracious,

6    wonderful person in the world.  I'm just not there.

7    Sometimes it's been my experience that -- on more than

8    one occasion -- that difficulties arise and no one is

9    exactly in the right.

10          What I'm saying is, you haven't made

11    any kind of record of that today.  You have not.

12          MS. HARRISON:  It's in my affidavit.

13          THE COURT:  What, that they didn't

14    give you documents?

15          MS. HARRISON:  It's in my affidavit

16    that my very first phone call with Nasser Kazeminy's

17    law firm is the man threatening me.  It's a very

18    difficult group of lawyers.  I've never experienced

19    that kind of difficulty in my life, and I've been

20    practicing for 20 years.  And I practice in

21    New York City where you think they're tough.  I have

22    not experienced this before.  And I really believe

23    that we need --

24          THE COURT:  Well, you're in Chancery

1    now.  I don't know who is representing -- I can't

2    pronounce his name at this point.

3              MR. EAGLE:  This is David Eagle.  I'm

4    representing Nasser Kazeminy.  I never met Miss

5    Harrison until this morning.  Never had a phone call

6    or e-mail.  We're in Delaware.  We're in Chancery

7    Court.  Everyone is going to work cooperatively.

8              THE COURT:  If you hear from somebody

9    who is not admitted pro hac about this case, then

10   bring it to the attention of the Court.  What you did

11   in -- before this case was filed -- again, I was not

12   the Judge.  I don't know if this was before in the

13   later case, or after the dismissal or whatever.  But I

14   have found that when people have to file pro hac and

15   get -- you know, face the music, all -- we do have

16   Delaware lawyers here and they're regularly

17   accountable to the Court.  And they're the ones -- the

18   people who are appearing here are the ones going to be

19   responsible for discovery.

20             I also expect -- I shouldn't have to

21   say this, but I've been astonished -- I expect that

22   the Delaware lawyers will be meaningful in discovery

23   and discovery is not left to clients.  People visit

24   offices, people find out where the documents are.

 1  People don't tell clients, "Go through your hard drive

 2  and find your e-mails."  That is not discovery.  That

 3  was never appropriate discovery before e-mail.  It's

 4  certainly not now.  You never told a client, "Oh, look

 5  in your drawer.  Find all the good stuff and send it

 6  to me."  Yeah.  Right.  I mean, that is not a

 7  trustworthy way to do discovery.

 8            I'm also assuming, if there was a

 9  special committee report, that a lot of the stuff is

10  compiled.

11            MS. SCHENKER POLLECK:  Your Honor,

12  could you order a stipulated order for discovery or --

13            THE COURT:  If you all -- the ones

14  getting close to the line now are on the plaintiffs'

15  side of the table.  Okay?  This is not take-out.  I'm

16  not taking your take-out menu.  I ordered expedited

17  discovery.  The first instance you sit down, you can

18  use the room here and you can talk to your colleagues.

19  The way we're going to do this is documents first.  I

20  said that.  I think I've been pretty clear.  You get

21  the documents from all the defendants.

22            What I would then suggest is a period

23  of time for the plaintiff to put together an amended

24  pleading.  I'm not going to say whether expedited

1    discovery means they get the documents in ten days, 20

2    days or 30 days.  This is a claim for money.  Okay?

3    This is what this is about.  I'm also not going to

4    have two groups of plaintiffs acting in an

5    uncoordinated way.

6                    MS. KRAFT:  Your Honor, Denise Kraft.

7    I intend to fully coordinate.  We don't have the

8    ability to do that yet.  We will absolutely coordinate

9    this case.

10                   THE COURT:  Right.  Again, get --

11   think about your litigation budgets, think about early

12   on whether, you know, it makes sense to go forward or

13   whether you want to take a shot at resolving it early

14   because it's going to get expensive.  But that's the

15   structure.  I'm not going to sit here and tell you how

16   many minutes.

17                   You haven't even talked to the people

18   on the other side.

19                   Okay.  Thank you.

20                   (Conference adjourned at 10:35 a.m.)

21

22

23

24

                        CERTIFICATE

1                    I, DIANE G. McGRELLIS, Official Court

2    Reporter of the Chancery Court, State of Delaware, do

3    hereby certify that the foregoing pages numbered 3

4    through 25 contain a true and correct transcription of

5    the proceedings as stenographically reported by me at

6    the hearing in the above cause before the Vice

7    Chancellor of the State of Delaware, on the date

8    therein indicated.

9                    IN WITNESS WHEREOF I have hereunto set

10   my hand at Wilmington, this 3rd day of November, 2009.

11

12                       /s/ Diane G. McGrellis
                         ----------------------------
13                       Official Court Reporter
                          of the Chancery Court
14                          State of Delaware

15

16   Certification Number: 108-PS
     Expiration:   Permanent
17

18

19

20

21

22

23

24

                  CHANCERY COURT REPORTERS

# EXHIBIT B

1          IN THE UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF TEXAS

3                 HOUSTON DIVISION

4  DEEP MARINE HOLDINGS, INC.    §    CASE NO. 10-3026-H1-ADV
                                 §    HOUSTON, TEXAS
5  VERSUS                        §    THURSDAY,
                                 §    JANUARY 21, 2010
6  FLI DEEP MARINE, LLC          §    3:00 P.M. TO 4:13 P.M.

7

           <u>TEMPORARY RESTRAINING ORDER HEARING</u>
8
          BEFORE THE HONORABLE MARVIN ISGUR
9           UNITED STATES BANKRUPTCY JUDGE

10

11                  APPEARANCES:

12       FOR PLAINTIFF:      SEE NEXT PAGE

13       FOR DEFENDANT:      SEE NEXT PAGE

14       COURT RECORDER:     SUZANNE GUEVARA

15       COURT CLERK:        RISHONA SMITH

16

17

18

19

20                  PREPARED BY:

21       JUDICIAL TRANSCRIBERS OF TEXAS, INC.
                  P.O. Box 925675
22            Houston, Texas 77292-5675
          Tel: 281-328-6179 ▼ Fax: 281-462-2016
23            www.judicialtranscribers.com

24

25    Proceedings recorded by electronic sound recording;
      transcript produced by transcription service.

1                          **APPEARANCES:**

2   FOR THE PLAINTIFFS/DEBTORS,
    DEEP MARINE HOLDINGS, INC.:    MARCY E. KURTZ, ESQ.
3                                  JASON G. COHEN, ESQ.
                                   BRACEWELL & GIULIANA, LLP
4                                  711 LOUISIANA ST., STE 2300
                                   HOUSTON, TX  77002
5                                  713-221-1416

6
    FOR CREDITOR'S COMMITTEE:      PAUL MOAK, ESQ.
7                                  MCKOOL SMITH
                                   600 TRAVIS ST., SUITE 7000
8                                  HOUSTON, TX  77002
                                   713-485-7300
9

10                     APPEARING TELEPHONICALLY:

11  FOR THE DEFENDANT,
    FLI DEEP MARINE, LLC,
12  BRESSNER PARTNERS, LTD.,
    LOGAN AND HARLEY LANGBERG:     ANTHONY J. PADUANO, ESQ.
13                                 JASON SNYDER, ESQ.
                                   PADUANO WEINTRAUB, LLP
14                                 1251 AVENUE OF THE AMERICAS
                                   SUITE 920
15                                 NEW YORK, NY  10020
                                   212-785-9100
16

17  FOR NASSER KAZEMINY:           LISA GOLDEN, ESQ.
                                   JASPAN SCHLESINGER LLC
18                                 300 GARDEN CITY PLAZA, 5TH FL.
                                   GARDEN CITY, NY  11530
19                                 516-746-8000

20
    FOR OTTO CANDIES, LLC,
21  OTTO CANDIES, III,
    CANDIES SHIPBUILDERS, LLC:     KARL J. ZIMMERMAN, ESQ.
22                                 BALDWIN HASPEL BURKE & MAYER
                                   SUITE 2200 ENERGY CENTER
23                                 1100 POYDRAS ST.
                                   NEW ORLEANS, LA  70163
24                                 504-569-2900

25

```
 1   FOR NASSER KAZEMINY,
     DANIEL ERICSON, AND
 2   JK HOLDINGS:                    JOSEPH M. WINDLER, ESQ.
                                     WINTHROP & WEINSTINE, PA
 3                                   225 S. 6TH ST., #3500
                                     MINNEAPOLIS, MN  55402
 4                                   612-604-6400

 5   FOR NASSER KAZEMINY AND
     CANDIES ENTITIES:               TONY DAVIS, ESQ.
 6                                   BAKER BOTTS, LLP
                                     ONE SHELL PLAZA
 7                                   910 LOUISIANA ST.
                                     HOUSTON, TX  77002
 8                                   713-229-1547

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              <u>EXHIBITS</u>

2    <u>PLAINTIFFS/DEBTORS</u>:              <u>Marked</u>      <u>Offered</u>     <u>Received</u>

3    **Exhibit Number 1**              10          16          17
     **Exhibit Number 2**              11          16          17
4    **Exhibit Number 3**              11          16          17
     **Exhibit Number 4**              12          16          17
5    **Exhibit Number 5**              12          16          17
     **Exhibit Number 6**              12          16          17
6    **Exhibit Number 7**              13          16          17
     **Exhibit Number 8**              13          16          17
7    **Exhibit Number 9**              13          16          17
     **Exhibit Number 10**             13          16          17
8    **Exhibit Number 11**             14          16          17
     **Exhibit Number 12**             15          16          17
9    **Exhibit Number 13**             15          16          17
     **Exhibit Number 14**             16          16          17
10   **Exhibit Number 15**             15          16          17

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **HOUSTON, TEXAS, THURSDAY, JANUARY 21, 2010, 3:00 P.M.**

2            **THE COURT**:  All right.  Please be seated.

3                Okay.  We're here on the Temporary

4    Restraining Order hearing in the Deep Marine Holdings case.

5    It's Adversary proceeding 10-3026.  We'll take appearances

6    in court, then we'll take appearances on the telephone.

7            **MS. KURTZ:**  Good afternoon, Your Honor.  Marcy

8    Kurtz with Jason Cohen, here on behalf of the Debtor and the

9    Plaintiffs in the adversary proceeding.

10           **THE COURT:**  All right.

11           **MR. MOAK:**  Good afternoon, Your Honor.  Paul Moak,

12   M-O-A-K, on behalf of the Creditor's Committee.

13           **THE COURT:**  All right.  Anyone else appearing here

14   in court?

15       (No audible response.)

16           **THE COURT:**  All right.  On the telephone, we have

17   an appearance from New York.  Who would that be?

18           **MR. PADUANO:**  Your Honor, it's Anthony Paduano and

19   Jason Snyder, dialing in right now for FLI Deep Marine, LLC,

20   Bressner Partners, Logan Langberg, Harley Langberg.

21           **THE COURT:**  All right.  Thank you.

22           **MR. PADUANO:**  And Your Honor, I've submitted a pro

23   hac vice application and also on the phone is -- or dialing

24   is in Lisa Golden from the Jaspan Schlesinger firm, also in

25   New York.

1            **THE COURT:**  All right.

2            **MR. PADUANO:**  At some point will enter her

3 appearance in this case, as well.

4            **THE COURT:**  Okay.  I probably have both of you-all

5 available on the phone right now.

6                 Ms. Golden, can you hear me?  Ms. Golden, are

7 you there?

8      (No audible response.)

9            **MR. PADUANO:**  She's supposed to dial in, Your

10 Honor.  I don't know if she's here yet or not.

11            **THE COURT:**  I'm showing I've got two people from

12 your firm both on the phone, so I assume she's somewhere.

13            **MR. PADUANO:**  Thank you, Your Honor.

14            **THE COURT:**  And then I have somebody from the 516

15 area code?

16            **MR. PADUANO:**  That's her, Your Honor.

17            **MS. GOLDEN:**  Good afternoon, Your Honor.

18            **THE COURT:**  Thank you.   Who's here from the 516?

19            **MS. GOLDEN:**  Your Honor?

20            **THE COURT:**  Yes.

21            **MS. GOLDEN:**  Hi.  The 516 number is Lisa Golden.

22            **THE COURT:**  All right.  Thank you.

23            **MS. GOLDEN:**  And we are in the process of also

24 preparing our pro hac vice motion.

25            **THE COURT:**  All right.  Let's not -- anyone who

1  wants to appear in a TRO hearing can appear without the

2  necessity of the pro hac.  I'm not going to get too tied up

3  on that, but thank you for telling me.

4         **MS. GOLDEN:**  Thank you, Your Honor.

5                And then from, I think, New Orleans, who do

6  we have?

7         **MR. ZIMMERMAN:**  Karl Zimmerman from Baldwin Haspel

8  Burke & Mayer, representing Otto Candies, LLC, Otto Candies,

9  III, and Candies Shipbuilders, LLC, which is a creditor in

10 the bankruptcy proceeding.

11        **THE COURT:**  Thank you.

12        **MR. ZIMMERMAN:**  I also filed a pro hac vice

13 application.

14        **THE COURT:**  All right.  I haven't seen any for HUX

15 yet, so same rule for you.

16               In the 612 area code?  Do we have anybody

17 from 612 participating?  Hold on.  I didn't click it right.

18 Let me try that from the 612?

19        **MR. WINDLER:**  Your Honor?

20        **THE COURT:**  Yes.  Who do we have?

21        **MR. WINDLER:**  Joseph Windler with the law firm of

22 Winthrop and Weinstine in Minneapolis.  I represent Nasser

23 Kazeminy, JK Holdings, DMT Ventures, Daniel Ericson, John

24 Hudgeons, and Eugene Diploma in the Delaware proceedings and

25 the Kazeminy's in the bankruptcy proceeding, as well.

1          THE COURT:  Thank you.

2               And finally, we have someone from Houston,

3   713-668 exchange?

4          MR. DAVIS:  Hi, Your Honor.  Tony Davis.  My plane

5   literally just landed.  I'm here on behalf of the Kazeminy

6   and Candies entities.

7          THE COURT:  Thank you.  All right.  I've read the

8   application and some of the exhibits.  There's an opposition

9   brief that I did not see until I just walked out and I now

10  see it on my screen.

11         MS. KURTZ:  Did Your Honor want to take a minute

12  to read that?

13         THE COURT:  Yeah.  I need to.  I did not realize

14  that had been filed and I apologize.

15         MS. KURTZ:  That's fine.  No problem.  Let me --

16         THE COURT:  What time did that come in?

17         MR. PADUANO:  Your Honor, there's also -- Anthony

18  Paduano, Your Honor.  There's also an affidavit with

19  probably substantial exhibits that we've also put on the

20  PACER.

21         THE COURT:  Right.  That's part of that opposition

22  brief, right?

23         MR. PADUANO:  There are two separate instruments,

24  Your Honor, two separate documents.

25         MS. KURTZ:  The brief, Your Honor, is about 16

1   pages and then there's a rather -- you know, about an inch

2   stack of exhibits attached to an affidavit, which was a

3   document filed just after the memorandum.

4          THE COURT:  Right.  I think the way it got filed

5   -- and I just want to make sure I'm reading the right thing

6   -- is that the affidavit got filed along with the brief as

7   an attachment to the brief.  I just want to be sure that's

8   what you want me to read?  And I'm looking -- it got filed

9   at 2:59, so I'm not going to feel too bad that I didn't get

10  to read it before I got out here.

11         MR. PADUANO:  That's fine.  No, Your Honor, of

12  course not.  I'm looking at Docket Number 146 that --

13         THE COURT:  I've got document 14 is the brief.

14         MR. PADUANO:  Correct.

15         THE COURT:  And then it has attached to it an

16  affidavit and then the affidavit has attached to it, 21

17  exhibits.

18         MR. PADUANO:  Correct, Your Honor, yes.

19         THE COURT:  That's it?  Okay.  Let me just step

20  down and let me go read that.  I'm just going to have

21  everybody hold on the phone while I go back and read it.

22  I'm sure this will be ten or 15 minutes and I'll come back

23  and we'll restart the hearing.  Thank you.

24      (Recess taken from 3:07 p.m. to 3:18 p.m.)

25         THE COURT:  Okay.  Ms. Kurtz, let's go ahead.

1         **MS. KURTZ:**  Thank you, Your Honor.  Mr. Moak may

2  have just stepped to the men's room.  He'll be in just any

3  minute.  I just wanted to tell the Court we're ready to go

4  though.

5         **THE COURT:**  Okay.

6         **MS. KURTZ:**  Your Honor, I think that -- I've been

7  debating here.  I think I'm just going to start in

8  chronological order how this began and bring us to the

9  current, which will then lead into why we're here today, why

10  we're entitled to a Temporary Restraining Order and meet the

11  standard for that and the specific relief we're asking the

12  Court for today, based on the pleadings that are live in the

13  Delaware action.

14         If the Court has the Exhibit Book that was

15  prepared by the Plaintiffs/Debtors in front of you, I'm

16  going to just highlight through what those exhibits are.

17  That will make more sense when I offer those exhibits into

18  evidence, Your Honor.

19    **(Plaintiffs/Debtors Exhibit Number 1 marked for**

20  **identification.)**

21         **MS. KURTZ:**  If you'll look at Exhibit Number 1,

22  the actions between the Delaware Defendants -- I'm sorry,

23  the Delaware Plaintiffs, who are the Defendants in the

24  adversary proceeding, started when they filed a Verified

25  Complaint, which we have as Exhibit Number 1, alleging what

1  they claim on their own, if you look at page 1 to be a

2  shareholder's derivative action claims brought against the

3  Debtors and certain of the other individual Defendants that

4  have been named in the Delaware action.

5       **(Plaintiffs/Debtors Exhibit Number 2 marked for**

6  **identification.)**

7           **MS. KURTZ:**  And that matter, Your Honor, if you'll

8  notice Exhibit Number 2, was dismissed by the court -- by

9  the Chancery Court of Delaware for a failure to follow

10  certain of the rules or to state it even more objectively.

11  Apparently there was a demand by the Plaintiffs in that case

12  for certain information.  The Defendants had not had a

13  sufficient time to respond to that demand for information.

14  The Chancery Court said, "I'm going to dismiss this action

15  and give them a chance to respond."

16       **(Plaintiffs/Debtors Exhibit Number 3 marked for**

17  **identification.)**

18           **MS. KURTZ:**  Shortly after doing that, Your Honor,

19  if you'll look at Exhibit Number 3?  Plaintiff's First

20  Amended Petition was filed in the State District Court in

21  Harris County, Texas.  It is virtually identical to Exhibit

22  Number 1 and it was filed two months after the dismissal of

23  Exhibit Number 1 and after the entry of the Order, Exhibit

24  Number 2.  These claims are also in derivative in nature.

25  They say so themselves on page 3 and otherwise in that

1    Complaint.  They are very similar, if not verbatim, in many

2    cases to the allegations that are found in Exhibit Number 1.

3        **(Plaintiffs/Debtors Exhibit Number 4 marked for**

4    **identification.)**

5            **MS. KURTZ:**  There was an Amended Motion to Dismiss

6    and an Order granting that dismissal, which we've marked as

7    "Exhibit Number 4," where the Defendants in the State Court

8    action in Texas, which were the same as the Defendants in

9    the Delaware -- the first Delaware action, where they sought

10   and obtained a dismissal of the Texas suit because the

11   claims were derivative in nature and that the Plaintiff

12   lacked standing to bring them.

13       **(Plaintiffs/Debtors Exhibit Numbers 5 and 6 marked for**

14   **identification.)**

15           **MS. KURTZ:**  Exhibit Number 5 is the live

16   Complaint.  Exhibit Number 6 is what we've called a

17   "copycat" or a "Me, Too, Complaint," filed by an additional

18   Plaintiff, the same Defendants.  And that -- those are the

19   two actions, Your Honor, 5 and 6, that we're here on today

20   where the Debtors are asking the Court to enter a Temporary

21   Restraining Order until such time as you can determine

22   whether the claims that have been pled in Exhibits Numbers 5

23   and 6 are property of the estate or otherwise stayed as

24   being direct actions against the Debtor.

25       **(Plaintiffs/Debtors Exhibit Number 7 marked for**

1   identification.)

2          **MS. KURTZ:**  Exhibit Number 7, Your Honor, is the

3   Suggestion of Bankruptcy.  As you know, this bankruptcy case

4   was filed on December 4th, here in this Court, and a

5   Suggestion of that Bankruptcy was filed with the Chancery

6   Court in Delaware advising all of the parties and the Court

7   that the action should be stayed.

8          **(Plaintiffs/Debtors Exhibits Numbers 8 and 9 marked for**

9   **identification.)**

10         **MS. KURTZ:**  Exhibits Numbers 8 and 9, Your Honor,

11  are the current as of the submission of the Exhibit

12  Notebook.  Case histories are what we call "Docket Sheets"

13  for the live actions that Complainant Number -- Exhibit

14  Number 5 and similarly, the one that's at Exhibit Number 6.

15  Those are Plaintiffs' Exhibits Numbers 8 and 9.

16         **(Plaintiffs/Debtors Exhibit Number 10 marked for**

17  **identification.)**

18         **MS. KURTZ:**  In response to the Suggestion of

19  Bankruptcy, there wasn't a pleading filed, but instead, the

20  Plaintiffs in the Delaware action prepared a letter to the

21  Court to the Vice Chancellor, dated December 8th, that's

22  been attached as "Exhibit Number 10," advising the Court

23  that they intended to pursue their claims against the

24  non-debtors.

25         **(Plaintiffs/Debtors Exhibit Number 11 marked for**

1    **identification.)**

2           **MS. KURTZ:**   In response to that letter, the

3    Debtor's Counsel in the Delaware action, Mr. K.B. Battaglini

4    of the Greenberg Traurig Law Firm, who is -- has a motion

5    pending in this Court for retention of special counsel to

6    continue that -- it's necessary to continue that

7    representation -- filed a response to the December 8th

8    letter, which you'll find at Exhibit Number 11, advising the

9    Delaware Court, not only of the automatic stay against the

10   Debtors, but also as to the parties related to the Debtors

11   where the claims were aggregated and also advising that

12   Court and all of the parties that the claims were derivative

13   in nature.

14           As -- if you'll go back, Your Honor, I'll do

15   this in the argument now, but if you'll go back and review

16   Exhibits Number 8 and 9, notwithstanding the Suggestion of

17   Bankruptcy filed December 4th and the letter December 11th

18   indicating that the Debtors' view was that the claims

19   alleged in the Delaware action were derivative in nature,

20   the Plaintiffs continued to prosecuted their claims, not

21   again the Defendants, but against all of the non-debtor

22   Defendants, notwithstanding the Debtors' position and

23   statement to the Court that they belong to the Debtor and

24   that the Plaintiffs should not proceed.

25           **(Plaintiffs/Debtors Exhibit Number 12 marked for**

1    **identification.)**

2         **MS. KURTZ:**  The -- as a result of that, Your

3    Honor, I sent a letter, which is Exhibit Number 13, to all

4    of the Counsel in the Delaware action -- I'm sorry, Exhibit

5    Number 12.  I sent a letter to all of the Delaware Counsel

6    advising them not to proceed and if they did, that we would

7    come to this Court and seek injunctive relief, that we

8    prefer not to do that, that it was the Debtors' position, as

9    stated by Mr. Battaglini already, that the claims that they

10   pled were derivative in nature and belonged to the estate

11   and should be pursued by the estate, or a designee of the

12   estate.

13        **(Plaintiffs/Debtors Exhibit Number 13 marked for**

14   **identification.)**

15        **MS. KURTZ:**  The response to that was Exhibit

16   Number 13, where they said essentially they intended to

17   continue to prosecute those claims and causes of action.

18        **(Plaintiffs/Debtors Exhibit Number 15 marked for**

19   **identification.)**

20        **MS. KURTZ:**  If you'll skip to Exhibit Number 15,

21   which was added in an Amended Exhibit List, Your Honor,

22   today the Plaintiffs' Counsel wrote another letter to Vice

23   Chancellor Strine, reiterating that they intended to go

24   forward with their claims against the non-debtor Defendants

25   and arguing that the stay did not apply.

1       **(Plaintiffs/Debtors Exhibit Number 14 marked for**

2       **identification.)**

3               MS. KURTZ:  Exhibit Number 14, Your Honor, is just

4       various emails indicating that notice of today's hearing was

5       appropriate under the circumstances for a Temporary

6       Restraining Order.

7               THE COURT:  All right.

8               MS. KURTZ:  I'd move for submission of Exhibits 1

9       through 15, Your Honor.

10      **(Plaintiffs/Debtors Exhibits Numbers 1 through 15**

11      **offered into evidence.)**

12              THE COURT:  All right.

13              MS. KURTZ:  They've been sent to all of the

14      parties.  To my knowledge, on the phone, they were sent to

15      them along with the Exhibit List.  They were sent to them by

16      PDF yesterday.

17              THE COURT:  All right.  Let me hear from

18      Mr. Paduano to start with.

19              MR. PADUANO:  Your Honor, the documents are all to

20      our eyes authentic.  I don't have any objection as to that.

21      We're a little bit handicapped, given the shortness of

22      notice we've had for the hearing to make -- complete so we'd

23      ask the Court at some point for leave to make a supplemental

24      -- to accept the documents introduced for completeness, but

25      as to these exhibits, we don't have objection.

1          **THE COURT:**  Thank you.  We're going to admit them

2    solely for the purpose of the TRO Hearing, not for the

3    purpose of any other hearing, so that if you do need to

4    offer something for completeness, whether we issue the TRO

5    or not, we're obviously going to get to some preliminary

6    injunction hearing, and at that point, all your objections

7    will be preserved and you can offer them at that point, if

8    you need to.

9        **(Plaintiffs/Debtors Exhibits Numbers 1 through 15**

10   **received in evidence.)**

11          **MR. PADUANO:**  Thank you.

12          **THE COURT:**  Thank you.

13          **MS. KURTZ:**  Thank you.  Your Honor, we're here

14   today for Temporary Restraining Order Hearing.  We're not

15   asking the Court to decide on the merits today, you know, on

16   two days' notice without adequate time for the Adversary

17   Defendants to respond, to determine unequivocally that the

18   claims -- although we think you could, we're not asking you

19   to do that, that they are unequivocally derivative claims.

20   It is the Debtors' belief based on admissions by the

21   Delaware Plaintiffs themselves, by comments from the

22   Delaware Court, and by following the case law, that the

23   claims are very likely derivative in nature and belong to

24   the estate.

25          And if the Plaintiffs in the Delaware action

1    are allowed to proceed on those actions, which they've

2    indicated as late as today, that they intend to do, absent

3    an Order from this Court, that there will be irreparable

4    harm and injury to the Debtor.

5              And the reason for that would be this is not

6    something where you can say -- proceed and if I'm wrong, we

7    can sue you and we can get a monetary damage.  We're talking

8    about litigation proceeding, so to the extent those claims

9    are owned by someone, and we are not able to prosecute them,

10   that would be an irreparable injury.  That is, in essence,

11   someone taking over control and direction of an asset of the

12   Debtors' estate where we would have no control over how

13   those proceeded.

14             The other -- if there's -- Exhibits Numbers 8

15   and 9, I think, Your Honor, if you go through those, contain

16   adequate evidence for the Court to show that there is an

17   emergency at hand here.  There is discovery outstanding.

18   There are answers that are due by these non-debtor

19   Defendants.  The Court -- I think it's called the "Court of

20   Chancery" in Delaware and the Vice Chancellor there has

21   already entered a ruling that the discovery should proceed

22   at an expedited basis.

23             So if this Court does not enter a restraining

24   order, I think that that lawsuit in Delaware will just

25   proceed far enough down the path that when this Court makes

1  a determination that the claims in the underlying action are

2  property of the estate, we won't be able to "unring the

3  bell."

4          The standard, Your Honor, is irreparable

5  injury, whether there's an adequate remedy at law,

6  likelihood that we would prevail on the merits, once there

7  is a trial, a balance of hardships and the effect on public

8  interest.

9          It's clear that the Plaintiffs intend to

10  proceed absent an Order of the Court.  The injury, Your

11  Honor, I've indicated is irreparable in that it can't be

12  remedied by monetary recompense.  There's no way to say,

13  "We'll pay you back later, if you just let us proceed

14  today."

15          The Delaware Plaintiffs have argued in their

16  response that they should be allowed to proceed and if at

17  some point in the future you decide the claims are

18  derivative, well they will have been prosecuting those on

19  behalf of everybody.  But I think if those claims belong to

20  the estate, the estate can do with them as they please.

21  They could be turned over to the Committee, which, in fact,

22  has already been discussed to the Committee Counsel to

23  investigate and prosecute those claims, as may be

24  appropriate.  They could be compromised, settled.  They

25  could be negotiated in some way as part of a plan.  There

1    are a lot of different things, strategy or otherwise, that

2    could take place if the Debtors themselves were able to

3    manage their own assets.

4              The no adequate remedy at law, Your Honor, is

5    very similar to the irreparable injury.  Sometimes those two

6    are combined when the Court analyzes whether the standard

7    has been met.  Here again, no monetary reward would do, no

8    "unringing of the bell."

9              The substantial likelihood of success on the

10   merits is the most important element.  I'd like to reserve

11   that for last so I could go through the actual causes of

12   action, Your Honor.

13             The balance of the hardships:  The only

14   injury to the Delaware Plaintiffs, Your Honor, would be a

15   delay of time.  The injury to the Debtors is an irreparable

16   loss of their legal right to pursue their claim.  It would

17   be like giving a hard asset away to someone and saying,

18   "Sell it," and we could always take the money later, but

19   they may not -- they may not know the market.

20             They may not sell it for the right price.

21   They may not -- we don't know what they would do with it.

22   And so here, particularly because we're not talking about a

23   hard asset, but a legal right, we have no idea what the

24   strategy would be, or how that litigation would proceed, or

25   whether there would be benefit to other creditors that might

1  be reaped, if, for example, the Unsecured Creditors

2  Committee Counsel were to pursue those claims for the

3  benefit of all of the creditors of the estate.

4          The truth is, there's probably no harm to the

5  public interest.  This is always a difficult element to meet

6  with respect to a TRO, I think, in a Bankruptcy Court, but I

7  think it is always in the public's interest to maintain the

8  status quo until the Court of proper jurisdiction can

9  determine whether there's a right that should be preserved

10 here, and that's what we're trying to do.

11         With respect to substantial likelihood of

12 success on the merits, Your Honor, you have to -- this Court

13 has already written an opinion, which is squarely on point

14 with our facts here.  I don't know that we could have a set

15 of facts any more exact to the facts in the Court's case,

16 *Dexterity Surgical*, at 365 Bankruptcy 690.  In that case,

17 the Court looked to the standard set forth in *Tooley versus*

18 *Donaldson*.  It's *Tooley versus Donaldson Lufkin* -- and I can

19 never pronounce the last name, at 845 A2d 1031, Delaware,

20 2004.

21         The Fifth Circuit has instructed the Courts

22 in the Southern District to look to state law to determine

23 if claims are direct or derivative and this Court has held

24 in *Dexterity* that actions involving the internal affairs of

25 the "corporation" are governed by the law of the state of

1    incorporation.  Here the claims brought by the Delaware

2    Plaintiffs focus on Deep Marine Holdings, Inc., which is a

3    Delaware corporation.

4              From this point, Your Honor, the facts of the

5    underlying lawsuit in Delaware are almost exactly like the

6    facts in *Dexterity*.  What the Court found in *Dexterity* and

7    following the *Tooley* standard, is that the proper analysis

8    to distinguish between direct and derivative actions should

9    be based on who actually suffered the harm, the corporation

10   or the person bringing the claim and who would receive the

11   benefit if the harm was undone.  In other words, once there

12   is a remedy and a recovery, who is going to get that?  The

13   individual shareholders or the Debtor themselves?

14             And seven, analyzing the first prong, it's

15   helpful to ask -- in other words, when -- not just who the

16   name is on the pleading.  You know, "I've sued in my own

17   name and I say that I've been injured," but instead, it's

18   helpful to ask, "Has the Plaintiff demonstrated that they

19   can prevail without showing that there was an injury to the

20   corporation?"

21             And if you go through the specific causes of

22   action in the underlying Delaware case, you can see that

23   they are either directly against the Debtor and/or stayed

24   and we don't really need a TRO, there's been no indication

25   by the Plaintiffs in the Delaware action that they intend to

1  proceed against the Debtor, for example, on the appraisal
2  rights claims.  So while the first cause of action is for
3  appraisal rights against DMT, we don't need a TRO for that.
4  That would be automatically stayed.
5         The second cause of action, Your Honor, and
6  similarly, causes of action two through six, the first --
7  the cause of action two is a claim against the officers and
8  directors for breaches of their fiduciary duty.  And then
9  three, four, five and six are -- I was going to say
10 "clever," but I don't mean to be pejorative -- sort of
11 interesting variations of breaches of fiduciary duty.
12        The third cause of action is a claim against
13 the controlling shareholder Defendants for their breaches of
14 fiduciary duty.
15        The fourth is a claim against the controlling
16 shareholder Defendants for unjust enrichment, which they got
17 as a result of that breach of fiduciary duty.
18        The fifth one is the claim against the
19 controlling shareholder Defendants for aiding and abetting a
20 breach of fiduciary duty.
21        And the sixth one is a claim against the
22 officers and directors for aiding and abetting a breach of
23 fiduciary duty.
24        So they're all really a breach of fiduciary
25 duty claim.  And so they allege in their Complaint, Your

1   Honor, in all of them this -- the ones that are live and in

2   all of the preceding ones that were dismissed where they

3   clearly represented in their pleadings themselves that they

4   were holding derivative claims, that the officers and

5   directors and the other individuals that have been sued,

6   were aiding and approving DMT actions for the private

7   purposes of the controlling shareholders, that would be the

8   Otto Candies entities and also the Kazeminy entities.

9            These actions allegedly include gross misuse

10  of corporate funds, self dealing, corporate looting, failure

11  to follow corporate formalities, gross mismanagement.  They

12  have alleged very specific things, like money going out of

13  the company to some Senator's wife.  They've alleged that

14  there were improper dealings on commercial transactions

15  between the insiders and the company that have caused the

16  company to take on additional debt, which then enabled that

17  particular shareholder to flip that debt to more equity than

18  he was entitled to.

19            But all of those causes of action, you have

20  to prove that there was some damage to the company, and if

21  there was a remedy, if there has been money transferred

22  improperly -- for example, from the company to the Senator's

23  wife -- that would be a fraudulent transfer and the money

24  for that would not go back to the shareholders, who may have

25  been harmed from that, it would go back to the company

1    because everybody -- all of the creditors and parties-in-

2    interest of the Debtor would be harmed by that and would be

3    entitled to reap the benefit of that money coming back into

4    the Debtor.

5              And so, the Plaintiffs, while they may have

6    been injured, they have been no differently injured than

7    people similarly situated on whose behalf they should be

8    bringing the claims and the remedy would benefit everyone.

9    It would -- the money would come back to the Debtor and the

10   proceeds -- the remedy for that would benefit all of the

11   Creditors and parties-in-interest of the Debtor.

12             Your Honor, the seventh -- I just was going

13   to reiterate that argument.  I think I can go through it

14   with each of the other claims, but I think two, three, six

15   are identical, Your Honor.  They are just some version of

16   the breach of fiduciary duty.

17             The seventh cause of action, Your Honor, is a

18   claim against the Defendants in the Delaware action for

19   fraud through active concealment of material facts.  And you

20   know, I was -- you know, honestly I would say this claim is

21   a little harder to call, but where I think the other ones

22   are absolutely and unequivocally derivative actions for the

23   benefit of the estate, I would say that the seventh cause of

24   action is probably both, something that would be a

25   derivative action for the benefit of all of the creditors

1    and something where the minority shareholders could argue

2    that the failure to disclose certain information was

3    directly harmful to them, so there would be an overlap

4    there.

5             But again today, Your Honor, I don't know

6    that we have to make a concrete decision.  We have to show

7    that there is a high likelihood that we would appeal on the

8    merits when there is an actual trial and the fact even that

9    this cause of action could be either one and the same with

10   the eighth one, Your Honor.  Maybe the eighth one -- or the

11   seventh one less so than the eighth one -- where there is --

12   where there could be both.  I mean, I don't know that it

13   would -- I don't think that there is a single claim in here

14   that belongs just to the Defendants, but I think that seven

15   and eight may arguably belong to both.

16            But clearly you could show on the fraud

17   through active concealment of material facts, that it is the

18   Debtor that would reap the benefit, if there was a remedy.

19   The -- I think the argument is that the officers and

20   directors falsified corporate documents to cover up improper

21   payments to third parties.  I think this was the cause of

22   action where they alleged that there were payments to Otto

23   Candies that shouldn't have been made and that that enabled

24   the company to increase the -- carry a higher debt in favor

25   of Otto Candies, which he was then able to flip for a higher

1   percentage interest.

2          So again, they may have been harmed by that.

3   There may be a duplication where there is a derivative

4   action and a direct action, but there is also a derivative

5   action at stake.

6          The eighth cause of action fraud through

7   silence in the face of a duty to disclosure is very similar,

8   both in terms of the facts that are pled, and the cause of

9   action itself for fraud through active concealment -- I'm

10  not sure what the difference is between active concealment

11  and failure to disclose through silence.  I mean, to me, the

12  allegation is that there is a fraud, that they had

13  information they should have disclosed.  Bad things were

14  happening.  The company was looted.  There was financial

15  hardship and damage to the company, which should be

16  rectified for the benefit for all of the Creditors and

17  parties-in-interest.

18         The ninth cause of action claimed for --

19  claimed against the controller shareholder Defendants for

20  wrongful equity dilution:  This is phrased as if it were the

21  shareholders who were hurt by the dilution of the Debtors'

22  equity.  You know, the Court has been clear in the *Dexterity*

23  case and as guided by the Fifth Circuit not to look at how

24  the claims are actually pled or how they're titled, you

25  know, what they called them, but, in fact, to look at the

1    substance of the claim itself.  And the claim for dilution

2    rests on the premise that the Debtors overpaid for assets

3    sold and leased to them by Otto Candies, the same stories

4    again, and then converted that to inflated debt equity and

5    diluting the outstanding shares.

6              So they have pled it as if they were harmed

7    individually, but they weren't.  And it's the company that

8    was harmed by those actions and that would make that a

9    derivative claim.

10             The tenth cause of action is for an

11   accounting and while that is a direct cause of action, it is

12   a claim against the Debtor and would be stayed by the

13   automatic stay without need of a Temporary Restraining Order

14   from this Court.

15             So Your Honor, it's a very long way of saying

16   that this Court has exclusive jurisdiction to determine what

17   is property of the estate by arguing -- by focusing the Vice

18   Chancellor Strine in the Delaware Chancery Court on whether

19   the stay applies to Debtors versus non-debtors, it skips a

20   really important issue.  I think in general -- and at first

21   glance, if this were a different kind of lawsuit, if it were

22   not one that contained derivative actions, that would be a

23   very strong and compelling argument to the Court in Delaware

24   that:  Why are these non-debtors reaping the benefit of an

25   automatic stay?

1          And the parties there might be left with just
2     the argument about the aggregation of claims, that there is
3     indemnity provisions that sort of -- what we call in Texas,
4     "inextricably intertwined," which they don't use in
5     Delaware, but that kind of argument.  In this case, though,
6     I think the more compelling argument is that the claims
7     belong to the estate.  So it's not that the actions are
8     stayed against non-debtors.  It's that they very likely
9     should proceed, but they should proceed through this Court,
10    either by the Debtor or a designee of the Debtor.
11          And I think that's important.  I understand
12    the Delaware Plaintiffs' argument, which they pled in sort
13    of a notice way, their response, which I also understand on
14    short notice, that you know:  Why would we want the Debtors
15    to pursue this claim?  I mean, you know, they are the
16    targets here, but the law says that those claims belong to
17    the Debtor and now really the Debtor is a new entity.
18    Courts recognize that Debtors are really a new and different
19    entity than the entity that existed on December 3rd and the
20    difference we have here is that I have a Creditor's
21    Committee who is very interested in these same claims, to
22    investigate them, to determine if there has been wrongdoing
23    by the officers and directors.
24          So while those claims belong to the estate, I
25    would anticipate from a lot of angles, that there would be

1    constituencies already active in this case, who may not want

2    the Debtor to have sole control or any control over those

3    claims and causes of action.

4             **THE COURT:** Didn't we displace management?

5             **MS. KURTZ:** Yes.  We've got a Chief Restructuring

6    Officer.  That's why I was going to say, so --

7             **THE COURT:** So forgetting the Committee for a

8    minute, we don't have --

9             **MS. KURTZ:** Correct.

10            **THE COURT:** -- the same management people?

11            **MS. KURTZ:** We do not.

12            **THE COURT:** Okay.

13            **MS. KURTZ:** We do not, although to be clear and

14   you know, Your Honor, the former President and the former

15   Chief Financial Officer are still assisting the Chief

16   Restructuring Officer, in different capacities.  They both

17   are extensively helping with marketing efforts, either for

18   the sale of the vessels or for investors to invest in the

19   company for reorganization.

20                 I'm not prepared to say today what the long-

21   term likelihood is of employment for those --

22            **THE COURT:** But official control is vested, as I

23   recall by our Order, exclusively in the CRO.

24            **MS. KURTZ:** And he is exercising that exclusively.

25            **THE COURT:** Okay.

1          **MS. KURTZ:**  So he would either keep those, or if

2    there was substantial push back and/or an order from this

3    Court, we have had preliminary discussions with the

4    Unsecured Creditor's Committee, you know, so that they could

5    do conflicts checks, if we -- if we needed to punt that

6    particular litigation or investigation, would they be

7    prepared to take that?

8               So we believe strongly that the claims belong

9    to the estate for the benefit of all of the creditors and

10   parties-in-interest.  We understand that there could be an

11   argument that the Debtor may not be the perfect person to

12   pursue those.

13              Our argument back would be:  We have a Chief

14   Restructuring Officer.  We have independent management

15   today.  If you're still not satisfied, we have an Unsecured

16   Creditor's Committee.  Those make the facts very different

17   than they were on December 3rd and prior in time.

18          **THE COURT:**  All right.  Mr. Paduano, what kind of

19   response do you have?

20          **MR. PADUANO:**  Your Honor, thank you very much.  I

21   want to make it very clear that what's pending in the

22   Delaware Court is not a derivative action.  They're direct

23   claims against the Defendants there.  And the Counsel has

24   correctly stated that we have disclaimed any interest in

25   anyway of pursuing anything in light of the bankruptcy stay,

1   any claims against Deep Marine Holdings, Inc. or Deep Marine

2   Technology.

3          So Your Honor, then to the extent the

4   argument and the application for this Court is based on the

5   analogous of how we've got derivative claims, it's just not

6   the case.  Moreover, the reliance the Court has just heard

7   about Your Honor's decision in *Dexterity* and the Delaware

8   case that underlies that concern shareholders.  We are not

9   shareholders of the Debtors.  Our shares have been canceled,

10  in a word, and the Court can look at Exhibit "O" to my

11  affidavit.  It shows the merger of what our interest to

12  another entity and don't have an interest right now, the way

13  the law works in Delaware, in either of the Debtors.

14         And clearly, Your Honor's decision in

15  *Dexterity* and the Delaware *Tooley* case be to shareholders

16  and then was trying to evade the automatic bankruptcy stay.

17  We're not shareholders.  They and another machination, which

18  I'll get to in a second, cancelled our shares by doing a

19  short form Delaware merger.

20         And Your Honor, that gets to the point of

21  what's going on here.  What's going on here, as Counsel

22  says, they asked the Delaware Court to stay our action.

23  They filed the Suggestion of Bankruptcy.  That is attached

24  to Exhibit F of my Affidavit, giving notice once the

25  Delaware Court was going to allow the case to proceed,

1  actually on an expedited basis, that these entities that

2  have been merged literally out of business, were going to

3  file for bankruptcy and the Delaware Court, as Counsel

4  correctly stated, set an expedited schedule for discovery.

5            And the reason for that is that these

6  Defendants here, specifically Mr. Candies and Mr. Kazeminy,

7  the Candies' entities, Mr. Candies and Mr. Kazeminy, we

8  think seriously made misrepresentations to the Delaware

9  Court.  This dispute started in the fall of 2008 when on a

10 confidential basis, a source came to our clients.  It's a

11 very small corporation with very few shareholders, that

12 there was wrongdoing.  Our client, under Delaware law, made

13 a demand as they must to the corporation asking that the

14 corporation investigate the wrongdoing and see if there was

15 merit to it, and we made that demand.

16           For more than five months, nothing happened

17 with that demand.  In the interim, we sued.  We did, in

18 fact, file a derivative action in Delaware.  And the

19 Defendants met that that action with a Motion to Dismiss,

20 saying that our client was not ripe, that dismissal was

21 because the Special Committee Minister Battaglini was

22 counsel to -- Greenberg Traurig was Counsel to -- said it

23 hadn't had enough time after three months to complete its

24 work.  So the Delaware Court dismissed without prejudice and

25 allow the Special Committee to complete its work.

1             The Special Committee completed its work on

2    June 30th, 2009.  The next day -- there's a typo in my

3    affidavit, Your Honor.  I apologize for that.  The next day

4    on July 1st, 2009, our shares were cancelled -- our clients'

5    shares were effectively cancelled and there was a short-form

6    Delaware merger, which the Kazeminy entities and the Candies

7    entities were entitled to do because of their vast majority

8    holdings in this closed corporation.

9             Thereafter, Your Honor, we filed the current

10   action that the Defendants seek to have, in effect, stayed

11   because they believe in some form that it runs afoul of the

12   stay, and our claims don't.  This was, as they say, the

13   Court when it takes the time to go through our papers, there

14   are a few shareholders.  We identified wrongdoing.  The

15   company had been valued as we pled in Delaware at more than

16   100 million dollars -- derivative transaction for more than

17   100 million dollars.  On July 1st, 2009, the company's value

18   was nothing.  There's a valuation that's attached in the

19   papers here.  I'm sure the Court noticed a merge in

20   Exhibit O that shows their shares were worth a dollar.

21            And Your Honor, we've got serious claims

22   against these non-officers, non-directors of the bankruptcy

23   entities for what they've done to our shares.  They had

24   duties to us.  They have fiduciary duties to us as majority

25   shareholders, as organizers of the investment, a host of

1  duties and frankly, the reason that they wrote to your Court

2  seeking a TRO is because the Vice Chancellor Shrine is, I

3  think, going to hold her feet to the fire and say that that

4  entities that are not encompassed by the Bankruptcy Court

5  stay are entitled to that protection, and that includes

6  Mr. Candies, Jr., Mr. Candies, III, Mr. Kazeminy, DCC

7  Ventures and JK Holdings Corporation and KOC, Otto Candies,

8  LLC and obviously there's issues with the former directors,

9  who might have greater claim to the protection of this

10 Court, but I don't think that the organizers of the

11 investment.  Outside investors, who were neither directors,

12 nor officers, who were employees of the bankrupt entities, I

13 don't think they get to enjoy the stay at all.

14            So we do have these direct claims because

15 they have done things that have destroyed our values.

16 Counsel has conceded that the ultimate chance we take of the

17 success on the merits by the Debtors here is nil.  She just

18 said that some of these claims may be joint, even if their

19 analysis somehow they've got a derivative action in

20 Delaware, even though it's not apprised, at some point we

21 get to pursue those claims against these people who have

22 wronged us and I don't see how a stay can be issued when

23 we've got a concession that claims may be pursued at all.

24            As to the argument somehow that there's

25 irreparable injury here, these entities, as far as we know

1   in Delaware, we've been deprived of lawsuit, has no idea

2   what has happened to them at all, except for the valuation

3   that showed them at no values as of July 1st, 2009.  I don't

4   know how they could possibly be injured by re-pursuing

5   claims against non-officers, directors and employees,

6   agents, in another forum at all.

7           And this concept, somehow that the claims

8   that we have regarding our shares and what was our seven

9   million dollars that we were entitled to, the value of our

10  shares before this deceit started, somehow belongs to the

11  corporation or to other creditors, I don't see that at all.

12  I don't see how they could possibly apply because again, our

13  claims don't run against the corporation.  Now in light of

14  the stay, we can't pursue, but clearly against the actions

15  that Mr. Kazeminy took and Mr. Otto, the entities and others

16  that they took, we clearly get to pursue those.

17          They ran the companies as their Candy Store

18  and we got close to them and came very close to firming

19  things up in Delaware.  They cancelled out shares -- a very

20  aggressive act.  It clearly got the attention of the

21  Delaware Court, which is why we're on the phone today

22  because I don't know how they're going to explain that

23  result to the Delaware Court.  So the concept somehow that

24  these claims should be -- our claims in Delaware should be

25  stayed and surrendered to Counsel that's being retained by

1  these two entities that were worth a dollar as of July 1st,

2  2009 because of being pursued by Counsel, that is nominated

3  by the Debtors to pursue them as to others where they're

4  speculating that at some point their bills are being paid by

5  Mr. Kazeminy and Mr. Candies, who orchestrated these

6  entities and do stuff to invest in the entities and have

7  done everything to frustrate our interest into that.  The

8  concept of this claim is being pursued diligently, fairly --

9  analyzed diligently and fairly at all, so we cannot -- I

10 don't see how Counsel can possibly overcome that conflict in

11 any way.

12              So even if there were Proof of Claims

13 ultimately it wouldn't be the estate controlled by these

14 same entities that would be pursuing those claims.  So, Your

15 Honor, this is not a situation where the *Dexterity* decision

16 applies.  It's not something where you've got parties, us,

17 in front of you who are trying to end around the stay at

18 all.  I think they've been chewed by half by cancelling our

19 shares.  They began arguing that we were shareholders trying

20 to get around your stay, but we're not.  We're former

21 shareholders.  They kicked us out.  We don't have a claim,

22 according to them if they're to be believed as to the equity

23 or debt or assets or anything of Deep Marine Holdings and

24 Deep Marine Technology and the four special purpose entities

25 that we're unfamiliar with, that are part of the action in

1    your Court.  They kicked us out.

2              So we'd like to sue them, but you know, the

3    stay is there, but at the end of the day, if they're right,

4    they've short-form merged us out of our equity positions.

5    You know, we don't have a claim there.  We have an appraisal

6    proceeding in Delaware that's already been commenced, that's

7    starting, that under Delaware law is supposed to go forward

8    to assign a value, their value, to our shares we would

9    clearly then say because that involved the Debtors of Your

10   Honor's Court.

11             So Your Honor I don't think there's a record

12   in front of you to take the extraordinary action of truly

13   taking away the jurisdiction of the Court in Delaware that's

14   got these claims in front of it that is dispute has been

15   kicking around in various forms and so for well over a year

16   and we have the Court in Delaware to help us.  We got in the

17   Court in Delaware to expedite things because the assets have

18   been taken away from us and now we must pursue these

19   individuals.

20             Our task is quite difficult and we take this

21   as just another effort to make it that much more difficult

22   and much more expensive for our clients.  So we'd ask the

23   Court to deny the TRO Application in its entirety to the

24   extent that if the Debtors want to go forward after some

25   discovery to see what actually is going on and where the

1  right to remedies actually lie after discovery, we could

2  appear back before the Court for a preliminary injunction, I

3  would ask that the most that this Court does is strike at

4  this time.

5          Thank you.

6          **THE COURT:**  All right.  Thank you.

7          All right.  I'm granting the Temporary

8  Restraining Order and let me give the reasons why I'm going

9  to grant the Temporary Restraining Order:  Actually, I

10 oftentimes deny Temporary Restraining Orders because I think

11 that we need to be extraordinarily careful in issuing one,

12 but having reviewed really the four corners of the Complaint

13 to determine what the story is, I think that the Plaintiffs'

14 view of what the Complaint says -- not maybe what it could

15 say, not maybe what somebody wants it to say, but what it

16 says unambiguously largely states claims that are property

17 of the estate.

18         I am guided today by Fifth Circuit law that

19 says that if something is arguably property of the estate,

20 that it is a violation of the automatic stay to exercise any

21 control over it or to take any action against it and I refer

22 the parties to the *Chestnut* case at 422 F.3d 298.

23         We have jurisdiction over this matter under

24 20 U.S.C. Section 1334.  It is a core matter under 20 U.S.C.

25 Section 157 in determining whether to grant a Temporary

1    Restraining Order, I will follow Fifth Circuit law under

2    *Speaks versus Cruz*, at 445 F.3d 396, a 2006 Fifth Circuit

3    case, the standard for standard, substantial likelihood of

4    success on the merits, a substantial threat of irreparable

5    harm if the injunction is not granted, that the threatened

6    injury to the Movant outweighs any harm to the Non-Movant

7    that may result from the injunction and that the injunction

8    will not undermine the public interest.

9              First, is there a substantial likelihood of

10   success on the merits?  My answer is that I think there's a

11   pretty overwhelming likelihood of success on the merits as

12   the Complaint is now pled.  Now I think that Mr. Paduano

13   makes persuasive arguments that there may be a complaint

14   that they can file that would not violate the automatic stay

15   and when an amended complaint gets presented to me, if it

16   gets presented before the expiration of the TRO or if it

17   gets presented at the Preliminary Injunction Hearing, this

18   ruling may change and it may change very dramatically for

19   those of you that are interested in the outcome.

20             I'm ruling on this Complaint, not really on

21   the Complaint described by Defendant's Counsel.  Let me just

22   go through -- and I'm not going to go through every

23   paragraph of the Complaint right now, but I'm going to go

24   through some of the Complaint and just say why I think this

25   is a fairly obvious decision.  The Complaint starts off by

1   saying, "This action is filed by the victims of a conspiracy

2   to loot Deep Marine Holdings and its subsidiaries, including

3   its wholly owned subsidiary, Deep Marine Technology."  It's

4   a corporate looting case.  That is what is pled.

5            When I do to the causes of action, I think

6   everybody agrees that the cause of action for appraisal

7   rights is stayed.  The second cause of action is a claim for

8   general breach of fiduciary duties, without really

9   describing what those breaches are, but referencing back to

10  paragraphs 1 through 148, that largely describe the looting,

11  the self-dealing, the misuse of corporate funds, and

12  describe them in way that, you know, frankly are very

13  persuasive and offensive if true.  I'm obviously not

14  deciding what's true, but there is a major corporate looting

15  case is pled here.

16           When I look at the third cause of action, it

17  gets more specific than the second.  Paragraph 157, however,

18  goes and says, "Otto Candies sold vessels and equipment,

19  some of which were not seaworthy and required hundreds of

20  thousands of dollars to repair to DMT at inflated prices

21  while Otto Candies was a controlling shareholder of DMT and

22  while Otto Candies, III, was a member of DMT's Board of

23  Directors.  By reason of the actions described above, Otto

24  Candies and Otto Candies, III, breached their fiduciary

25  duties to DMT by engaging in a classic case of self-dealing

1  thereby looting DMT and its subsidiaries, unfairly diluting

2  minority shareholder Plaintiffs and diminishing the value of

3  Plaintiffs' DMT stock."

4           This cause of action has nothing to do with

5  the theft of the shares.  It has to do with looting of the

6  corporation.  The unjust enrichment is the same kind of

7  Complaint.

8           The fifth cause of action, again we don't get

9  the specifics.  We're incorporate prior paragraphs, but by

10 incorporating them in each of these situations as the basis

11 for the cause of action, what the Plaintiffs rely on is

12 injury to the corporation for the measure of the damages to

13 the Plaintiffs and when they rely on injury to the

14 corporation as the measure of the damages to the Plaintiffs,

15 they are stating a cause of action that in my mind -- at

16 least arguably under *Chestnut* and I think probably more than

17 arguably, belong to the estate to bring.

18          The seventh and eighth causes of action are

19 sufficiently ambiguous that I don't know what they are.

20 Again, they incorporate the prior paragraphs.  By

21 incorporating the prior paragraphs, they arguably are

22 property of the estate and that is the standard I am

23 required to follow under *Chestnut*.

24          The wrongful equity dilution, I agree almost

25 precisely with the way that Ms. Kurtz described it, which

1  although it is described as a shareholder dilution, what it

2  says is that the shareholders were diluted because assets of

3  the corporation were diverted out and by doing that, it

4  diluted the value of the shares by diversion of corporation

5  assets.

6              And finally, of course, the accounting is the

7  direct claim against the Debtors.

8              I find that as pled, every claim is either

9  actually or arguably a claim that is owned by the estate or

10 is a claim against the Debtors.  I therefore find there is a

11 substantial likelihood of success on the merits.

12             With respect to a substantial threat of

13 irreparable harm if the injunction is not granted, I find

14 there is irreparable harm for two primary reasons.  The

15 first is:  The law holds that a violation of the stay is by

16 definition irreparable injury.  So if they are violating the

17 stay by exercising control in violation of Section 362(c) --

18 excuse me, 362(a), that is, in fact, a violation of the stay

19 and it satisfies a substantial threat of irreparable harm.

20             Second, I think there is irreparable harm if

21 the injunction is not granted because in all likelihood,

22 prosecution of the cases is a void act, and if we get to a

23 prosecution and a result and it's void, that result is going

24 to create such a mess, I don't think we'll ever be able to

25 put Humpty Dumpty back together again.  It just makes no

1   sense to allow it to proceed until what is pled is what they

2   have a right to proceed on.

3               Three, that the threatened injury to the

4   Movant outweighs any harm to the Non-Movant that may result

5   from the injunction.  I think absolutely that is the case

6   from what I have seen.  The Debtor owns these claims, at

7   least some of them without question.  All of them the Debtor

8   arguably owns or the Debtor is a Defendant in.  It is

9   unreasonable to believe that somebody else should be able to

10  control that without injuring the Debtor and moreover, the

11  probability that these actions would then ultimately be

12  determined to be void makes the problem even worse.

13              I frankly don't see any harm to the

14  Non-Movants under this situation.  They want to proceed with

15  litigation, but they have not argued or shown me any harm to

16  them in delay other than that they want to move ahead, and I

17  understand wanting to move ahead and we're going to set

18  things relatively promptly here, but wanting to move ahead

19  does not constitute injury.  There just isn't any injury

20  that at least has been argued to me of holding up, taking a

21  breath, and seeing what's going on in this situation.

22              Moreover, an awful lot of what is argued as

23  the injury has to do with the fact that "The crooks are in

24  charge of suing the crooks," is the way that I'm going to

25  put it.  I don't think that's what's going on in this case.

1  One of the very first things that we did was we ordered that

2  the people that are being complained about were divested of

3  control over the case.

4           I know that the folks on the phone don't know

5  me, but I probably have a reputation down here for turning

6  down Motions to Compromise Controversies more than any other

7  judge in this state does.  I do turn those down

8  unfortunately for people fairly regularly and the

9  probability of me rubber stamping a compromise that is going

10 to allow these folks to walk away in the light of -- if I

11 get a good objection to it, it's fairly low.  I mean, I take

12 my 9019 responsibilities with a great deal of seriousness

13 and perhaps more seriously than some people would like for

14 me to do, but I think there probably shouldn't be a whole

15 lot of worry, that I'm going to end up rubber stamping a

16 9019 motion.

17          And I would also tell the folks, you need to

18 come oppose it.  It's not that I'm just going to go out on

19 my own, but opposed 9019 motions here get treated with a

20 great deal of serious evaluation.

21          Finally, with respect to public interest, I

22 think the Fifth Circuit standard is that the injunction will

23 not undermine the public interest.  I don't think this one

24 does, so I'm going to issue the Temporary Restraining Order.

25 It obviously doesn't last very long.  This is the first TRO

1    that I've issued since the new rules.  I don't know if it's

2    a 14-day standard or a 10, but I'm going to look it up.

3              Let me see.  Fourteen days under Rule 7065 as

4    applying Rule 65(b)(2), so we need to have a hearing within

5    the next two weeks.

6              Mr. Paduano, I'd rather set this at your

7    convenience, since you're going to be traveling.  Can you

8    tell me a convenient time for you during the week of

9    February the 1st and I'll try and get you a hearing on a day

10   that's convenient to you?

11             **MR. PADUANO:**  It's the -- sorry, Your Honor.  I'm

12   just looking.

13             **THE COURT:**  And obviously, you're welcome to

14   participate by phone, but I suspect you're going to want to

15   be here.

16             **MR. PADUANO:**  Yes.  I will be.  One second, Your

17   Honor, please?

18        **(Pause)**

19             **MR. PADUANO:**  Your Honor, I take it the Court

20   still has discretion to move things out a little bit.  Would

21   February the 8th work, the Monday?

22             **THE COURT:**  I can go to the 8th, if you want to

23   consent to the entry of the TRO, but I can't if you won't.

24             **MR. PADUANO:**  We will consent to it.

25             **THE COURT:**  Okay.

1        **MR. PADUANO:**  We will consent then up to the date.

2        **THE COURT:**  Right.  Well, you're going to consent

3   that I'm going to issue an TRO for longer than the 14 days,

4   is what you're going to consent to?

5        **MR. PADUANO:**  Yeah, I understand the Court's

6   ruling is we do consent to the additional period of time,

7   yes.

8        **THE COURT:**  Okay.  I actually have time on the

9   8th.  I think a trial must have cancelled.  I'm not sure

10  why.  I've got -- let me just open a couple of docket

11  settings I've got and see how time consuming they're going

12  to be.  What I proposed to do is to limit each side for

13  maybe an hour and a half for their preliminary injunction

14  presentation, maybe two hours, and see if that works for

15  everybody?  Does that work for both sides?

16       **MR. PADUANO:**  Yes, Your Honor.

17       **MS. KURTZ:**  Did -- I'm sorry, Your Honor, did you

18  give us a time on the 8th?  I've --

19       **THE COURT:**  Well, I'm going to look at that.  I'm

20  trying to figure out, can you live with an hour and a half

21  to two hours for your presentation?

22       **MS. KURTZ:**  Okay.  I'm sure.  I mean, two hours

23  would probably be better, but I usually go under.  That's

24  fine.

25       **THE COURT:**  I can give you two hours.  How do you

1  look on the 8th?

2       **MS. KURTZ:**  And Your Honor, I've got a motion -- I

3  know it sounds small, but I've got a Motion for Relief from

4  Stay hearing set -- let me see if that's the 8th or the 9th.

5  I apologize.  Give me one minute.  No, it's the 9th.  I'm

6  clear on the 8th, I'm sorry.  I'm clear on the 8th.

7       **THE COURT:**  Let me see what I've got.  If I set

8  this for 2:00 o'clock in the afternoon and then we go till

9  6:00, will that let you take a morning flight in,

10 Mr. Paduano?

11      **MR. PADUANO:**  Your Honor, whatever time is

12 convenient for the Court.  I'll probably be there the day

13 before.

14      **THE COURT:**  We can start it -- we can start at

15 10:45 in the morning, if you-all want to.  We'll take a

16 fairly -- at 1:30 I've got a hearing that's going to take

17 about 15 minutes.  I've got a 9:00 o'clock.  I just want to

18 be sure it's over before everybody shows up, so if you-all

19 want to start at 10:30, 10:45, and then I'll give each side

20 two hours.

21      **MR. PADUANO:**  10:30 would be great, Your Honor.

22      **THE COURT:**  All right.  We'll issue the TRO.  I'll

23 get all the findings of fact.  I've got to incorporate them

24 actually into writing, I think, under the rules for that,

25 but I will get that done.  The TRO will probably go out

1    tonight.  If not, it will go out in the morning.

2                   We'll set the hearing for February 8th at

3    10:30 in the morning on the Preliminary Injunction.  By

4    agreement, each side is going to be limited to two hours for

5    their control of court time that will include your direct

6    examination of any witness and any cross-examination.  It

7    will include any opening and closing.  I'll read your

8    materials beforehand to try and save you having to do an

9    opening.  And we'll have the full time allotted.

10                   Just be sure to reserve that time for me,

11   Ms. Smith.

12                   Anything else we need to do today?

13        **MR. PADUANO:**  Would the Court entertain a -- would

14   it be possible to take some limited discovery in aid of our

15   hearing?

16        **THE COURT:**  Absolutely.  You're entitled to all

17   the discovery that you-all can notice up and get done.  If

18   you want me to compel some right now, I'd probably prefer

19   that you-all confer first and if you don't reach an

20   agreement, file a Motion to Compel and I'll get discovery.

21        **MR. PADUANO:**  Great.  We'll do that, Your Honor.

22   Thank you.

23        **MS. KURTZ:**  The discovery, Your Honor, I just want

24   to be clear, would be in connection with the ownership of

25   the claims?

1          **THE COURT:**  Well, it's going to have to be

2    connection with the merits of the preliminary injunction

3    that's being sought.

4          **MS. KURTZ:**  Right.  But I mean --

5          **THE COURT:**  So I don't want to say it's only that

6    because, I mean, there may be some other issues.  It isn't

7    obviously an underlying merits discovery, but there may be

8    things that are broader than who owns the claims.

9          **MS. KURTZ:**  You answered my question in your

10   comment.  Thank you.

11         **THE COURT:**  Thank you.   Yes, sir?

12         **MR. MOAK:**  Your Honor, on behalf of the Committee,

13   obviously we're not parties to the action, but we would like

14   the opportunity to participate at the preliminary injunction

15   hearing.  Obviously, Ms. Kurtz --

16         **THE COURT:**  Whose side are you going to take?

17         **MR. MOAK:**  We came today to speak in support of

18   Mrs. Kurtz' client, the Debtors, and we will do that at the

19   preliminary injunction hearing and we will coordinate with

20   her, so as not to duplicate our effort.  In part, the reason

21   I didn't speak today, Your Honor, was because she basically

22   covered every topic that I would like to have covered,

23   but --

24         **THE COURT:**  I'm not sure that you'll be a party to

25   it, but if you -- if the other side doesn't object, I'll

1   deal with it, but certainly I'm going to make you get time

2   from her, out of her two hours.

3           **MR. MOAK:**  We understand, Your Honor, and we'll

4   coordinate with her.  I appreciate that.

5           **THE COURT:**  But I don't want to make a statement

6   today because I don't know what the other side's position

7   will be as to whether you should be allowed to participate

8   or not.

9           **MR. MOAK:**  It may be then, Your Honor, in light of

10  that, we may file a Motion to Intervene.  I'm just going to

11  try to give that --

12          **THE COURT:**  If you file a Motion to Intervene,

13  I'll take it up at that point.

14          **MR. MOAK:**  Thank you, Your Honor.

15          **THE COURT:**  Thank you.

16              Anybody else need anything clarified today?

17      (No audible response.)

18          **THE COURT:**  Okay.  Thank you for the presentation.

19  I appreciate getting educated about this.  I will get a TRO

20  out, I hope before I go home tonight.

21              Thank you.

22          **MR. PADUANO:**  Thank you, Your Honor.

23      **(Proceeding adjourned at 4:12 p.m.)**

24

25                      **\* \* \* \* \***

1   *I certify that the foregoing is a correct transcript from*

2   *the electronic sound recording of the proceedings in the*

3   *above-entitled matter.*

4   */s lmartin*

5   _____

6   *JUDICIAL TRANSCRIBERS OF TEXAS, INC.*

7   *JTT JOB/INVOICE # 28061*

8   *DATE: JANUARY 25, 2010*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| FLI DEEP MARINE LLC, BRESSNER | : |
| PARTNERS LTD., LOGAN LANGBERG | : |
| AND HARLEY LANGBERG | : |
| | : |
| Plaintiffs, | : |
| | : |
| vs. | :  Civil Action |
| | :  No. 5020-VCS |
| PAUL McKIM, B.J. THOMAS, | : |
| DANIEL ERIKSON, FRANCIS WADE | : |
| ABADIE, OTTO CANDIES, JR., | : |
| OTTO CANDIES, III, EUGENE | : |
| DePALMA, LARRY LENIG, JOHN | : |
| ELLINGBOE, BRUCE GILMAN, JOHN | : |
| HUDGENS, NASSER KAZEMINY, DCC | : |
| VENTURES, LLC, NJK HOLDINGS | : |
| CORPORATION, NKOC, INC., OTTO | : |
| CANDIES, LLC, DEEP MARINE | : |
| HOLDINGS, INC., AND DEEP | : |
| MARINE TECHNOLOGY, INC., | : |
| | : |
| Defendants. | : |

- - -

Chancery Court Chambers
New Castle County Courthouse
Wilmington, Delaware
Monday, November 2, 2009
10:00 a.m.


BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor.


OFFICE CONFERENCE


------------------------------------------------------

CHANCERY COURT REPORTERS
500 North King Street - Suite 11400
Wilmington, Delaware 19801-3759
(302) 255-0525

2

```
1    APPEARANCES:

2              LAURIE SCHENKER POLLECK, ESQ.
               Jaspan Schlesinger LLP
3                   -and-
               MICHAEL A. LEON, ESQ.
4              of the New York Bar
               Jaspan Schlesinger LLP
5                   -and-
               KATHERINE B. HARRISON, ESQ.
6              JASON J. SNYDER, ESQ.
               of the New York Bar
7              Paduano & Weintraub LLP
                  For Plaintiffs FLI Deep Marine LLC,
8                 Bressner Partners Ltd.,
                  Logan Langberg and Harley Langberg
9

10             PATRICIA L. ENERIO, ESQ.
               Proctor Heyman LLP
11                For Defendant Paul McKim

12             RICK S. MILLER, ESQ. (via telephone)
               Ferry, Joseph & Pearce, P.A.
13                For Defendant B.J. Thomas

14             MICHAEL J. MAIMONE, ESQ.
               JOSEPH CICERO, ESQ.
15             Greenberg Traurig, LLP
                  For Defendants Deep Marine Holdings, Inc.
16                and Deep Marine Technology, Inc.

17             DENISE SEASTONE KRAFT, ESQ.
               TYLER O'CONNELL, ESQ.
18             Edwards Angell Palmer & Dodge LLP
                  For DeepWork, Inc.
19

20             FRANCES GAUTHIER, ESQ.
               Stradley Ronon Stevens & Young, LLP
21                  -and-
               KEVIN W. GOLDSTEIN, ESQ.
22             of the Pennsylvania Bar
               Stradley Ronon Stevens & Young, LLP
23                For Otto Candies, Jr., Otto Candies, III

                                     (Cont'd)
24
```

CHANCERY COURT REPORTERS

3

1    APPEARANCES: (Cont'd)

2            TODD C. SCHILTZ, ESQ.
             Drinker Biddle & Reath LLP
3              For Defendants Bruce Gilman, Larry Lenig
               and Francis Wade Abadie
4
             DAVID S. EAGLE, ESQ.
5            Klehr, Harrison, Harvey, Branzburg &
             Ellers LLP
6              For Defendants Daniel Erikson,
               Eugene DePalma, John Hudgens,
7              Nasser Kazeminy, DCC Ventures, LlC and
               NJK Holdings Corporation
8
9                        -  -  -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

CHANCERY  COURT  REPORTERS

4

1              THE COURT:  Good morning, everyone.

2   You may proceed.

3              MS. HARRISON:  Good morning, Your

4   Honor.  Kate Harrison from Paduano & Weintraub,

5   counsel to FLI Deep Marine LLC, Bressner Partners,

6   Ltd., and the Langbergs, former minority shareholders

7   of approximately 5 percent of Deep Marine Holdings,

8   Inc., and its wholly owned subsidiaries Deep Marine

9   Technology, which we call together DMT.

10              Plaintiffs were most recently squeezed

11   out of DMT in a Delaware short-form merger.  The

12   defendants are DMT, the controlling shareholders and

13   their entities, the current and former officers and

14   directors who have systematically stripped plaintiff

15   of their entire $1.75 million investment and their

16   legal rights to complain or even inquire about what

17   happened to the company they invested in.

18              Plaintiff invested approximately

19   $1.75 million in 2002 in a startup company to provide

20   subsea services in the oil and gas industry --

21   offshore, mainly, Gulf of Mexico.

22              THE COURT:  I've read everything.

23   We're at a scheduling conference.

24              What is it you're seeking to enjoin?

1              MS. HARRISON:  We want to make sure

2    that what remains of the assets of DMT are not taken

3    out of the jurisdiction so that we are left with

4    absolutely no remedy.

5              We fear that DMT and these defendants

6    are right now in the middle of selling the last few

7    valuable assets -- the vessels -- and that they may be

8    selling them under market value and that the proceeds

9    will disappear.  So we seek to -- we seek to enjoin

10   only sales out of the ordinary course, and we just ask

11   that the proceeds be held in escrow and we seek

12   expedited discovery.

13              THE COURT:  Okay.

14              MR. MAIMONE:  Your Honor, Mike Maimone

15   for Deep Marine Holdings and Deep Marine Technology.

16              What plaintiffs are seeking here is,

17   in my view, unusual.  I don't -- we view this as a

18   statutory appraisal action.  We think all the issues

19   that are set forth in the complaint should be dealt

20   with in the appraisal action.  I think the Glassman

21   decision in the Supreme Court holds that.

22              Actually, the fiduciary duty claims

23   are probably subject to a motion to dismiss by my

24   friends on the defendants' side, since I represent the

6

1    company, the company has no fiduciary duty.  But in

2    connection with the current application, plaintiffs

3    base their application on pure speculation.  Deep

4    Marine is an operating company.  I was told by Deep

5    Marine that there's no plans to liquidate.  There's no

6    plans to dissolve.  They're merely trying to raise

7    cash to keep the operations going.

8                    The plaintiffs, as a form of

9    stockholders, have taken the status as creditors.  In

10   the Alabama By-Products decision, the Supreme Court

11   held that if you perfect your appraisal rights --

12   we're not conceding that everyone perfected their

13   appraisal rights -- but to the extent that any of the

14   plaintiffs perfected their appraisal rights, they're

15   creditors of the company and we believe they have full

16   rights of creditors.  They have the fraudulent

17   conveyance laws to protect them -- 174 to protect

18   them.  They have all the relief that the Court of

19   Chancery recognized in North American Catholic to

20   protect them.

21                   So we don't really see the reason to

22   enter a TRO because Deep -- there's no -- based in the

23   complaint or any of the papers tendered, a TRO -- Deep

24   Marine is an operating company.  It's going forward.

1    If that changes, then plaintiffs can enforce their

2    rights at that time.  Right now, plaintiffs haven't a

3    ripeness argument because nothing is happening.

4    Plaintiffs are dealing with speculation because they

5    don't know anything and there's nothing really to

6    know.  This is a damages action, where we can just

7    move forward in the ordinary course.  My friends on

8    the defendants' side could file whatever motions they

9    deem appropriate in connection with a motion to

10   dismiss.  The company will deal with the appraisal

11   action appropriately, and we can just move forward

12   with the appraisal action and whatever motion practice

13   my friends feel --

14               THE COURT:  When the appraisal notice

15   was given, was the special committee report disclosed?

16               MR. MAIMONE:  My understanding is it

17   was not.

18               MS. HARRISON:  As you can tell from

19   the chronology of the case, the company announced that

20   the committee had reached its conclusion.  It did not

21   give anybody the report, and the very next day it

22   announced the short-form merger.  So it thereby ruined

23   our standing to continue the derivative action the

24   very next day.  So we find the timing of that highly

8

1   suspicious.  I think, when Vice Chancellor Noble

2   dismissed our derivative action without prejudice, he

3   assumed that we would be back.

4                    THE COURT:  Did no one get Mr. Miller

5   on the phone?

6                    He is on the line.

7                    Okay.  Here's what we're going to do,

8   folks.  I'm not setting up any kind of injunction

9   schedule.  I don't know what we would enjoin.  On the

10  other hand, I am granting expedited discovery.  I'm

11  not exactly clear -- off the record.

12                    (Discussion off the record.)

13                    THE COURT:  Back on the record.  This

14  is a little wacky situation.  I don't want -- I will

15  tell the defendants -- individual defendants -- don't

16  be looking for me to be sympathetic to motions to stay

17  discovery.  Discovery is not going to be stayed.  I'm

18  allowing expedited discovery because, frankly, this is

19  a record that creates a situation that -- at least a

20  colorable perception that people are horsing around.

21  I mean, the moving papers, with all fairness to the

22  defendants, telling me that they somehow got

23  vindicated in the derivative action, that's not what

24  happened at all.  That is not what Vice Chancellor

1   Noble's decision says.  What it says is people goofed

2   up.  It's not the first time I've seen people goof up

3   like this.  Folks who don't consult with Delaware

4   lawyers early on in a process sometimes, when they

5   make a demand, they go, "Oops."  But the point is,

6   there's basis under the law to challenge even a

7   special committee's investigation.  But you have to

8   wait until it's done.

9                  As I understand what the defendants

10  did before Vice Chancellor Noble is say, "Look, the

11  law's the law."  They goofed up.  I believe

12  Vice Chancellor Noble indicated some doubts about the

13  independence of the committee.  He let the process go

14  forward.  Frankly, the defendants made arguments about

15  the amount of time they needed.  It's not clear to me.

16  You can all shed light on this later on whether the

17  defendants were forthcoming about when they were

18  planning the merger, whether they were at all planning

19  a merger during the pendency of the suit before

20  Vice Chancellor Noble, whether they let anyone know

21  about it.  Very interesting circumstances.

22                  It may well be that all of these

23  things can be litigated purely in the context of the

24  appraisal.  But the reality is, that's why discovery

CHANCERY COURT REPORTERS

1    should go forward because, if the defendants' --

2    individual defendants' -- argument is it all got

3    bought into the respondent, but you have to value all

4    these claims in the appraisal, well, then, the

5    discovery should go forward because it's essentially a

6    merits discovery.  It's going to be relevant to value.

7                    I also think there is some concern

8    about the respondent and the ability of the respondent

9    to answer these claims.  You know, it would be a much

10   more edifying record, if somebody wants to put out an

11   appraisal notice with the actual report, if there is

12   such a report.  Who knows at this point?  What there

13   was some sort of exculpatory release apparently

14   saying, you know, nothing happened that was actionable

15   and there's a short-form merger and I think people got

16   offered pennies.

17                    MS. HARRISON:  One penny a share.

18                    THE COURT:  A penny a share.

19                    So, it's a rather odd circumstance.  I

20   have read Glassman.  I'm very familiar with the 253

21   jurisprudence.  I don't know what the exception is for

22   fraud, other sorts of things.  But I won't rule out at

23   this stage the following possibility.  There's a

24   derivative action pending.  Folks made a procedural

CHANCERY COURT REPORTERS

1   goof-up by making a demand.  A special committee is

2   formed in order to delay, doesn't really do a

3   professional job or an independent job, issues a

4   report which -- to somebody, but not to any of the

5   people who brought the derivative claims.  And while

6   it gets the case dismissed on the grounds of delay,

7   that we need to investigate this and, immediately upon

8   concluding this thing, a short-form merger is done to

9   excuse -- to essentially wipe out the claim.  We do

10  know that there is jurisprudence that says, when a

11  merger is done specifically for the purpose of getting

12  rid of claims, that that doesn't really get rid of the

13  claims.  If there's ever a circumstance again where

14  people have played themselves into a perception, I

15  could not on a motion to dismiss rule out the

16  inference that these folks wanted to get rid of these

17  claims and did a short-form merger.  You know, mergers

18  are powerful things.  They're not just thought of

19  instantaneously.  This one was done fairly shortly

20  after Vice Chancellor Noble considered a motion to

21  dismiss and granted it.

22              So what I would also urge on the

23  plaintiffs' side -- and I think I get into the

24  Delaware law.  There's really no need.  We're seeing

CHANCERY COURT REPORTERS

12

1   this more and more in the Court.  7 million counts.  I

2   mean, I'm not saying -- you know, aiding and abetting

3   against the officer and director defendants.  If

4   you're an officer and director, there's a term for

5   when you aid and abet a breach of fiduciary duty.

6   It's called a breach of fiduciary duty.  It's

7   not -- we don't have like everybody is guilty of a

8   breach of fiduciary duty, plus because they did it in

9   concert with their fellows in aiding and abetting

10  claim.

11              I don't know what this fraud through

12  concealment is.  How is that different from breach of

13  fiduciary duty?  Fraud through silence in the face of

14  disclosure.  A claim against controlling shareholders

15  for wrongful equity dilution.  Claim against

16  controlling shareholder defendants for unjust

17  enrichment.  I don't know how that's different from

18  the third cause of action, which is claims against the

19  controlling shareholder for breaches of their

20  fiduciary duties.  It strikes me that, if they didn't

21  breach their fiduciary duties, there was no unjust

22  enrichment that, with respect to wrongful equity

23  dilution, what you're arguing is, there is a breach of

24  fiduciary duty and therefore these were self-dealing

13

1  transactions that wrongfully diluted folks because the

2  transactions were improperly priced or motivated.

3  These are not really separate causes of action.

4           Accounting.  Accounting is a remedy.

5  You can put that in the wherefore clause, I believe.

6  You can say, wherefore because there have been

7  breaches of fiduciary duty, we need to get to the

8  bottom of this.  There ought to be an accounting.  All

9  I'm saying is, you're going to get expedited

10 discovery.  I would urge on the cost sides of this --

11 I don't know how big this company is or what it is.

12 All I do know is two, four, six, eight, ten, 12, 13,

13 plus Mr. Miller on the phone, 14 lawyers, let the

14 record reflect.  And I may have miscounted.  I'm not

15 that great at math.  Fourteen lawyers already.  This

16 is an expensive morning; right?  For the cost of this

17 morning, you could have doubled the consideration

18 given in the merger to the plaintiff.  Right?

19           You know, only clients know what

20 really happened.  Obviously there are professors of

21 philosophy who would say even they don't actually know

22 what happens.  They have a perception of what

23 happened.  But my point is that, you know, one of the

24 things that our profession really has to do is, you

14

1    always have to take -- you want to be vigilant in

2    representing your clients, but you actually need to

3    challenge them and talk to them.  I don't know how

4    really valuable this is from the plaintiffs' side.  I

5    don't know if this was a business going down the

6    drain.  There's obviously the possibility, for

7    example, that these people did trivial -- even if you

8    accept the complaint as true -- did trivial

9    self-dealing transactions around the margins because

10   there was a political buddy.  But that, in the scheme

11   of the world, they don't add up to a lot of economic

12   value.

13                    I mean, you know, is this case really

14   about Mr. -- former Senator and Mrs. Coleman?  If it's

15   a matter of that and some sort of principle, the case

16   might be settleable on that basis.  Give to the people

17   who were cashed out the maximum amounts allegedly

18   overpaid to Senator Coleman and Mrs. Coleman.  As I

19   get it -- I might be wrong -- but it wouldn't be

20   gazillions of dollars.  It might be nice for people

21   like around here who work for the state and yearly pay

22   cuts, we would like to have some supplement of 25,000,

23   or whatever it was a month, or $75,000.

24                    But my point is that out of that does

15

1    not an appraisal case make.  These obviously -- these

2    things with boats, though, and other things, at first

3    I couldn't -- Mr. Candies' name got me distracted

4    because I was trying to figure out the synergies

5    between a maritime company and some sort of candy

6    company, until I realized this was just a person's

7    name.  It's like oh, there's Candies.  A venerable

8    chocolatier in Minneapolis.  Everybody at

9    Christmastime gives a box of Otto Candies to their

10   kids.

11            But what I'm saying, you have to size

12   up what you get out of this rather than you're just

13   angry.  I'm not saying that's what's motivating it.

14   You have to figure that out.

15            On the defendants' side, again, you

16   know, you can't represent your clients without doing a

17   reality check on what went on.  And sometimes things

18   that -- you know, sometimes things that look slick are

19   perfectly fine.  And when it's all said and done, it

20   all looks above board.  Obviously, when things that

21   are done are slick, they look slick.  The genuinely

22   slick don't look slick because they figure out ways

23   for it not to look, you know, so immediately

24   suspicious.  This is a situation where people managed.

16

1   Might have been the best thing in the end.  I don't

2   know.  But obviously was a course of events that

3   didn't look exactly edifying, particularly a

4   short-form merger like this where the economic

5   consideration given to the people being cashed out was

6   basically bupkis.

7                    So, before you get into discovery, you

8   may want to figure out where your respective positions

9   are.  What are the plaintiffs seeking out of this?  I

10  don't know how many stockholders there were in

11  general.  Obviously the investment -- is the

12  investment of all the cashed out people 1.7 million?

13                   MS. HARRISON:  No.  That's just our

14  clients.  There are a couple of other -- not very many

15  minority shareholders.  There are a couple of other

16  groups.

17                   THE COURT:  You don't know what their

18  percentage holdings were in comparison to your

19  clients?

20                   MS. HARRISON:  Well, at the end of it,

21  because of the short-form merger, they held

22  90 percent, we held 5 percent.

23                   THE COURT:  I'm just talking about

24  like in terms of cash in.  You're saying your clients

1   put in 1.7 million to get in?

2                   MS. HARRISON:  I don't know that.  But

3   I know there is a group -- there is another group of

4   minority shareholders --

5                   THE COURT:  Did they perfect appraisal

6   rates?

7                   MS. KRAFT:  DeepWork is here, Your

8   Honor, we filed a tag-along action and we did perfect

9   our rights, is our contention, and that was somewhere

10  in the vicinity of $800,000.  A little bit over a

11  million.  I'm still trying to figure that out.

12                  THE COURT:  So there's another action.

13  Have I gotten papers in chambers about that?

14                  MS. KRAFT:  They were sent over on

15  Friday.  My understanding -- and I spoke with counsel

16  for the FLI plaintiff earlier -- is that there are a

17  couple other minority shareholders.  This was not

18  filed as a class action.  That's another consideration

19  for amendment.  We haven't really spoken about that.

20                  THE COURT:  Well, I think one of the

21  things you ought to be talking about is coordinating

22  whether it's a class action or not.  Obviously it

23  would be better to have one complaint.  But between

24  your two groups, do we essentially have all the other

18

```
 1    minority --

 2                    MS. HARRISON:  I think a couple of the

 3    defendants also have -- were minority shareholders.

 4                    THE COURT:  I'm assuming they don't

 5    care about that.

 6                    MS. HARRISON:  Right.  But what I'm

 7    saying is, I think it's a very small universe of

 8    minority shareholders.

 9                    MS. KRAFT:  We're thinking maybe about

10    a group of five or six.  Would that be correct?

11                    MS. HARRISON:  Yeah, at most.

12                    THE COURT:  Five or six, in addition

13    to your groups?

14                    MS. HARRISON:  No, I think it might be

15    DeepWork and maybe one other group only.

16                    THE COURT:  Is Mr. McKim part of one

17    of these groups?

18                    MS. HARRISON:  Mr. McKim is a

19    defendant.

20                    THE COURT:  I understand that.  I get

21    that he's a defendant.  Your papers didn't seem

22    particularly hostile toward him.

23                    MS. HARRISON:  Well, because we

24    believe he was a whistleblower, in a sense.
```

1          THE COURT:  Right.

2          What I'm trying to talk about here

3 is -- in a room where we got -- what did we say? --we

4 counted up with Mr. Miller, 15 or 14 lawyers -- is, as

5 we go forward, there will be material amounts of money

6 spent.

7          MS. HARRISON:  Absolutely right.

8          THE COURT:  All I'm saying is,

9 sometimes what people want -- you know, they don't

10 want to be suckers -- is sometimes, if you focus early

11 on what's at stake, what the costs of enforcement are

12 and all that kind of good stuff, you know, it may be

13 like everybody gives their clients litigation budgets

14 and all that kind of stuff.  That before you go spend

15 hundreds of thousands of dollars, as you will in

16 discovery, no doubt, that you begin to think about,

17 you know, what it is.  Sometimes people's investments

18 in -- "Like I at least want my money back and I think

19 these people are jerks and I will never invest with

20 them again.  If I can at least get the skin that I put

21 in the game back or something like it, then I'm

22 willing to move on because I'm realistic about the

23 world."  You know, I don't know.  I don't know what

24 that would mean in terms of the defendants.  I don't

1   know any of it.

2           I do know, as professionals, if you're

3   representing people who are being rational, now is the

4   time, rather than later, to think about it.  What I'm

5   saying to the defendants is, this is not a surgical

6   case.  This is not one you're going to come in and say

7   this is a really neat, tidy record.  We had

8   Warren Buffett and Bill Gates as the special

9   committee, advised by counsel for religious elders and

10  ethics professors, and therefore, you know, you just

11  get rid of it early.  It's just not going to be that

12  way.  It may over time bear up.  But it bears up

13  after, you know, that wonderful thing we call

14  discovery.

15          And after the discovery happens,

16  people writing briefs and all that kind of stuff,

17  which, again, I don't know how people keep that in the

18  five figures.  Since you all -- you are going to have

19  those costs, too.  Fee shifting is not prevalent in

20  the U.S.  I don't know what these things are worth in

21  the current market.  So take that to heart.  I don't

22  need to set a schedule at this point.  You need to

23  talk about getting discovery going.

24          What I would suggest would be

1   rational, if you're not going to get it settled, would

2   be that you focus on getting some document discovery

3   done first, then perhaps getting the plaintiffs to --

4   the multiple plaintiffs to coordinate and file an

5   amended pleading that everybody takes a shot at.

6              MS. HARRISON:  Your Honor, this is a

7   difficult group of lawyers.  I've had already

8   difficult experiences with this group.  If I could ask

9   you to set some kind of a schedule, also.  We need it.

10  That's one reason I'm here.

11             THE COURT:  What I would tell to the

12  defendants, this is going to be sort of

13  self-enforcing.  You're going to have claims holding

14  over your head until you get the document discovery

15  done.

16             You know, it's going to be pretty

17  simple.  You know, they're going to want to get rid of

18  the claims.  Well, you're shaking your head.  I'm not

19  going to do this.  Look, they're in court now.  If

20  people horse around with this Court, this Court takes

21  care of them.  I've ordered the discovery to go

22  forward and it's going to go forward.  If people are

23  obstinate, they will -- you can file a motion.

24             MS. HARRISON:  Thank you.

1          THE COURT:  I think everybody

2    understands.

3          I have no idea -- you said they're

4    difficult.  I don't know how difficult you've been,

5    not to say that you're not the most gracious,

6    wonderful person in the world.  I'm just not there.

7    Sometimes it's been my experience that -- on more than

8    one occasion -- that difficulties arise and no one is

9    exactly in the right.

10          What I'm saying is, you haven't made

11    any kind of record of that today.  You have not.

12          MS. HARRISON:  It's in my affidavit.

13          THE COURT:  What, that they didn't

14    give you documents?

15          MS. HARRISON:  It's in my affidavit

16    that my very first phone call with Nasser Kazeminy's

17    law firm is the man threatening me.  It's a very

18    difficult group of lawyers.  I've never experienced

19    that kind of difficulty in my life, and I've been

20    practicing for 20 years.  And I practice in

21    New York City where you think they're tough.  I have

22    not experienced this before.  And I really believe

23    that we need --

24          THE COURT:  Well, you're in Chancery

CHANCERY COURT REPORTERS

1    now.  I don't know who is representing -- I can't

2    pronounce his name at this point.

3                    MR. EAGLE:  This is David Eagle.  I'm

4    representing Nasser Kazeminy.  I never met Miss

5    Harrison until this morning.  Never had a phone call

6    or e-mail.  We're in Delaware.  We're in Chancery

7    Court.  Everyone is going to work cooperatively.

8                    THE COURT:  If you hear from somebody

9    who is not admitted pro hac about this case, then

10   bring it to the attention of the Court.  What you did

11   in -- before this case was filed -- again, I was not

12   the Judge.  I don't know if this was before in the

13   later case, or after the dismissal or whatever.  But I

14   have found that when people have to file pro hac and

15   get -- you know, face the music, all -- we do have

16   Delaware lawyers here and they're regularly

17   accountable to the Court.  And they're the ones -- the

18   people who are appearing here are the ones going to be

19   responsible for discovery.

20                   I also expect -- I shouldn't have to

21   say this, but I've been astonished -- I expect that

22   the Delaware lawyers will be meaningful in discovery

23   and discovery is not left to clients.  People visit

24   offices, people find out where the documents are.

1    People don't tell clients, "Go through your hard drive

2    and find your e-mails."  That is not discovery.  That

3    was never appropriate discovery before e-mail.  It's

4    certainly not now.  You never told a client, "Oh, look

5    in your drawer.  Find all the good stuff and send it

6    to me."  Yeah.  Right.  I mean, that is not a

7    trustworthy way to do discovery.

8                 I'm also assuming, if there was a

9    special committee report, that a lot of the stuff is

10   compiled.

11                MS. SCHENKER POLLECK:  Your Honor,

12   could you order a stipulated order for discovery or --

13                THE COURT:  If you all -- the ones

14   getting close to the line now are on the plaintiffs'

15   side of the table.  Okay?  This is not take-out.  I'm

16   not taking your take-out menu.  I ordered expedited

17   discovery.  The first instance you sit down, you can

18   use the room here and you can talk to your colleagues.

19   The way we're going to do this is documents first.  I

20   said that.  I think I've been pretty clear.  You get

21   the documents from all the defendants.

22                What I would then suggest is a period

23   of time for the plaintiff to put together an amended

24   pleading.  I'm not going to say whether expedited

25

1  discovery means they get the documents in ten days, 20

2  days or 30 days.  This is a claim for money.  Okay?

3  This is what this is about.  I'm also not going to

4  have two groups of plaintiffs acting in an

5  uncoordinated way.

6                 MS. KRAFT:  Your Honor, Denise Kraft.

7  I intend to fully coordinate.  We don't have the

8  ability to do that yet.  We will absolutely coordinate

9  this case.

10                THE COURT:  Right.  Again, get --

11 think about your litigation budgets, think about early

12 on whether, you know, it makes sense to go forward or

13 whether you want to take a shot at resolving it early

14 because it's going to get expensive.  But that's the

15 structure.  I'm not going to sit here and tell you how

16 many minutes.

17                You haven't even talked to the people

18 on the other side.

19                Okay.  Thank you.

20                (Conference adjourned at 10:35 a.m.)

21

22

23

24

1                          CERTIFICATE

2                    I, DIANE G. McGRELLIS, Official Court

3     Reporter of the Chancery Court, State of Delaware, do

4     hereby certify that the foregoing pages numbered 3

5     through 25 contain a true and correct transcription of

6     the proceedings as stenographically reported by me at

7     the hearing in the above cause before the Vice

8     Chancellor of the State of Delaware, on the date

9     therein indicated.

10                       IN WITNESS WHEREOF I have hereunto set

11    my hand at Wilmington, this 3rd day of November, 2009.

12

13                      /s/ Diane G. McGrellis
                        ----------------------------
14                      Official Court Reporter
                         of the Chancery Court
15                        State of Delaware

16

17    Certification Number: 108-PS
      Expiration:  Permanent
18

19

20

21

22

23

24

# EXHIBIT B

1            IN THE UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4  DEEP MARINE HOLDINGS, INC.    §    CASE NO. 10-3026-H1-ADV
                                 §    HOUSTON, TEXAS
5  VERSUS                        §    THURSDAY,
                                 §    JANUARY 21, 2010
6  FLI DEEP MARINE, LLC          §    3:00 P.M. TO 4:13 P.M.

7

            <u>TEMPORARY RESTRAINING ORDER HEARING</u>
8
            BEFORE THE HONORABLE MARVIN ISGUR
9             UNITED STATES BANKRUPTCY JUDGE

10

11                     APPEARANCES:

12       FOR PLAINTIFF:      SEE NEXT PAGE

13       FOR DEFENDANT:      SEE NEXT PAGE

14       COURT RECORDER:     SUZANNE GUEVARA

15       COURT CLERK:        RISHONA SMITH

16

17

18

19

20                     PREPARED BY:

21       JUDICIAL TRANSCRIBERS OF TEXAS, INC.
                    P.O. Box 925675
22            Houston, Texas 77292-5675
          Tel: 281-328-6179 ▼ Fax: 281-462-2016
23            www.judicialtranscribers.com

24

     Proceedings recorded by electronic sound recording;
25      transcript produced by transcription service.

1                          __APPEARANCES:__

2    FOR THE PLAINTIFFS/DEBTORS,
     DEEP MARINE HOLDINGS, INC.:    MARCY E. KURTZ, ESQ.
3                                   JASON G. COHEN, ESQ.
                                    BRACEWELL & GIULIANA, LLP
4                                   711 LOUISIANA ST., STE 2300
                                    HOUSTON, TX  77002
5                                   713-221-1416

6
     FOR CREDITOR'S COMMITTEE:      PAUL MOAK, ESQ.
7                                   MCKOOL SMITH
                                    600 TRAVIS ST., SUITE 7000
8                                   HOUSTON, TX  77002
                                    713-485-7300
9

10                    APPEARING TELEPHONICALLY:

11   FOR THE DEFENDANT,
     FLI DEEP MARINE, LLC,
12   BRESSNER PARTNERS, LTD.,
     LOGAN AND HARLEY LANGBERG:     ANTHONY J. PADUANO, ESQ.
13                                  JASON SNYDER, ESQ.
                                    PADUANO WEINTRAUB, LLP
14                                  1251 AVENUE OF THE AMERICAS
                                    SUITE 920
15                                  NEW YORK, NY  10020
                                    212-785-9100
16

17   FOR NASSER KAZEMINY:           LISA GOLDEN, ESQ.
                                    JASPAN SCHLESINGER LLC
18                                  300 GARDEN CITY PLAZA, 5TH FL.
                                    GARDEN CITY, NY  11530
19                                  516-746-8000

20
     FOR OTTO CANDIES, LLC,
21   OTTO CANDIES, III,
     CANDIES SHIPBUILDERS, LLC:     KARL J. ZIMMERMAN, ESQ.
22                                  BALDWIN HASPEL BURKE & MAYER
                                    SUITE 2200 ENERGY CENTER
23                                  1100 POYDRAS ST.
                                    NEW ORLEANS, LA  70163
24                                  504-569-2900

25

```
 1  FOR NASSER KAZEMINY,
    DANIEL ERICSON, AND
 2  JK HOLDINGS:                     JOSEPH M. WINDLER, ESQ.
                                     WINTHROP & WEINSTINE, PA
 3                                   225 S. 6TH ST., #3500
                                     MINNEAPOLIS, MN  55402
 4                                   612-604-6400

 5  FOR NASSER KAZEMINY AND
    CANDIES ENTITIES:                TONY DAVIS, ESQ.
 6                                   BAKER BOTTS, LLP
                                     ONE SHELL PLAZA
 7                                   910 LOUISIANA ST.
                                     HOUSTON, TX  77002
 8                                   713-229-1547

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              <u>EXHIBITS</u>

2    <u>PLAINTIFFS/DEBTORS</u>:              <u>Marked</u>      <u>Offered</u>      <u>Received</u>

3    **Exhibit Number 1**                10         16          17
     **Exhibit Number 2**                11         16          17
4    **Exhibit Number 3**                11         16          17
     **Exhibit Number 4**                12         16          17
5    **Exhibit Number 5**                12         16          17
     **Exhibit Number 6**                12         16          17
6    **Exhibit Number 7**                13         16          17
     **Exhibit Number 8**                13         16          17
7    **Exhibit Number 9**                13         16          17
     **Exhibit Number 10**               13         16          17
8    **Exhibit Number 11**               14         16          17
     **Exhibit Number 12**               15         16          17
9    **Exhibit Number 13**               15         16          17
     **Exhibit Number 14**               16         16          17
10   **Exhibit Number 15**               15         16          17

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       **HOUSTON, TEXAS, THURSDAY, JANUARY 21, 2010, 3:00 P.M.**

2              **THE COURT**:  All right.  Please be seated.

3              Okay.  We're here on the Temporary

4    Restraining Order hearing in the Deep Marine Holdings case.

5    It's Adversary proceeding 10-3026.  We'll take appearances

6    in court, then we'll take appearances on the telephone.

7          **MS. KURTZ:**  Good afternoon, Your Honor.  Marcy

8    Kurtz with Jason Cohen, here on behalf of the Debtor and the

9    Plaintiffs in the adversary proceeding.

10             **THE COURT:**  All right.

11         **MR. MOAK:**  Good afternoon, Your Honor.  Paul Moak,

12   M-O-A-K, on behalf of the Creditor's Committee.

13             **THE COURT:**  All right.  Anyone else appearing here

14   in court?

15       (No audible response.)

16             **THE COURT:**  All right.  On the telephone, we have

17   an appearance from New York.  Who would that be?

18         **MR. PADUANO:**  Your Honor, it's Anthony Paduano and

19   Jason Snyder, dialing in right now for FLI Deep Marine, LLC,

20   Bressner Partners, Logan Langberg, Harley Langberg.

21             **THE COURT:**  All right.  Thank you.

22         **MR. PADUANO:**  And Your Honor, I've submitted a pro

23   hac vice application and also on the phone is -- or dialing

24   is in Lisa Golden from the Jaspan Schlesinger firm, also in

25   New York.

1          **THE COURT:**  All right.

2          **MR. PADUANO:**  At some point will enter her

3   appearance in this case, as well.

4          **THE COURT:**  Okay.  I probably have both of you-all

5   available on the phone right now.

6               Ms. Golden, can you hear me?  Ms. Golden, are

7   you there?

8       (No audible response.)

9          **MR. PADUANO:**  She's supposed to dial in, Your

10  Honor.  I don't know if she's here yet or not.

11         **THE COURT:**  I'm showing I've got two people from

12  your firm both on the phone, so I assume she's somewhere.

13         **MR. PADUANO:**  Thank you, Your Honor.

14         **THE COURT:**  And then I have somebody from the 516

15  area code?

16         **MR. PADUANO:**  That's her, Your Honor.

17         **MS. GOLDEN:**  Good afternoon, Your Honor.

18         **THE COURT:**  Thank you.  Who's here from the 516?

19         **MS. GOLDEN:**  Your Honor?

20         **THE COURT:**  Yes.

21         **MS. GOLDEN:**  Hi.  The 516 number is Lisa Golden.

22         **THE COURT:**  All right.  Thank you.

23         **MS. GOLDEN:**  And we are in the process of also

24  preparing our pro hac vice motion.

25         **THE COURT:**  All right.  Let's not -- anyone who

 1  wants to appear in a TRO hearing can appear without the

 2  necessity of the pro hac.  I'm not going to get too tied up

 3  on that, but thank you for telling me.

 4          **MS. GOLDEN:**  Thank you, Your Honor.

 5              And then from, I think, New Orleans, who do

 6  we have?

 7          **MR. ZIMMERMAN:**  Karl Zimmerman from Baldwin Haspel

 8  Burke & Mayer, representing Otto Candies, LLC, Otto Candies,

 9  III, and Candies Shipbuilders, LLC, which is a creditor in

10  the bankruptcy proceeding.

11          **THE COURT:**  Thank you.

12          **MR. ZIMMERMAN:**  I also filed a pro hac vice

13  application.

14          **THE COURT:**  All right.  I haven't seen any for HUX

15  yet, so same rule for you.

16              In the 612 area code?  Do we have anybody

17  from 612 participating?  Hold on.  I didn't click it right.

18  Let me try that from the 612?

19          **MR. WINDLER:**  Your Honor?

20          **THE COURT:**  Yes.  Who do we have?

21          **MR. WINDLER:**  Joseph Windler with the law firm of

22  Winthrop and Weinstine in Minneapolis.  I represent Nasser

23  Kazeminy, JK Holdings, DMT Ventures, Daniel Ericson, John

24  Hudgeons, and Eugene Diploma in the Delaware proceedings and

25  the Kazeminy's in the bankruptcy proceeding, as well.

1          **THE COURT:**  Thank you.

2               And finally, we have someone from Houston,

3  713-668 exchange?

4          **MR. DAVIS:**  Hi, Your Honor.  Tony Davis.  My plane

5  literally just landed.  I'm here on behalf of the Kazeminy

6  and Candies entities.

7          **THE COURT:**  Thank you.  All right.  I've read the

8  application and some of the exhibits.  There's an opposition

9  brief that I did not see until I just walked out and I now

10  see it on my screen.

11          **MS. KURTZ:**  Did Your Honor want to take a minute

12  to read that?

13          **THE COURT:**  Yeah.  I need to.  I did not realize

14  that had been filed and I apologize.

15          **MS. KURTZ:**  That's fine.  No problem.  Let me --

16          **THE COURT:**  What time did that come in?

17          **MR. PADUANO:**  Your Honor, there's also -- Anthony

18  Paduano, Your Honor.  There's also an affidavit with

19  probably substantial exhibits that we've also put on the

20  PACER.

21          **THE COURT:**  Right.  That's part of that opposition

22  brief, right?

23          **MR. PADUANO:**  There are two separate instruments,

24  Your Honor, two separate documents.

25          **MS. KURTZ:**  The brief, Your Honor, is about 16

1   pages and then there's a rather -- you know, about an inch

2   stack of exhibits attached to an affidavit, which was a

3   document filed just after the memorandum.

4           THE COURT:  Right.  I think the way it got filed

5   -- and I just want to make sure I'm reading the right thing

6   -- is that the affidavit got filed along with the brief as

7   an attachment to the brief.  I just want to be sure that's

8   what you want me to read?  And I'm looking -- it got filed

9   at 2:59, so I'm not going to feel too bad that I didn't get

10  to read it before I got out here.

11          MR. PADUANO:  That's fine.  No, Your Honor, of

12  course not.  I'm looking at Docket Number 146 that --

13          THE COURT:  I've got document 14 is the brief.

14          MR. PADUANO:  Correct.

15          THE COURT:  And then it has attached to it an

16  affidavit and then the affidavit has attached to it, 21

17  exhibits.

18          MR. PADUANO:  Correct, Your Honor, yes.

19          THE COURT:  That's it?  Okay.  Let me just step

20  down and let me go read that.  I'm just going to have

21  everybody hold on the phone while I go back and read it.

22  I'm sure this will be ten or 15 minutes and I'll come back

23  and we'll restart the hearing.  Thank you.

24      **(Recess taken from 3:07 p.m. to 3:18 p.m.)**

25          THE COURT:  Okay.  Ms. Kurtz, let's go ahead.

1          **MS. KURTZ:**  Thank you, Your Honor.  Mr. Moak may

2    have just stepped to the men's room.  He'll be in just any

3    minute.  I just wanted to tell the Court we're ready to go

4    though.

5          **THE COURT:**  Okay.

6          **MS. KURTZ:**  Your Honor, I think that -- I've been

7    debating here.  I think I'm just going to start in

8    chronological order how this began and bring us to the

9    current, which will then lead into why we're here today, why

10   we're entitled to a Temporary Restraining Order and meet the

11   standard for that and the specific relief we're asking the

12   Court for today, based on the pleadings that are live in the

13   Delaware action.

14          If the Court has the Exhibit Book that was

15   prepared by the Plaintiffs/Debtors in front of you, I'm

16   going to just highlight through what those exhibits are.

17   That will make more sense when I offer those exhibits into

18   evidence, Your Honor.

19      **(Plaintiffs/Debtors Exhibit Number 1 marked for**

20   **identification.)**

21          **MS. KURTZ:**  If you'll look at Exhibit Number 1,

22   the actions between the Delaware Defendants -- I'm sorry,

23   the Delaware Plaintiffs, who are the Defendants in the

24   adversary proceeding, started when they filed a Verified

25   Complaint, which we have as Exhibit Number 1, alleging what

1   they claim on their own, if you look at page 1 to be a

2   shareholder's derivative action claims brought against the

3   Debtors and certain of the other individual Defendants that

4   have been named in the Delaware action.

5        **(Plaintiffs/Debtors Exhibit Number 2 marked for**

6   **identification.)**

7        **MS. KURTZ:**  And that matter, Your Honor, if you'll

8   notice Exhibit Number 2, was dismissed by the court -- by

9   the Chancery Court of Delaware for a failure to follow

10  certain of the rules or to state it even more objectively.

11  Apparently there was a demand by the Plaintiffs in that case

12  for certain information.  The Defendants had not had a

13  sufficient time to respond to that demand for information.

14  The Chancery Court said, "I'm going to dismiss this action

15  and give them a chance to respond."

16       **(Plaintiffs/Debtors Exhibit Number 3 marked for**

17  **identification.)**

18       **MS. KURTZ:**  Shortly after doing that, Your Honor,

19  if you'll look at Exhibit Number 3?  Plaintiff's First

20  Amended Petition was filed in the State District Court in

21  Harris County, Texas.  It is virtually identical to Exhibit

22  Number 1 and it was filed two months after the dismissal of

23  Exhibit Number 1 and after the entry of the Order, Exhibit

24  Number 2.  These claims are also in derivative in nature.

25  They say so themselves on page 3 and otherwise in that

1    Complaint.  They are very similar, if not verbatim, in many

2    cases to the allegations that are found in Exhibit Number 1.

3        **(Plaintiffs/Debtors Exhibit Number 4 marked for**

4    **identification.)**

5            **MS. KURTZ:**  There was an Amended Motion to Dismiss

6    and an Order granting that dismissal, which we've marked as

7    "Exhibit Number 4," where the Defendants in the State Court

8    action in Texas, which were the same as the Defendants in

9    the Delaware -- the first Delaware action, where they sought

10   and obtained a dismissal of the Texas suit because the

11   claims were derivative in nature and that the Plaintiff

12   lacked standing to bring them.

13       **(Plaintiffs/Debtors Exhibit Numbers 5 and 6 marked for**

14   **identification.)**

15           **MS. KURTZ:**  Exhibit Number 5 is the live

16   Complaint.  Exhibit Number 6 is what we've called a

17   "copycat" or a "Me, Too, Complaint," filed by an additional

18   Plaintiff, the same Defendants.  And that -- those are the

19   two actions, Your Honor, 5 and 6, that we're here on today

20   where the Debtors are asking the Court to enter a Temporary

21   Restraining Order until such time as you can determine

22   whether the claims that have been pled in Exhibits Numbers 5

23   and 6 are property of the estate or otherwise stayed as

24   being direct actions against the Debtor.

25       **(Plaintiffs/Debtors Exhibit Number 7 marked for**

1  identification.)

2       **MS. KURTZ:**  Exhibit Number 7, Your Honor, is the

3  Suggestion of Bankruptcy.  As you know, this bankruptcy case

4  was filed on December 4th, here in this Court, and a

5  Suggestion of that Bankruptcy was filed with the Chancery

6  Court in Delaware advising all of the parties and the Court

7  that the action should be stayed.

8       **(Plaintiffs/Debtors Exhibits Numbers 8 and 9 marked for**

9  **identification.)**

10      **MS. KURTZ:**  Exhibits Numbers 8 and 9, Your Honor,

11  are the current as of the submission of the Exhibit

12  Notebook.  Case histories are what we call "Docket Sheets"

13  for the live actions that Complainant Number -- Exhibit

14  Number 5 and similarly, the one that's at Exhibit Number 6.

15  Those are Plaintiffs' Exhibits Numbers 8 and 9.

16      **(Plaintiffs/Debtors Exhibit Number 10 marked for**

17  **identification.)**

18      **MS. KURTZ:**  In response to the Suggestion of

19  Bankruptcy, there wasn't a pleading filed, but instead, the

20  Plaintiffs in the Delaware action prepared a letter to the

21  Court to the Vice Chancellor, dated December 8th, that's

22  been attached as "Exhibit Number 10," advising the Court

23  that they intended to pursue their claims against the

24  non-debtors.

25      **(Plaintiffs/Debtors Exhibit Number 11 marked for**

1    **identification.)**

2         **MS. KURTZ:**   In response to that letter, the

3    Debtor's Counsel in the Delaware action, Mr. K.B. Battaglini

4    of the Greenberg Traurig Law Firm, who is -- has a motion

5    pending in this Court for retention of special counsel to

6    continue that -- it's necessary to continue that

7    representation -- filed a response to the December 8th

8    letter, which you'll find at Exhibit Number 11, advising the

9    Delaware Court, not only of the automatic stay against the

10   Debtors, but also as to the parties related to the Debtors

11   where the claims were aggregated and also advising that

12   Court and all of the parties that the claims were derivative

13   in nature.

14         As -- if you'll go back, Your Honor, I'll do

15   this in the argument now, but if you'll go back and review

16   Exhibits Number 8 and 9, notwithstanding the Suggestion of

17   Bankruptcy filed December 4th and the letter December 11th

18   indicating that the Debtors' view was that the claims

19   alleged in the Delaware action were derivative in nature,

20   the Plaintiffs continued to prosecuted their claims, not

21   again the Defendants, but against all of the non-debtor

22   Defendants, notwithstanding the Debtors' position and

23   statement to the Court that they belong to the Debtor and

24   that the Plaintiffs should not proceed.

25         **(Plaintiffs/Debtors Exhibit Number 12 marked for**

1   **identification.)**

2         **MS. KURTZ:**  The -- as a result of that, Your

3   Honor, I sent a letter, which is Exhibit Number 13, to all

4   of the Counsel in the Delaware action -- I'm sorry, Exhibit

5   Number 12.  I sent a letter to all of the Delaware Counsel

6   advising them not to proceed and if they did, that we would

7   come to this Court and seek injunctive relief, that we

8   prefer not to do that, that it was the Debtors' position, as

9   stated by Mr. Battaglini already, that the claims that they

10  pled were derivative in nature and belonged to the estate

11  and should be pursued by the estate, or a designee of the

12  estate.

13       **(Plaintiffs/Debtors Exhibit Number 13 marked for**

14  **identification.)**

15         **MS. KURTZ:**  The response to that was Exhibit

16  Number 13, where they said essentially they intended to

17  continue to prosecute those claims and causes of action.

18       **(Plaintiffs/Debtors Exhibit Number 15 marked for**

19  **identification.)**

20         **MS. KURTZ:**  If you'll skip to Exhibit Number 15,

21  which was added in an Amended Exhibit List, Your Honor,

22  today the Plaintiffs' Counsel wrote another letter to Vice

23  Chancellor Strine, reiterating that they intended to go

24  forward with their claims against the non-debtor Defendants

25  and arguing that the stay did not apply.

1      **(Plaintiffs/Debtors Exhibit Number 14 marked for**

2   **identification.)**

3          MS. KURTZ:   Exhibit Number 14, Your Honor, is just

4   various emails indicating that notice of today's hearing was

5   appropriate under the circumstances for a Temporary

6   Restraining Order.

7          THE COURT:   All right.

8          MS. KURTZ:   I'd move for submission of Exhibits 1

9   through 15, Your Honor.

10     **(Plaintiffs/Debtors Exhibits Numbers 1 through 15**

11  **offered into evidence.)**

12         THE COURT:   All right.

13         MS. KURTZ:   They've been sent to all of the

14  parties.   To my knowledge, on the phone, they were sent to

15  them along with the Exhibit List.   They were sent to them by

16  PDF yesterday.

17         THE COURT:   All right.   Let me hear from

18  Mr. Paduano to start with.

19         MR. PADUANO:   Your Honor, the documents are all to

20  our eyes authentic.   I don't have any objection as to that.

21  We're a little bit handicapped, given the shortness of

22  notice we've had for the hearing to make -- complete so we'd

23  ask the Court at some point for leave to make a supplemental

24  -- to accept the documents introduced for completeness, but

25  as to these exhibits, we don't have objection.

1          **THE COURT:**  Thank you.  We're going to admit them

2    solely for the purpose of the TRO Hearing, not for the

3    purpose of any other hearing, so that if you do need to

4    offer something for completeness, whether we issue the TRO

5    or not, we're obviously going to get to some preliminary

6    injunction hearing, and at that point, all your objections

7    will be preserved and you can offer them at that point, if

8    you need to.

9          **(Plaintiffs/Debtors Exhibits Numbers 1 through 15**

10   **received in evidence.)**

11         **MR. PADUANO:**  Thank you.

12         **THE COURT:**  Thank you.

13         **MS. KURTZ:**  Thank you.  Your Honor, we're here

14   today for Temporary Restraining Order Hearing.  We're not

15   asking the Court to decide on the merits today, you know, on

16   two days' notice without adequate time for the Adversary

17   Defendants to respond, to determine unequivocally that the

18   claims -- although we think you could, we're not asking you

19   to do that, that they are unequivocally derivative claims.

20   It is the Debtors' belief based on admissions by the

21   Delaware Plaintiffs themselves, by comments from the

22   Delaware Court, and by following the case law, that the

23   claims are very likely derivative in nature and belong to

24   the estate.

25              And if the Plaintiffs in the Delaware action

1  are allowed to proceed on those actions, which they've

2  indicated as late as today, that they intend to do, absent

3  an Order from this Court, that there will be irreparable

4  harm and injury to the Debtor.

5           And the reason for that would be this is not

6  something where you can say -- proceed and if I'm wrong, we

7  can sue you and we can get a monetary damage.  We're talking

8  about litigation proceeding, so to the extent those claims

9  are owned by someone, and we are not able to prosecute them,

10 that would be an irreparable injury.  That is, in essence,

11 someone taking over control and direction of an asset of the

12 Debtors' estate where we would have no control over how

13 those proceeded.

14           The other -- if there's -- Exhibits Numbers 8

15 and 9, I think, Your Honor, if you go through those, contain

16 adequate evidence for the Court to show that there is an

17 emergency at hand here.  There is discovery outstanding.

18 There are answers that are due by these non-debtor

19 Defendants.  The Court -- I think it's called the "Court of

20 Chancery" in Delaware and the Vice Chancellor there has

21 already entered a ruling that the discovery should proceed

22 at an expedited basis.

23           So if this Court does not enter a restraining

24 order, I think that that lawsuit in Delaware will just

25 proceed far enough down the path that when this Court makes

1  a determination that the claims in the underlying action are

2  property of the estate, we won't be able to "unring the

3  bell."

4          The standard, Your Honor, is irreparable

5  injury, whether there's an adequate remedy at law,

6  likelihood that we would prevail on the merits, once there

7  is a trial, a balance of hardships and the effect on public

8  interest.

9          It's clear that the Plaintiffs intend to

10  proceed absent an Order of the Court.  The injury, Your

11  Honor, I've indicated is irreparable in that it can't be

12  remedied by monetary recompense.  There's no way to say,

13  "We'll pay you back later, if you just let us proceed

14  today."

15          The Delaware Plaintiffs have argued in their

16  response that they should be allowed to proceed and if at

17  some point in the future you decide the claims are

18  derivative, well they will have been prosecuting those on

19  behalf of everybody.  But I think if those claims belong to

20  the estate, the estate can do with them as they please.

21  They could be turned over to the Committee, which, in fact,

22  has already been discussed to the Committee Counsel to

23  investigate and prosecute those claims, as may be

24  appropriate.  They could be compromised, settled.  They

25  could be negotiated in some way as part of a plan.  There

1   are a lot of different things, strategy or otherwise, that

2   could take place if the Debtors themselves were able to

3   manage their own assets.

4            The no adequate remedy at law, Your Honor, is

5   very similar to the irreparable injury.  Sometimes those two

6   are combined when the Court analyzes whether the standard

7   has been met.  Here again, no monetary reward would do, no

8   "unringing of the bell."

9            The substantial likelihood of success on the

10  merits is the most important element.  I'd like to reserve

11  that for last so I could go through the actual causes of

12  action, Your Honor.

13           The balance of the hardships:  The only

14  injury to the Delaware Plaintiffs, Your Honor, would be a

15  delay of time.  The injury to the Debtors is an irreparable

16  loss of their legal right to pursue their claim.  It would

17  be like giving a hard asset away to someone and saying,

18  "Sell it," and we could always take the money later, but

19  they may not -- they may not know the market.

20           They may not sell it for the right price.

21  They may not -- we don't know what they would do with it.

22  And so here, particularly because we're not talking about a

23  hard asset, but a legal right, we have no idea what the

24  strategy would be, or how that litigation would proceed, or

25  whether there would be benefit to other creditors that might

1  be reaped, if, for example, the Unsecured Creditors

2  Committee Counsel were to pursue those claims for the

3  benefit of all of the creditors of the estate.

4        The truth is, there's probably no harm to the

5  public interest.  This is always a difficult element to meet

6  with respect to a TRO, I think, in a Bankruptcy Court, but I

7  think it is always in the public's interest to maintain the

8  status quo until the Court of proper jurisdiction can

9  determine whether there's a right that should be preserved

10 here, and that's what we're trying to do.

11        With respect to substantial likelihood of

12 success on the merits, Your Honor, you have to -- this Court

13 has already written an opinion, which is squarely on point

14 with our facts here.  I don't know that we could have a set

15 of facts any more exact to the facts in the Court's case,

16 *Dexterity Surgical*, at 365 Bankruptcy 690.  In that case,

17 the Court looked to the standard set forth in *Tooley versus*

18 *Donaldson*.  It's *Tooley versus Donaldson Lufkin* -- and I can

19 never pronounce the last name, at 845 A2d 1031, Delaware,

20 2004.

21        The Fifth Circuit has instructed the Courts

22 in the Southern District to look to state law to determine

23 if claims are direct or derivative and this Court has held

24 in *Dexterity* that actions involving the internal affairs of

25 the "corporation" are governed by the law of the state of

1   incorporation.  Here the claims brought by the Delaware

2   Plaintiffs focus on Deep Marine Holdings, Inc., which is a

3   Delaware corporation.

4           From this point, Your Honor, the facts of the

5   underlying lawsuit in Delaware are almost exactly like the

6   facts in *Dexterity*.  What the Court found in *Dexterity* and

7   following the *Tooley* standard, is that the proper analysis

8   to distinguish between direct and derivative actions should

9   be based on who actually suffered the harm, the corporation

10  or the person bringing the claim and who would receive the

11  benefit if the harm was undone.  In other words, once there

12  is a remedy and a recovery, who is going to get that?  The

13  individual shareholders or the Debtor themselves?

14          And seven, analyzing the first prong, it's

15  helpful to ask -- in other words, when -- not just who the

16  name is on the pleading.  You know, "I've sued in my own

17  name and I say that I've been injured," but instead, it's

18  helpful to ask, "Has the Plaintiff demonstrated that they

19  can prevail without showing that there was an injury to the

20  corporation?"

21          And if you go through the specific causes of

22  action in the underlying Delaware case, you can see that

23  they are either directly against the Debtor and/or stayed

24  and we don't really need a TRO, there's been no indication

25  by the Plaintiffs in the Delaware action that they intend to

1 proceed against the Debtor, for example, on the appraisal

2 rights claims.  So while the first cause of action is for

3 appraisal rights against DMT, we don't need a TRO for that.

4 That would be automatically stayed.

5          The second cause of action, Your Honor, and

6 similarly, causes of action two through six, the first --

7 the cause of action two is a claim against the officers and

8 directors for breaches of their fiduciary duty.  And then

9 three, four, five and six are -- I was going to say

10 "clever," but I don't mean to be pejorative -- sort of

11 interesting variations of breaches of fiduciary duty.

12          The third cause of action is a claim against

13 the controlling shareholder Defendants for their breaches of

14 fiduciary duty.

15          The fourth is a claim against the controlling

16 shareholder Defendants for unjust enrichment, which they got

17 as a result of that breach of fiduciary duty.

18          The fifth one is the claim against the

19 controlling shareholder Defendants for aiding and abetting a

20 breach of fiduciary duty.

21          And the sixth one is a claim against the

22 officers and directors for aiding and abetting a breach of

23 fiduciary duty.

24          So they're all really a breach of fiduciary

25 duty claim.  And so they allege in their Complaint, Your

1   Honor, in all of them this -- the ones that are live and in

2   all of the preceding ones that were dismissed where they

3   clearly represented in their pleadings themselves that they

4   were holding derivative claims, that the officers and

5   directors and the other individuals that have been sued,

6   were aiding and approving DMT actions for the private

7   purposes of the controlling shareholders, that would be the

8   Otto Candies entities and also the Kazeminy entities.

9           These actions allegedly include gross misuse

10  of corporate funds, self dealing, corporate looting, failure

11  to follow corporate formalities, gross mismanagement.  They

12  have alleged very specific things, like money going out of

13  the company to some Senator's wife.  They've alleged that

14  there were improper dealings on commercial transactions

15  between the insiders and the company that have caused the

16  company to take on additional debt, which then enabled that

17  particular shareholder to flip that debt to more equity than

18  he was entitled to.

19          But all of those causes of action, you have

20  to prove that there was some damage to the company, and if

21  there was a remedy, if there has been money transferred

22  improperly -- for example, from the company to the Senator's

23  wife -- that would be a fraudulent transfer and the money

24  for that would not go back to the shareholders, who may have

25  been harmed from that, it would go back to the company

1   because everybody -- all of the creditors and parties-in-

2   interest of the Debtor would be harmed by that and would be

3   entitled to reap the benefit of that money coming back into

4   the Debtor.

5           And so, the Plaintiffs, while they may have

6   been injured, they have been no differently injured than

7   people similarly situated on whose behalf they should be

8   bringing the claims and the remedy would benefit everyone.

9   It would -- the money would come back to the Debtor and the

10  proceeds -- the remedy for that would benefit all of the

11  Creditors and parties-in-interest of the Debtor.

12          Your Honor, the seventh -- I just was going

13  to reiterate that argument.  I think I can go through it

14  with each of the other claims, but I think two, three, six

15  are identical, Your Honor.  They are just some version of

16  the breach of fiduciary duty.

17          The seventh cause of action, Your Honor, is a

18  claim against the Defendants in the Delaware action for

19  fraud through active concealment of material facts.  And you

20  know, I was -- you know, honestly I would say this claim is

21  a little harder to call, but where I think the other ones

22  are absolutely and unequivocally derivative actions for the

23  benefit of the estate, I would say that the seventh cause of

24  action is probably both, something that would be a

25  derivative action for the benefit of all of the creditors

1  and something where the minority shareholders could argue

2  that the failure to disclose certain information was

3  directly harmful to them, so there would be an overlap

4  there.

5          But again today, Your Honor, I don't know

6  that we have to make a concrete decision.  We have to show

7  that there is a high likelihood that we would appeal on the

8  merits when there is an actual trial and the fact even that

9  this cause of action could be either one and the same with

10 the eighth one, Your Honor.  Maybe the eighth one -- or the

11 seventh one less so than the eighth one -- where there is --

12 where there could be both.  I mean, I don't know that it

13 would -- I don't think that there is a single claim in here

14 that belongs just to the Defendants, but I think that seven

15 and eight may arguably belong to both.

16          But clearly you could show on the fraud

17 through active concealment of material facts, that it is the

18 Debtor that would reap the benefit, if there was a remedy.

19 The -- I think the argument is that the officers and

20 directors falsified corporate documents to cover up improper

21 payments to third parties.  I think this was the cause of

22 action where they alleged that there were payments to Otto

23 Candies that shouldn't have been made and that that enabled

24 the company to increase the -- carry a higher debt in favor

25 of Otto Candies, which he was then able to flip for a higher

1   percentage interest.

2            So again, they may have been harmed by that.

3   There may be a duplication where there is a derivative

4   action and a direct action, but there is also a derivative

5   action at stake.

6            The eighth cause of action fraud through

7   silence in the face of a duty to disclosure is very similar,

8   both in terms of the facts that are pled, and the cause of

9   action itself for fraud through active concealment -- I'm

10  not sure what the difference is between active concealment

11  and failure to disclose through silence.  I mean, to me, the

12  allegation is that there is a fraud, that they had

13  information they should have disclosed.  Bad things were

14  happening.  The company was looted.  There was financial

15  hardship and damage to the company, which should be

16  rectified for the benefit for all of the Creditors and

17  parties-in-interest.

18           The ninth cause of action claimed for --

19  claimed against the controller shareholder Defendants for

20  wrongful equity dilution:  This is phrased as if it were the

21  shareholders who were hurt by the dilution of the Debtors'

22  equity.  You know, the Court has been clear in the *Dexterity*

23  case and as guided by the Fifth Circuit not to look at how

24  the claims are actually pled or how they're titled, you

25  know, what they called them, but, in fact, to look at the

1   substance of the claim itself.  And the claim for dilution

2   rests on the premise that the Debtors overpaid for assets

3   sold and leased to them by Otto Candies, the same stories

4   again, and then converted that to inflated debt equity and

5   diluting the outstanding shares.

6                    So they have pled it as if they were harmed

7   individually, but they weren't.  And it's the company that

8   was harmed by those actions and that would make that a

9   derivative claim.

10                   The tenth cause of action is for an

11  accounting and while that is a direct cause of action, it is

12  a claim against the Debtor and would be stayed by the

13  automatic stay without need of a Temporary Restraining Order

14  from this Court.

15                   So Your Honor, it's a very long way of saying

16  that this Court has exclusive jurisdiction to determine what

17  is property of the estate by arguing -- by focusing the Vice

18  Chancellor Strine in the Delaware Chancery Court on whether

19  the stay applies to Debtors versus non-debtors, it skips a

20  really important issue.  I think in general -- and at first

21  glance, if this were a different kind of lawsuit, if it were

22  not one that contained derivative actions, that would be a

23  very strong and compelling argument to the Court in Delaware

24  that:  Why are these non-debtors reaping the benefit of an

25  automatic stay?

1          And the parties there might be left with just

2   the argument about the aggregation of claims, that there is

3   indemnity provisions that sort of -- what we call in Texas,

4   "inextricably intertwined," which they don't use in

5   Delaware, but that kind of argument.  In this case, though,

6   I think the more compelling argument is that the claims

7   belong to the estate.  So it's not that the actions are

8   stayed against non-debtors.  It's that they very likely

9   should proceed, but they should proceed through this Court,

10  either by the Debtor or a designee of the Debtor.

11         And I think that's important.  I understand

12  the Delaware Plaintiffs' argument, which they pled in sort

13  of a notice way, their response, which I also understand on

14  short notice, that you know:  Why would we want the Debtors

15  to pursue this claim?  I mean, you know, they are the

16  targets here, but the law says that those claims belong to

17  the Debtor and now really the Debtor is a new entity.

18  Courts recognize that Debtors are really a new and different

19  entity than the entity that existed on December 3rd and the

20  difference we have here is that I have a Creditor's

21  Committee who is very interested in these same claims, to

22  investigate them, to determine if there has been wrongdoing

23  by the officers and directors.

24         So while those claims belong to the estate, I

25  would anticipate from a lot of angles, that there would be

1   constituencies already active in this case, who may not want

2   the Debtor to have sole control or any control over those

3   claims and causes of action.

4           **THE COURT:**  Didn't we displace management?

5           **MS. KURTZ:**  Yes.  We've got a Chief Restructuring

6   Officer.  That's why I was going to say, so --

7           **THE COURT:**  So forgetting the Committee for a

8   minute, we don't have --

9           **MS. KURTZ:**  Correct.

10          **THE COURT:**  -- the same management people?

11          **MS. KURTZ:**  We do not.

12          **THE COURT:**  Okay.

13          **MS. KURTZ:**  We do not, although to be clear and

14  you know, Your Honor, the former President and the former

15  Chief Financial Officer are still assisting the Chief

16  Restructuring Officer, in different capacities.  They both

17  are extensively helping with marketing efforts, either for

18  the sale of the vessels or for investors to invest in the

19  company for reorganization.

20              I'm not prepared to say today what the long-

21  term likelihood is of employment for those --

22          **THE COURT:**  But official control is vested, as I

23  recall by our Order, exclusively in the CRO.

24          **MS. KURTZ:**  And he is exercising that exclusively.

25          **THE COURT:**  Okay.

1          **MS. KURTZ:**  So he would either keep those, or if

2      there was substantial push back and/or an order from this

3      Court, we have had preliminary discussions with the

4      Unsecured Creditor's Committee, you know, so that they could

5      do conflicts checks, if we -- if we needed to punt that

6      particular litigation or investigation, would they be

7      prepared to take that?

8               So we believe strongly that the claims belong

9      to the estate for the benefit of all of the creditors and

10     parties-in-interest.  We understand that there could be an

11     argument that the Debtor may not be the perfect person to

12     pursue those.

13              Our argument back would be:  We have a Chief

14     Restructuring Officer.  We have independent management

15     today.  If you're still not satisfied, we have an Unsecured

16     Creditor's Committee.  Those make the facts very different

17     than they were on December 3rd and prior in time.

18          **THE COURT:**  All right.  Mr. Paduano, what kind of

19     response do you have?

20          **MR. PADUANO:**  Your Honor, thank you very much.  I

21     want to make it very clear that what's pending in the

22     Delaware Court is not a derivative action.  They're direct

23     claims against the Defendants there.  And the Counsel has

24     correctly stated that we have disclaimed any interest in

25     anyway of pursuing anything in light of the bankruptcy stay,

1  any claims against Deep Marine Holdings, Inc. or Deep Marine
2  Technology.

3           So Your Honor, then to the extent the
4  argument and the application for this Court is based on the
5  analogous of how we've got derivative claims, it's just not
6  the case.  Moreover, the reliance the Court has just heard
7  about Your Honor's decision in *Dexterity* and the Delaware
8  case that underlies that concern shareholders.  We are not
9  shareholders of the Debtors.  Our shares have been canceled,
10  in a word, and the Court can look at Exhibit "O" to my
11  affidavit.  It shows the merger of what our interest to
12  another entity and don't have an interest right now, the way
13  the law works in Delaware, in either of the Debtors.

14           And clearly, Your Honor's decision in
15  *Dexterity* and the Delaware *Tooley* case be to shareholders
16  and then was trying to evade the automatic bankruptcy stay.
17  We're not shareholders.  They and another machination, which
18  I'll get to in a second, cancelled our shares by doing a
19  short form Delaware merger.

20           And Your Honor, that gets to the point of
21  what's going on here.  What's going on here, as Counsel
22  says, they asked the Delaware Court to stay our action.
23  They filed the Suggestion of Bankruptcy.  That is attached
24  to Exhibit F of my Affidavit, giving notice once the
25  Delaware Court was going to allow the case to proceed,

1   actually on an expedited basis, that these entities that

2   have been merged literally out of business, were going to

3   file for bankruptcy and the Delaware Court, as Counsel

4   correctly stated, set an expedited schedule for discovery.

5            And the reason for that is that these

6   Defendants here, specifically Mr. Candies and Mr. Kazeminy,

7   the Candies' entities, Mr. Candies and Mr. Kazeminy, we

8   think seriously made misrepresentations to the Delaware

9   Court.  This dispute started in the fall of 2008 when on a

10  confidential basis, a source came to our clients.  It's a

11  very small corporation with very few shareholders, that

12  there was wrongdoing.  Our client, under Delaware law, made

13  a demand as they must to the corporation asking that the

14  corporation investigate the wrongdoing and see if there was

15  merit to it, and we made that demand.

16           For more than five months, nothing happened

17  with that demand.  In the interim, we sued.  We did, in

18  fact, file a derivative action in Delaware.  And the

19  Defendants met that that action with a Motion to Dismiss,

20  saying that our client was not ripe, that dismissal was

21  because the Special Committee Minister Battaglini was

22  counsel to -- Greenberg Traurig was Counsel to -- said it

23  hadn't had enough time after three months to complete its

24  work.  So the Delaware Court dismissed without prejudice and

25  allow the Special Committee to complete its work.

1          The Special Committee completed its work on

2    June 30th, 2009.  The next day -- there's a typo in my

3    affidavit, Your Honor.  I apologize for that.  The next day

4    on July 1st, 2009, our shares were cancelled -- our clients'

5    shares were effectively cancelled and there was a short-form

6    Delaware merger, which the Kazeminy entities and the Candies

7    entities were entitled to do because of their vast majority

8    holdings in this closed corporation.

9          Thereafter, Your Honor, we filed the current

10   action that the Defendants seek to have, in effect, stayed

11   because they believe in some form that it runs afoul of the

12   stay, and our claims don't.  This was, as they say, the

13   Court when it takes the time to go through our papers, there

14   are a few shareholders.  We identified wrongdoing.  The

15   company had been valued as we pled in Delaware at more than

16   100 million dollars -- derivative transaction for more than

17   100 million dollars.  On July 1st, 2009, the company's value

18   was nothing.  There's a valuation that's attached in the

19   papers here.  I'm sure the Court noticed a merge in

20   Exhibit O that shows their shares were worth a dollar.

21         And Your Honor, we've got serious claims

22   against these non-officers, non-directors of the bankruptcy

23   entities for what they've done to our shares.  They had

24   duties to us.  They have fiduciary duties to us as majority

25   shareholders, as organizers of the investment, a host of

1   duties and frankly, the reason that they wrote to your Court

2   seeking a TRO is because the Vice Chancellor Shrine is, I

3   think, going to hold her feet to the fire and say that that

4   entities that are not encompassed by the Bankruptcy Court

5   stay are entitled to that protection, and that includes

6   Mr. Candies, Jr., Mr. Candies, III, Mr. Kazeminy, DCC

7   Ventures and JK Holdings Corporation and KOC, Otto Candies,

8   LLC and obviously there's issues with the former directors,

9   who might have greater claim to the protection of this

10  Court, but I don't think that the organizers of the

11  investment.  Outside investors, who were neither directors,

12  nor officers, who were employees of the bankrupt entities, I

13  don't think they get to enjoy the stay at all.

14          So we do have these direct claims because

15  they have done things that have destroyed our values.

16  Counsel has conceded that the ultimate chance we take of the

17  success on the merits by the Debtors here is nil.  She just

18  said that some of these claims may be joint, even if their

19  analysis somehow they've got a derivative action in

20  Delaware, even though it's not apprised, at some point we

21  get to pursue those claims against these people who have

22  wronged us and I don't see how a stay can be issued when

23  we've got a concession that claims may be pursued at all.

24          As to the argument somehow that there's

25  irreparable injury here, these entities, as far as we know

1   in Delaware, we've been deprived of lawsuit, has no idea

2   what has happened to them at all, except for the valuation

3   that showed them at no values as of July 1st, 2009.  I don't

4   know how they could possibly be injured by re-pursuing

5   claims against non-officers, directors and employees,

6   agents, in another forum at all.

7            And this concept, somehow that the claims

8   that we have regarding our shares and what was our seven

9   million dollars that we were entitled to, the value of our

10  shares before this deceit started, somehow belongs to the

11  corporation or to other creditors, I don't see that at all.

12  I don't see how they could possibly apply because again, our

13  claims don't run against the corporation.  Now in light of

14  the stay, we can't pursue, but clearly against the actions

15  that Mr. Kazeminy took and Mr. Otto, the entities and others

16  that they took, we clearly get to pursue those.

17            They ran the companies as their Candy Store

18  and we got close to them and came very close to firming

19  things up in Delaware.  They cancelled out shares -- a very

20  aggressive act.  It clearly got the attention of the

21  Delaware Court, which is why we're on the phone today

22  because I don't know how they're going to explain that

23  result to the Delaware Court.  So the concept somehow that

24  these claims should be -- our claims in Delaware should be

25  stayed and surrendered to Counsel that's being retained by

1    these two entities that were worth a dollar as of July 1st,

2    2009 because of being pursued by Counsel, that is nominated

3    by the Debtors to pursue them as to others where they're

4    speculating that at some point their bills are being paid by

5    Mr. Kazeminy and Mr. Candies, who orchestrated these

6    entities and do stuff to invest in the entities and have

7    done everything to frustrate our interest into that.  The

8    concept of this claim is being pursued diligently, fairly --

9    analyzed diligently and fairly at all, so we cannot -- I

10   don't see how Counsel can possibly overcome that conflict in

11   any way.

12           So even if there were Proof of Claims

13   ultimately it wouldn't be the estate controlled by these

14   same entities that would be pursuing those claims.  So, Your

15   Honor, this is not a situation where the *Dexterity* decision

16   applies.  It's not something where you've got parties, us,

17   in front of you who are trying to end around the stay at

18   all.  I think they've been chewed by half by cancelling our

19   shares.  They began arguing that we were shareholders trying

20   to get around your stay, but we're not.  We're former

21   shareholders.  They kicked us out.  We don't have a claim,

22   according to them if they're to be believed as to the equity

23   or debt or assets or anything of Deep Marine Holdings and

24   Deep Marine Technology and the four special purpose entities

25   that we're unfamiliar with, that are part of the action in

1  your Court.  They kicked us out.

2             So we'd like to sue them, but you know, the

3  stay is there, but at the end of the day, if they're right,

4  they've short-form merged us out of our equity positions.

5  You know, we don't have a claim there.  We have an appraisal

6  proceeding in Delaware that's already been commenced, that's

7  starting, that under Delaware law is supposed to go forward

8  to assign a value, their value, to our shares we would

9  clearly then say because that involved the Debtors of Your

10 Honor's Court.

11            So Your Honor I don't think there's a record

12 in front of you to take the extraordinary action of truly

13 taking away the jurisdiction of the Court in Delaware that's

14 got these claims in front of it that is dispute has been

15 kicking around in various forms and so for well over a year

16 and we have the Court in Delaware to help us.  We got in the

17 Court in Delaware to expedite things because the assets have

18 been taken away from us and now we must pursue these

19 individuals.

20            Our task is quite difficult and we take this

21 as just another effort to make it that much more difficult

22 and much more expensive for our clients.  So we'd ask the

23 Court to deny the TRO Application in its entirety to the

24 extent that if the Debtors want to go forward after some

25 discovery to see what actually is going on and where the

1  right to remedies actually lie after discovery, we could

2  appear back before the Court for a preliminary injunction, I

3  would ask that the most that this Court does is strike at

4  this time.

5           Thank you.

6           **THE COURT:**  All right.  Thank you.

7           All right.  I'm granting the Temporary

8  Restraining Order and let me give the reasons why I'm going

9  to grant the Temporary Restraining Order:  Actually, I

10 oftentimes deny Temporary Restraining Orders because I think

11 that we need to be extraordinarily careful in issuing one,

12 but having reviewed really the four corners of the Complaint

13 to determine what the story is, I think that the Plaintiffs'

14 view of what the Complaint says -- not maybe what it could

15 say, not maybe what somebody wants it to say, but what it

16 says unambiguously largely states claims that are property

17 of the estate.

18          I am guided today by Fifth Circuit law that

19 says that if something is arguably property of the estate,

20 that it is a violation of the automatic stay to exercise any

21 control over it or to take any action against it and I refer

22 the parties to the *Chestnut* case at 422 F.3d 298.

23          We have jurisdiction over this matter under

24 20 U.S.C. Section 1334.  It is a core matter under 20 U.S.C.

25 Section 157 in determining whether to grant a Temporary

1  Restraining Order, I will follow Fifth Circuit law under

2  *Speaks versus Cruz*, at 445 F.3d 396, a 2006 Fifth Circuit

3  case, the standard for standard, substantial likelihood of

4  success on the merits, a substantial threat of irreparable

5  harm if the injunction is not granted, that the threatened

6  injury to the Movant outweighs any harm to the Non-Movant

7  that may result from the injunction and that the injunction

8  will not undermine the public interest.

9          First, is there a substantial likelihood of

10  success on the merits?  My answer is that I think there's a

11  pretty overwhelming likelihood of success on the merits as

12  the Complaint is now pled.  Now I think that Mr. Paduano

13  makes persuasive arguments that there may be a complaint

14  that they can file that would not violate the automatic stay

15  and when an amended complaint gets presented to me, if it

16  gets presented before the expiration of the TRO or if it

17  gets presented at the Preliminary Injunction Hearing, this

18  ruling may change and it may change very dramatically for

19  those of you that are interested in the outcome.

20          I'm ruling on this Complaint, not really on

21  the Complaint described by Defendant's Counsel.  Let me just

22  go through -- and I'm not going to go through every

23  paragraph of the Complaint right now, but I'm going to go

24  through some of the Complaint and just say why I think this

25  is a fairly obvious decision.  The Complaint starts off by

1    saying, "This action is filed by the victims of a conspiracy

2    to loot Deep Marine Holdings and its subsidiaries, including

3    its wholly owned subsidiary, Deep Marine Technology."  It's

4    a corporate looting case.  That is what is pled.

5              When I do to the causes of action, I think

6    everybody agrees that the cause of action for appraisal

7    rights is stayed.  The second cause of action is a claim for

8    general breach of fiduciary duties, without really

9    describing what those breaches are, but referencing back to

10   paragraphs 1 through 148, that largely describe the looting,

11   the self-dealing, the misuse of corporate funds, and

12   describe them in way that, you know, frankly are very

13   persuasive and offensive if true.  I'm obviously not

14   deciding what's true, but there is a major corporate looting

15   case is pled here.

16             When I look at the third cause of action, it

17   gets more specific than the second.  Paragraph 157, however,

18   goes and says, "Otto Candies sold vessels and equipment,

19   some of which were not seaworthy and required hundreds of

20   thousands of dollars to repair to DMT at inflated prices

21   while Otto Candies was a controlling shareholder of DMT and

22   while Otto Candies, III, was a member of DMT's Board of

23   Directors.  By reason of the actions described above, Otto

24   Candies and Otto Candies, III, breached their fiduciary

25   duties to DMT by engaging in a classic case of self-dealing

1   thereby looting DMT and its subsidiaries, unfairly diluting

2   minority shareholder Plaintiffs and diminishing the value of

3   Plaintiffs' DMT stock."

4                This cause of action has nothing to do with

5   the theft of the shares.  It has to do with looting of the

6   corporation.  The unjust enrichment is the same kind of

7   Complaint.

8                The fifth cause of action, again we don't get

9   the specifics.  We're incorporate prior paragraphs, but by

10  incorporating them in each of these situations as the basis

11  for the cause of action, what the Plaintiffs rely on is

12  injury to the corporation for the measure of the damages to

13  the Plaintiffs and when they rely on injury to the

14  corporation as the measure of the damages to the Plaintiffs,

15  they are stating a cause of action that in my mind -- at

16  least arguably under *Chestnut* and I think probably more than

17  arguably, belong to the estate to bring.

18               The seventh and eighth causes of action are

19  sufficiently ambiguous that I don't know what they are.

20  Again, they incorporate the prior paragraphs.  By

21  incorporating the prior paragraphs, they arguably are

22  property of the estate and that is the standard I am

23  required to follow under *Chestnut*.

24               The wrongful equity dilution, I agree almost

25  precisely with the way that Ms. Kurtz described it, which

1   although it is described as a shareholder dilution, what it

2   says is that the shareholders were diluted because assets of

3   the corporation were diverted out and by doing that, it

4   diluted the value of the shares by diversion of corporation

5   assets.

6           And finally, of course, the accounting is the

7   direct claim against the Debtors.

8           I find that as pled, every claim is either

9   actually or arguably a claim that is owned by the estate or

10  is a claim against the Debtors.  I therefore find there is a

11  substantial likelihood of success on the merits.

12          With respect to a substantial threat of

13  irreparable harm if the injunction is not granted, I find

14  there is irreparable harm for two primary reasons.  The

15  first is:  The law holds that a violation of the stay is by

16  definition irreparable injury.  So if they are violating the

17  stay by exercising control in violation of Section 362(c) --

18  excuse me, 362(a), that is, in fact, a violation of the stay

19  and it satisfies a substantial threat of irreparable harm.

20          Second, I think there is irreparable harm if

21  the injunction is not granted because in all likelihood,

22  prosecution of the cases is a void act, and if we get to a

23  prosecution and a result and it's void, that result is going

24  to create such a mess, I don't think we'll ever be able to

25  put Humpty Dumpty back together again.  It just makes no

1   sense to allow it to proceed until what is pled is what they

2   have a right to proceed on.

3              Three, that the threatened injury to the

4   Movant outweighs any harm to the Non-Movant that may result

5   from the injunction.  I think absolutely that is the case

6   from what I have seen.  The Debtor owns these claims, at

7   least some of them without question.  All of them the Debtor

8   arguably owns or the Debtor is a Defendant in.  It is

9   unreasonable to believe that somebody else should be able to

10  control that without injuring the Debtor and moreover, the

11  probability that these actions would then ultimately be

12  determined to be void makes the problem even worse.

13             I frankly don't see any harm to the

14  Non-Movants under this situation.  They want to proceed with

15  litigation, but they have not argued or shown me any harm to

16  them in delay other than that they want to move ahead, and I

17  understand wanting to move ahead and we're going to set

18  things relatively promptly here, but wanting to move ahead

19  does not constitute injury.  There just isn't any injury

20  that at least has been argued to me of holding up, taking a

21  breath, and seeing what's going on in this situation.

22             Moreover, an awful lot of what is argued as

23  the injury has to do with the fact that "The crooks are in

24  charge of suing the crooks," is the way that I'm going to

25  put it.  I don't think that's what's going on in this case.

1    One of the very first things that we did was we ordered that

2    the people that are being complained about were divested of

3    control over the case.

4              I know that the folks on the phone don't know

5    me, but I probably have a reputation down here for turning

6    down Motions to Compromise Controversies more than any other

7    judge in this state does.  I do turn those down

8    unfortunately for people fairly regularly and the

9    probability of me rubber stamping a compromise that is going

10   to allow these folks to walk away in the light of -- if I

11   get a good objection to it, it's fairly low.  I mean, I take

12   my 9019 responsibilities with a great deal of seriousness

13   and perhaps more seriously than some people would like for

14   me to do, but I think there probably shouldn't be a whole

15   lot of worry, that I'm going to end up rubber stamping a

16   9019 motion.

17             And I would also tell the folks, you need to

18   come oppose it.  It's not that I'm just going to go out on

19   my own, but opposed 9019 motions here get treated with a

20   great deal of serious evaluation.

21             Finally, with respect to public interest, I

22   think the Fifth Circuit standard is that the injunction will

23   not undermine the public interest.  I don't think this one

24   does, so I'm going to issue the Temporary Restraining Order.

25   It obviously doesn't last very long.  This is the first TRO

1   that I've issued since the new rules.  I don't know if it's

2   a 14-day standard or a 10, but I'm going to look it up.

3              Let me see.  Fourteen days under Rule 7065 as

4   applying Rule 65(b)(2), so we need to have a hearing within

5   the next two weeks.

6              Mr. Paduano, I'd rather set this at your

7   convenience, since you're going to be traveling.  Can you

8   tell me a convenient time for you during the week of

9   February the 1st and I'll try and get you a hearing on a day

10  that's convenient to you?

11             **MR. PADUANO:**  It's the -- sorry, Your Honor.  I'm

12  just looking.

13             **THE COURT:**  And obviously, you're welcome to

14  participate by phone, but I suspect you're going to want to

15  be here.

16             **MR. PADUANO:**  Yes.  I will be.  One second, Your

17  Honor, please?

18        **(Pause)**

19             **MR. PADUANO:**  Your Honor, I take it the Court

20  still has discretion to move things out a little bit.  Would

21  February the 8th work, the Monday?

22             **THE COURT:**  I can go to the 8th, if you want to

23  consent to the entry of the TRO, but I can't if you won't.

24             **MR. PADUANO:**  We will consent to it.

25             **THE COURT:**  Okay.

JUDICIAL TRANSCRIBERS OF TEXAS, INC.

1          **MR. PADUANO:**  We will consent then up to the date.

2          **THE COURT:**  Right.  Well, you're going to consent

3    that I'm going to issue an TRO for longer than the 14 days,

4    is what you're going to consent to?

5          **MR. PADUANO:**  Yeah, I understand the Court's

6    ruling is we do consent to the additional period of time,

7    yes.

8          **THE COURT:**  Okay.  I actually have time on the

9    8th.  I think a trial must have cancelled.  I'm not sure

10   why.  I've got -- let me just open a couple of docket

11   settings I've got and see how time consuming they're going

12   to be.  What I proposed to do is to limit each side for

13   maybe an hour and a half for their preliminary injunction

14   presentation, maybe two hours, and see if that works for

15   everybody?  Does that work for both sides?

16         **MR. PADUANO:**  Yes, Your Honor.

17         **MS. KURTZ:**  Did -- I'm sorry, Your Honor, did you

18   give us a time on the 8th?  I've --

19         **THE COURT:**  Well, I'm going to look at that.  I'm

20   trying to figure out, can you live with an hour and a half

21   to two hours for your presentation?

22         **MS. KURTZ:**  Okay.  I'm sure.  I mean, two hours

23   would probably be better, but I usually go under.  That's

24   fine.

25         **THE COURT:**  I can give you two hours.  How do you

1   look on the 8th?

2           **MS. KURTZ:**  And Your Honor, I've got a motion -- I

3   know it sounds small, but I've got a Motion for Relief from

4   Stay hearing set -- let me see if that's the 8th or the 9th.

5   I apologize.  Give me one minute.  No, it's the 9th.  I'm

6   clear on the 8th, I'm sorry.  I'm clear on the 8th.

7           **THE COURT:**  Let me see what I've got.  If I set

8   this for 2:00 o'clock in the afternoon and then we go till

9   6:00, will that let you take a morning flight in,

10  Mr. Paduano?

11          **MR. PADUANO:**  Your Honor, whatever time is

12  convenient for the Court.  I'll probably be there the day

13  before.

14          **THE COURT:**  We can start it -- we can start at

15  10:45 in the morning, if you-all want to.  We'll take a

16  fairly -- at 1:30 I've got a hearing that's going to take

17  about 15 minutes.  I've got a 9:00 o'clock.  I just want to

18  be sure it's over before everybody shows up, so if you-all

19  want to start at 10:30, 10:45, and then I'll give each side

20  two hours.

21          **MR. PADUANO:**  10:30 would be great, Your Honor.

22          **THE COURT:**  All right.  We'll issue the TRO.  I'll

23  get all the findings of fact.  I've got to incorporate them

24  actually into writing, I think, under the rules for that,

25  but I will get that done.  The TRO will probably go out

1  tonight.  If not, it will go out in the morning.

2              We'll set the hearing for February 8th at

3  10:30 in the morning on the Preliminary Injunction.  By

4  agreement, each side is going to be limited to two hours for

5  their control of court time that will include your direct

6  examination of any witness and any cross-examination.  It

7  will include any opening and closing.  I'll read your

8  materials beforehand to try and save you having to do an

9  opening.  And we'll have the full time allotted.

10             Just be sure to reserve that time for me,

11  Ms. Smith.

12             Anything else we need to do today?

13        **MR. PADUANO:**  Would the Court entertain a -- would

14  it be possible to take some limited discovery in aid of our

15  hearing?

16        **THE COURT:**  Absolutely.  You're entitled to all

17  the discovery that you-all can notice up and get done.  If

18  you want me to compel some right now, I'd probably prefer

19  that you-all confer first and if you don't reach an

20  agreement, file a Motion to Compel and I'll get discovery.

21        **MR. PADUANO:**  Great.  We'll do that, Your Honor.

22  Thank you.

23        **MS. KURTZ:**  The discovery, Your Honor, I just want

24  to be clear, would be in connection with the ownership of

25  the claims?

1          **THE COURT:**  Well, it's going to have to be

2  connection with the merits of the preliminary injunction

3  that's being sought.

4          **MS. KURTZ:**  Right.  But I mean --

5          **THE COURT:**  So I don't want to say it's only that

6  because, I mean, there may be some other issues.  It isn't

7  obviously an underlying merits discovery, but there may be

8  things that are broader than who owns the claims.

9          **MS. KURTZ:**  You answered my question in your

10  comment.  Thank you.

11          **THE COURT:**  Thank you.   Yes, sir?

12          **MR. MOAK:**  Your Honor, on behalf of the Committee,

13  obviously we're not parties to the action, but we would like

14  the opportunity to participate at the preliminary injunction

15  hearing.  Obviously, Ms. Kurtz --

16          **THE COURT:**  Whose side are you going to take?

17          **MR. MOAK:**  We came today to speak in support of

18  Mrs. Kurtz' client, the Debtors, and we will do that at the

19  preliminary injunction hearing and we will coordinate with

20  her, so as not to duplicate our effort.  In part, the reason

21  I didn't speak today, Your Honor, was because she basically

22  covered every topic that I would like to have covered,

23  but --

24          **THE COURT:**  I'm not sure that you'll be a party to

25  it, but if you -- if the other side doesn't object, I'll

1  deal with it, but certainly I'm going to make you get time

2  from her, out of her two hours.

3          **MR. MOAK:**  We understand, Your Honor, and we'll

4  coordinate with her.  I appreciate that.

5          **THE COURT:**  But I don't want to make a statement

6  today because I don't know what the other side's position

7  will be as to whether you should be allowed to participate

8  or not.

9          **MR. MOAK:**  It may be then, Your Honor, in light of

10  that, we may file a Motion to Intervene.  I'm just going to

11  try to give that --

12          **THE COURT:**  If you file a Motion to Intervene,

13  I'll take it up at that point.

14          **MR. MOAK:**  Thank you, Your Honor.

15          **THE COURT:**  Thank you.

16              Anybody else need anything clarified today?

17      (No audible response.)

18          **THE COURT:**  Okay.  Thank you for the presentation.

19  I appreciate getting educated about this.  I will get a TRO

20  out, I hope before I go home tonight.

21              Thank you.

22          **MR. PADUANO:**  Thank you, Your Honor.

23      **(Proceeding adjourned at 4:12 p.m.)**

24

25                          **\* \* \* \* \***

1    *I certify that the foregoing is a correct transcript from*

2    *the electronic sound recording of the proceedings in the*

3    *above-entitled matter.*

4    */s lmartin*

5    _____

6    *JUDICIAL TRANSCRIBERS OF TEXAS, INC.*

7    *JTT JOB/INVOICE # 28061*

8    *DATE: JANUARY 25, 2010*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C



ENTERED
06/13/2011

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **DEEP MARINE HOLDINGS, INC.**, *et al*, | § | **Case No. 09-39313** |
| Debtor(s). | § | |
| | § | **Chapter 11** |
| | § | |
| **DEEP MARINE HOLDINGS, INC.**, *et al*, | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | **Adversary No. 10-3026** |
| | § | |
| **FLI DEEP MARINE LLC**, *et al*, | § | |
| Defendant(s). | § | **Judge Isgur** |

### MEMORANDUM OPINION

For the reasons set forth below, the Court grants, in part, and denies, in part, the Liquidating Trustee's Motion for Summary Judgment.

### Background

On December 4, 2009, Deep Marine Holdings, Inc. ("DMH"), Deep Marine Technology Incorporated ("DMT"), Deep Marine 1, LLC, Deep Marine 2, LLC, Deep Marine 3, LLC and Deep Marine 4, LLC (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

Prior to the Debtors' bankruptcy filing, two actions (the "Delaware Actions") had been filed in the Delaware Chancery Court against DMH, DMT, and former officers, directors, or shareholders of the Debtors (collectively, the "Delaware Defendants").[1]    The plaintiffs (the

---

[1] On October 26, 2009, Delaware Plaintiffs FLI Deep Marine LLC, Bressner Partners Ltd., Logan Langberg, and Harley Langberg filed a complaint in the Delaware Chancery Court initiating *FLI Deep Marine LLC, Bressner Partners Ltd., Logan Langberg, and Harley Langberg v. Paul McKim, B.J. Thomas, Daniel Erickson, Francis Wade Abadie, Otto Candies, Jr., Otto Candies, III, Eugene DePalma, Larry Lenig, John Ellingboe, Bruce Gilman, John Hudgens, Nasser Kazeminy, DCC Ventures, LLC, NJK Holdings Corporation, NKOC, Inc., Otto Candies, LLC, Deep Marine Holdings, Inc. and Deep Marine Technology Inc.*, No. 5020-VCS, which is now pending before Vice Chancellor Strine.

"Delaware Plaintiffs") in the Delaware Actions are former minority shareholders of the Debtors.[2] The Delaware Plaintiffs asserted the following causes of action against one or more of the Delaware Defendants[3]:

1. Breach of fiduciary duty against the officers and directors of the Debtors;

2. Breach of fiduciary duty against allegedly controlling shareholders of the Debtors;

3. Unjust enrichment against allegedly controlling shareholders of the Debtors;

4. Aiding and abetting a breach of fiduciary duty against allegedly controlling shareholders of the Debtors;

5. Aiding and abetting a breach of fiduciary duty against officers and directors of the Debtors;

6. Fraud through active concealment of material facts against all Delaware Defendants;

7. Fraud through silence in the face of a duty to disclose against all Delaware Defendants;

8. Wrongful equity dilution against allegedly controlling shareholders of Debtors.

On January 19, 2010, the Debtors initiated this lawsuit against the Delaware Plaintiffs by filing Debtor's Original Complaint and Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction (ECF No. 1) . The Complaint alleges that the Delaware Actions contain derivative claims that are property of the Debtors' estates pursuant to 11 U.S.C. § 541. Among other things, the Complaint seeks: (i) a declaratory judgment that the

---

On October 30, 2009, Deepwork Inc. filed a complaint initiating *Deepwork Inc. v. Paul McKim, B.J. Thomas, Daniel Erickson, Francis Wade Abadie, Otto Candies, Jr., Otto Candies, III, Eugene DePalma, Larry Lenig, John Ellingboe, Bruce Gilman, John Hudgens, Nasser Kazeminy, DCC Ventures, LLC, NJK Holdings Corporation, NKOC, Inc., Otto Candies, LLC, Deep Marine Holdings, Inc. and Deep Marine Technology Inc.*, No. 5032-VCS, which is also now pending before Vice Chancellor Strine.

[2] The Delaware Plaintiffs were originally shareholders of DMT. Their DMT shares were allegedly subsequently exchanged for shares in DMH. For the sake of simplicity, the Court refers to Delaware Plaintiffs as shareholders of DMT throughout this opinion.

[3] The Delaware Plaintiffs also asserted claims for appraisal rights and an accounting against the Debtors. These claims are not in dispute in this adversary proceeding.

Delaware Actions are property of the Debtors' estates; (ii) a temporary restraining order barring the Delaware Plaintiffs from prosecuting the Delaware Actions until the Court has determined which actions are property of the bankruptcy estates; and (iii) a preliminary and permanent injunction enjoining Delaware Plaintiffs from any act to obtain possession or exercise control over property of the estates.

On January 21, 2010, the Court granted the Debtors' request for a temporary restraining order. The Temporary Restraining Order (ECF No. 16) provided, in part, that:

> Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure, it is ordered that the Defendants, and all persons working in active concert with them, are restrained from prosecuting (i) Case No. 5020-VCS pending in the Court of Chancery of the State of Delaware; (ii) Case No. 5032-VCS pending in the Court of Chancery of the State of Delaware; and (iii) any other lawsuit arising out of the facts and circumstances described in either of the two foregoing lawsuits; provided, this Temporary Restraining Order does not preclude the Defendants from filing any lawsuit that is submitted to and approved for filing by this Court.[4]

On June 2, 2010, the Court confirmed the Debtors' bankruptcy plan, which authorized the sale of substantially all of the Debtors' assets. The confirmation order transferred all of Debtors' remaining assets to a Liquidating Trust and appointed John Bittner to the position of Liquidating Trustee. Bittner's duties include, among other things, handling claims owned by the Liquidating Trust.

On February 16, 2011, the Liquidating Trustee filed Plaintiff's Motion for Summary Judgment (ECF No. 133). The Liquidating Trustee argues that the Delaware Actions primarily allege that some or all of the Delaware Defendants misused corporate funds, engaged in corporate looting, failed to follow corporate formalities, and/or grossly mismanaged the Debtors.

---

[4] The parties subsequently agreed that the Temporary Restraining Order would remain in effect until the Court holds a preliminary injunction hearing.

According to the Liquidating Trustee, the Delaware Actions are, essentially, corporate looting lawsuits. If that is true, the Delaware Actions would constitute derivative actions belonging solely to the Liquidating Trust. The Liquidating Trustee requests a permanent injunction containing injunctive language that is nearly identical to the January 21, 2010 Temporary Restraining Order.

On March 16, 2011, one of the Delaware Plaintiffs,[5] FLI Deep Marine LLC ("FLI"), filed the Response of Defendant FLI Deep Marine LLC to Plaintiff's Motion for Summary Judgment (ECF No. 137). FLI claims that it does not seek to pursue any of the derivative claims that belong to the Liquidating Trustee. FLI's Response does not attempt to counter the majority of the Liquidating Trustee's arguments in his Motion for Summary Judgment, essentially conceding that most of the underlying claims in the Delaware Actions are derivative.

Instead, FLI requests the Court's permission to file an amended complaint in the Delaware Court of Chancery asserting only three allegedly direct claims (the "Allegedly Direct Claims"). Specifically, FLI's Allegedly Direct Claims are claims against: (i) certain Delaware Defendants designated by FLI as the "Controlling Shareholders"[6] for (a) breach of the fiduciary duty owed by the Controlling Shareholders to FLI and (b) for shareholder oppression; and (ii) Joseph Grano, Jr. for aiding and abetting the Controlling Shareholders' breach of fiduciary duty owed to FLI. FLI argues that its claims for breach of fiduciary duty, oppression, and aiding and abetting are direct claims because they seek redress for harm inflicted directly upon FLI.

---

[5] Bressner Partners Ltd., Logan Langberg, Harley Langberg, and Deepwork Inc. have not responded to the Liquidating Trustee's Motion for Summary Judgment.

[6] The "Controlling Shareholders" include: (i) Nasser Kazeminy; (ii) DCC Ventures, LLC, a company allegedly owned or controlled by Kazeminy; (iii) NJK Holdings Corporation, a company allegedly owned or controlled by Kazeminy; (iv) Otto Candies, Jr.; (v) Otto Candies, III; (vi) Otto Candies, LLC, a company allegedly owned or controlled by Candies, Jr. and Candies, III; and (vii) the Triomphe Investors, LLC, a company allegedly owned or controlled by Kazeminy's son, Nader Kazeminy.

## Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Fed. R. Bankr. P. 7056 incorporates Rule 56 in adversary proceedings.

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine dispute of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.[7] Fed. R. Civ. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The Court should not weigh the evidence. A credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). However, a party may object

---

[7] If a party fails to support an assertion or to address another party's assertion as required by Rule 56(c), the Court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if, taking the undisputed facts into account, the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e).

that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2).

"The moving party bears the burden of establishing that there are no genuine issues of material fact." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Malacara*, 353 F.3d at 403. Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. *Sossamon*, 560 F.3d at 326. The non-moving party must cite to specific evidence demonstrating a genuine dispute. Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986). The nonmoving party must also "articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

If the nonmovant bears the burden of proof of an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim. *Norwegian Bulk Transp. A/S*, 520 F.3d at 412. Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Celotex*, 477 U.S. at 324. The motion should be granted only if the non-movant cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

**Issue Presented**

For the purposes of his Motion for Summary Judgment, the Liquidating Trustee stipulates that all facts alleged by the Delaware Plaintiffs in the Delaware Actions are true. Accordingly, the Court's task is only to determine whether the claims asserted in the Delaware Actions are direct or derivative claims.

**Facts**

The Court summarizes the factual allegations of the Delaware Actions. The allegations are assumed true for the purposes of this Memorandum Opinion.

The Delaware Plaintiffs were early investors in DMT, originally purchasing shares in the company in 2002. By 2006, the Delaware Plaintiffs' shares of DMT common stock represented more than 8.5% of the company's overall outstanding common stock. The Delaware Plaintiffs have collectively invested over $1.73 million in DMT.

This is a case primarily about the Controlling Shareholders' alleged usurpation of power over, mismanagement and looting of the Debtors, and the failure of the Debtors' officers and directors to prevent the Controlling Shareholders from doing so. The Controlling Shareholders include: (i) Nasser Kazeminy; (ii) DCC Ventures, LLC, a company allegedly owned or controlled by Kazeminy; (iii) NJK Holdings Corporation, a company allegedly owned or controlled by Kazeminy; (iv) Otto Candies, Jr. and (v) Otto Candies, III; (vi) Otto Candies, LLC, a company allegedly owned or controlled by Candies, Jr. and Candies, III (collectively "Candies"); and (vii) the Triomphe Investors, LLC, a company allegedly owned or controlled by Kazeminy's son, Nader Kazeminy. For the sake of simplicity, any reference to "Kazeminy and Candies" in this Memorandum Opinion should be considered as synonymous with "Controlling Shareholders."

Kazeminy (and companies he owned or controlled) became the majority shareholder of the Debtors. Candies subsequently gained a significant portion of ownership in the Debtors. Kazeminy and Candies collectively became owners of 90% of the Debtors' outstanding common stock. Kazeminy and Candies then allegedly used their control over the Debtors and their officers and directors to benefit themselves at the Debtors' and their shareholders expense.

1. **Transactions Between Otto Candies, LLC and DMT—as Alleged in Delaware Complaint**

DMT regularly did business with Otto Candies, LLC which supplied vessels for DMT's subsea projects. Due to Candies' relationship with Kazeminy and the officers and directors of DMT, the business transactions between Otto Candies, LLC and DMT were often not at arms-length and resulted in DMT incurring substantial losses.

For instance, during 2006, 2007, and 2008, Otto Candies, LLC repeatedly misrepresented the state of its vessels and then charged DMT hundreds of thousands of dollars to lease and charter vessels that were broken, poorly built, or not able to meet U.S. Coast Guard regulations. This forced DMT to pay substantial sums to repair the defective vessels that Otto Candies, LLC had off-loaded onto it. It also resulted in the loss of valuable contracts with DMT's customers and, consequently, the loss of millions of dollars in revenue.

Otto Candies, LLC also sold vessels to the Debtors at inflated prices. In May 2007, Candies and Kazeminy caused DMT to pay $6 million above the contracted price to purchase a vessel, later named the Emerald, simply because Candies demanded such amount at the closing of the sale transaction. In October 2007, DMT purchased the vessels the Agnes and the Sapphire. The consideration for the purchase was $35 million in DMT stock, although the two vessels were worth no more than $28 million. This resulted in an overpayment to Candies of at least $7 million.

As in the Agnes and Sapphire transaction, DMT at times paid Candies in convertible debt, instead of cash, for services and vessels. When Candies converted the DMT debt into DMT common equity, Candies received more DMT shares than it would have received had DMT not overpaid for the assets and services. This diluted Delaware Plaintiffs' shares and enabled Candies to join Kazeminy as Controlling Shareholders of the Debtors.

### 2. Improper Payments Made by DMT—as Alleged in Delaware Complaint

Kazeminy's influence over DMT is evidenced by the improper payments that were made at his direction. First, at Kazeminy's direction, DMT sent three payments of $25,000.00 each to a former United States Senator from Minnesota, Norm Coleman, through an insurance company that employed Senator Coleman's wife. Kazeminy's relative, Behnaz Ghaufouri, received a $6,000.00 transfer from DMT. These payments were made despite the fact that neither Coleman nor Ghafouri performed any services for DMT.

### 3. The Short-Form Merger—as Alleged in Delaware Complaint

On October 10, 2008, after learning of, among other things, Candies' self-dealing and the payments to Senator Coleman, the Delaware Plaintiffs sent a shareholder demand letter to the DMT board of directors. The Delaware Plaintiffs demanded an investigation into the alleged wrongful conduct. DMT responded by establishing a special committee to investigate the allegations raised in the demand letter. According to the Delaware Plaintiffs, this special committee was not independent and failed to conduct a proper investigation. On June 30, 2009, the special committee released a press statement declaring that it found no wrongdoing over the course of its investigation.

The day after the press statement's release, as part of a scheme to deprive the Delaware Plaintiffs of their standing to bring derivative claims, Kazeminy and Candies commenced and

concluded a Delaware Section 253 short-form merger. The short-form merger was entered into between the Debtors and NKOC, Inc.[8] The Delaware Plaintiffs were not notified and did not consent to the merger.

On July 11, 2009, ten days after the merger, the Delaware Plaintiffs were notified of the merger and offered one cent per share for their DMT shares. Although the company was purportedly valued as worth over $100 million in the 18 months preceding the merger, the notice of merger stated that the company had become so bereft of assets and laden with debt as to be worth nothing at all. The merger compensation totaled $22,000.00 for all minority shares of DMT.

The short-form merger effectively terminated the Delaware Plaintiffs' ownership in the Debtors and rendered the Controlling Shareholders 100% owners of the Debtors.

### Analysis[9]

A derivative lawsuit is an action that is commenced by a corporation's shareholder on behalf of the corporation for harm allegedly done to the corporation. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* 845 A.2d 1031, 1036 (Del. 2004). "Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation." *Id.* A shareholder may also bring a direct action for direct injuries to the shareholder's legal rights as a shareholder. *Id.* In such direct lawsuits, "the recovery or other relief flows directly to the stockholders, not to the corporation." *Id.*

---

[8] NKOC is named after the initials of Nasser Kazeminy and Otto Candies. NCOK was merged into DMH and NCOK's separate corporate existence ceased as of the date of the merger.

[9] The parties agree that Delaware law governs this dispute. *See also In re Dexterity Surgical, Inc.*, 365 B.R. 690, 695 (Bankr. S.D. Tex. 2007) "Under Texas law, actions involving the internal affairs of a foreign corporation are governed by the law of the state of incorporation.") (citations omitted).

In order to determine whether a claim is direct or derivative, the "analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy"? *Id.* at 1035. Courts must "look to the nature of the wrong and to whom the relief should go." *Id.* at 1039. In order to have a direct claim, a "stockholder's claimed direct injury must be independent of any alleged injury to the corporation." *Id.* "The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.*

Furthermore, under *Tooley*, "the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint." *In re J.P. Morgan Chase & Co.'s S'Holders Litig.*, 906 A.2d 808, 817 (Del. 2005) (internal citation omitted). "Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists." *Id.* (internal citation omitted).

The possible derivative and direct causes of action fall into three categories. First are the claims that are clearly derivative, where the shareholder's injury flows directly from harm to the corporation. As an example, a derivative claim would exist if a corporate executive breaches a fiduciary duty and approves improper financial transactions, resulting in harm to the corporation and a consequent reduction in the value of stock held by shareholders. The second category is that of clearly direct claims, where the stockholder proves an individualized injury but where the corporation is unharmed as a result. The third category is where certain shareholders suffer an individualized injury in addition to an injury to the corporation as a whole, which may result in both direct and derivative claims. The Court in *Tooley* stated that "the stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail

11

without showing an injury to the corporation." 845 A.2d at 1039. This does not mean, however, that all shareholder claims are derivative if they result from a transaction injuring both the corporation and shareholders. *See Gentile v. Rossette*, 906 A.2d 91 (Del. 2006) (holding that, under *Tooley*, independent harms to a corporation and to certain shareholders may derive from the same transaction, resulting in direct and derivative claims for the shareholders).

The Court must now analyze each of the Delaware Plaintiffs' claims for the purpose of determining whether they constitute direct or derivative claims. As set forth below, all of the claims except those relating to the allegation of an independent injury (here, equity dilution and expropriation of economic value) are derivative claims.

### 1. Breach of Fiduciary Duty Against Debtors' Officers and Directors

The Delaware Plaintiffs' first claim at issue is for breach of fiduciary duty against DMT's officers and directors. The Delaware Plaintiffs allege that the actions of DMT's officers and directors, in aiding and approving DMT actions for the private purposes of the Controlling Shareholders, were without merit, served no legitimate business purpose, and were not in the best interests of DMT and/or its shareholders. These actions include gross misuse of corporate funds, self-dealing, equity dilution, failure to follow corporate formalities, and gross mismanagement.

The Liquidating Trustee argues that the Delaware Plaintiffs' breach of fiduciary duty claim against the officers and directors arises out of harm inflicted upon the Debtors, not the minority shareholders. According to the Liquidating Trustee, it was the Debtors' funds that were allegedly misused, the Debtors' opportunities that have been lost because of alleged self-dealing, the Debtors' operations hurt by the alleged failure to follow corporate formalities, and the Debtors' business damaged by the alleged mismanagement.

FLI's Response to the Liquidating Trustee's Motion for Summary Judgment does not contest the Liquidating Trustee's argument on this point. FLI essentially concedes that the breach of fiduciary duty claim against DMT's officers and directors is a derivative claim.

The Court largely agrees with the Liquidating Trustee that the breach of fiduciary duty claim asserted by the Delaware Plaintiffs against the Debtors' officers and directors is derivative. For example, the harm caused by the officers and directors concerning Candies' allegedly inflated sale prices for Candies' vessels was borne by the Debtors. The same can be said for the payments allegedly made to Senator Coleman. Likewise, it is the Debtors who would reap any recovery against Candies for overcharges or Senator Coleman for the $75,000.00 in alleged improper transfers.

The missing link in most of the Delaware Plaintiffs' allegations against the Debtors' officers and directors is an independent injury suffered by the Delaware Plaintiffs. For instance, there is no doubt that the substantial overpayments allegedly collected by Candies damaged shareholder value by decreasing the Debtors' equity. But that harm corresponded to the primary injury, the overpayments themselves, which depleted the Debtors' resources. The decline in shareholder value from overpayments to Candies is not an injury that is independent of any injury to the Debtors.

On the other hand, the Court finds that certain allegations involving equity dilution and expropriation of value must survive the Liquidating Trustee's Motion for Summary Judgment because they contain an independent injury. A claim of breach of fiduciary duty by corporate officers or directors related to this independent injury is direct. This relates to the allegation that Candies was, at times, overpaid through the Debtors' issuance of convertible notes in Candies'

favor. Candies later converted these notes into DMT equity, thereby diluting the Delaware Plaintiffs' ownership stake in the Debtors and expropriating some of its value.

Generally speaking, "claims of overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative." *Rossette*, 906 A.2d at 99. However, Delaware law recognizes that one variation of corporate overpayment results in both direct and derivative claims. This is where "(1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders." *Id.* at 100. In a normal overpayment situation, "dilution in value of the corporation's stock is merely the unavoidable result . . . of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction." *Id.* at 99. Therefore in the normal overpayment situation, the stockholders have only a derivative claim. *Id.* In the above atypical situation where shares are issued to a controlling shareholder for the purposes of diluting the holdings of minority shareholders, "[a] separate harm also results: an extraction from the [minority] shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence the [minority] shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefitted." *Id.* at 100. The claim for recovery of the overpayment by the corporation is still, of course, derivative. *Id.* However, the minority shareholders also have a direct claim for the expropriation of value from their equity interests that benefitted the majority shareholders. *Id.* This type of situation, in which harm befalls both the corporation and the

minority shareholders, falls into the third category listed above. It passes the *Tooley* test, because although separate harms to the corporation and the shareholder result from the same transaction, they are independent of one another. *Id.* at 99.

An important aspect of the situation described in *Rossette* is that the form of overpayment must be stock in order for the dual harms to result. *Id.* at 100. However, the issuance of sham convertible notes might inflict similar injury. If the issuance of convertible notes were a sham, intended at the outset to be converted into equity, the Debtors' balance sheet would reflect only a sham liability for the convertible notes. It would be a temporary, fictitious liability that would evaporate once the conversion was executed. Just like an issuance of additional shares for no consideration, this would create unique harm to the minority shareholders. The substance of the Debtors' assets and liabilities would be unaffected from beginning to end, and therefore neither transaction would result in injury to the Debtor. All of the injury would flow to the allegedly-diluted minority shareholders.

When a worthless (or hyper-valued) asset is obtained for stock (or, for that matter, for sham convertible notes that are the equivalent of stock) issued to majority shareholders, only the minority shareholders would suffer true injury. Although the corporation might temporarily record the inflated value on its books, marketplace realities would eventually control valuation. When the asset was then reduced to true market value, the only lasting effect would be on the now-diluted minority shareholders. Their ownership percentage in the Debtor would decrease due to the issuance of stock (or the sham conversion). The Debtor's total equity remains unchanged since nothing was paid for the stock, while the minority shareholders' percentage of the Debtor's total equity decreases. This represents a unique and independent injury suffered by the Delaware Plaintiffs. *See In re J.P. Morgan Chase & Co.*, 906 A.2d 808, 818 (Del. Ch. 2005)

(a direct claim exists "where a significant stockholder's interest is increased at the sole expense of the minority") (internal citation omitted).

Accordingly, to the extent that the Delaware Plaintiffs allege an independent injury concerning equity dilution and expropriation of value from their holdings, falling into either the second or third category above, the Liquidating Trustee's Motion for Summary Judgment is denied. With regard to all remaining allegations, the Court holds that the Delaware Plaintiffs' claim for breach of fiduciary duty against the Debtors' officers and directors is a derivative claim and, therefore, property of the Liquidating Trust.

The Court recognizes that this ruling creates a unique fact issue that must be resolved in ensuing litigation—was the issuance of the convertible debt a sham? If the convertible debt was legitimately issued, the harm from the issuance of the debt was suffered by the corporation and the minority shareholder's loss would be derivative. If the issuance of the convertible debt was a sham intended to expropriate value from and dilute the minority shareholders' holdings, then they have suffered a direct injury. The burden of proof must rest on the minority shareholders to demonstrate any such sham.

## 2. Breach of Fiduciary Duty by the Debtors' Controlling Shareholders

The Delaware Plaintiffs' second claim at issue in the Motion for Summary Judgment is a claim against the Controlling Shareholder Defendants for Breach of Fiduciary Duty. As with the claim against the Corporate Director's and Officers, the Delaware Plaintiffs allege many illegitimate acts by the Controlling Shareholders, including looting, self-dealing, and unfair dilution of the minority shareholder's interest. (ECF No. 1, p. 46).

The Liquidating Trustee argues that this "Delaware Cause of Action is clearly focused on harm to the Debtors, and . . . is a derivative claim that belongs to the Trustee." [MSJ, p. 11] The Court agrees with the Liquidating Trustee regarding most but not all of the allegations.

Except as set forth in the next sentence, the breach of fiduciary duty claims against Debtors' Controlling Shareholders are derivative claims. The breach of fiduciary duty claims against Debtors' Controlling Shareholders are direct claims only to the extent that the alleged breach is (i) the improper issuance of dilutive shares, (ii) the issuance of sham convertible notes for the purpose of dilution, or (iii) an improper use of the Delaware short-form merger that resulted in injury to the Delaware Plaintiffs.

### 3. Unjust Enrichment Against Debtors' Controlling Shareholders

The Delaware Plaintiffs next claim at issue is for Unjust Enrichment Against Debtors' Controlling Shareholders. They allege that the Controlling Shareholders unjustly enriched themselves with DMT's corporate assets, to the detriment of the Plaintiffs. (ECF No. 1, p. 47).

The Liquidating Trustee again alleges that any claims of unjust enrichment are derivative, and therefore property of the Liquidating Trust. The Court agrees with the Liquidating Trustee insofar as the claims relate to corporate looting and generic self-dealing, with the defendants unjustly enriching themselves with DMT's corporate assets. However, a claim of unjust enrichment via expropriation of value from the minority shareholders' DMT holdings, as opposed to unjust enrichment via theft of corporate assets, is direct. The unjust enrichment claims are derivative except as set forth in the next sentence. The unjust enrichment claims are direct claims only to the extent of injuries from (i) the improper issuance of dilutive shares, (ii) the issuance of sham convertible notes for the purpose of dilution, or (iii) an improper use of the Delaware short-form merger that resulted in injury to the Delaware Plaintiffs..

### 4. Aiding and Abetting a Breach of Fiduciary Duty Against Debtors' Controlling Shareholders

The aiding and abetting claims are derivative claims to the extent that the actions that were aided or abetted resulted in derivative injuries as set forth in this opinion. To the extent that the actions that were aided and abetted resulted in direct injury, as set forth in this opinion, the aiding and abetting allegations are direct.

### 5. Aiding and Abetting a Breach of Fiduciary Duty Against Debtors' Officers and Directors

The aiding and abetting claims are derivative claims to the extent that the actions that were aided or abetted resulted in derivative injuries as set forth in this opinion. To the extent that the actions that were aided and abetted resulted in direct injury, as set forth in this opinion, the aiding and abetting allegations are direct.

### 6. Fraud Through Active Concealment Against All Defendants

The allegations in the Delaware Complaint with respect to this claim relate to efforts by Defendants to shield relevant information about DMT, not to the independent injury allegedly suffered by the Delaware Plaintiffs. This claim is derivative.

### 7. Fraud Through Silence in the Face of a Duty to Disclose Against All Defendants

As with the claim of Fraud through Active Concealment, the allegations contained in the Complaint do not relate to the independent injury allegedly suffered by the Delaware Plaintiffs. This claim is derivative.

### 8. Wrongful Equity Dilution Against Debtors' Controlling Shareholders

This issue is fully addressed in the breach of fiduciary duty cause of action against the Debtors' Officers and Shareholders. The Court incorporates the reasoning set forth in that section.

**9. Shareholder Oppression**

This issue is fully addressed in the breach of fiduciary duty cause of action against the Debtors' Officers and Shareholders. The Court incorporates the reasoning set forth in that section.

**Conclusion**

For the above stated reasons, the Liquidating Trustee's Motion for Summary Judgment is granted in part and denied in part.

The Court believes that the reasoning in this Memorandum Opinion fully resolves all matters in dispute between the parties. Within 14 days, the parties must either (i) set forth any remaining disputes; or (ii) file a proposed final judgment consistent with this opinion.

SIGNED **June 13, 2011.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE



# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
08/05/2011

| | | |
|---|---|---|
| IN RE: | § | |
| **DEEP MARINE HOLDINGS, INC.,** *et al,* | § | **Case No. 09-39313** |
| Debtor(s). | § | |
| | § | **Chapter 11** |
| | § | |
| **DEEP MARINE HOLDINGS, INC.,** *et al,* | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | **Adversary No. 10-03026** |
| | § | |
| **FLI DEEP MARINE LLC,** *et al,* | § | |
| Defendant(s). | § | **Judge Isgur** |

## REPORT AND RECOMMENDATION

This Court issued its Memorandum Opinion on June 13, 2011, in contemplation of entry of a final judgment. *In re Deep Marine Holdings, Inc.,* 2011 WL 2420274 (Bankr. S.D. Tex. June 13, 2011). A copy is attached as Exhibit "A" and incorporated into this Report. Ten days later the Supreme Court handed down *Stern v. Marshall*, 564 U.S. _____ (June 23, 2011). This Court must reconsider its authority to issue a final judgment in this case.

*Stern* concerned a bankruptcy court's authority over a debtor's common-law counterclaim to a proof of claim filed against the estate. The Supreme Court held that a bankruptcy court may not constitutionally enter a final judgment over a counterclaim that would not necessarily be resolved by the resolution of the proof of claim. *Id.* at *24. The counterclaim did not constitute a "public rights" dispute. *Id.* at *21. Although public rights disputes may be decided by non-Article III tribunals, public rights disputes must involve rights "integrally related to a particular federal government action." *Id.* at *17-18. The Supreme Court held that it would be an impermissible exercise of the judicial power of the United States to enter a final judgment on the counterclaim. *Id.* at *21.

1 / 3

The broader applicability of *Stern* remains unclear. One of the principal issues concerns the extent to which bankruptcy courts may exercise authority over essential bankruptcy matters under the "public rights" exception. In *Thomas v. Union Carbide Agricultural Products Co.*, the Supreme Court held that a right closely integrated into a public regulatory scheme may be resolved by a non-Article III tribunal. 473 U.S. 568, 593 (1985). The Bankruptcy Code is a scheme for restructuring debtor-creditor relations, necessarily including "the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *Central Va. Cmty. College v. Katz*, 546 U.S. 356, 363-64 (2006); *see Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982) (plurality opinion) (noting in dicta that the restructuring of debtor-creditor relations "may well be a 'public right'"). *But see Stern*, 2011 WL 2472792, at *20 n.7 ("We noted [in *Granfinanciera*] that we did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.'").

Assuming *arguendo* the restructuring of debtor-creditor relations is a public right, this Court does not have authority to enter a final judgment in this case. Bankruptcy courts, of course, must be able to protect the bankruptcy estate. However, a final judgment in this case requires a determination that property is or is not a part of the bankruptcy estate. Such a determination is an exercise of the judicial power of the United States. *See* Caleb Nelson, *Adjudication in the Political Branches*, 107 COLUM. L. REV. 449 (2007) (noting 'judicial power' historically needed "to dispose conclusively of an individual's legal claim to private rights that fit the template of life, physical liberty, or traditional forms of property"). Determining a cause of action to be derivative and an asset of the bankruptcy estate, along with issuing a permanent injunction,

qualifies as a conclusive determination of an individual's legal claim of a private right regarding a form of property.

This Court believes *Stern*'s reasoning does not permit this Court to enter a Final Judgment in the present matter. Therefore, this Court submits this Report and Recommendation to the District Court, recommending it accept the findings of fact and law contained in this Court's June 13, 2011 Memorandum Opinion.

SIGNED **August 4, 2011.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

Westlaw.

Slip Copy, 2011 WL 2420274 (Bkrtcy.S.D.Tex.)

**(Cite as: 2011 WL 2420274 (Bkrtcy.S.D.Tex.))**

**H**

Only the Westlaw citation is currently available.

United States Bankruptcy Court,

S.D. Texas,

Houston Division.

In re DEEP MARINE HOLDINGS, INC., et al, Debtor(s).

Deep Marine Holdings, Inc., et al, Plaintiff(s)

v.

Fli Deep Marine LLC, et al, Defendant(s).

Bankruptcy No. 09–39313.

Adversary No. 10–3026.

June 13, 2011.

Jason Gary Cohen, Laura L. Venta, Marcy E. Kurtz, Bracewell & Giuliani LLP, Houston, TX, for Plaintiffs.

Anthony Paduano, Paduano Weintraub LLP, New York, NY, Lisa M. Mastrodomenico, Jaspan Schlesinger LLP, Garden, TX, Thomas M. Kirkendall, Attorney at Law, The Woodlands, TX, for Defendants.

## MEMORANDUM OPINION

MARVIN ISGUR, Bankruptcy Judge.

*1 For the reasons set forth below, the Court grants, in part, and denies, in part, the Liquidating Trustee's Motion for Summary Judgment.

## Background

On December 4, 2009, Deep Marine Holdings, Inc. ("DMH"), Deep Marine Technology Incorporated ("DMT"), Deep Marine 1, LLC, Deep Marine 2, LLC, Deep Marine 3, LLC and Deep Marine 4, LLC (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

Prior to the Debtors' bankruptcy filing, two actions (the "Delaware Actions") had been filed in the Delaware Chancery Court against DMH, DMT, and former officers, directors, or shareholders of the Debtors (collectively, the "Delaware Defendants"). [FN1] The plaintiffs (the "Delaware Plaintiffs") in the Delaware Actions are former minority shareholders of the Debtors. [FN2] The Delaware Plaintiffs asserted the following causes of action against one or more of the Delaware Defendants [FN3]:

<u>FN1</u>. On October 26, 2009, Delaware Plaintiffs FLI Deep Marine LLC, Bressner Partners Ltd., Logan Langberg, and Harley Langberg filed a complaint in the Delaware Chancery Court initiating *FLI Deep Marine LLC, Bressner Partners Ltd., Logan Langberg, and Harley Langberg v. Paul McKim, B.J. Thomas, Daniel Erickson, Francis Wade Abadie, Otto Candies, Jr., Otto Candies, III, Eugene DePalma, Larry Lenig, John Ellingboe, Bruce Gilman, John Hudgens, Nasser Kazeminy, DCC Ventures, LLC, NJK Holdings Corporation, NKOC, Inc., Otto Candies, LLC, Deep Marine Holdings, Inc. and Deep Marine Technology Inc.,* No. 5020–VCS, which is now pending before Vice Chancellor Strine.

On October 30, 2009, Deepwork Inc. filed a complaint initiating *Deepwork Inc. v. Paul McKim, B.J. Thomas, Daniel Erickson, Francis Wade Abadie, Otto Candies, Jr., Otto Candies, III, Eugene DePalma, Larry Lenig, John Ellingboe, Bruce Gilman, John Hudgens, Nasser Kazeminy, DCC Ventures, LLC, NJK Holdings Corporation, NKOC, Inc., Otto Candies, LLC, Deep Marine Holdings, Inc. and Deep Marine Technology Inc.,* No. 5032–VCS, which is also now pending before Vice Chancellor Strine.

<u>FN2</u>. The Delaware Plaintiffs were originally shareholders of DMT. Their DMT shares were allegedly subsequently exchanged for shares in DMH. For the sake of simplicity, the Court refers to Delaware Plaintiffs as shareholders of DMT throughout this opinion.

<u>FN3</u>. The Delaware Plaintiffs also asserted claims for appraisal rights and an accounting against the Debtors. These claims are not in dispute in this adversary proceeding.

1. Breach of fiduciary duty against the officers and directors of the Debtors;

2. Breach of fiduciary duty against allegedly controlling shareholders of the Debtors;

3. Unjust enrichment against allegedly controlling shareholders of the Debtors;

4. Aiding and abetting a breach of fiduciary duty against allegedly controlling shareholders of the Debtors;

5. Aiding and abetting a breach of fiduciary duty against officers and directors of the Debtors;

6. Fraud through active concealment of material facts against all Delaware Defendants;

7. Fraud through silence in the face of a duty to disclose against all Delaware Defendants;

8. Wrongful equity dilution against allegedly controlling shareholders of Debtors.

On January 19, 2010, the Debtors initiated this lawsuit against the Delaware Plaintiffs by filing Debtor's Original Complaint and Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction (ECF No. 1). The Complaint alleges that the Delaware Actions contain derivative claims that are property of the Debtors' estates pursuant

to 11 U.S.C. § 541. Among other things, the Complaint seeks: (i) a declaratory judgment that the Delaware Actions are property of the Debtors' estates; (ii) a temporary restraining order barring the Delaware Plaintiffs from prosecuting the Delaware Actions until the Court has determined which actions are property of the bankruptcy estates; and (iii) a preliminary and permanent injunction enjoining Delaware Plaintiffs from any act to obtain possession or exercise control over property of the estates.

On January 21, 2010, the Court granted the Debtors' request for a temporary restraining order. The Temporary Restraining Order (ECF No. 16) provided, in part, that:

Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure, it is ordered that the Defendants, and all persons working in active concert with them, are restrained from prosecuting (i) Case No. 5020–VCS pending in the Court of Chancery of the State of Delaware; (ii) Case No. 5032–VCS pending in the Court of Chancery of the State of Delaware; and (iii) any other lawsuit arising out of the facts and circumstances described in either of the two foregoing lawsuits; provided, this Temporary Restraining Order does not preclude the Defendants from filing any lawsuit that is submitted to and approved for filing by this Court.[FN4]

FN4. The parties subsequently agreed that the Temporary Restraining Order would remain in effect until the Court holds a preliminary injunction hearing.

*2 On June 2, 2010, the Court confirmed the Debtors' bankruptcy plan, which authorized the sale of substantially all of the Debtors' assets. The confirmation order transferred all of Debtors' remaining assets to a Liquidating Trust and appointed John Bittner to the position of Liquidating Trustee. Bittner's duties include, among other things, handling claims owned by the Liquidating Trust.

On February 16, 2011, the Liquidating Trustee filed Plaintiff's Motion for Summary Judgment (ECF No. 133). The Liquidating Trustee argues that the Delaware Actions primarily allege that some or all of the Delaware Defendants misused corporate funds, engaged in corporate looting, failed to follow corporate formalities, and/or grossly mismanaged the Debtors. According to the Liquidating Trustee, the Delaware Actions are, essentially, corporate looting lawsuits. If that is true, the Delaware Actions would constitute derivative actions belonging solely to the Liquidating Trust. The Liquidating Trustee requests a permanent injunction containing injunctive language that is nearly identical to the January 21, 2010 Temporary Restraining Order.

On March 16, 2011, one of the Delaware Plaintiffs,[FN5] FLI Deep Marine LLC ("FLI"), filed the Response of Defendant FLI Deep Marine LLC to Plaintiff's Motion for Summary Judgment (ECF No. 137). FLI claims that it does not seek to pursue any of the derivative claims that belong to the Liquidating Trustee. FLI's Response does not attempt to counter the majority of the Liquidating Trustee's arguments in his Motion for Summary Judgment, essentially conceding that most of the underlying claims in the Delaware Actions are derivative.

FN5. Bressner Partners Ltd., Logan Langberg, Harley Langberg, and Deepwork Inc. have not responded to the Liquidating Trustee's Motion for Summary Judgment.

Instead, FLI requests the Court's permission to file an amended complaint in the Delaware Court of Chancery asserting only three allegedly direct claims (the "Allegedly Direct Claims"). Specifically, FLI's Allegedly Direct Claims are claims against: (i) certain Delaware Defendants designated by FLI as the "Controlling Shareholders" [FN6] for (a) breach of the fiduciary duty owed by the Controlling Shareholders to FLI and (b) for shareholder oppression; and (ii) Joseph Grano, Jr. for aiding and abetting the Controlling Shareholders' breach of fiduciary duty owed to FLI. FLI argues that its claims for breach of fiduciary duty, oppression, and aiding and abetting are direct claims because they seek redress for harm inflicted directly upon FLI.

> FN6. The "Controlling Shareholders" include: (i) Nasser Kazeminy; (ii) DCC Ventures, LLC, a company allegedly owned or controlled by Kazeminy; (iii) NJK Holdings Corporation, a company allegedly owned or controlled by Kazeminy; (iv) Otto Candies, Jr.; (v) Otto Candies, III; (vi) Otto Candies, LLC, a company allegedly owned or controlled by Candies, Jr. and Candies, III; and (vii) the Triomphe Investors, LLC, a company allegedly owned or controlled by Kazeminy's son, Nader Kazeminy.

### Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Fed. R. Bankr.P. 7056 incorporates Rule 56 in adversary proceedings.

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine dispute of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir.2009); *Warfield v.. Byron*, 436 F.3d 551, 557 (5th Cir.2006). A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir.2008).

**\*3** A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir.2009). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir.2003). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact. [FN7] Fed.R.Civ.P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. Fed.R.Civ.P. 56(c)(3). The Court should not weigh the evidence. A credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir.2007). However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed.R.Civ.P. 56(c)(2).

> FN7. If a party fails to support an assertion or to address another party's assertion as required by Rule 56(c), the Court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if, taking the undisputed facts into account, the movant is entitled to it; or (4) issue any other appropriate order. Fed.R.Civ.P. 56(e).

"The moving party bears the burden of establishing that there are no genuine issues of material fact." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir.2008). The evidentiary support needed to meet the

initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Malacara,* 353 F.3d at 403. Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. *Sossamon,* 560 F.3d at 326. The non-moving party must cite to specific evidence demonstrating a genuine dispute. Fed.R.Civ.P. 56(c)(1); *Celotex Corp. v. Cattrett,* 477 U.S. 317, 324 (1986). The nonmoving party must also "articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force,* 379 F.3d 293, 301 (5th Cir.2004). Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

If the nonmovant bears the burden of proof of an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim. *Norwegian Bulk Transp. A/S,* 520 F.3d at 412. Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Celotex,* 477 U.S. at 324. The motion should be granted only if the nonmovant cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.,* 431 F.3d 191, 197 (5th Cir.2005).

### Issue Presented

**\*4** For the purposes of his Motion for Summary Judgment, the Liquidating Trustee stipulates that all facts alleged by the Delaware Plaintiffs in the Delaware Actions are true. Accordingly, the Court's task is only to determine whether the claims asserted in the Delaware Actions are direct or derivative claims.

### Facts

The Court summarizes the factual allegations of the Delaware Actions. The allegations are assumed true for the purposes of this Memorandum Opinion.

The Delaware Plaintiffs were early investors in DMT, originally purchasing shares in the company in 2002. By 2006, the Delaware Plaintiffs' shares of DMT common stock represented more than 8.5% of the company's overall outstanding common stock. The Delaware Plaintiffs have collectively invested over $1.73 million in DMT.

This is a case primarily about the Controlling Shareholders' alleged usurpation of power over, mismanagement and looting of the Debtors, and the failure of the Debtors' officers and directors to prevent the Controlling Shareholders from doing so. The Controlling Shareholders include: (i) Nasser Kazeminy; (ii) DCC Ventures, LLC, a company allegedly owned or controlled by Kazeminy; (iii) NJK Holdings Corporation, a company allegedly owned or controlled by Kazeminy; (iv) Otto Candies, Jr. and (v) Otto Candies, III; (vi) Otto Candies, LLC, a company allegedly owned or controlled by Candies, Jr. and Candies, III (collectively "Candies"); and (vii) the Triomphe Investors, LLC, a company allegedly owned or controlled by Kazeminy's son, Nader Kazeminy. For the sake of simplicity, any reference to "Kazeminy and Candies" in this Memorandum Opinion should be considered as synonymous with "Controlling Shareholders."

Kazeminy (and companies he owned or controlled) became the majority shareholder of the Debtors. Candies subsequently gained a significant portion of ownership in the Debtors. Kazeminy and Candies collectively became owners of 90% of the Debtors' outstanding common stock. Kazeminy and Candies then allegedly used their control over the Debtors and their officers and directors to benefit themselves at the Debtors' and their shareholders expense.

**1. Transactions Between Otto Candies, LLC and DMT—as Alleged in Delaware Complaint**

DMT regularly did business with Otto Candies, LLC which supplied vessels for DMT's subsea projects. Due to Candies' relationship with Kazeminy and the officers and directors of DMT, the business transactions between Otto Candies, LLC and DMT were often not at arms-length and resulted in DMT incurring substantial losses.

For instance, during 2006, 2007, and 2008, Otto Candies, LLC repeatedly misrepresented the state of its vessels and then charged DMT hundreds of thousands of dollars to lease and charter vessels that were broken, poorly built, or not able to meet U.S. Coast Guard regulations. This forced DMT to pay substantial sums to repair the defective vessels that Otto Candies, LLC had off-loaded onto it. It also resulted in the loss of valuable contracts with DMT's customers and, consequently, the loss of millions of dollars in revenue.

**\*5** Otto Candies, LLC also sold vessels to the Debtors at inflated prices. In May 2007, Candies and Kazeminy caused DMT to pay $6 million above the contracted price to purchase a vessel, later named the Emerald, simply because Candies demanded such amount at the closing of the sale transaction. In October 2007, DMT purchased the vessels the Agnes and the Sapphire. The consideration for the purchase was $35 million in DMT stock, although the two vessels were worth no more than $28 million. This resulted in an overpayment to Candies of at least $7 million.

As in the Agnes and Sapphire transaction, DMT at times paid Candies in convertible debt, instead of cash, for services and vessels. When Candies converted the DMT debt into DMT common equity, Candies received more DMT shares than it would have received had DMT not overpaid for the assets and services. This diluted Delaware Plaintiffs' shares and enabled Candies to join Kazeminy as Controlling Shareholders of the Debtors.

**2. Improper Payments Made by DMT—as Alleged in Delaware Complaint**

Kazeminy's influence over DMT is evidenced by the improper payments that were made at his direction. First, at Kazeminy's direction, DMT sent three payments of $25,000.00 each to a former United States Senator from Minnesota, Norm Coleman, through an insurance company that employed Senator Coleman's wife. Kazeminy's relative, Behnaz Ghaufouri, received a $6,000.00 transfer from DMT. These payments were made despite the fact that neither Coleman nor Ghafouri performed any services for DMT.

**3. The Short–Form Merger—as Alleged in Delaware Complaint**

On October 10, 2008, after learning of, among other things, Candies' self-dealing and the payments to Senator Coleman, the Delaware Plaintiffs sent a shareholder demand letter to the DMT board of directors. The Delaware Plaintiffs demanded an investigation into the alleged wrongful conduct. DMT responded by establishing a special committee to investigate the allegations raised in the demand letter. According to the Delaware Plaintiffs, this special committee was not independent and failed to conduct a proper investigation. On June 30, 2009, the special committee released a press statement declaring that it found no wrongdoing over the course of its investigation.

The day after the press statement's release, as part of a scheme to deprive the Delaware Plaintiffs of their standing to bring derivative claims, Kazeminy and Candies commenced and concluded a Delaware Section 253 short-form merger. The short-form merger was entered into between the Debtors and NKOC, Inc. [FN8] The Delaware Plaintiffs were not notified and did not consent to the merger.

FN8. NKOC is named after the initials of Nasser Kazeminy and Otto Candies. NCOK was merged into DMH and

NCOK's separate corporate existence ceased as of the date of the merger.

On July 11, 2009, ten days after the merger, the Delaware Plaintiffs were notified of the merger and offered one cent per share for their DMT shares. Although the company was purportedly valued as worth over $100 million in the 18 months preceding the merger, the notice of merger stated that the company had become so bereft of assets and laden with debt as to be worth nothing at all. The merger compensation totaled $22,000.00 for all minority shares of DMT.

*6 The short-form merger effectively terminated the Delaware Plaintiffs' ownership in the Debtors and rendered the Controlling Shareholders 100% owners of the Debtors.

Analysis[FN9]

FN9. The parties agree that Delaware law governs this dispute. *See also* *In re Dexterity Surgical, Inc.,* 365 B.R. 690, 695 (Bankr.S.D.Tex.2007) "Under Texas law, actions involving the internal affairs of a foreign corporation are governed by the law of the state of incorporation.") (citations omitted).

A derivative lawsuit is an action that is commenced by a corporation's shareholder on behalf of the corporation for harm allegedly done to the corporation. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* 845 A.2d 1031, 1036 (Del.2004). "Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation." *Id.* A shareholder may also bring a direct action for direct injuries to the shareholder's legal rights as a shareholder. *Id.* In such direct lawsuits, "the recovery or other relief flows directly to the stockholders, not to the corporation." *Id.*

In order to determine whether a claim is direct or derivative, the "analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy"? *Id.* at 1035. Courts must "look to the nature of the wrong and to whom the relief should go." *Id.* at 1039. In order to have a direct claim, a "stockholder's claimed direct injury must be independent of any alleged injury to the corporation." *Id.* "The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.*

Furthermore, under *Tooley,* "the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint." *In re J.P. Morgan Chase & Co.'s S'Holders Litig.,* 906 A.2d 808, 817 (Del.2005) (internal citation omitted). "Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists." *Id.* (internal citation omitted).

The possible derivative and direct causes of action fall into three categories. First are the claims that are clearly derivative, where the shareholder's injury flows directly from harm to the corporation. As an example, a derivative claim would exist if a corporate executive breaches a fiduciary duty and approves improper financial transactions, resulting in harm to the corporation and a consequent reduction in the value of stock held by shareholders. The second category is that of clearly direct claims, where the stockholder proves an individualized injury but where the corporation is unharmed as a result. The third category is where certain shareholders suffer an individualized injury in addition to an injury to the corporation as a whole, which may result in both direct and derivative claims. The Court in *Tooley* stated that "the stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without

showing an injury to the corporation." 845 A.2d at 1039. This does not mean, however, that all shareholder claims are derivative if they result from a transaction injuring both the corporation and shareholders. See _Gentile v. Rossette_, 906 A.2d 91 (Del.2006) (holding that, under _Tooley_, independent harms to a corporation and to certain shareholders may derive from the same transaction, resulting in direct and derivative claims for the shareholders).

*7 The Court must now analyze each of the Delaware Plaintiffs' claims for the purpose of determining whether they constitute direct or derivative claims. As set forth below, all of the claims except those relating to the allegation of an independent injury (here, equity dilution and expropriation of economic value) are derivative claims.

### 1. Breach of Fiduciary Duty Against Debtors' Officers and Directors

The Delaware Plaintiffs' first claim at issue is for breach of fiduciary duty against DMT's officers and directors. The Delaware Plaintiffs allege that the actions of DMT's officers and directors, in aiding and approving DMT actions for the private purposes of the Controlling Shareholders, were without merit, served no legitimate business purpose, and were not in the best interests of DMT and/or its shareholders. These actions include gross misuse of corporate funds, self-dealing, equity dilution, failure to follow corporate formalities, and gross mismanagement.

The Liquidating Trustee argues that the Delaware Plaintiffs' breach of fiduciary duty claim against the officers and directors arises out of harm inflicted upon the Debtors, not the minority shareholders. According to the Liquidating Trustee, it was the Debtors' funds that were allegedly misused, the Debtors' opportunities that have been lost because of alleged self-dealing, the Debtors' operations hurt by the alleged failure to follow corporate formalities, and the Debtors' business damaged by the alleged mismanagement.

FLI's Response to the Liquidating Trustee's Motion for Summary Judgment does not contest the Liquidating Trustee's argument on this point. FLI essentially concedes that the breach of fiduciary duty claim against DMT's officers and directors is a derivative claim.

The Court largely agrees with the Liquidating Trustee that the breach of fiduciary duty claim asserted by the Delaware Plaintiffs against the Debtors' officers and directors is derivative. For example, the harm caused by the officers and directors concerning Candies' allegedly inflated sale prices for Candies' vessels was borne by the Debtors. The same can be said for the payments allegedly made to Senator Coleman. Likewise, it is the Debtors who would reap any recovery against Candies for overcharges or Senator Coleman for the $75,000.00 in alleged improper transfers.

The missing link in most of the Delaware Plaintiffs' allegations against the Debtors' officers and directors is an independent injury suffered by the Delaware Plaintiffs. For instance, there is no doubt that the substantial overpayments allegedly collected by Candies damaged shareholder value by decreasing the Debtors' equity. But that harm corresponded to the primary injury, the overpayments themselves, which depleted the Debtors' resources. The decline in shareholder value from overpayments to Candies is not an injury that is independent of any injury to the Debtors.

On the other hand, the Court finds that certain allegations involving equity dilution and expropriation of value must survive the Liquidating Trustee's Motion for Summary Judgment because they contain an independent injury. A claim of breach of fiduciary duty by corporate officers or directors related to this independent injury is direct. This relates to the allegation that Candies was, at times, overpaid through the Debtors' issuance of convertible notes in Candies' favor. Candies later converted these notes into DMT equity, thereby diluting the Delaware Plaintiffs' ownership stake in the Debtors and

expropriating some of its value.

**\*8** Generally speaking, "claims of overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative." *Rossette*, 906 A.2d at 99. However, Delaware law recognizes that one variation of corporate overpayment results in both direct and derivative claims. This is where "(1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders." *Id.* at 100. In a normal overpayment situation, "dilution in value of the corporation's stock is merely the unavoidable result ... of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction." *Id.* at 99. Therefore in the normal overpayment situation, the stockholders have only a derivative claim. *Id.* In the above atypical situation where shares are issued to a controlling shareholder for the purposes of diluting the holdings of minority shareholders, "[a] separate harm also results: an extraction from the [minority] shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence the [minority] shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefitted." *Id.* at 100. The claim for recovery of the overpayment by the corporation is still, of course, derivative. *Id.* However, the minority shareholders also have a direct claim for the expropriation of value from their equity interests that benefitted the majority shareholders. *Id.* This type of situation, in which harm befalls both the corporation and the minority shareholders, falls into the third category listed above. It passes the *Tooley* test, because although separate harms to the corporation and the shareholder result from the same transaction, they are independent of one another. *Id.* at 99.

An important aspect of the situation described in *Rossette* is that the form of overpayment must be stock in order for the dual harms to result. *Id.* at 100. However, the issuance of sham convertible notes might inflict similar injury. If the issuance of convertible notes were a sham, intended at the outset to be converted into equity, the Debtors' balance sheet would reflect only a sham liability for the convertible notes. It would be a temporary, fictitious liability that would evaporate once the conversion was executed. Just like an issuance of additional shares for no consideration, this would create unique harm to the minority shareholders. The substance of the Debtors' assets and liabilities would be unaffected from beginning to end, and therefore neither transaction would result in injury to the Debtor. All of the injury would flow to the allegedly-diluted minority shareholders.

**\*9** When a worthless (or hyper-valued) asset is obtained for stock (or, for that matter, for sham convertible notes that are the equivalent of stock) issued to majority shareholders, only the minority shareholders would suffer true injury. Although the corporation might temporarily record the inflated value on its books, marketplace realities would eventually control valuation. When the asset was then reduced to true market value, the only lasting effect would be on the now-diluted minority shareholders. Their ownership percentage in the Debtor would decrease due to the issuance of stock (or the sham conversion). The Debtor's total equity remains unchanged since nothing was paid for the stock, while the minority shareholders' percentage of the Debtor's total equity decreases. This represents a unique and independent injury suffered by the Delaware Plaintiffs. *See In re J.P. Morgan Chase & Co.*, 906 A.2d 808, 818 (Del. Ch.2005) (a direct claim exists "where a significant stockholder's interest is increased at the sole expense of the minority") (internal citation omitted).

Accordingly, to the extent that the Delaware Plaintiffs allege an independent injury concerning equity dilution and expropriation of value from their holdings, falling into either the second or third category above, the Liquidating Trustee's Motion for Summary Judgment is denied. With regard to all remaining allegations, the Court holds that the Delaware Plaintiffs' claim for breach of fiduciary duty against the Debtors' officers and directors is a derivative claim and, therefore,

property of the Liquidating Trust.

The Court recognizes that this ruling creates a unique fact issue that must be resolved in ensuing litigation—was the issuance of the convertible debt a sham? If the convertible debt was legitimately issued, the harm from the issuance of the debt was suffered by the corporation and the minority shareholder's loss would be derivative. If the issuance of the convertible debt was a sham intended to expropriate value from and dilute the minority shareholders' holdings, then they have suffered a direct injury. The burden of proof must rest on the minority shareholders to demonstrate any such sham.

**2. Breach of Fiduciary Duty by the Debtors' Controlling Shareholders**

The Delaware Plaintiffs' second claim at issue in the Motion for Summary Judgment is a claim against the Controlling Shareholder Defendants for Breach of Fiduciary Duty. As with the claim against the Corporate Director's and Officers, the Delaware Plaintiffs allege many illegitimate acts by the Controlling Shareholders, including looting, self-dealing, and unfair dilution of the minority shareholder's interest. (ECF No. 1, p. 46).

The Liquidating Trustee argues that this "Delaware Cause of Action is clearly focused on harm to the Debtors, and ... is a derivative claim that belongs to the Trustee." [MSJ, p. 11] The Court agrees with the Liquidating Trustee regarding most but not all of the allegations.

*10 Except as set forth in the next sentence, the breach of fiduciary duty claims against Debtors' Controlling Shareholders are derivative claims. The breach of fiduciary duty claims against Debtors' Controlling Shareholders are direct claims only to the extent that the alleged breach is (i) the improper issuance of dilutive shares, (ii) the issuance of sham convertible notes for the purpose of dilution, or (iii) an improper use of the Delaware short-form merger that resulted in injury to the Delaware Plaintiffs.

**3. Unjust Enrichment Against Debtors' Controlling Shareholders**

The Delaware Plaintiffs next claim at issue is for Unjust Enrichment Against Debtors' Controlling Shareholders. They allege that the Controlling Shareholders unjustly enriched themselves with DMT's corporate assets, to the detriment of the Plaintiffs. (ECF No. 1, p. 47).

The Liquidating Trustee again alleges that any claims of unjust enrichment are derivative, and therefore property of the Liquidating Trust. The Court agrees with the Liquidating Trustee insofar as the claims relate to corporate looting and generic self-dealing, with the defendants unjustly enriching themselves with DMT's corporate assets. However, a claim of unjust enrichment via expropriation of value from the minority shareholders' DMT holdings, as opposed to unjust enrichment via theft of corporate assets, is direct. The unjust enrichment claims are derivative except as set forth in the next sentence. The unjust enrichment claims are direct claims only to the extent of injuries from (i) the improper issuance of dilutive shares, (ii) the issuance of sham convertible notes for the purpose of dilution, or (iii) an improper use of the Delaware short-form merger that resulted in injury to the Delaware Plaintiffs.

**4. Aiding and Abetting a Breach of Fiduciary Duty Against Debtors' Controlling Shareholders**

The aiding and abetting claims are derivative claims to the extent that the actions that were aided or abetted resulted in derivative injuries as set forth in this opinion. To the extent that the actions that were aided and abetted resulted in direct injury, as set forth in this opinion, the aiding and abetting allegations are direct.

**5. Aiding and Abetting a Breach of Fiduciary Duty Against Debtors' Officers and Directors**

The aiding and abetting claims are derivative claims to the extent that the actions that were aided or abetted resulted in derivative injuries as set forth in this opinion. To the extent that the actions that were aided and abetted resulted in direct injury, as set forth in this opinion, the aiding and abetting allegations are direct.

**6. Fraud Through Active Concealment Against All Defendants**

The allegations in the Delaware Complaint with respect to this claim relate to efforts by Defendants to shield relevant information about DMT, not to the independent injury allegedly suffered by the Delaware Plaintiffs. This claim is derivative.

**7. Fraud Through Silence in the Face of a Duty to Disclose Against All Defendants**

*11 As with the claim of Fraud through Active Concealment, the allegations contained in the Complaint do not relate to the independent injury allegedly suffered by the Delaware Plaintiffs. This claim is derivative.

**8. Wrongful Equity Dilution Against Debtors' Controlling Shareholders**

This issue is fully addressed in the breach of fiduciary duty cause of action against the Debtors' Officers and Shareholders. The Court incorporates the reasoning set forth in that section.

**9. Shareholder Oppression**

This issue is fully addressed in the breach of fiduciary duty cause of action against the Debtors' Officers and Shareholders. The Court incorporates the reasoning set forth in that section.

**Conclusion**

For the above stated reasons, the Liquidating Trustee's Motion for Summary Judgment is granted in part and denied in part.

The Court believes that the reasoning in this Memorandum Opinion fully resolves all matters in dispute between the parties. Within 14 days, the parties must either (i) set forth any remaining disputes; or (ii) file a proposed final judgment consistent with this opinion.

Bkrtcy.S.D.Tex.,2011.
In re Deep Marine Holdings, Inc.
Slip Copy, 2011 WL 2420274 (Bkrtcy.S.D.Tex.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| DEEP MARINE HOLDINGS, INC., *et al.*, | § | |
| Debtors, | § | |
| | § | |
| DEEP MARINE HOLDINGS, INC., *et al.*, | § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. 11-2926 |
| | § | |
| FLI DEEP MARINE LLC, *et al.*, | § | |
| Defendants. | § | |

## O R D E R

A Bankruptcy Court may not issue a final order or judgment in matters that are within the exclusive authority of Article III courts. *Stern v. Marshall*, 131 S.Ct. 2594, 2620 (2011). In *Stern*, the bankruptcy estate asserted a state-law counterclaim to a creditor's proof of claim. The Supreme Court held that a bankruptcy court did not have the constitutional authority to enter final judgment over a counterclaim that would not necessarily be resolved by the resolution of the proof of claim. *Id.* at 2611.

The debtor's fraud claim does not fall within the Court's constitutional authority because it is not integrally related to the claims adjudication process in Judge Marvin Isgur's bankruptcy case, nor does the claim arise out of the bankruptcy itself.

The Court has reviewed the Memorandum and Recommendation (Instrument No. 1) signed by Bankruptcy Judge on August 4, 2011, regarding **Instrument 133**. The Court has reviewed the Memorandum and Recommendation and made a de novo review of the Bankruptcy Judge's recommended dispositions, and after consideration of the applicable

law, is of the opinion that said Memorandum and Recommendation should be adopted by this Court. It is therefore

ORDERED, ADJUDGED and DECREED that United States Bankruptcy Judge's Memorandum and Recommendation is hereby adopted by this Court and the Liquidating Trustee's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part** as noted therein.

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the ⟨⟩ day of October, 2011, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| DEEP MARINE HOLDINGS, INC., and DEEP MARINE TECHNOLOGY INCORPORATED | § § § § | |
| Plaintiffs, | § § | |
| v. | § § § | CIVIL ACTION NO. 11-2926 |
| FLI DEEP MARINE LLC, BRESSNER PARTNERS LTD., LOGAN LANBERG HARLEY LANBERG, and DEEPWORK, INC., | § § § § § § | |
| Defendants. | § | |

## FINAL JUDGMENT

On October 14, 2011, the Court issued an Order, (Instrument No. 4), adopting the Bankruptcy Court's Report and Recommendation and its Memorandum Opinion. (Instrument No. 1). For the reasons set forth in the Bankruptcy Court's Memorandum Opinion it is hereby **FOUND, ORDERED, and ADJUDGED** that:

The following causes of action are derivative claims and property of the Deep Marine Liquidating Trust, such that the Defendants are barred from asserting such claims by the Confirmation Order and Bankruptcy Code:

1. The cause of action for breach of fiduciary duty against the officers and directors and certain shareholders of Deep Marine Technology Inc. and Deep Marine Holdings Incorporated (together, "DMT").
2. The cause of action asserted by the Defendants in the Delaware Actions against certain shareholders of DMT for unjust enrichment.
3. The cause of action asserted by the Defendants in the Delaware Actions against certain shareholders of DMT for aiding and abetting a breach of fiduciary duty.

4. The cause of action asserted by the Defendants in the Delaware Actions against officers and directors of DMT for aiding and abetting a breach of fiduciary duty.

5. The cause of action asserted by the Defendants in the Delaware Actions against certain shareholders of DMT for wrongful equity dilution.

6. Any cause of action for shareholder oppression asserted or to be asserted by the Defendants against certain shareholders of DMT.

7. The cause of action asserted by the Defendants in the Delaware Actions against all defendants in the Delaware Actions for fraud through active concealment.

8. The cause of action asserted by the Defendants in the Delaware Actions against all defendants in the Delaware Actions for fraud through silence in the face of a duty to disclose.

**EXCEPT THAT**, to the extent that any cause of action described above in numbers one through six is based on (a) the improper issuance of dilutive shares, (b) the issuance of sham convertible notes for the purpose of dilution, or (c) an improper use of the Delaware short-form merger that resulted in injury to the Defendants, such causes of action are not derivative and therefore the Defendants are not enjoined from pursuing these direct claims in any court of competent jurisdiction.

All derivative causes of action described herein are property of the Deep Marine Liquidating Trust and the Defendants are permanently enjoined from pursuing any legal action or exercising any control over such causes of action.

**THIS IS A FINAL JUDGMENT**.

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the _____ day of January, 2012, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**